# EXHIBIT A-1

# CLAIM PRESENTED TO THE CITY OF PITTSBURG

*Please read the instructions on the back before completing.*    FORM 4.1

| | |
|---|---|
| 1. Claimant's Name: *(Please Print)* Wade Derby | Reserved for Filing Stamp |
| Claimant's Address: Law Office of Daniel Horowitz PO Box 1547 | |
| City, State, Zip: Lafayette, Ca. 94549 | |
| Day Phone: ( 925 ) 283-1863   Eve: (   ) | City Claim No.: |

**2. When did the damage or injury occur?**
Month:   Day:   Year: 1988 to present   Time: a.m. or p.m.

**3. At which location did the damage or injury occur?**   Police Report No.:
    Various locations, see attached

**4. a. What happened and why is the City responsible?**
See attached. Claim is for damages arising from discrimination based upon
age, sex; whistle blowing and for ethical conduct contrary to department policy

**b. Name and position of responsible City Employee(s), if known:**
                                    See attached

**5. What damage or injury occurred?**   Loss of promotion, unwarranted firing, unwarranted
discipline, on the job harassment, loss of earnings, loss of pension.

**6. Claim amount (only if less than $10,000):**

If the amount exceeds $10,000, please check the court for appropriate jurisdiction:
_____ Municipal Court (claims up to $25,000)   _x_Superior Court (claims over $25,000)

**7. How did you arrive at the amount claimed?**  Please attach documentation.
        Calculated loss of pay on promotion, loss of pay due to job loss
and added costs of commute to new job, loss of pension benefits, emotional
    and physical injuries, statutory and attorney's fees.

**8.** I declare under penalty of perjury under the laws of the State of California that the following information is true and correct, and that this declaration was executed on _____, 20____, at _____ CA.

_____
*Signature of Claimant or Representative*

**9. Official Notices and Correspondence**
*If represented by an insurance company or an attorney, please provide the information requested below:*
Name and Capacity:*(please print)*

Address:

City, State, Zip:

Daytime Phone: _____   Evening: _____

## PRESENTING A CLAIM TO THE CITY OF PITTSBURG

⇒ PLEASE TYPE OR PRINT CLEARLY ALL OF THE INFORMATION REQUESTED ON THE CLAIM FORM.
⇒ YOU MUST COMPLETE EACH SECTION OR YOUR CLAIM MAY BE RETURNED TO YOU AS INSUFFICIENT.
⇒ THE FOLLOWING PROVIDES SPECIFIC INSTRUCTIONS FOR COMPLETING EACH SECTION OF THE CLAIM FORM.

1. **NAME AND MAILING ADDRESS OF CLAIMANT** – State the full name and mailing address of the person(s) claiming damage or injury. Please include a daytime and evening telephone number.

2. **WHEN DID THE DAMAGE OR INJURY OCCUR?** – State the exact month, date, year, and approximate time (if known) of the incident which caused the alleged damage/injury.

   Under State law, claims relating to causes of action for personal injury, wrongful death, property damage, and crop damage must be presented to the City of Pittsburg no later than six months after the incident date. Please note that evidence of **"presentation"** includes a clear postmark date on an envelope, or a certification of personal service, or service by mail.

   When filing a claim beyond the six-month period, you must explain the reason the claim was not filed within the six-month period. This explanation is called "**application for leave to present a late claim**". In considering your claim, the City will first decide whether the late claim application should be granted or denied. (See Government Code Section 911.4 for the legally acceptable reasons a claim may be filed late.) Only if your late claim application is granted will the City then consider the merits of your claim.

   Claims relating to any cause of action other than personal injury, wrongful death, property damage, and crop damage must be presented no later than one year after the incident date. (See Government Code Section 911.2).

3. **AT WHICH LOCATION DID THE DAMAGE OR INJURY OCCUR?** – Please include street address, city, county, intersection, etc. If possible, also include the Police Report number.

4. **WHAT HAPPENED AND WHY IS THE CITY RESPONSIBILE?** – Please explain the circumstances that led to the alleged damage or injury. State all facts which support your claim with the City and why the City is responsible for the alleged damage or injury. If known, identify the name of the City Department(s) and/or City employee(s) that allegedly caused the damage or injury.

5. **WHAT DAMAGE OR INJURY OCCURRED?** – Provide in full a detailed description of the damage/injury that allegedly resulted from the incident. (What specific damage or injury do you claim resulted from the alleged actions?)

6. **CLAIM AMOUNT:** - State the specific total dollar amount you are claiming as result of the alleged damage/injury. If damage/injury is continuing or is anticipated in the future, indicate with a "+" following the dollar figure if $10,000 or under. If the total dollar amount is unspecified or exceeds $10,000, designate the appropriate court jurisdiction for the claim.

7. **HOW DID YOU ARRIVE AT THE AMOUNT CLAIMED?** – Provide a breakdown of how the total amount that you are claiming was computed. You may declare expenses incurred and/or future anticipated expenses. If you have supporting documentation (i.e., bills, payment receipts, cost estimates) please attach copies of them to your claim.

8. **SIGNATURE:** - The claim must be signed by the claimant or by the attorney/representative of the claimant. The City will not accept the claim without a property signature. Government Code Section 910.2 provides: "The claim shall be signed by the claimant or by some person on his/her behalf."

9. **OFFICIAL NOTICES AND CORRESPONDENCE -** Provide the name and mailing address of the person to whom all official notices and other correspondence from the City should be sent, only if other than claimant. Please provide telephone numbers for the representative, if applicable.

⇒ SUBMIT COMPLETED AND RELATED DOCUMENTATION TO: The City Clerk of the City of Pittsburg, 65 Civic Avenue, Pittsburg, CA 94565. Personal service of claims can be accomplished during regular City business hours (8:00 a.m. to 5:00 p.m.), Monday through Friday (excluding City holidays) at the City of Pittsburg Civic Center, 65 Civic Avenue, 3rd Floor, Pittsburg, CA 94565.

⇒ If you wish to receive a stamped copy of your claim, return the form to the City Clerk with a cover letter along with a stamped, self addressed envelope informing the City of your request.

⇒ You will receive a letter from the Risk Management Office indicating your claim has been received and is being investigated. You will receive an explanation of the investigation results within 45 days in most instances.

If, after reading these instructions, you have questions or need additional information regarding the filing of a claim with the City Clerk of Pittsburg, please contact the City Clerk's staff at (925) 252-4850.

**Please return this claim form to: Office of the City Clerk, Attn: Alice Evenson, City of Pittsburg, 65 Civic Avenue, Pittsburg, CA 94565.**

**THANK YOU!**

# EXHIBIT A-2

# ATTACHMENT TO WADE DERBY'S
# NOTICE OF CLAIM

**Claimant:**

Wade Derby

**Claim Submitted by:**

Daniel Horowitz, Attorney at Law
P.O. Box 1547
Lafayette, California 94549
(925) 283-1863

1

### A Connecticut Yankee in King Arthur's Court

Wade Derby was hired by Pittsburg PD in January 1988 having Honorably Discharged from the United States Army.  Unknown to Wade Derby, the Pittsburg Police Department was systematically corrupt and unprofessional at that time.

Just two weeks into his employment, his supervisor told officers to clear the scene of a violent barricaded subject, who was mentally unstable. His tactics were flawed and public complaints arose.  This forced an internal investigation.  The newly minted officer, Wade Derby was dragged into the internal investigation and was told that he should support his superiors. Wade Derby simply testified accurately which meant that his statement hurt his superior.  He was ostracized at that time but his military and natural born stubbornness caused him to dig in and not quit.

In retaliation for not lying to back his supervisor during the Internal Affairs investigation Wade Derby was attacked.   He was alleged to have committed off-duty misconduct at a store in Antioch.   The person announcing the complaint was none other than the same Sergeant who had blown the operation and had been found derelict.   Derby fought back and demanded a full investigation.  The complaints were withdrawn.  The sergeant then retired using a medical excuse in order to obtain the maximum retirement benefits.

This type of medical retirement and retaliation was part of the culture of corruption that the idealistic military veteran, Wade Derby had to confront.  His personality and his military training prevented Derby from backing down from a fight an over time he developed a reputation as the honest officer and the "go to" officer when there a need to fight corruption.

2

## SAVING JOHN CONATY'S LIFE (1st Time)

In 1989, John Conaty (now an inspector with the Contra Costa County District

Attorney's office) was dispatched with Wade Derby to a loud biker party on Bruno Ave. in

Pittsburg. As Wade Derby arrived John Conaty was on the ground fighting with a biker

surrounded by several others.  A Hells Angel prospect named Anchar Urbain reached into his

vest to remove a revolver and moved quickly toward Officer Conaty.  Derby trapped the in

Urbain's hand as he withdrew it, warned Conaty at the same time and also restrained Urbain

over the hood of a parked car. Wade Derby took him into custody and together with Conaty

stopped the disturbance. Urbain later admitted that he was possibly thinking of shooting Officer

Conaty.

## PITTSBURG PD ON STEROIDS

In 1989 incident when Wade Derby was on a street drug team with Matt Wasteney and

working under Lt. A. Baker, and Sgt. Evan Kohler.  There were two detectives working

undercover narcotics at the time.  While they were happy to arrest people for buying, using and

selling drugs, it was also true that several other department members to include supervisors all

were themselves using drugs, specifically (but not exclusively), anabolic steroids.  The drugs

were prescribed by a corrupt physician (Copeland) from Antioch. This was common knowledge

among the administration that turned a blind eye. Derby was once taken to the doctor's office

while an officer went inside and got his injection.  Derby, consistent with his policy and practice,

refused an offer of an "introduction" to this doctor and declined to enter the office with the

officer.   Consistent with Derby's whistleblowing background, he told the officer if he ever

3

involved Derby in his improper activity at any level, he (Derby) would "take it further."

Later, the physician's office was raided by DEA, and there were concerns among the officers using steroids that they would be implicated. Police officers from all over the East County were named as steroid patients. Among the included offenders was the now convicted criminal, former officer Kevin Butler. [today Butler is in custody for masterminding the Central County Task Force scandal involving Norm Welch and others.]

## SEX, DRUGS & CORRUPTION

In 1990 a local Pittsburg prostitute named Susan Sheldon went on Geraldo Rivera and spoke nationally about having sex in a van with Pittsburg PD narcotic officers to work off criminal charges. Typical of Pittsburg PD, no investigation was ever started. Susan was murdered among a series of other prostitutes that year. The case was never solved and some officers of that era believed it was a police officer killing them.

Also in 1990, Officer Wasteney and Wade Derby were contacted by a parole agent Mike Mermelstein about a person who wanted to inform to help her brother. The woman met Wasteney, Mermelstein and Wade Derby at the Concord Parole office. The person was afraid because Pittsburg Officers were involved. She did not trust Pittsburg PD at all. The person stated that Derby's boss, his detectives and another sergeant stole money from her brother and his father. She said they paid the police off to let them sell drugs. Note: The sergeant identified as Sgt. Zbacnik was one of the people who systematically attacked Derby over the years. Derby and Wasteney reported this to Lt. Baker, and the new narcotics Sergeant, Nick Baker. Typical of Pittsburg PD, nothing was ever done.

4

## SOME ATTEMPTS TO CLEAN UP THE MESS

The corruption and crime at Pittsburg PD included the arrests of Sgt. George Elzie and Officer Eric Bergen who were charged with murder and kidnaping. George Elzie worked as a member of the county drug task force until his promotion to sergeant. He was replaced by now City Councilman Pete Longmire. Sgt. Elzie was arrested while attending supervisor's school at LAPD for lewd acts in a peep show parlor. He used his undercover ID during the arrest and concealed it for some time.

### DERBY STEPS FORWARD (Again)

Ever the whistle blower, Wade Derby provided evidence to the Sheriff's Office they used during the prosecution of George Elzie for murder. Elzie is on parole today. Eric Bergen remains in custody for life.

### PITTSBURG PD POLICY

### HANG OUT WITH PROSTITUTES

### OR "Are you a Fag?"

In 1990, Wade Derby was sent to an undercover drug school in Visalia in place of one of the other detectives. Another detective drove and as he and Derby car pooled to Visalia. On the ride down Hampton told Derby that Hampton had arranged for a couple of stewardesses to entertain them while away from home. The other detective was married at the time, and Wade

5

Derby had just gotten engaged. Derby declined.  The other detective repeatedly criticized Derby for refusing to participate.  When the officers returned from the trip, his supervisor asked Wade Derby why he would not go out with the ladies. The sergeant even asked Wade Derby if he was "a Fag" and he implied that it must be true.  He did this in a way that made it negative if in fact Wade Derby were Gay.

On the job sexual activity was part of the job perk at Pittsburg.  It was common among the officers to have blatant public affairs. Officers bragged about having sex at the police station. Officers shared pictures of department staff that they had engaged with.   Derby's refusal to participate made him an outsider and dangerous as he might then "snitch".

Even his partner Matt Wasteney jokingly asked Wade Derby if Derby was gay because he heard from their supervisor and the other detective telling other officers about Derby not engaging in sexual liaisons with the women in Visalia.  Lt. Baker in turned also teased Wade Derby about being Derby being gay after this incident.   Derby told Lt. Baker that he was not happy with the harassment due to Wade Derby's choices. Nothing was ever done to prevent the harassment.

### BUY MY HOUSE

In 1991, Wade Derby had a falling out with Lt. A. Baker because Lt. Baker attempted to use his rank to force Wade Derby to purchase real estate from him (Baker) Wade Derby had agreed to leave the in house drug unit and go to the state drug task force after being offered the position by Chief Castiglione and Agent Ron Luna.  At the same time, Wade Derby and another officer (Ming) leased a home from Lt. A. Baker.   Baker believed that the officers (Derby and

6

Ming) would purchase the home from him when they could afford to.  Instead, they decided not

to purchase the house and shortly after that Ming was released/fired from probation, without

cause. Ming also reported corruption to the department and a plot to kill a Pittsburg officer

during this time.  Lt. A. Baker was very upset with Derby and Ming over Ming's reporting and

especially over their failure to buy the house from him.  The fact that Derby had a male

roommate and that they jointly considered purchasing Baker's house, led to additional fodder for

the "Derby is a fag" attacks.

The home had serious structural defects and was an unwise investment. Lt. A. Baker had

often asked for early rent payment and asked that Wade Derby prepaid months in advance.  After

the tenancy ended, Lt. A. Baker never returned the security deposit.


## DIRECT CORRUPTION AS POLICY

Prior to his departure from the in house narcotics unit, Wade Derby served multiple

search warrants on a notorious drug dealer named Lorenzo Lee. George Elzie assisted.  The

officers staged at a fire station on Willow Pass called 86. As they prepared the raid team to go to

his primary home on Clearland Cr. in then West Pittsburg, Elzie had to quickly make a phone

call inside the fire station after the raid briefing. When they arrived at the dope dealer's house

they were casually waiting for the police to arrive. All that was located was a cache of drugs

discarded in the neighbor's yard. Lorenzo Lee later cooperated and told police George Elzie

called him and warning him that the police were coming moments before. Lt. Baker, Sgt. Baker,

Matt Wasteney among others were present, and also present when Lorenzo spilled his guts about

7

Elzie. This matter was tape recorded and given to the supervisors as evidence.

As was standard at Pittsburg PD, nothing was done. However, separately, George Elzie was arrested by Pittsburg PD on a warrant issued through the county sheriff's department/DA's Office for murder. Absent the work of the CC County Sheriff, Elzie would be a free man.

In 1991, Wade Derby served a search warrant with Sgt. N. Baker, Matt Wasteney and others. Derby did an undercover bust on a heroin dealer in Pittsburg (Kelly Jones) and then served a roll over warrant in Concord on Northwood Dr. with Derby as the case agent. They seized a large amount of heroin, cocaine, methamphetamine, a blue Camero and several thousand dollars in cash. It was customary to have a beer in the back parking lot of Pittsburg PD, after a good case. Matt Wasteney and Derby were told by Sgt. Baker to get some beer and chips. Derby asked with what money, and Derby and Wasteney were told to take it from the seized assets and to replace it later. Neither Derby nor Wasteney would do this. Wade Derby went to the ATM at B of A on Railroad Ave. and took out his own money. He and Wasteney went to Pittsburg Liquor and Deli and purchased some chips and a 12 pack of beer. When they returned with the items, Sgt. Baker and another officer (Longmire), got mad and chastised them for not getting more items. They drove off in the seized Camero with all of the money and evidence. They returned with a case of beer and snacks.

Derby and Wasteney refused to drink or eat any of the food other than that which they purchased. Derby and Wasteney refused to do anything unethical with the drug proceeds and Derby made it known he was going to account for every dollar he had seized. As a result no

8

money was taken that night, but it put Derby in a negative light with his peers.

### KICKING THE DRUGS OUT OF PEOPLE

Derby buried himself in his anti-narcotics work and tried to maintain a belief that the PD would be getting better. Also in 1991, he ran a series of street level reverse sale of rock cocaine on Diane Ave. in Pittsburg. Wasteney, Terrence Williams and Wade Derby all posed as drug dealers, and sold to buyers pulling up in cars. Lt. Baker and Sgt. Baker were all part of the arrest team.   In one instance, Wade Derby made a sale to a young white male who tried to swallow the cocaine as he was being apprehended.  Lt. A. Baker took the young man to the side of his van and kicked him in the stomach and then knee thrusted him several times in the abdomen, while calmly telling him not to struggle and to spit out the drugs before he died.  There is no medical reason to have thought that swallowing the small item would cause any physical harm. Wade Derby witnessed the tail end of this incident and abruptly took the prisoner away from Lt. Baker to stop any further physical harm.  This type of physical abuse was common in Pittsburg and while it has abated, it has not stopped. The cover up of this police initiated violence at the highest levels, continues.

### AFRICAN AMERICANS ARE "CRACK BABIES"

Physical abuse of citizens ran hand in hand with racism among a small group individual officers.  The Chief of Police (Baker) referred to African Americans with criminal backgrounds as "Crack Babies".   This was not meant as a criticism of drug use and its harm to children, it was a way to paint a broad group people as subhuman and incapable of living as civilized human

9

beings.  The regular use of disparaging terms was not just tolerated, it was the lingua franca of many in the department.   Derby and others refused to join in these racist conversations and they stuck together as reformers.

## VANISHING KILOS OF COCAINE

SFPD had loaned Pittsburg two kilos of high quality cocaine so that they could use them for undercover operations.  Wade Derby had signed for the drugs.  When SFPD asked for the drugs to be returned, Lt. Baker ordered Wade Derby to give the two kilos to him (Baker) so that Baker could arrange the turn over.   Baker had other officers return the drugs.  After the drugs were returned to SFPD Wade Derby received a call from Lt. Molinari. He told Wade Derby that one of the returned kilos was brown sugar and not cocaine. Derby knew that the kilos were that of high grade cocaine powder, as he had the drugs analyzed by the Contra Costa County Crime Lab in order to obtain a court order to use them in reverse sting operations.   Wade Derby reported this to his superiors who did what Pittsburg PD always did - nothing.

## GRAND JURY

Wade Derby testified before the Grand Jury (1992) investigating Pittsburg corruption. He detailed one case, where an undocumented immigrant with probable fake ID, was arrested for a drug offense. He had a large amount of cash with him.  He was asked to sign a disclaimer for the money seized.   When he did, he was released.   As Derby testified, at that time all of the command staff drove asset seized cars and all of the undercover cars were seizures, some of which had not yet cleared for use or ownership transfer.  Releasing people who signed money disclaimers was also commonplace.

10

## CHRISTMAS PRESENTS IN JULY

In 1992 Derby had a search warrant for a house at 300 Jimno Avenue in Pittsburg (One of the warrants Derby was ordered to leave in house before departing to the task force). There were kilos of cocaine and drug money in this house. They executed the warrant without Derby and located a cache of stolen guns and jewelry. The kilos of cocaine were gone but for the wrappers as was the money, over $100,000. The guns were exotic weapons used in Hollywood movies. In fact one of the guns was used by former governor Arnold S. in the movie, Predator. The Pittsburg PD department SWAT team was given this gun and a fun day at the range by Wayne's Gun Shop in thanks from the owner of the Hollywood Arms props. It was headline news as well as the untraceable jewelry found.

Several witness officers were aware Lt. Baker, and others were in the room with the doors closed for extended time until the FBI arrived to see the jewelry. It was all stolen from large heist in San Francisco. One of the officers in the room was Jim Hartley. Hartley was later charged with falsifying police reports in 2005. It was rumored that the officers in the room with the jewelry   took some of the items that day. Until Hartley was charged with a criminal offense he was often in trouble but never was seriously disciplined.

The protection of bad applies like Hartley included covering up his beating of a handcuffed prisoner in front of then Sgt. Addington, who received a letter of reprimand for failing to take action as a supervisor. He also had sex with an underage cadet and was never charged or disciplined.  The difference between a "bad apple" and a standard Pittsburg PD

11

officer was the degree of exposure that the conduct brought to the department and the presence
of "wood" on superiors.  Hartley always said he had "wood" on Lt. Baker and they could not
touch him.

## HARTLEY DIDN'T HAVE "WOOD" ON DERBY

Derby again created bad feelings when he did an investigation into Hartley falsifying
arrest reports. Hartley and Salgado (Deceased) were prosecuted for that in 2005/2006. Derby and
Steiner did an independent audit of cases where officers template (wrote over) reports. There
were other officers with somewhat questionable case, but Hartley and Salgado's cases were most
egregious. However, it was decided by the chief that their cases were not to the save level of
severity as Hartley and Salgado.    Derby was later was deposed in a lawsuit filed against
members of Pittsburg PD administration about this. As always, Derby was truthful and this
created resentment toward him.   Nothing ever happened to those officers. They are now
command staff.

## THE FAGGOTS IN CITY GOVERNMENT

This same disdain for the job carried over to disdain for members of City government.  In
2005/2006, the chief and Captain Zbacnik often made make fun of the new City Manager (Marc
Grisham). In front of staff and other officers, they called him "Sugar Shack" which to them
implied that he was Gay and that this was a negative thing.  Grisham was referred to as "the fag"
and "the faggot".   Derby and Grisham had a solid relationship and open communication and
Derby resented the attempts to degrade Mr. Grisham. Derby strongly voiced his opposition to
these terms but was laughed at for speaking out.  Given Derby's history of not participate in the

12

sexual misconduct on the job and his former male roommate, Chief Baker disliked him defending Grisham and not participating in the banter.  Baker often had Derby deal with Marc Grisham directly because Chief Baker preferred not having to.

In 1992, Wade Derby was asked to go before the grand jury and tell them about corruption in the department. Derby went before the grand jury and testified.  (Some details provided infra). Thereafter, Chief Castiglione and Lt. Dave Millicam, abruptly retired.

Lt. Baker and Wade Derby remained at odds with one another throughout these years.   During this time, Derby a producer of the highest level but he constantly suffered from the sneers and insults of other officers.

## SAVING JOHN CONATY'S LIFE (Time 2)

In 1993/1994, Wade Derby returned to patrol work at the police department.   That year, (1994), Derby again possibly kept John Conaty from harm during a car stop on Railroad Ave. (in front of the Mar Rey motel).

Two white supremacists from Merced came to town to commit a possible hate crime for fun. When Derby and Conaty pulled over the car they did not know this. The driver and passenger were heavily armed. John Conaty was at the driver window and the occupants did not see Derby approach. The driver and passenger had their hands on the guns and were getting ready to possibly open fire on Conaty.  Derby intervened by grabbing him through the car window, while holding the driver at gunpoint as he warned John Conaty about the guns in his view.

**Then the Lord rained down burning sulfur on Sodom and Gomorrah**

In 1993/1994 Chief Casey came in after Castiglione was ousted. Casey brought with him promise of a new and better era. With this change two officers were charged with criminal acts of sex with a minor and another for theft of evidence. Bill Hendricks was charged with sexual harassment of recently retired records manager Michelle Beyhan. She was paid an undisclosed settlement and then Hendricks was sent to oversee Code Enforcement as punishment by Chief Casey.   Code Enforcement went on to be called the Penal Colony as anyone in trouble got sent there. This is documented in a lawsuit dismissed in federal court filed by former Officers Ron Huppert and Salgado.

Sgt. Zbacnik and Sgt. Kohler were disciplined after Zbacnik pulled down Kohler's pants during self-defense class, exposing him to the only female officer at the time Patty Meyers. Patty left the department and went to Fairfield PD where she filed sexual harassment charges against other officers.

In 1994 a female reserve officer began having relations with a married inspector and a sergeant. Derby at the time was single and when she was a civilian Derby and this female became friends.

The forces of disrepute fought back.  Lt. Hendricks had tried to get Derby in trouble by claiming he was spoken to in a disrespectful tone. This was dismissed by his superiors as Lt. Hendricks had no credibility with them. However, for a brief period of time, Derby then a

14

probationary Corporal was placed on weekly evaluations as the department was contemplating possible demotion of Derby as a Corporal.  One of these men involved in sex scandals had previously been exposed for having sexual involvement with an informant named Diana Sivil and was reduced in rank. Others allegedly had sexual relations with this same woman when she was 17 years old and were disciplined internally. This was covered up as other lesser misconduct. She (Sivil) was the girlfriend of a notorious drug dealer named Theotis Stewart. She implicated several officers in corruption as well.

Chief Casey was faced with a department so full of corruption that he could only address the issue in pieces or chunks.  He started the move towards change with many of the officers who survived Castiglione and his regime. Don Allen was arrested for stealing evidence after creditors constantly called about debts owed and a car dealership wanted him to pay late registration fees. Don Allen took a registration from the evidence in a homicide and placed it on his own car to disguise his late fees.

Officer David Teague was arrested for sex with a minor.  Elzie and Bergen were charged with murder and kidnap. Wade Derby was promoted by Casey to Corporal in 1995.

### WADE DERBY SAVES KIRK SULLIVAN'S LIFE

In 1995, Kirk Sullivan, Cassandra Wilkerson's brother was working patrol in the El Pueblo Housing Projects.  The PD were having an influx of Project Trojan Gang members from Richmond trying to establish them in Pittsburg. Sullivan made a traffic stop and the suspect car parked facing the officer's stop. The plate was registered out of Richmond. Knowing about the problems with Richmond gangs Derby rushed to assist Sullivan, and advised over the radio for

15

him to stage and await his cover car.   When he arrived Sullivan was at the rear of the car searching a very large male (Floyd Hollins). Derby saw his cover officer Dupont, literally 20 yards away hiding himself behind a tree with Sullivan exposed. Derby quietly approached from the opposite direction focusing on the passenger.  The passenger (Denzel Allison) did not see Wade Derby. The passenger had his hand on the grip frame of a semi-auto pistol and was looking back at Sullivan, about to open fire. Wade Derby recognized this and stopped Allison. It turned out Allison had committed a triple homicide in Richmond, the gun was stolen and he made a statement he was likely going to shoot Sullivan. Allison is currently serving a life sentence in prison.

## THE REFORM CHIEF PROMOTES WADE DERBY

Wade Derby was promoted to Sergeant.  Raman was an officer on this crew and was having an affair with a female deputy who once worked for the sheriff's office. He and then Sgt. Addington later got in trouble after they left the city unsupervised and went to dispatch in Martinez to flirt with the ladies and take them donuts. It was later jokingly called Donut Gate, by many.   Wade Derby was put in charge of a street gang unit consisting of Eric Gomez, Jim Hartley, Javier Salgado, Kirk Sullivan and David Zuniga. This group halted gang violence and took back the image of the community. Chief Casey had Derby testify before the grand jury regarding the PD's gang enforcement practices after Det. Ron Huppert claimed they were falsely reporting them.

In 1997, Chief Casey ordered Wade Derby to go with him for a press conference in support of President Clinton's crime bill. He wanted Derby to be photographed with several local

16

Democrats, like George Miller. Derby was interviewed by KCBS. Derby told Casey he did not support the crime bill personally as he was a supporter of the 2nd Amendment. Casey told him he understood, but wanted him there anyway. Casey did not care for Derby's honesty about this matter and how it conflicted with his values and oath of to support and defend the constitution of the United States.

There was ongoing controversy about gang violence and what was investigated as a gang related matter   A counter group existed in the department. Lt. Zbacnik and the homicide team who wanted to say all gang murders were something other than gang murders. They were all carrying out the orders of Chief Casey and Lt. A. Baker was now a laterally appointed Commander.  There was clashes over the random murder vs. ongoing gang murder labels.

## POOR CHOICES HURT A REFORMER

Sadly, the reform Chief made some bad choices.  Chief Casey had a new way of reporting crimes that could be perceived as questionable cases due to lack of a credible witness, workable leads, no prosecution desired, or some other questionable circumstance. Example: a guy buying drugs or trying to pick up a prostitute gets beaten up and his money forcibly taken. Instead of it being a Strong-Arm Robbery/Aggravated Assault Felony, it became a suspicious circumstance information report. More importantly, it was no longer reported and statistically recorded as a part 1 crime to the FBI index.

17

Wade Derby and many line officers rejected this new reporting style but the supervisors were ordered to have the reports changed to the new methods. They even made a new reported manual about how to prepare the cases correctly to lower crime stats. This was written by Lt. Keeler who later resigned from the department after becoming frustrated with the profession. Wade Derby was warned by supervisors for voicing his opinion about non-factual reporting of crimes.

Once again, Wade Derby was on the outside.

In 1997 after Sgt. Wade Derby's supervisor got into trouble with the command after unproven allegations were made that he was having a relationship with another officer's girlfriend and cheating on his wife on duty. All other sergeants were promoted to Lieutenant except for him. Instead, he was banished code enforcement. Pittsburg PD was still cleaning house but it was still persisting in providing false crime statistics, a problem that would continue and worsen under Aaron Baker.

## DERBY MARGINALIZED

Wade Derby was again ostracized for his whistle blowing and his non-compliance with questionable practices. All other supervisors got to do specialty assignments but Derby remained in patrol. He became the senior street sergeant and finally went to day watch in 1998. Meanwhile, the Chief continued to target the corrupt officers. A lieutenant got in trouble and was forced to medically retire after being caught in a gambling scandal. Another lieutenant was also implicated but nothing ever happened to him. This was later considered a cover up by

18

Huppert and Salgado who filed a lawsuit about this and other matters.

## DERBY SUCCEEDS AT THE STREET LEVEL

In 1999 a lieutenant was overseeing the in house Narc unit and was supervised by Commander A. Baker.  It was rumored that the Commander caught the lieutenant at the movies in Antioch on duty with his mistress. The unit was considered non-productive and had seen its better days.  Derby was called in to reform things and take command as a sergeant. Aaron Baker covered it all up and made it look as if it was time to get a Lieutenant back to managing and not working undercover. Aaron Baker was now to become interim Chief.  When Wade Derby took over the unit and they immediately took staffing from four down to three and within 8 months two other detectives were promoted to sergeant. This left Derby with one guy, named David Zuniga. He and Derby became one of the highest producing and most respected Narc units in the region. They had record seizures of money and drugs. They won accolades from the DA, DEA and DOJ.

## 2000/2001 - THE CORRUPTION CONTINUES

In 2000/2001 Wade Derby worked directly for Commander Hendricks as the Narc Unit Supervisor. During this time Det. Zuniga and Derby raided a house in Pittsburg and arrested the dealer, Name Withheld, for heroin and methamphetamine sales. He told Derby and Zuniga that he was arrested earlier in the day by the street team, staffed by an officer and another sergeant.

19

He told Derby and Zuniga he agreed to be their informant and they mistakenly let him keep his drugs and money. This was not proper protocol.  Derby and Zuniga arrested the dealer and got his full statement. Derby notified Commander Hendricks, as well as the street team sergeant. Detective Zuniga wrote the report and submitted it for review.  The report written factually and recognized that the other officers meant no malice and it was an unproven statement from a convicted felon. (Later Derby would testify before the Grand Jury about this) Hendricks ordered Zuniga and Derby to alter the report. They refused and instead, Hendricks pulled the report from secure records and altered it. He also destroyed the original. What he did not know is that to protect the truth, Derby gave an original copy to IA investigator Charles White and Zuniga and Derby kept copies. Derby brought this to Chief Baker's attention and told him he would not compromise his badge for this. Chief Baker did nothing to Hendricks.

## COMMANDER HENDRICKS THE PHOTOGRAPHER

In 2001 Commander Hendricks regularly showed his staff photos that included an employee. Hendricks had a side photography business offering professional nude and sensual personal photography. He and his wife also ran a lingerie model service Every one knew the PD had this Commander with a proven prior for sexual harassment operating a nude photography business. He even asked Derby's sister in law if she might like to pose. His wife's twin sister. Chief Baker was well aware of this but no one stopped it.  Hendricks was run out of the PD after his second sustained sexual harassment claim and lawsuit filed by a woman named Erin Janes.

## DERBY FIGHTS BACK USING SCHOOL

20

In 2002-2003, Wade Derby went back to school and obtained a B.A. in Business and an M.A. in Leadership. Casey left the city as Chief briefly; and Aaron Baker was hired as Chief and returned to work as City Manager. In December 2002 Commander Hendricks was forced to retire after his second sustained sexual harassment allegation.

Aaron Baker's reign started with hope. Wade Derby became Lieutenant and he started reforming all units he was in charge of. But this enlightened period was short lived. As Derby started to uncover high levels of tolerance to sexual harassment and criminal misconduct, he was targeted for retaliation. To humiliate Derby for cleaning house, he was instructed to query female employees as to what tampons they wanted in the women's rest room. The Chief then publically "commended" his work. Derby was humiliated and this was what was intended. Toni Baldazo was often the target of harassment. She reported that an officer (a women), made racists remarks about some pictures of Toni's friends. Wade Derby immediately took action and the female officer said she made some jokes about gang signs that Toni could have gotten offended about. Derby gave the officer a written reprimand at the request of Chief Baker. Had a male officer done the same thing, no reprimand would have been issued. Perhaps recognizing their precarious position in this department, with Derby's support, the parties then worked out their differences. While the female officer was written up for her comment, the Chief at times commented to command staff in office about the size of Toni's breasts and how he admired them. There was no penalty for this.

During this time Derby had to investigate incidents occurring in our records division involving civilian staff. A female employee was stealing petty cash temporarily to fund an

21

abortion. She was having an affair with an officer but would never come out and say it was his child. Everyone including the chief knew of her relationship with the officer. She was allowed to resign without charges being filed in order to protect the officer and department.

A fellow lieutenant spoke up against Pittsburg's African American female Mayor for political reasons and in his official capacity. The mayor alleged he made a racially biased statement which was deemed untrue. This placed the chief in a bad light because it exposed to the public the rampant racism in the department. Later a rumor was leaked that alleged the same lieutenant got caught using his department car to drive to Reno to gamble and go to a legal house of prostitution with another officer. The lieutenant retired medically.

## DERBY GETS MONEY FOR LAW ENFORCEMENT

Wade Derby wrote grants at this time and often. Some of the grants were for equipment, some were for personnel and all required use reports. He had a grant that still exists today called CDBG (Community Block Development). This is a HUD federal grant for personnel. After it was discovered that two officers (Hartley/Salgado) were falsifying reports, the department went through an internal audit by a company called Matrix.

## PEOPLE WHO LIVE IN GLASS HOUSES
## SHOULDN'T THROW DILDOES

What others covered up, Wade Derby found as culpable conduct. A sergeant allegedly

22

tripped down the stairwell and had to retire on disability following a sustained finding (by Derby) of misconduct (in 2007/2008). Derby had sustained the finding that the sergeant threw dildos at another officer and then made sexual comments poking fun at these officers in front of female staff. [The sergeant is friends with friends with Cassandra Wilkerson, a fact that is important as will be explained later.]

At this time, doing IA work was considered being a traitor. This is still common in many departments. IA investigators were often harassed. Following these findings against the sergeant. The sergeant's friend and brother of Cassandra Wilkerson, began to send pornographic emails to PPD staff, and supervisors, as well as other law enforcement agencies using PD email. He used his self-appointed "bully pulpit" to people his nickname for Derby's private part, calling it (in a loud voice), "The Whopper". He did this in front of male and female officers and ignored Derby when Derby asked him stop.

Despite having some good policies, racism, sexism and discrimination pervaded the department. The opening gay HR director, Mark Fox, was the target of name calling by the Chief. Some of the Chief's favorite terms were "fairy", and "fag". Wade Derby shared office space with HR maintained a strong working relationship. Derby often invited them to holiday luncheons and hosted and naturally included Marc Fox and his team. The chief would challenge Derby as to why he did that and Derby told him he (Derby) had no problems with Mr. Fox. This was not well received by the Chief. Mr. Fox initiated an internal investigation against the chief's friend after she started speaking openly about her sister's involvement with the Assistant City Manager .She was reprimanded as a result.

### DERBY HAS MAJOR SURGERY

Wade Derby got sick in late 2007 and had to have major surgery. Wade Derby was out until April 2008. He returned and learned that Sgt. Raman was going to promote and take Wade Derby's job. Contrary to recent false allegations of sexism, it was Wade Derby who had reformed the Pittsburg PD recruiting program so that the number of female officers on both a numerical and percentage basis was the highest in department history.

Contrary to claims that Wade Derby engaged in sexism, this conduct was rampant in the department and not connected to Wade Derby. For example, Wade Derby participated in the hiring of a female officer (Name Withheld). The Police Chief was smitten with her and openly spoke about how she was "hot", and he would leave his wife for her if he were younger. He said this often in front of many male officers (including Raman, Addington, Zbacnik, Nick Baker, Callahan and others). Even some rank and file officers knew about his feelings for this officer. While the female officer dealt with this on the job harassment, she was unfairly treated by the Chief and others. The command structure repeatedly intimidated those such as Wade Derby, who would not go along with the sophomoric sex jobs and sexual harassment of female officers. It was easy to be set up for false charges and a cold shoulder that carried with it the fear of a "Serpico" type abandonment.

### OPPORTUNISTIC ATTACKS ON WADE DERBY

Attacks could be great or petty. For example, a sergeant and officer once started a rumor that Wade Derby said his captain was incompetent and screwed up an officer's funeral planning. This was never stated by Wade Derby but the next day Wade Derby was called into the chief's

24

office with the other captain. The Chief was told that Wade Derby was "talking shit about the captain" and he wanted Derby reprimanded. Wade Derby stated that the allegations were false and demanded to talk to that captain directly. He was allowed to do so. The matter ended without further action but it became clear that the command structure would always make life miserable for someone who would not join the corrupt team.

Wade Derby pursued continuing educational opportunities, published articles, won awards, taught various continuing education programs, and achieved an excellent records of both arrests and convictions.   His objective stats and achievements provided a high level of protection. Criticism were often petty as well as clearly unfounded.   Captain Zbacnik wrote in Wade Derby's performance evaluation that Wade Derby micro managed the records supervisor. This was later retracted.  Zbacnik became Derby's direct supervisor and all their interactions of importance were leaked to his friends including Addington, Raman and Callahan.

When training opportunities, prime assignments and promotional opportunities presented, Wade Derby was overlooked and Captain Zbacnik supported now Chief Addington.

Despite ignoring Derby's accomplishments, his work itself was used by Pittsburg PD. For example, Derby designed a program called the "Total Policing Program". This was a highly successful community based approach to police work.   Rather than allow Derby the credit for this program, Captain Zbacnik falsely claimed that Wade Derby stole money and used a city credit card to buy a personal gun. He claimed Wade Derby sold department guns to a barber shop in Texas.   There was never any evidence of this and there could not be because they were invented. When Wade Derby complained to the Chief, the Chief laughed and refused to stop the

25

slander.

Wade Derby was undermined constantly. Members of his staff made small mistakes and were chastised. Other supervisors and their team had broad latitude.  For no reason, Wade Derby was removed from the SWAT team and range team and all other specialized duties.   At this stage, Derby's ethical standing was a known and established threat in the department. Derby's tenacity had allowed him to move up the ranks but as he became potentially qualified for Chief, he became an increasing threat to those who had for years if not more than a decade, promoted moral corruption and legal wrongdoing.

Wade Derby and Brian Addington shared the idea to start doing crime analysis and shared it with Chief Baker. A clerk did the calculations the statistics were used in meetings. They came into play strongly with Total Policing and the articles Wade Derby wrote. Wade Derby and others also used them in presentations to the City Manager and command.  Wade Derby was starting to push for accountability individually and as a department.
Addington seized the chance to showcase his analytical skills fully and started making Wade Derby's stats a monthly report. The chief used these everywhere, but the numbers were less than honest.   Major crimes such as rape, were still reported as simple assaults or as suspicious circumstances.  Wade Derby stood up in a staff meeting and solidified his fate by saying "we do not need to lie to the public about crime reduction because we honestly had." Wade Derby was looked upon by peers with the, "you just hung yourself look."

During this time Derby's father was diagnosed with terminal cancer. The PD started downsizing Derby's former unit and the chief no longer wanted Derby to go to city council

26

meetings or other public functions. Wade Derby also was no longer asked to attend department head meetings.   Addington and Raman were now in the limelight and Wade Derby was being moved out of the way. The investigations unit moved to the second floor and Derby's unit was put in a small space on the first floor. Callahan was put in charge with Addington overseeing the unit.

As Chief Baker prepared to retire, the thought of placing Derby in the Chief's spot was dangerous.  With Derby at the top, the corruption would be exposed and arrests would be made. The sexism and racism would be dealt with.  The under reporting of crime statistics at the instruction of Chief Baker would be exposed.   The danger of Derby making chief was great. Derby's Total Policing concept had gone national and agencies were calling, coming to visit and making inquiries. The first couple of inquiries the chief allowed Derby to speak. Then, Addington was assigned to discuss the program without Derby.  Effectively, Derby's creation was being credited to the PD's new golden boy.   Wade Derby was never returned to the jobs, some of which Wade Derby created and to all of which Wade Derby made hugely successful and meaningful to the department.

Wade Derby was gained weight after his surgery. The chief made disparaging comments to Derby about "porking up". Wade Derby added that after his surgery the doctor said it was expected and Wade Derby would likely have a protruding lower abdomen due to the open surgery incisions which destroyed all of my abdominal muscles.  The mocking of his physical changes continued unabated.

Wade Derby was always outstanding academically and he signed up for the Captain's

27

test. Three of Chief Baker's friends, all chiefs or former, sat on the panel along with Cpt. N.

Baker who was retiring the next day.  Callahan was saying the chief told him Wade Derby was

not promotable and it was common knowledge Addington would prevail.  During this time,

Derby was openly and frequently objecting to the practice where Pittsburg would deliberately

falsify crime reporting in order to make it appear that crime was dropping.  During this time a

stabbing was listed as a suspicious circumstance and later changed to murder when the victim

died.  The paperwork was destroyed to cover this up.  Derby voiced his complaints to the Chief

himself and to command staff.

Wade Derby took the test and was told by all panel members Wade Derby did an

outstanding job.  There were rampant rumors within hours Wade Derby had defeated Addington,

and Raman for the number #1 spot. The chief called all the competitors in and said he would

interview all three the next day. Everyone was saying Raman did not even pass. Raman later told

Derby that he (Raman) did not pass. Wade Derby even got a congratulatory phone call from HR

saying Wade Derby was rated Highly Qualified.  The chief and Wade Derby met and the Chief

stated that Addington and Wade Derby tied and the Chief had chosen Addington.  After some

discussion, the Chief admitted that Wade Derby had done better than Addington but that he had

the right to pick his best choice and that was Addington. He went on to say how he had to tell Lt.

Raman he did not even qualify and how he needed Wade Derby, his most experience command

member to help lead the department into the future. He added, he planned to have Addington

become chief and he would in fact promote Wade Derby to Captain next. Wade Derby made it

clear that he would like to still compete to be the next Chief but would accept the secondary spot

28

captain's spot. This displeased the Chief who asked Derby about his health and commented (once again) on his weight gain. The chief told Derby he would be promoted in a few months after Addington to Captain.

After being bypassed for promotion the chief offered him a position overseeing Code Enforcement and Records. Wade Derby accepted and the Chief stated that Wade Derby was to get the second Captain's spot. Instead Wade Derby was taken further out of the loop.

Wade Derby still had the trusted but unenviable job of doing IA investigations. The position led to greater resentment among the PD. Wade Derby was ordered by the Chief and Addington to change the outcome of an investigation Wade Derby did on an officer who was also being investigated for sexual assault and assault under color of authority by the FBI. Specifically, Wade Derby found that officer at fault for misconduct and association with a felon. After almost a year passed Wade Derby was ordered to change it from sustained and make it not sustained. At this point Wade Derby followed orders but saved a copy of the original as proof if needed.

Wade Derby was also assigned a case of 4 white officers beating an African American man at the Pittsburg Marina. Wade Derby worked on this case for over 8 months awaiting a trial outcome. The case became a federal lawsuit still pending. Derby was fair and objective and did not use his responsibility as a way to protect the department. As the Chief prepared to resign, the competition to replace him became heated. Sexually harassment charges were filed by a former officer who had moved to Harris County (Texas), resigned to leave police work, separated from her husband and who then leveled sexually harassment charges against various

29

officers. This person was Cassandra Wilkerson.  Lt. Raman her direct supervisor was the first person she accused of this.  Later, Wade Derby was among those accused, but implicated by a third party not Wilkerson.  The third party was among the group that Derby had challenged during his career.

During his defense to these charges, Derby's investigator spoke to the ex-husband of Ms. Wilkerson. He confirmed that Ms. Wilkerson had discussed sexually harassment.  However, she had not mentioned Derby as the perpetrator, she had stated that it Pittsburg's police Chief, Baker and Lt. Raman. This information was provided by Derby to the IA investigators (Addington and Perry) who completely ignored this in order to protect Chief Baker and in order to continue the attack on Wade Derby.

In the course of the IA investigation it came to light that this accuser was so trusting of Derby that when her son got in trouble, she referred him to Derby for help.  She was friends with Derby and his wife. One of the two main acts of alleged misconduct took place in Derby's home off-duty with his wife present. Wade Derby and his wife waived the spousal privilege and his wife related the incident and having no significance and just arising out of friends joking around. Years had passed and the now accuser had not ever said a word about it.

Her other main allegation had to do with alleged sexual stares in the police parking lot. Later, once the case was filed, she admitted, under oath, that she had no facts to support her allegation and just thought it to be true.  She also admitted that a document that she had signed and submitted under penalty of perjury, was not in fact, true.  She blamed this on her attorney, Stan Casper, claiming that he prepared the document and had her sign it.

Even though allegations were made against Raman and Addington, neither was ever disciplined and both were promoted even as the lawsuit was pending. Derby however was subjected to an IA investigation led by Addington. A mass of evidence was submitted by Derby which was ignored by Addington. Later, in the civil lawsuit, Raman and Addington relied upon this same material to attack Wilkerson in their defense.

Derby was told by Addington that the IA was going against Derby and that Derby would be demoted and likely terminated. He offered Derby a deal. Agree to resign in early 2016, take a few days off work and keep his rank. Derby accepted the deal rather than risk his pension and his reputation.

Upon return to work Derby was tormented. His gun was taken as was his police vehicle during the period he was being investigated. He was put on quasi civilian status as a clerk in the records room with little or no command. He was not allowed to fraternize with other officers. He was told could not attend, parties, funerals or even private events with other officers. This included memorials for fallen colleagues, and department dinners and he was told he could not be in the Department photo. In his place, they had an acting lieutenant sit in. Meanwhile, his (false) accuser, was on medical leave and posting pictures of her partying at sporting events and having a great life.

Addington became Chief and Raman a captain. When the lawsuit was dismissed and Derby's innocence proven, the Chief failed and refused to purge the IA file or rescind the coerced retirement date. Meanwhile, despite her admitted false allegations, Cassandra Wilkerson was fast tracked for promotion.

31

Despite the pressures, Derby continued to act ethically and effectively. During this period of banishment, he learned that two police officers who had left the department, were to be witnesses in criminal cases in the Contra Costa County Superior Court. These former officers were terrible people. They had a practice of beating suspects and other Pittsburg officers had turned them in. A criminal case had been generated and a criminal case number computer generated as well. The Chief (Addington) then made a deal. Resign and all will be forgotten. The officers resigned and unlawfully, their criminal investigation was terminated and the very existence of the criminal investigation was purged. The files were kept, secretly, in the Chief's office.

The Public Defender's office got wind of the wrongdoing and filed a motion for a court review of the records of these officers. By law, the facts of the criminal investigation had to be turned over the Superior Court. Chief Addington instructed his staff to NOT disclose this material and to misrepresent the state of the file to the court. Criminal cases went forward with the evidence of the gross criminality of the officers, covered up.

More specifically, in May 2014 a Pitchess Motion was filed. Derby was asked to go to that Pitchess Motion but to only provide the administrative leave form he had and not the real material. Wade Derby went to court with records manager Joyce Lowe and met the City Attorney. Derby told her there was a file and if asked he was going to advise the court of its existence. The City Attorney did not instruct Derby to provide the file and therefore was criminally complicit in Chief Addington's misconduct. The City Attorney managed to get the hearing continued and reset it on a day when Wade Derby was on vacation. This is a further act

32

in furtherance of a criminal conspiracy.   When Wade Derby returned he found out they had the

hearing and the records manager did not tell them there was file.   Derby wrote a specific

memorandum objecting to this fraud and also told the chief face to face that this conduct was

wrongful.   Among all of the matters, this was the straw that broke the camel's back and most

specifically led up to Wade Derby not getting a per diem or having his discipline reversed.

Therefore, Wade Derby claims damages of $ 100 million dollars including lost wages,

mental, emotional, physical damages, attorney's fees, statutory damages, and reduction in

retirement benefits, loss of promotions and other damages.

Dated: March 21, 2016

_____
Daniel Horowitz
Attorney for Wade Derby

33

# EXHIBIT B

Form 6.6a

 **City of Pittsburg**
65 Civic Drive, Pittsburg, CA  94565 (925) 252-6900

## NOTICE OF UNTIMELY CLAIM

DATE OF NOTICE:  April 22, 2016

FROM:  City of Pittsburg

(<em>Public Entity to whom was presented</em>)

TO:  Law Office of Daniel Horowitz

(<em>Person to whom notice is to be sent</em>)

P.O. Box 1547

<em>Number        Street</em>

Lafayette          CA          94549

<em>City          State          Zip Code</em>

NAME OF CLAIMANT (*if different from above*):   Wade Derby

DATE CLAIM WAS PRESENTED:   March 21, 2016

### PLEASE TAKE NOTICE

The claim you presented against the City of Pittsburg on March 21, 2016  is being returned because it was not presented within (6) six months after the event or occurrence as required by law. Because the claim was not presented within the time allowed by law, no action was taken on the claim. The City has no authority to take action on any claim presented more than one year after the event or occurrence. [*See Government Code §901 and 911.2 – 911.4*]

The late claim procedure cannot be invoked on behalf of claims that are late under the one-year rule.  The court is without jurisdiction to grant leave to file a late claim against the government if application is filed more than one-year after accrual of a cause of action.

You may seek advice of an attorney of your choice, at your own cost, in connection with this matter. If you desire to consult an attorney, you should do so immediately.

Signature: _____

Name and Title:   Neville Vania, Human Resource Manager

Enclosures

cc:     Municipal Risk Management



# City of Pittsburg

65 Civic Drive, Pittsburg, CA  94565 (925) 252-6900

## PROOF OF MAILING

I am a citizen of the United States and a resident of the County of Contra Costa; I am over the age of 18 years and not a party to the within above entitled action; my business address is City Clerk Office, 65 Civic Avenue, 3rd Floor, Pittsburg, California 94565.

On April 22, 2016, I served the Notice of Untimely Claim and the Denial of application to File Late Claim on the Claimant in said action, by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the United States Post Office mail box at City Clerk Office, 65 Civic Avenue, 3rd Floor, Pittsburg, California, 94565 addressed as follows:

Law Office of Daniel Horowitz
P.O. Box 1547
Lafayette, CA  94549

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  April 22, 2016 at Pittsburg, California.

Signature: _Brian Villanueva_

Name and Title:    Brian Villanueva, Human Resource Specialist

```
TRANSMISSION VERIFICATION REPORT
```

```
                                    TIME  : 04/26/2016 01:35PM
                                    NAME  : LAW OFFICE
                                    FAX   : 925
                                    TEL   : 9252
                                    SER.# : U63091G2NI70155
```

```
        DATE,TIME              04/26  01:35PM
        FAX NO./NAME           2524138
        DURATION               00:00:38
        PAGE(S)                03
        RESULT                 OK
        MODE                   STANDARD
                               ECM
```

# EXHIBIT C

# LAW OFFICE OF DANIEL HOROWITZ
## 3650 Mt. Diablo Blvd. - Suite 225
## Lafayette, California 94549

Physical Address

3650 Mt. Diablo Blvd.
Suite 225
Lafayette, California 94549

Facsimile: 925-2█████
Telephone: 925-283-1863                     E-Mail:  Horowitz@Whitecollar.US

April 26, 2016

Neville Vania
Human Resource Manager
City of Pittsburg
65 Civic Drive
Pittsburg, California 94565

Re: "Notice of Untimely Claim"
    Wade Derby

Dear Mr. Vania:

Thank you for your prompt response to the claim filed by Wade Derby.  You provided us with a "Notice of Untimely Claim" (Form 6.6a).  I appreciate the attempt to communicate the basis of your, however, would you be kind enough to send the claim for review by an attorney.  The basic law on accrual is that "For purposes of calculating ... time limits, the date on which an action accrues is the date upon which it would be deemed to have accrued under the applicable statute of limitations." (Gov.Code, § 901.)  *Loehr v. Ventura Cty. Cmty. Coll. Dist.*, 147 Cal. App. 3d 1071, 1078  (Ct. App. 1983)

The date of his severance/termination is the date the clock starts.

Thank you.

Daniel Horowitz

# EXHIBIT D



# CALIFORNIA DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING
### COMPLAINT OF DISCRIMINATION UNDER THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT
## EMPLOYMENT

**DFEH CASE NUMBER:**
**770869-228710**

**NAME:**
Wade Derby

**TELEPHONE NUMBER:**
▮▮▮▮▮▮▮▮

**ADDRESS:**
▮▮▮▮▮▮

**CITY/STATE/ZIP:**
▮▮▮▮▮▮▮

**NAMED OF THE EMPLOYER, PERSON, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICES COMMITTEE, OR STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME:**

**NAME:**
City of Pittsburg

**TELEPHONE NUMBER:**
925-252-4993

**ADDRESS:**
65 Civic Avenue

**CITY/STATE/ZIP:**
Pittsburg, Ca. 94565

**NUMBER OF EMPLOYEES:**
100

**TYPE OF EMPLOYER**
Government

**DATE MOST RECENT DISCRIMINATION TOOK PLACE (Month/Day/Year):** 1-9-16

**NAME THE INDIVIDUALS WHOM YOU WISH TO FILE AGAINST (Individuals who were involved in this particular complaint):**

**NAME/TITLE:**
Chief Brian Addington

**ADDRESS:**
65 Civic Avenue Pitrsburg, Ca. 94565

**TELEPHONE NUMBER:**
925-252-4861

RECEIVED

MAY 0 2 2016

Department of Fair Employment & Housing
Elk Grove

**Do you have an attorney who agreed to represent you in this matter?** ☑ Yes ☐ No

If yes, please provide the attorney's contact information.

Attorney Name:  Daniel Horowitz
Attorney Firm Name: Horowitz Law Office
Attorney Address: 3650 Mt. Diablo Blvd. Suite #225
Attorney City, State, and Zip: Lafayette. Ca. 94549

Employment Right-to-Sue Form
Revised 8/14

Page 2 of 3

I ALLEGE THAT I EXPERIENCED: ☑Discrimination ☑Harassment ☑Retaliation
BECAUSE OF MY ACTUAL OR PERCIEVED:

- ☑ Age- 40 and Over
- ☐ Ancestry
- ☐ Association with a Member of a Protected Class
- ☐ Color
- ☐ Disability
- ☑ Engagement in Protected Activity
- ☐ Family, Care or Medical Leave
- ☐ Genetic Information or Characteristics
- ☐ Marital Status
- ☐ Medical Condition- Cancer, Cancer Related Illness, or Genetic Characteristics
- ☐ Military or Veteran Status
- ☐ National Origin- Including Language Use Restrictions
- ☐ Race
- ☐ Religion
- ☐ Sex- Gender
- ☐ Sex- Gender Identity or Gender Expression
- ☐ Sex- Pregnancy
- ☐ Sexual Orientation

AS A RESULT, I WAS:

- ☐ Asked Impermissible, Non-Job Related Questions
- ☐ Demoted
- ☑ Denied a Good Faith Interactive Process
- ☑ Denied a Work Environment Free of Discrimination and/or Retaliation
- ☐ Denied Continuation of Employer-Paid Health Care Coverage While On Pregnancy Disability Leave
- ☐ Denied Employment
- ☐ Denied Equal Pay
- ☐ Denied Family Care or Medical Leave
- ☐ Denied Pregnancy Leave
- ☑ Denied Promotion
- ☐ Denied Reasonable Accommodation
- ☐ Denied Reinstatement
- ☐ Denied The Right to Wear Pants
- ☐ Forced to Quit
- ☐ Laid Off
- ☐ Terminated
- ☐ Tested for Genetic Characteristics
- ☐ Other (specify)

By submitting this complaint I am declaring under penalty of perjury under the laws of the State of California that the foregoing is true and correct of my own knowledge except as to matters stated on my information and belief, and as to those matters I believe it them to be true.

Signature of Complainant or Complainant's Legal Representative:          Date:

04-28-16

Printed Name:

Wade J. Derby

OAKLAND CA 945

28 APR 2016 PM 7 L



DFEH

2218 KAUSON DRIVE

SUITE #100

ELK GROVE, CA. 95758

# EXHIBIT E-1



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                    GOVERNOR EDMUND G. BROWN JR.

# DEPARTMENT OF FAIR EMPLOYMENT & HOUSING

DIRECTOR KEVIN KISH

2218 Kausen Drive, Suite 100 | Elk Grove | CA | 95758
800-884-1684 | TDD 800-700-2320
www.dfeh.ca.gov | email: contact.center@dfeh.ca.gov

May 18, 2016

RE: **Notice of Filing of Discrimination Complaint**
    DFEH Matter Number: 770869-228710
    Right to Sue: Derby /  City of Pittsburg

To All Respondent(s):

Enclosed is a copy of a complaint of discrimination that has been filed with the Department of Fair Employment and Housing (DFEH) in accordance with Government Code section 12960. This constitutes service of the complaint pursuant to Government Code section 12962. The complainant has requested an authorization to file a lawsuit. This case is not being investigated by the DFEH and is being closed immediately. A copy of the Notice of Case Closure and Right to Sue is enclosed for your records.

Please refer to the attached complaint for a list of all respondent(s) and their contact information.

**No response to DFEH is requested or required.**

Sincerely,

Department of Fair Employment and Housing

# EXHIBIT E-2



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                                    GOVERNOR EDMUND G. BROWN JR.

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**                                    DIRECTOR KEVIN KISH

2218 Kausen Drive, Suite 100 | Elk Grove | CA | 95758
800-884-1684 | TDD 800-700-2320
www.dfeh.ca.gov | email: contact.center@dfeh.ca.gov

May 18, 2016

Wade Derby



RE: **Notice of Case Closure and Right to Sue**
    DFEH Matter Number: 770869-228710
    Right to Sue: Derby / City of Pittsburg

Dear Wade Derby:

This letter informs you that the above-referenced complaint was filed with the Department of Fair Employment and Housing (DFEH) has been closed effective May 18, 2016  because an immediate Right to Sue notice was requested. DFEH will take no further action on the complaint.

**This letter is also your Right to Sue notice.** According to Government Code section 12965, subdivision (b), a civil action may be brought under the provisions of the Fair employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. The civil action must be filed within one year from the date of this letter.

To obtain a federal Right to Sue notice, you must visit the U.S. Equal Employment Opportunity Commision (EEOC) to file a complaint within 30 days of receipt of this DFEH Notice of Case Closure or within 300 days of the alleged discriminatory act, whichever is earlier.

Sincerely,

Department of Fair Employment and Housing

Enclosures

cc: City of Pittsburg
    Brian Addington

# EXHIBIT E-3



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency _____ GOVERNOR EDMUND G. BROWN JR.

# DEPARTMENT OF FAIR EMPLOYMENT & HOUSING

DIRECTOR KEVIN KISH

2218 Kausen Drive, Suite 100 | Elk Grove | CA | 95758
800-884-1684 | TDD 800-700-2320
www.dfeh.ca.gov | email: contact.center@dfeh.ca.gov

May 18, 2016

Daniel Horowitz
3650 Mt. Diablo Blvd., Ste 225
Lafayette CA 94549

RE: **Notice to Complainant's Attorney**
    DFEH Matter Number: 770869-228710
    Right to Sue: Derby / City of Pittsburg

Dear Attorney:

Attached is a copy of your client's complaint of discrimination filed with the Department of Fair Employment and Housing (DFEH) pursuant to the California Fair Employment and Housing Act, Government Code section 12900 et seq. Also attached is a copy of your client's Notice of Case Closure and Right to Sue. **Pursuant to Government Code section 12962, DFEH will not serve these documents on the employer.**

Please refer to the attached Notice of Case Closure and Right to Sue for information regarding filing a private lawsuit in the State of California.

Be advised that the Department of Fair Employment and Housing does not review or edit this complaint form to ensure that it meets procedural or statutory requirements.

Sincerely,

Department of Fair Employment and Housing

# EXHIBIT F

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement ("Agreement") is entered into between Wade Derby ("Employee"), and the City of Pittsburg ("City").

### RECITALS

WHEREAS, on or about March 12, 2012, the City received a complaint in which it was alleged that Employee engaged in harassing and/or inappropriate conduct;

WHEREAS, the City commenced an investigation into the allegations and said investigation, identified as Pittsburg Police Department Internal Investigation CI12-01 ("Investigation), determined that the allegations are sustained;

WHEREAS, Employee has acknowledge and/or admitted to much of the conduct alleged and found to be sustained in the Investigation and whereas the primary dispute between the parties is the level of discipline that should be imposed for Employee's misconduct;

WHEREAS, the Parties want to enter into this Agreement providing for a final disposition of this matter and certain future terms of employment for Employee; and

NOW, THEREFORE, for and in consideration of the mutual promises and covenants and consideration set forth herein, the Parties agree that all of the recitals are material provisions of this Agreement and also as follows:

### TERMS

1. The purpose of this Agreement is to provide Employee with an opportunity to continue his City employment notwithstanding the misconduct that was sustained as described in the Investigation.

2. This Agreement is in no way intended to restrict rights guaranteed to the City under State or Federal law. This Agreement is based on the unique facts of this situation and does not establish a precedent or past practice to govern any other case involving any other City employee.

3. Employee hereby tenders his irrevocable resignation, effective January 8, 2016. A copy of this resignation is attached hereto as Exhibit A.

4. City hereby accepts Employee's irrevocable resignation. In accepting said resignation, City does not guarantee that Employee will remain employed until January 8, 2016, as Employee continues to be subject to the same terms and conditions as other employees in the Police Management bargaining unit and future instances of misconduct and/or reductions in force may result in Employee's separation from employment before this date.

Page 1 of 6

5.      City agrees that it will not terminate or demote Employee for the sustained findings set forth in the Investigation. In exchange for the City's agreement not to demote or terminate, Employee agrees to accept the discipline outlined below:

a.  Suspension.  Employee agrees to accept a suspension of fifteen (15) working days.  This suspension shall be served on the following dates:  November 9, November 13 through November 16, November 19 through November 21, November 26 through November 29, and December 3 through December 5. While suspended from City service Employee shall forfeit all rights, privileges and salary or other fringe benefits while on such suspension, except that employee will receive paid holiday time off on the following dates:  November 12, 2012, November 22, 2012 and November 23, 2012.

b.  Reassignment.  Effective January 7, 2013 and until the effective date of Employee's resignation, Employee will be reassigned to perform Lieutenant level duties of an administrative nature.  Employee will no longer be responsible for supervising a bureau or division within the Police Department.  Employee will perform such administrative tasks as assigned by the Chief of Police or designee, including but not limited to implementing the terms of an evidence audit and assisting the Pittsburg Police Department with obtaining accreditation from the Commission on Accreditation of Law Enforcement Agencies ("CALEAL"). Employee will be excluded from any further watch commander duties, except as determined by the Chief of Police.

c.  Training.  On November 8, 2012, Employee shall attend a training seminar that is compliant with the requirements of AB 1825.

6.      Employee acknowledges and agrees as follows:  (a) that by agreeing to the terms of this Agreement, including paragraph 5 of this Agreement, he is waiving certain rights under the Public Safety Officers Procedural Bill of Rights in California Government Code sections 3300 et seq. ("POBR"); (b) that Employee has discussed his waiver of POBR rights with his legal counsel; (c) that Employee's waiver of POBR rights are limited to the waiver set forth in this Agreement; (d) that Employee's waiver of POBR rights is knowing and voluntary; and (e) Employee agrees and acknowledges he is signing this Agreement and agreeing to a limited waiver of his POBR rights in connection with the actions proposed in this Agreement, in exchange for the City not demoting him from the position of Lieutenant or terminating his employment at the present time based on the misconduct set forth in the Investigation.

7.      Employee further acknowledges and agrees as follows:  (a) that by agreeing to the terms of this Agreement, including paragraph 5 of this Agreement, he is waiving his rights to due process and a disciplinary appeal hearing under City policy, City or Police Department rule, and the Memorandum of Understanding between the City and the Pittsburg Police Manager's Group; (b) that Employee has discussed his waiver of any due process rights and disciplinary appeal rights with his legal counsel; (c) that Employee's waiver of his due process and disciplinary appeal rights are limited to the waiver set forth in this Agreement; (d) that  Employee's waiver of due process rights and disciplinary appeal rights is knowing and voluntary; and (e) Employee

agrees and acknowledges he is signing this Agreement and agreeing to a waiver of any due process rights and disciplinary appeal rights in connection with the actions proposed in this Agreement, in exchange for the City not demoting him from the position of Lieutenant or terminating his employment at the present time based on the misconduct set forth in the Investigation.

8.      In consideration of the above, the City agrees that no further discipline shall be considered or taken by the City towards Employee in response to the allegations set forth in the Investigation.

9.      Employee has requested and the City agrees to provide Employee with a leave of absence as set forth in this paragraph. Employee will be required to use any accrued paid time off while on leave. Employee is authorized to be absent from work and use the specified accrued leave as follows:

- November 1, 2012 through November 7, 2012, which absence will be charged to Employee's vacation bank;
- November 30, 2012, which absence will be charged to Employee's floating holiday bank; and
- December 6, 2012 through January 4, 2012, which absence will first be charge to employee's floating holiday bank followed by Employee's vacation bank.

If Employee does not have a sufficient number of hours of accrued leave to provide pay for the entire length of Employee's absence, Employee's absence will be unpaid. Employee is not eligible to use sick leave on the dates identified above, as Employee's request for a leave of absence has not been identified as being related to an illness or for a medical purpose.

9.      Employee, on behalf of himself, his heirs, representatives, successors, and assigns, hereby irrevocably and unconditionally releases and discharges the City from:

Any and all claims, charges, complaints, lawsuits, liabilities, claims for relief, obligations, promises, agreements, contracts, interests, controversies, injuries, damages, actions, causes of actions, suits, rights, demands, costs, losses, debts, liens, judgments, indebtedness, and expenses (including attorneys' fees and costs actually incurred), and all other claims and rights of action of all kinds and descriptions, whether known or unknown, suspected or unsuspected, actual or potential, which Employee now has, owns or holds, or claims to have, own or hold against the City, at common law or under any statute, rule, regulation, order or law, whether federal, state, or local, or on any grounds whatsoever, with respect to any act, omission, event, matter, claim, damage, loss, or injury arising out of the employment of, and/or the resignation of employment by Employee from the City, and/or with respect to any other claims, matter, or event arising prior to the execution of this Agreement by the Parties.

10.      Employee understands and agrees that he is waiving any rights he has, may have had, or may have, to pursue any and all remedies available to him under any employment-related

cause of action against the City, including, without limitation, any claims for discrimination, harassment and/or retaliation, claims under the Ralph M. Brown Act (California Government Code § 4950, et seq.), the California Fair Employment and Housing Act (California Government Code § 12900, et seq.), the California Family Rights Act (California Government Code § 12945.2), the Unruh and Gouge Civil Rights Acts (California Civil Code § 51, et seq.), all provisions of the California Labor Code and any wage orders or similar directives or authorities issued by any federal or state agency having enforcement powers, the Constitution of the United States, the Constitution of the State of California, Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e, et seq.), the Age Discrimination in Employment Act (29 U.S.C. § 621, et seq.), the Equal Pay Act (29 U.S.C. § 206(d)), the Fair Labor Standards Act (29 U.S.C. § 201, et seq.), the Family and Medical Leave Act (29 U.S.C. § 2601, et seq.), the Employment Retirement Income Security Act of 1974 (29 U.S.C. § 1001, et seq.), Sections 1981-88 of Title 42 of the United States Code (42 U.S.C. § 1981, et seq.), the Americans with Disabilities Act (42 U.S.C. § 12101, et seq.), claims of retaliation or whistle-blowing (including but not limited to California Labor Code § 1102.5, et seq. and Government Code § 12653), claims for breach of any type of contract, including written, oral or implied, breach of any covenant, promise or other duty pertaining to Employee's employment and/or the resignation of employment by Employee from the City, whether expressed or implied, and all other claims arising in contract, tort or equity or under any other statute, federal, state or local up to the date of execution of this Agreement.

11.     Employee, on behalf of himself, and his assigns, successors, agents and representatives, hereby waives any and all rights that he may have pursuant to California Civil Code Section 1542, which reads as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

12.     Employee waives any rights he might have to invoke section 1542 now or in the future with respect to the releases set out in this Agreement. Employee recognizes and acknowledges that factors which have caused him to enter into this Agreement may turn out to be incorrect or different from what he had previously anticipated, and Employee expressly assumes all of the risks of this waiver of Section 1542.

13.     Specific Acknowledgement of Waiver of Claims Under ADEA and OWBPA. The Age Discrimination in Employment Act of 1967 ("ADEA"; 29 U.S.C. §§ 621-634) makes it illegal for an employer to discharge any individual or otherwise discriminate with respect to the terms and privileges of an individual's employment on the basis that the individual is age forty or older. The Older Workers Benefit Protection Act ("OWBPA"; 29 U.S.C. §§ 626, et seq.), augments the ADEA and prohibits the waiver of any right or claim under the ADEA unless the waiver is knowing and voluntary. By signing this Agreement, Employee acknowledges that, in exchange for consideration, Employee knowingly and voluntarily waives and releases any rights that he may have under the ADEA and/or OWBPA. Employee further

Settlement Agreement Between
Deley and City of Pittsburg, et al.

Page 4 of 6

acknowledges that he has been advised and understands, pursuant to the provisions of the ADEA and OWBPA that:

a.  This waiver/release is written in a manner in which Employee understands.

b.  Employee is aware of, and has been advised by a representative or legal counsel of his own choosing, of his rights under the ADEA and OWBPA and the legal significance of his waiver of any possible claims he currently may have under the ADEA, OWBPA, or similar age discrimination laws.

c.  Employee is entitled to a reasonable time of at least twenty-one (21) days within which to review and consider this Agreement, and the waiver and release of any rights he may have under the ADEA, the OWBPA, or similar age discrimination laws, but he may, in the exercise of his own discretion, sign or reject this Agreement at any time before the expiration of the twenty-one (21) day period and Employee expressly waives this 21-day review period.

d.  The waivers and releases set forth in this Agreement shall not apply to any rights or claims that may arise after the effective date of this Agreement.

e.  Employee has had an opportunity to discuss this waiver and release with, and to be advised with respect thereto, by an attorney of his choice, and agrees that he does not need any additional time within which to review and consider this Agreement.

f.  Employee has seven (7) days following his execution of this Agreement to revoke it and the Agreement shall not become enforceable until the seven-day revocation period expires. Any notice of revocation must be in writing and must be received by the City, through its Chief of Police, Aaron Baker, at 65 Civic Avenue, Pittsburg, CA, 94565, no later than the seventh day after Employee executes the Agreement.

EMPLOYEE ACKNOWLEDGES BY HIS SIGNATURE THAT HE FULLY UNDERSTANDS HIS RIGHT TO DISCUSS THIS WAIVER WITH LEGAL COUNSEL, THAT HE HAS CAREFULLY READ AND FULLY UNDERSTANDS THE WAIVER, AND THAT HE IS VOLUNTARILY AGREEING TO WAIVE ANY CLAIMS THAT HE HAS OR MAY HAVE UNDER THE AGE DISCRIMINATION IN EMPLOYMENT ACT, THE OLDER WORKERS BENEFIT PROTECTION ACT, AND ANY OTHER LAWS PROHIBITING AGE DISCRIMINATION IN EMPLOYMENT ARISING FROM OR RELATED OR ATTRIBUTABLE TO THE PARTIES' ALLEGATIONS OR CLAIMS.

14.  This Agreement shall constitute a single integrated contract expressing the entire agreement between the Parties. Any prior agreements, promises, negotiations or representations written or oral, express or implied, relating to the subject matter of this Agreement, not expressly set forth in this Agreement, are of no force or effect between the Parties concerning the subject matter set forth herein.

15.  Each Party hereto represents and agrees that he or it has carefully read and fully understands all of the provisions of this Agreement, that he or it has had the chance to consult with a representative (including, but not limited to, an attorney), and that he or it is voluntarily,

without any duress or undue influence on the part of or on behalf of any Party, entering into this Agreement.

16.     Should any of the provisions or terms of this Agreement be determined illegal, invalid, or unenforceable by any court or governmental agency of competent jurisdiction, validity of the remaining parts, terms, or provisions, shall not be affected thereby and said illegal, invalid, or unenforceable part, term, or provision shall be deemed not to be a part of this Agreement.

17.     This Agreement is made and entered into in the State of California, and shall be governed, interpreted, and enforced under the laws of the State of California. The Parties agree that jurisdiction and/or venue of any action involving the validity, interpretation, or enforcement of this Agreement or any of its terms, provisions, or obligations, or claiming breach thereof, shall exist exclusively in a court located within the County of Contra Costa, State of California. The Parties further agree that this Agreement may be used as evidence in any subsequent proceeding in which any of the Parties allege a breach of this Agreement or seek to enforce its terms, conditions, provisions, or obligations.

18.     This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. A photocopy or facsimile transmission of the Agreement, including signatures, shall be deemed to constitute evidence of the Agreement having been executed.

IN WITNESS WHEREOF, the parties hereto have executed the SETTLEMENT AGREEMENT AND RELEASE.

Dated: 10·29·12

Wade Derby

Dated: 10/30/12

Aaron Baker
Chief of Police
On behalf of the City of Pittsburg

4851-8284-6225, v. 1

# EXHIBIT G

## FIRST AMENDMENT TO THE SETTLEMENT AGREEMENT AND RELEASE

This document constitutes the First Amendment to the Settlement Agreement and Release ("Agreement") entered into between Wade Derby ("Employee") and the City of Pittsburg ("City") on or about October 29, 2012 (copy attached).

### RECITALS

WHEREAS, as part of the Agreement, Employee tendered his irrevocable resignation, effective January 8, 2016, and the City accepted Employee's irrevocable resignation.

WHEREAS, Employee has requested to amend the effective date of his irrevocable resignation.

WHEREAS, the Parties want to enter into a mutually agreed upon revision to the Agreement to amend Employee's date of resignation to be effective as described below and no later than June 3, 2016.

WHERAS, the Parties mutually agree that all other terms, conditions and waivers in the Settlement Agreement remain unchanged.

NOW, THEREFORE, based upon the foregoing Recitals, the Parties agree to amend the Agreement as follows:

1. Paragraph 3 is replaced with the following:

By signing below, Employee hereby tenders his irrevocable resignation, to be effective on the earlier of either: (1) the date that employee exhausts his accrued vacation, administrative leave, Floating Holidays, and up to 32 hours of personal necessity leave hours, but not sick leave; or (2) June 3, 2016. By signing below, the City hereby accepts Employee's irrevocable resignation.

The Parties agree that, effective January 8, 2016, Employee will be placed on a Leave of Absence (Other than Family Medical Leave) pursuant to Rule 26 of the City's Personnel Rules. This leave will be unpaid, except that Employee may use any accrued vacation, administrative leave, Floating Holidays, and up to 32 hours personal necessity leave, during the period of January 8, 2016 through the effective date of his resignation. The Parties agree that Employee is not permitted to use sick leave or any personal necessity leave hours in excess of 32 hours during this period. Employee will continue to accrue vacation credits, sick leave credits, holiday pay, health and welfare benefits, salary advancement and other similar benefits while on leave. Employee will be permitted to participate in City benefit programs to the same extent as any other employees.

While on leave, Employee shall not perform any work on behalf of the City, unless specifically directed to do so by the City in writing. If Employee is assigned work to be performed after his placement on leave on January 8, 2016, Employee will be required to complete time cards detailing the number of hours worked and will be compensated for the hours worked at his hourly rate of pay.

Upon his effective date of resignation, Employee will receive compensation for any unused, accrued leave time pursuant to City policies and the applicable Memorandum of Understanding.

2.       Except as reflected in paragraph 1 above, the Parties agree that all other provisions of the Agreement remain unchanged.

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment to the Settlement Agreement and Release entered into on or about October 29, 2012.

Dated: _____         _____

Wade Derby

Dated: _____         _____

Joe Sbranti
City Manager
On behalf of the City of Pittsburg

# EXHIBIT H



**Chief of Police**

December 9, 2015

To Whom It May Concern:

I have known Lieutenant Wade Derby for over 21 years. Over this time, I have had the opportunity to work with Lt. Derby as a police officer, as one of his subordinates, as peers, and for the past five years as his supervisor. Lt. Derby is an exceptional police officer and has had a distinguished career with the Pittsburg Police Department. He has worked in many different assignments, including narcotics, investigations, SWAT, CNT, Patrol, etc. Not only has he worked many of these assignments as an officer, he has been entrusted with operational command over many of the assignments during the past 20 years that he has held rank within the Department. He also has volunteered to handle many assignments that are less coveted, but none-the-less essential, such as overseeing the Volunteer Program, the Code Enforcement Division, the Records Division and the Citizens Emergency Response Team.

Lt. Derby understands the role law enforcement plays within the community and he diligently works to improve the Department's operations and community involvement. He is an outstanding strategizer, always finding ways to improve as an organization. For the past several years, Lt. Derby has been assigned to conduct internal affair investigations, one of the most sensitive and critical roles within the organization. As always, he has done an excellent job in this role.

I have had the opportunity over the years to work with Lt. Derby during extremely stressful situations, he remains calm and professional, and systematically works through problems. He remains available all of the time, for both the Department and his subordinates. As Lt. Derby nears retirement with the Pittsburg Police Department, he has decided to pursue new employment opportunities. I have no doubt that he will excel in a new position. I wholeheartedly recommend him, and commend him, for his ambition. As his direct supervisor for the past five years, and the fourth highest ranking supervisor in the Department, he has been a trusted voice I have been able to rely on. If you have any questions feel free to call me at the phone number listed below.

Sincerely,

Brian Addington
Chief of Police

65 Civic Avenue ★ Pittsburg, California 94565 ★ (925) 252-4980 ★ www.ci.pittsburg.ca.us

# EXHIBIT I



September 26, 2016

<u>MEMORANDUM</u>

TO: Chief Brian Addington

FROM: Lieutenant Wade Derby

SUBJECT: Finalizing IA Matters/ Pitchess/Brady Issues

Chief, I wanted to offer a suggestion to potentially alleviate any confusion or future issues regarding internal affairs case dispositions/documentation as they relate to potential court proceedings in the aftermath of our administrative actions.

As you are aware, we have recently been faced with the matter of ███████████ resignation and the quandary of defense counsel/District attorney's office personnel learning about her being under investigation for misconduct by her own admission to them.

This led to a Pitchess matter in the court which I made two appearances on and then ultimately gave Joyce Baker the written notice I had placing ███████████ on paid administrative leave pending the outcome of the investigation.

Ultimately I never was called upon to testify and was not asked to. However, had I been asked, I would have to disclose I did an investigation, drew a complaint number, and performed an investigation to include interviewing witnesses, potential victims and the like. Joyce Baker did testify, but to what degree things were disclosed I am unclear.

What concerns me in this case is the fact that I have documents sitting on my desk which represent this body of work. I do not want to destroy them for obvious reasons. I am concerned because I do believe this Pitchess question and/or other issues pertaining to Officer Ingram and others who have resigned in lieu of termination, incarceration or some other negative reason will come up again.

I know Joyce Baker and I discussed this to some degree with our legal counsel during the Pitchess motion and they felt the best way to cope with these issues is to at least prepare a summary narrative to memorialize the investigation and hold it until it could legally be purged.

In fact, as you know we did this years ago with the ████████████ case and though not a summary the 53 page draft of the ██████ matter I just emailed you the other day come to mind as examples.

Memorializing things I believe will alleviate the possibility of having to have embarrassing issues surface later for our organization and for us the management team. It also eliminates any ethical quandaries about disclosure and nondisclosure in advance, creating that transparency when it matters most.

Perhaps I am being over cautious but I know this situation along with some recent situations I have found while doing background investigations have brought this to the forefront of my mind as a potential pitfall to be aware of. I am happy to discuss this with you further anytime and find out your thoughts on what you deem a best practice in these regards. Thank you

Respectfully Submitted,

Lt. Wade Derby

# EXHIBIT J



**Pittsburg Police Department**
*Brian Addington*
*Chief of Police*

October 6, 2015

Lieutenant Wade Derby
Pittsburg Police Department
65 Civic Avenue
Pittsburg, CA 94565

Dear Lt. Derby:

I received your memorandum dated September 16, 2015, and reviewed your previous memoranda on related matters.

Please be aware that the Department contacted the District Attorney's office in summer 2014 concerning potential criminal charges against Officers ███ and ███. This included discussion of *Brady* issues. Deputy District Attorney Douglass MacMaster, who handles *Brady* issues for the DA's office, was involved in these discussions. The DA's office made no indication that, based on the information it received, Officers ███ and ███ would be placed on the *Brady* list.

Relative to the *Pitchess* motion in the case of People v. Kevin Easter, rest assured that the memorandum dated October 22, 2014, along with your notes, were taken to the recent *Pitchess* hearing. On the date of the hearing, there was no in camera review because the judge found that the defense had not met its burden. The memorandum and notes will be taken to future *Pitchess* hearings in this or other cases. Our Custodian of Records and City Attorney are well aware of *Pitchess* motion requirements and procedures.

I appreciate your concern and diligence in this matter.

Chief Brian Addington

# EXHIBIT K



**Pittsburg Police Department**
*Brian Addington*
*Chief of Police*

October 19, 2015

Lieutenant Wade Derby
Pittsburg Police Department
65 Civic Avenue
Pittsburg, CA 94565

Lt. Derby:

I received your memorandum dated October 12, 2015. In it, you indicate that the City is expecting your resignation effective January 8, 2016. This is not accurate. As stipulated in the attached Settlement Agreement and Release, you already tendered your irrevocable resignation effective January 8, 2016. A copy of your signed resignation letter is also attached. The City accepted the irrevocable resignation and will proceed accordingly. While the City was willing to allow you to use leave from January 8, 2016 until your leave would have been exhausted, you rejected that offer. Thus, you will be paid for any unused leave with your final paycheck, which will reflect payment through January 8, 2016.

Relative to your assertion that the allegations made against you were "proven false," and the investigations findings should have been reversed, I remind you that the investigation sustained most of the allegations made against you, and led to your agreeing to enter into the above referenced Settlement Agreement and Release. Further, the Judge in the referenced lawsuit granted summary judgment dismissing you as a defendant because the Plaintiff (Wilkerson) failed to file timely government tort claims. There was no ruling that her accusations were "false." And while there was an admission of perjury that you witnessed, that admission was not attributed to any of the conduct that had been sustained against you. Further, that admission was thoroughly investigated and resolved.

You also indicate in your letter that the City is punishing you for "whistleblowing." The City is proceeding with the agreement you voluntarily entered into on or about October 29, 2012. I am unaware of you making any "whistleblowing" complaints. The City takes allegations such as these very serious. If you have such a compliant, please let me know.

Chief Addington

# EXHIBIT L

## PERSONNEL ACTION FORM

| NAME: | Derby, Wade | | | DEPARTMENT: |
|---|---|---|---|---|
| | Last | First | Middle | POLICE |
| ADDRESS: | | | | EFFECTIVE DATE 01/08/16 |
| CITY: | | ZIP: | | |

EMPLOYEE # 01812     HOME PHONE:

### TYPE OF ACTION

☐ APPOINTMENT ☐ JOB/DEPT CHANGE ☐ SALARY CHANGE ☐ INCENTIVES ☐ LEAVE OF ABSENCE ☒ SEPARATION

### APPOINTMENT – (ADD MULITPLE PAY RATES IF APPLICABLE)

| Title: | | Salary: | Range: | Step: |
|---|---|---|---|---|
| Charge Account No.: *(add %, if applicable)* | | | | |

### JOB/DEPT. CHANGE

☐ ACTING PAY (OUT OF CLASS) ☐ DEMOTION ☐ PROMOTION ☐ SPECIAL PROJECT ☐ TRANSFER ☐ SEASONAL TO REGULAR

Starting Date          End Date (if applicable)

| FROM | Title: | | | TO | Title: | | |
|---|---|---|---|---|---|---|---|
| | Department: | | | | Department: | | |
| | Salary: | Range: | Step: | | Salary: | Range: | Step: |

Account No.:

### SALARY CHANGE

| Title: | | | Date of Last Change: | | | |
|---|---|---|---|---|---|---|
| FROM: | Salary: | Range: | Step: | TO: | Salary: | Range: | Step: |

### INCENTIVES (IF APPLICABLE)

**SWORN:** ☐ BA/BS ☐ Master's ☐ Canine ☐ Command College ☐ P.O.S.T. Inter. ☐ P.O.S.T. Adv ☒ Uniform ☒ Holiday ☐ Bilingual

**AFSCME:** ☐ AICP ☐ Bilingual ☐ CE-PE ☐ PWS-D4 ☐ Uniform ☐ WPS – G4 ☐ WPS-G5 ☐ WPS-D1 ☐ WPS –D2 ☐ WPSDT BA/BS

**Teamsters** ☐ EM/E-D1 ☐ EM/E-D2 ☐ EM/E-D3 ☐ EM/E-D4 ☐ MWI/II –CSM – G1 ☐ MWI/II - CSM – G2 ☐ MWII/Lead - CSM – G3 ☐ MWI -A/B

☐ MWI-D1 ☐ MWI-D2 ☐ MWII–D1 ☐ MWII-D2 ☐ MW II – D3 ☐ MLW-D2 ☐ MLW–D3 ☐ MLW-D4 ☐ MWI/II-QAC ☐ MWII/LD- PCA

☐ Train-A/B ☐ Train-Load ☐ Train-Lift ☐ Uniform ☐ UST ☐ UTI/II-A/B ☐ WPO– G3 ☐ WPO – G4 ☐ WPOG3-D1 ☐ WP OG3 –D2

### LEAVE OF ABSENCE

| Title: | | Salary: | Range: | Step: |
|---|---|---|---|---|
| Starting Date: | Length of Leave: | | Return Date: | |
| ☐ Start    ☐ Return    ☐ Extension | | | | |

### SEPARATION

| Title: | Police Lieutenant | Salary: 12,500 | Range: 640 | Step: F |
|---|---|---|---|---|

Deceased ☐    Dismissal ☒    End of Temporary Work ☐    Lay off ☐    Resignation ☐    Retirement ☐

Duration of City Employment    FROM: 01/11/88    TO: 01/08/16

| HR ONLY: | REMARKS: | | |
|---|---|---|---|
| __ Payroll | | Supervisor Recommendation: | Date: |
| __ Department | Pay all accrued vacation and compensatory | | |
| __ Employee | time leave balances. | | |
| By ____ | | Department Head Approval | Date: 1/15/16 |
| On ____ | | | |
| **Data Entry** | | Human Resources Approval: | Date: 1/15/16 |
| By ____ | | | |
| On ____ | | | |