JACKSON LEWIS P.C.
MICHAEL J. CHRISTIAN (SBN 173727)
SHANE R. LARSEN (SBN 283966)
400 Capitol Mall, Suite 1600
Sacramento, California 95814
Telephone: (916) 341-0404
Facsimile: (916) 341-0141
Email: ChristianM@jacksonlewis.com
          Shane.Larsen@jacksonlewis.com

JACKSON LEWIS P.C.
CONOR J. DALE (SBN 274123)
50 California Street, 9th Floor
San Francisco, CA 94111-4615
Telephone: (415) 394-9400
Facsimile: (415) 394-9401
Email: Conor.Dale@jacksonlewis.com

Attorneys for Defendant
CITY OF PITTSBURG

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WADE DERBY, an individual,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF PITTSBURG and DOES 1-10;<br><br>Defendants. | Case No. 3:16-cv-05469-SI<br><br>**DECLARATION OF CONOR DALE IN SUPPORT OF THE CITY OF PITTSBURG'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>**[FRCP 56]**<br><br>Judge: The Hon. Susan Illston<br>Department: Courtroom 1 - 17th Floor<br>Date: May 25, 2018<br>Time: 9:00 a.m. |

DECLARATION OF CONOR DALE ISO
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

Case No. 3:16-cv-05469-SI

I, Conor Dale, declare as follows:

1.    I am an attorney licensed to practice law in the State of California and admitted to appear before this Court. I am an associate with the law firm of Jackson Lewis P.C., counsel of record in this matter for Defendant CITY OF PITTSBURG ("City"). I have personal knowledge of the matters stated herein, and if called to testify as to these matters, I could and would do so competently.

2.    Attached to this declaration as Exhibit 1 is a true and correct copy of the second amended complaint ("SAC") filed by Plaintiff Wade Derby ("Plaintiff") against the City in this case. Plaintiff's SAC is the operative complaint in this case.

3.    Counsel for Plaintiff deposed City Police Chief Brian Addington on March 2, 2018. I attended this deposition. Attached to this declaration as Exhibit 2 is a true and correct copy of the relevant portions of the transcript of Chief Addington's deposition.

4.    Counsel for the City deposed Plaintiff on February 26, 2018. I attended this deposition. Attached to this declaration as Exhibit 3 is a true and correct copy of the relevant portions of the transcript of Plaintiff's deposition.

5.    My firm previously represented the City in a lawsuit filed by Ms. Cassandra Wilkerson. I was the associate assigned to assist with the defense of this lawsuit. A true and correct copy of the civil complaint Ms. Wilkerson filed with the Superior Court of California, County of Contra Costa against the City has been attached to this declaration as Exhibit 4.

6.    Contra Costa County Superior Court Judge Steven Austin issued an order granting partial summary judgment of Ms. Wilkerson's lawsuit in December 2014. A true and correct copy of this order has been attached to this declaration as Exhibit 5.

7.    Counsel for Ms. Wilkerson filed a request for dismissal regarding her lawsuit on September 10, 2015. A true and correct copy of the executed, file-stamped request for dismissal with prejudice has been attached to this declaration as Exhibit 6. My firm received a copy of this document and confirmation that Ms. Wilkerson's lawsuit had been dismissed on September 28, 2015.

2

8.     Plaintiff filed a first and second amended complaint against the City. In response, the City filed motions to dismiss these complaints pursuant to Federal Rule of Civil Procedure 12(b)(6). Attached to this declaration as Exhibit 7 is a true and correct copy of the Court's order regarding the City's motion to dismiss Plaintiff's Second Amended Complaint.

9.     The City of Pittsburg also retained my firm to assist with a claim filed by Plaintiff against the City pursuant to the Government Claim Act. Attached to this declaration as Exhibit 8 is a true and correct copy of a Government Claim Form and attachment Plaintiff submitted to the City in or around March 2016;

10.     Attached to this declaration as Exhibit 9 is a true and correct copy of the Government Claim Form and related attachment Plaintiff filed as Exhibits A-1 and A-2 with his Second Amended Complaint.


I declare under penalty of perjury of the United States of America and the State of California that the foregoing is true and correct.


Executed on April 3, 2018 in San Francisco, California.


_____

Conor Dale

DECLARATION OF CONOR DALE ISO
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

Case No. 3:16-cv-05469-SI

# EXHIBIT 1

1  DANIEL A. HOROWITZ  SBN 92400
   P.O. Box 1547
2  Lafayette, CA 94549
   (925) 283-1863
3  Email: bdega@earthlink.net

4  CARMELA CARAMAGNO  SBN 139279
   P.O. Box 1811
5  Lafayette, CA 94549
   (925) 299-1904
6  Email: caramagnolaw@comcast.net

7  Attorney for plaintiff
   WADE Plaintiff
8

9                 UNITED STATES DISTRICT COURT

10              NORTHERN DISTRICT OF CALIFORNIA

11  WADE DERBY, an individual,          **No. 3:16-cv-05469-SI**

12                                      **SECOND AMENDED COMPLAINT
                                        FOR DAMAGES:**
13              Plaintiff,
                                        **1.  VIOLATION OF CIVIL RIGHTS
14                                      BASED ON FIRST AMENDMENT
                                        SPEECH (42 U.S.C. Section 1983)**
15                                      **2.  RETALIATION IN VIOLATION
                                        OF CALIFORNIA LABOR CODE §
16  v.                                  1102.5;**
                                        **3.  RETALIATION IN VIOLATION
17                                      OF GOVT. CODE § 12940, *et seq.***
                                        **4. BREACH OF CONTRACT**
18                                      **5. BREACH OF THE COVENANT OF
                                        GOOD FAITH AND FAIR DEALING**
19
20                                      **JURY TRIAL REQUESTED**

21  CITY OF PITTSBURG; and DOES 1-
    10,
22  inclusive,

23
                Defendants.
24  _____/

25

26      Plaintiff WADE DERBY ("PLAINTIFF") brings these causes of action against

27  Defendants CITY OF PITTSBURG (hereinafter "CITY"), a city duly organized and

28  existing under the laws of the State of California, the individually named defendant and

1 | Does 1-10, inclusive based on the following allegations:

2 | **PARTIES, VENUE AND JURISDICTION**

3 |  1. Plaintiff WADE DERBY, (hereinafter "Plaintiff") is a resident of Contra

4 | Costa County.   Plaintiff was, at all relevant times, an employee of the Pittsburg Police

5 | Department (hereinafter DEPARTMENT), a division of defendant CITY, except during

6 | those times of acts occurring after plaintiff's coerced "retirement" from DEPARTMENT

7 | in January 2016.

8 |  2. Plaintiff is informed and believes and thereon alleges that defendants,

9 | except defendant CITY, are natural persons, who were, at all relevant times, employees of

10 | CITY and/or DEPARTMENT.

11 |  3. Plaintiff is informed and believes that defendant CITY is a governmental

12 | entity, with their principal place of businesses located in Pittsburg, California, County of

13 | Contra Costa.

14 |  4. Plaintiff is informed and believes and thereon alleges that defendants DOES

15 | 1 through 10, inclusive, are fictitious names of defendants whose true names and

16 | capacities are at this time unknown to plaintiff.  Plaintiff is informed and believes and

17 | thereon alleges that each defendant so designated was the officer, director, shareholder,

18 | employer, employee, agent and/or other representative of named defendants, and that each

19 | defendant so designated is responsible in whole or in part for the damages suffered by

20 | plaintiff.

21 |  5. Plaintiff is informed and believes and thereon alleges that defendants and

22 | each of them, were acting as the agent, servant, or employee of each other and were

23 | acting within the scope of their respective employment, with the full knowledge and

24 | consent, either express or implied, of each of the other named defendants.  All defendants

25 | and others unnamed acted in concert with, in civil and/or criminal conspiracy with the

26 | others, and each defendant ratified the conduct of the others.

27 |  6. At all times stated herein, defendants knew or reasonably should have known

28 | that their actions and/or failure to act were fraudulent, breached their agreements with

WADE DERBY v. CITY OF PITTSBURG, et al.     Case No. 3:16-cv-05469-SI
SECOND AMENDED COMPLAINT    2

1    Plaintiff, violated the covenant of good faith and fair dealing, would violate plaintiff's

2    constitutional rights, his freedom from retaliation for the exercise of those rights, and

3    violate his civil rights.

4         7.     This Court is a Court of original subject matter jurisdiction as to all civil

5    actions arising under the Constitution, laws or treaties of the United States.  Plaintiff's

6    claims under 42 U.S.C.A. § 1983 arise under the Constitution and laws of the United

7    States, and thus this Court has original subject matter jurisdiction pursuant to 28 U.S.C. §

8    1331.

9         8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b) (1) and (2), in

10   that defendant CITY has offices and agents in, and does business in Pittsburg, California,

11   and thus resides in this District, and the acts giving rise to this claim occurred in this

12   District.

13              **EXHAUSTION OF ADMINISTRATIVE REMEDIES**

14        9.     On March 21, 2016, Plaintiff filed a timely claim for damages with

15   defendant CITY and has complied with any and all applicable governmental claims

16   statutes for those claims governed by a claims statute.   A true and correct copy of

17   plaintiff's Governmental Claim filed on March 21, 2016, is attached hereto as Exhibit "A-

18   1".  A true and correct copy of his "Attachment" to claim detailing a systematic and

19   continuous course of harassment and retaliation up to and including the date of his

20   coerced "retirement" is attached as Exhibit "A-2".

21        10.    A true and correct copy of defendants denial of the claim as untimely, dated

22   April 22, 2016, is attached as Exhibit "B".  A true and correct copy of Plaintiff's request

23   for reconsideration of that denial is attached as Exhibit "C".

24        11.    On May 2, 2016, plaintiff filed an Employment "Right To Sue" form with

25   the California Department of Fair Employment and Housing.  A true and correct copy of

26   plaintiff's "Right To Sue" form is attached as Exhibit "D".

27        12.    On May 18, 2016, plaintiff received three letters from the Department of

28   Fair Employment & Housing, including a "Notice of Filing Complaint," a "Notice of

1    Case Closure and Right To Sue" letter, and a "Notice to Complainant's Attorney" from

2    the Department of Fair Employment & Housing. True and correct copies of the three

3    May 18, 2016 letters are attached as Exhibits "E-1 to E-3"

4        13.    Plaintiff has exhausted all available administrative remedies in an attempt to

5    resolve the matters described in this Complaint.

6                **PLAINTIFF'S DISTINGUISHED EMPLOYMENT HISTORY**

7        14.    Plaintiff started at the PPD in 1988 as a patrol officer.

8        15.    Six months later, Plaintiff was appointed to the SWAT (Special Weapons

9    And Tactics) team.

10       16.    In 1989, Plaintiff was appointed to a street level drug enforcement team

11    called CAT (Crime Abatement Team).

12       17.    In 1990, Plaintiff was promoted to detective. Plaintiff's first assignment as

13    a detective was to the narcotics division. In 1992, Plaintiff was laterally promoted to the

14    State Narcotics Officer's task force "ECCNET".

15       18.    In 1994, Plaintiff was promoted to Corporal. Plaintiff served as a Corporal

16    for two years.

17       19.    In 1996, Plaintiff was promoted to Sergeant. This was the year that Plaintiff

18    began being assigned as the investigating officer to internal affairs investigations.

19       20.    In 2003, Plaintiff was promoted to Lieutenant. In 2006, Plaintiff became

20    the first officer in the PPD to graduate from command college. That same year, Plaintiff

21    completed a Master's degree in Leadership from St. Mary's College in Moraga. Plaintiff

22    was also the first officer at the PPD to graduate from the Police Executive Research

23    Forum (PERF) Leadership Program.

24       21.    By 2009, Plaintiff was the prime investigator for the DEPARTMENT and

25    CITY in their professional standards investigations. Plaintiff continued in these duties

26    until his forced retirement in 2016 pursuant to a "stipulated agreement" signed October

27    2012. Despite an alleged negative IA finding against plaintiff in 2012, plaintiff's rank

28    and status with the DEPARTMENT did not change, and Plaintiff continued to be the

1    officer in charge of conducting the highly sensitive personnel investigations.  In fact, on

2    December 9, 2015, ADDINGTON provided plaintiff with a glowing letter of

3    recommendation regarding his value as a law enforcement employee.  A true and correct

4    copy of that letter is attached as Exhibit "H".

5           22.     It was as a result of plaintiff's work on the professional standards, or "IA"

6    investigations, that in 2015 plaintiff learned that defendants were engaged in a civil

7    and/or criminal conspiracy that included withholding *Brady* material and misleading the

8    Courts during *Pitchess* hearings.   In October 2015, informed the Contra Costa Superior

9    Court about withheld evidence.  Following plaintiff's disclosures, and as a result of

10   plaintiff's insistence that defendants act truthfully, defendants created and sustained a

11   hostile work environment, harassed, retaliated against, mistreated, and caused plaintiff to

12   suffer adverse employment actions up to and following his retirement in 2016.  Said

13   actions violated plaintiff's rights, and were a breach of the 2012 stipulated agreement.

**PLAINTIFF'S HISTORY OF CORRUPTION FIGHTING**

**LEADING UP TO THE STIPULATED AGREEMENT**

16           23.     The DEPARTMENT has been plagued by corruption since as early as

17   1991.  In 1991, plaintiff testified in front of a grand jury regarding DEPARTMENT

18   corruption.  The Chief Castiglione and other members of his command staff were subjects

19   of the investigation.  Plaintiff was called as a witness who could testify credibly to act of

20   corruption occurring in DEPARTMENT.

21           24.     At that time, plaintiff was under then Lieutenant BAKER's command.

22   Castiglione's command staff, in which BAKER was a part, were under scrutiny.  Plaintiff

23   revealed information damaging to the entire command staff.  Chief Castiglione ultimately

24   left his position in the office as Chief of Police.

25           25.     Plaintiff again went before a grand jury in approximately 2002-2003, this

26   time about his commanding officer, Commander Hendrick's.  Commander Hendrick's

27   had given plaintiff orders to falsely and alter facts in a police report and plaintiff had

28   refused to do so.  Plaintiff also testified about an original report having been removed by

1   Commander Hendrick's from law enforcement records division.

2        26.    Prior to the incident involving falsification of crime records, allegations of

3   sexual harassment had been lodged against Commander Henricks.   Defendant CITY

4   settled the claim against Commander Hendricks.   Nonetheless, Hendricks was allowed to

5   keep his position.   It was not until after plaintiff's whistle blowing about Hendrick's false

6   crime reporting that Hendricks resigned.

7        27.    Plaintiff spoke out again against another chief, Chief Casey prior to the

8   events involving ADDINGTON.   This time plaintiff spoke out against the

9   DEPARTMENT's reporting of crime statistics.   Plaintiff complained that the manner in

10   which the DEPARTMENT was reporting crimes was unethical because the

11   DEPARTMENT was taking reportable felony offenses and reporting them as information

12   reports in a manner that understated crime reporting in defendant CITY.   These reports,

13   known as the Uniform Crime Reports ("UCR's") would ultimately be sent to other crime

14   fighting organizations such as the Federal Bureau of Investigations (hereinafter "FBI"),

15   who in turn reported that data as fact.

16        28.    In December of 2008, Plaintiff attended a staff meeting hosted by BAKER,

17   who had by then been promoted to Chief, and at that meeting, plaintiff spoke openly and

18   freely about the DEPARTMENT dishonestly reporting crime statistics through the use of

19   "informational reports" instead of felony crime reports.

20        29.    Prior to speaking out publicly against the DEPARTMENT's unethical

21   and misleading crime reporting, plaintiff was in line to become Chief of Police

22   according to statements made by Chief BAKER.   After speaking out at the staff

23   meeting, BALDAZO, who was close with Chief BAKER, lodged a sexual harassment

24   claim against plaintiff. The DEPARTMENT refused to formally investigate the

25   allegation, thus depriving plaintiff of any due process, and precluding plaintiff from

26   clearing his name and any taint of wrongdoing.

27   ///

28   ///

1        **DEFENDANT'S ATTEMPTS TO DESTROY AND NEUTRALIZE**

2                                   **PLAINTIFF**

3        30.    For over a decade, plaintiff fought corruption and mismanagement at the

4   DEPARTMENT.  Plaintiff exposed theft of money from drug arrests, falsification of

5   crime statistics when the DEPARTMENT chose not to report crimes against minorities,

6   the poor and the homeless among others, and exposed the DEPARTMENT when it

7   covered up criminal conduct by its officers and deliberately hid proof of those crimes

8   from criminal defense attorneys (See News Article, Exhibit "M").

9        31.    While other officers, supervisors, Chief's of police engaged in sexual

10  misconduct and outrageous behaviors, plaintiff worked his job honorably, cooperated

11  with the State Attorney General in corruption probes of the DEPARTMENT, and was a

12  major candidate for the job of Chief when the most overt attacks against him started.

13       32.    Plaintiff had a distinguished career with the DEPARTMENT that spanned

14  almost three decades.  For approximately seven years prior to his being forced to resign in

15  January 2016, plaintiff was the lead investigator tasked with conducting the

16  DEPARTMENT's "professional standards," or internal affairs ("IA's") investigations.

17  Plaintiff also conducted professional standards investigations for defendant City on other

18  City employees.

19       33.    In March 2012, plaintiff alerted ADDINGTON, then a Captain in the

20  command chain who was competing with plaintiff for the position of Chief, of potential

21  sexual harassment of Wilkerson by Lieutenant Raman.  No internal investigation was

22  done of Lieutenant Raman.

23       34.    Ironically, the allegations then turned against plaintiff, and plaintiff, the

24  whistle blower, became the focus of mistreatment of Wilkerson.  ADDINGTON,

25  plaintiff's main competitor for the Chief's position, was assigned the IA investigation

26  against Plaintiff, and recklessly, falsely, deliberately and/or maliciously sustained

27  allegations in order to destroy plaintiff as a competitor for the desired position.

28  Perpetrator Raman was then promoted to the position of Captain over plaintiff who was

1   competing for that position as well by alleging that plaintiff was not qualified for
2   promotion at that time based on the allegations of sexual harassment.

3       35.   In March of 2012, Cassandra Wilkerson (hereinafter "Wilkerson") made a
4   claim of sexual harassment against plaintiff.  She ultimately filed suit for the alleged
5   harassment against defendant CITY, Raman and plaintiff.  Wilkerson's claims against
6   plaintiff were ultimately dismissed on summary judgment.

7       36.   Wilkerson accused Raman of the same conduct as plaintiff, but as Raman
8   was allied with ADDINGTON, defendants rejected Wilkerson's claims without
9   investigating them,  shared attorneys with Raman in their defense of the civil lawsuit and
10  then promoted Raman to Captain.

11      37.   The purge of plaintiff and promotion of conspirators ADDINGTON (to
12  Chief) and Raman (to Captain) was based in large part upon plaintiff's refusal to remain
13  quiet about the DEPARTMENT'S falsification of crime reports which categorized
14  crimes against minorities, undocumented immigrants and the homeless as "suspicious"
15  rather than as crimes.  This deliberate under reporting of crimes included the
16  classification of a deliberate stabbing leading the death of the victim as a suspicious
17  circumstance.  Only when the victim died was the act classified as a crime (of murder).

18      38.   In October of 2012, Plaintiff was coerced into signing, at the threat of an
19  undeserved adverse employment action such as termination or demotion, an agreement to
20  resign four years hence in January of 2016.   A true and correct copy of that agreement is
21  attached as Exhibit "F".  The coercion included economic coercion of a threatened
22  demotion and firing with attendant losses of approximately one million dollars in lost
23  salary and pension.   With termination as the penalty, Wade Derby would have been
24  unable to be employed at another agency, to obtain a private investigators license or even
25  a license in another field such as a real estate license.

26      39.   At all times mentioned herein, plaintiff complied with his duties and
27  obligations under that agreement, and continued working for DEPARTMENT as agreed.

28

## PLAINTIFF'S REFUSAL TO BE DISHONEST IN COURT
## PROCEEDINGS

**(Retaliation Against Plaintiff And Creation Of A Hostile Work Environment**
**Subsequent To The Signing of The Stipulated Agreement For First Amendment**
**Exercise of Speech Relating To Defendant's Misleading The Courts During** *Pitchess*
**Hearings)**

40.     During the period from 2003-2015, Plaintiff was assigned and tasked with conducting internal affairs (hereinafter "IA") investigations of fellow Pittsburg police officers as part of his administrative duties.  Beginning in 2013 until the time of his release on January 8, 2016, Plaintiff was specifically assigned by ADDINGTON, Plaintiff's superior officer, to conduct almost all professional standards investigations within the organization.  During the 2013-2016 time period, Plaintiff conducted approximately forty internal affairs investigations.

41.     In 2014, Plaintiff was assigned to conduct internal affairs investigations on officers Ingram and Sibbitt.  Plaintiff was assigned to this IA up through the period of his termination on January 8, 2016.  By June of 2014, Plaintiff had conducted substantial work on the IA, including interviews of potential witnesses.  Based on Plaintiff's early findings during the course of the investigation, a parallel criminal investigation was launched by DEPARTMENT on or about May of 2014.

42.     In June of 2014, Plaintiff requested permission to conduct the interviews of Ingram and Sibbitt and requested permission to finalize the IA.  Finalizing the IA would include documenting all aspects of the investigation formally in writing.  This internal affairs report would customarily be maintained in ADDINGTON's office where the internal affairs files were maintained.  These IA files, and the finalized report, would then be part of the officers personnel record which would be produced in camera pursuant to relevant *Pitchess* motions.

43.     In making this request, Plaintiff was following established custom and practice relating to an IA investigation.  Plaintiff made multiple requests to complete the

1   interviews of Sibbitt and Ingram, to finalize his report, and/or be allowed to write a
2   summary of his findings, including a summary of his interviews of officers Sibbitt and
3   Ingram.

4        44.    In June 2014, Plaintiff met with employees of defendant CITY.  At these
5   meetings, Plaintiff again requested permission to document his findings on the Ingram
6   and Sibbitt IA for court *Pitchess* compliance purposes.  Plaintiff was repeatedly ordered
7   by ADDINGTON not to complete the finalized written IA report.

8        45.    Plaintiff's requests to document the IA findings were denied during
9   relevant time periods of court hearings on *Pitchess* motions.  Plaintiff is informed and
10   believes that the existence of this ongoing internal affairs investigation and the evidence
11   obtained in the process were not disclosed at *Pitchess* hearings occurring between May
12   14, 2014 and  October 6, 2015.

13        46.    Prior to the first *Pitchess* hearing in May of 2014, Plaintiff met with
14   defendant ADDINGTON and Cpt. Raman regarding the upcoming *Pitchess* hearing.
15   Present at this meeting was Joyce Lowe, the Custodian of Records.  Plaintiff was ordered
16   to attend the *Pitchess* hearing.  At this meeting, Plaintiff was ordered by ADDINGTON
17   not to take his IA files to the court, except for one document showing that officer Ingram
18   had been placed on administrative leave.

19        47.    Plaintiff requested permission to take the entire IA file to the Court and to
20   show the City Attorney the entire IA file as was custom and practice, and to comply with
21   the law.  Plaintiff put everyone in that meeting on notice that he fully intended to comply
22   with the law and that if he was called to testify *in camera* he would disclose to the Court
23   any factual data the Court deemed necessary.   Subsequent to that meeting, and prior to
24   the first *Pitchess* hearing, Plaintiff complained both to the Custodian of Records, Joyce
25   Lowe and to defendant CITY's attorneys about the proposed limited *Pitchess* disclosure
26   ordered by ADDINGTON.

27        48.    In May 2014, at the time of the first scheduled *Pitchess* hearing, Plaintiff
28   met with attorneys for defendant CITY and again complained about ADDINGTON's

1   order for limited disclosure.  Plaintiff informed defendant CITY's attorney of the contents

2   of his IA investigation and file.  Plaintiff informed the attorney that he would not willfully

3   withhold any information during this legal process as he was ordered to by

4   ADDINGTON.

5         49.    The *Pitchess* hearing did not occur that afternoon, but instead was

6   continued to a later date.  That afternoon, after the hearing had been continued, Plaintiff

7   again informed custodian Lowe that he would not withhold information ordered to be

8   disclosed by the Court.

9         50.    Plaintiff was expecting to appear at the rescheduled *Pitchess* hearing, but

10  instead, the hearing was attended by employees of defendant CITY as the hearing had

11  been put off to a date when Plaintiff was known to be out on vacation.

12        51.    Plaintiff learned upon his return from vacation by employees of defendant

13  CITY that his investigation and the contents of his IA file were not disclosed at the

14  *Pitchess* hearing which occurred without him being present.

15        52.    Concerned about this irregularity, Plaintiff communicated with

16  ADDINGTON, this time by way of memorandum, requesting permission to draft a

17  summary of his IA which would be available to the Court on review of a *Pitchess* motion.

18  A true and correct copy of Plaintiff's memorandum to ADDINGTON (erroneously dated

19  September 26, 2016) is attached as Exhibit "I".)  Plaintiff was again ordered by

20  ADDINGTON not to draft such a summary.

21        53.    In the midst of these events, toward the end of 2014, plaintiff again took the

22  captain's promotional examination.  This time, instead of placing as the top candidate as

23  he had when he took the examination in 2011, plaintiff was told he was not "qualified"

24  for the promotion based on the prior sexual harassment allegations.  The designation as

25  unqualifed was contrary to the 2012 contract provision stating that no further discipline

26  would be considered or taken against plaintiff as a result of those allegations, and was

27  taken in retaliation for plaintiff's speaking out about the Sibbitt and Ingram IA's.

28        54.    On or about March 3, 2015, Plaintiff learned that once again the Contra

1    Costa County courts had been mis-informed regarding the existence and contents of the

2    Ingram/Sibbitt IA investigation.  Plaintiff again advised employees of defendant CITY

3    and DEPARTMENT of the need to disclose such information.  The incident was

4    described by defendants as a mistake.

5        55.    Plaintiff asked ADDINGTON for permission to appear in Court to correct

6    the record and inform the court of the IA investigation and contents.  ADDINGTON

7    refused to give Plaintiff permission to take the requested action.

8        56.    In or around March 15, 2015, ADDINGTON told Plaintiff to consider the

9    IA of officers Ingram and Sibbitt closed.   Defendants then caused the IA number which

10   had been assigned to the case deleted as having been "issued in error."

11       57.    On or about October 6, 2015, Plaintiff appeared in Court and advised the

12   court of the fact that IA information and files had previously been kept from it.

13       58.    Plaintiff's whistleblowing activities recently resulted in the setting aside of

14   fifteen (15) convictions that were wrongfully obtained by the illegal actions of the

15   defendants and ADDINGTON's withholding *Brady* material during *Pitchess* hearings.

16   (Exhibit M).

17       59.    Following plaintiff's appearance in the Contra Costa County Superior Court

18   on October 6, 2015, Plaintiff received a letter from ADDINGTON insisting that

19   defendants had complied with their *Brady* obligations at the *People v. Easter Pitchess*

20   hearing, and insisting that defendant CITY and the DEPARTMENT and its employees

21   were aware of *Pitchess* requirements and procedures.  Attached as Exhibit "J" is a true

22   and correct letter dated October 6, 2015 Plaintiff received from ADDINGTON trying to

23   justify to Plaintiff why the IA information had not been disclosed to the courts.   Further

24   ADDINGTON claimed that he was advised to withhold the information by the City

25   Attorney of Pittsburg.

26       60.    Prior to speaking out about defendant's *Pitchess* and *Brady* violations, and

27   during the negotiation of the 2012 agreement,  plaintiff was advised by ADDINGTON

28   that if plaintiff continued to work at DEPARTMENT, plaintiff would have the

WADE DERBY v. CITY OF PITTSBURG, et al.                    Case No. 3:16-cv-05469-SI
SECOND AMENDED COMPLAINT                      12

1    opportunity to renegotiate the resignation depending on the outcome of the Wilkerson

2    allegations.  Plaintiff was further advised that he could continue working per diem

3    following any retirement from the DEPARTMENT as was standard policy, practice and

4    procedure for retirees.

5        61.    The DEPARTMENT were authorized and did in fact negotiate with

6    Plaintiff to continue in his employment with DEPARTMENT.  Attached as Exhibit "G" is

7    a true and correct copy of a proposed "First Amendment to the Settlement Agreement

8    And Release" prepared by defendant CITY.

9        62.    After plaintiff's disclosure to the Contra Costa Superior Court on October 6,

10   2015 about defendant's withholding of *Brady* material and mishandling of *Pitchess*

11   motions, defendants ceased negotiations in retaliation against plaintiff because of his

12   ongoing whistle blowing activities.

13       63.  On October 19, 2015, Plaintiff received a letter from ADDINGTON informing

14   him that defendants were cutting off negotiations for Plaintiff's continued employment

15   with the DEPARTMENT and insisting that his previously stipulated resignation would be

16   enforced.  A true and correct copy of ADDINGTON's October 19, 2016 letter to Plaintiff

17   is attached as Exhibit "K".)

18       64.    In approximately November-December of 2015, ADDINGTON informed

19   Plaintiff that he was cutting off all employment negotiations and would not honor the

20   promises made to plaintiff specifically or standard DEPARTMENT policy and procedure

21   generally.

22       65.    Prior to plaintiff's whistleblowing testimony in the Contra Costa County

23   Superior Court in October 2015, ADDINGTON had indicated that plaintiff would qualify

24   for several types of continued employment with the DEPARTMENT following any

25   retirement, including per diem work.  Defendant ADDINGTON had also informed

26   plaintiff that he could continue working part-time as a contract worker doing background

27   and internal affairs investigations for defendant DEPARTMENT. These representations

28   were consistent with the DEPARTMENT's pattern and practice to allow retired officers

1   to become so employed.

2         66.    Prior to plaintiff's whistle blowing testimony in the Contra Costa County

3   Superior Court in October 2015, plaintiff had requested to maintain his credentials by

4   being a reserve volunteer police officer for the DEPARTMENT.  ADDINGTON had

5   authority to authorize, and had agreed to allow plaintiff to do so.

6         67.    Prior to plaintiff's whistle blowing testimony in the Contra Costa County

7   Superior Court in October 2015, ADDINGTON had asked plaintiff if he would be willing

8   to work patrol as acting Captain in order to provide leadership to field officers and engage

9   in retraining related to their duties.

10        68.    After plaintiff's whistle blowing testimony in the Contra Costa County

11   Superior Court in October 2015, ADDINGTON informed plaintiff that defendant CITY

12   denied him the opportunity to serve as acting captain in order to preclude plaintiff from

13   obtaining what amounted to a promotion.

14        69.  In October-November of 2015, and again in January of 2016, ADDINGTON

15   informed plaintiff that he would not be allowed to work per diem following his

16   retirement.  Plaintiff was also informed that he would not be allowed to work as a

17   contract employee, and that ADDINGTON was foreclosing any potential work with the

18   DEPARTMENT whether it be per diem, contractual, or reserve employment.

19        70.    At the time he entered into the 2012 agreement, plaintiff was aware of, and

20   induced to rely upon, a standard policy and practice in the DEPARTMENT that if IA

21   claims were proven false, a prior negative IA finding would be set aside.   Such a policy

22   was not followed in plaintiff's case even though plaintiff's own allegations in his defense

23   were adopted and used by defendants to defend the civil lawsuit filed by Wilkerson, and

24   even though plaintiff's accuser later admitted to committing perjury, admitted that many

25   of her allegations were written for her by an attorney and were untrue when she claimed

26   they were true (under penalty of perjury), and her claims against plaintiff were dismissed.

27        71.    At all times mentioned herein, plaintiff was aware of, and induced to rely

28   upon, a standard policy and practice in the DEPARTMENT wherein IA findings would

1  be purged from his personnel file three years after they were sustained.

2      72.     After plaintiff's whistle blowing testimony in the Contra Costa County

3  Superior Court in October 2015, ADDINGTON informed plaintiff that defendant CITY

4  and the DEPARTMENT would not be purging plaintiff's IA file in contravention of

5  defendant's own policies and procedures.  Plaintiff is informed and believes that

6  defendants continue to maintain the unpurged IA file.

7      73.     Defendants actions constituted a breach of the 2012 agreement, and

8  disparate and unfair treatment of plaintiff were part of an unknown and undisclosed

9  ongoing unlawful civil and/or criminal conspiracy.   As part of that conspiracy,

10  defendants negligently, recklessly, and/or intentionally sought to undermine and deter

11  plaintiff in terms of both his whistle blowing activities and his professional aspirations

12  and competition with defendants for key DEPARTMENT employment positions.  Said

13  actions were also tantamount to an attempt to bribe or threaten Wade Derby into silent

14  acquiesence of illegal and unethical activities.  As long as Wade Derby ignored criminal

15  and unlawful conduct, he would receive the benefits; if he stood for the truth, he would be

16  and was, punished.

17      74.     ADDINGTON, now the new Chief, continued to harass and tried to destroy

18  plaintiff's career and further employment advancement as plaintiff subsequently revealed

19  ADDINGTON's civil and/or criminal misconduct by misleading the Courts, and by

20  deliberately hiding exculpatory evidence from criminal defense attorneys.

21      75.     The disparate, retaliatory and unfair treatment of plaintiff was part of a

22  continuing pattern of harassment that persisted until plaintiff left the DEPARTMENT in

23  January of 2016.  Defendants actions created and sustained a hostile work environment.

24  The adverse employment actions against plaintiff after plaintiff's signing of the 2012

25  agreement were designed to discourage, suppress, and punish plaintiff's whistle blowing

26  activities.  In addition to the actions listed in 1-74 above, plaintiff's continued

27  harassment, punishment and discipline included, but were not limited to, being excluded

28  from DEPARTMENT photographs so as to lessen his recognition, standing in the

1  DEPARTMENT, being excluded from areas of employment, being given a gag order,

2  offensive sticker's being put on his door and desk, not being allowed to work per diem

3  after retirement like other retirees as promised, a pattern of ongoing threats of being fired,

4  being left out of command staff meetings, and being assigning internal affairs

5  investigations in disciplinary cases which defendants knew would make plaintiff a target

6  for complaints by disgruntled employees who were being investigated, being excluded

7  from City Council meetings attended by the rest of command staff, being called a pariah,

8  and being mocked by his Captain, all of which contributed to plaintiff's being passed up

9  for promotion to Captain, and which lessened his chances of promotion and continued

10  employment with the DEPARTMENT.

11      76.    The 2012 agreement did not preclude any of the above-referenced

12  employment options or benefits, and did not preclude plaintiff from advancing and being

13  promoted within the DEPARTMENT. The agreement also did not preclude plaintiff from

14  negotiating to continue working for defendant DEPARTMENT, and did not preclude

15  plaintiff from being hired as a contract employee, as a per diem employee, or as a reserve

16  officer following any retirement from the department. The withholding of these

17  employment opportunities and benefits was retaliatory and not contractually bargained

18  for.

19      77.    Moreover, plaintiff did not waive, under the terms of the 2012 agreement,

20  any causes of action accruing after the date of its execution by the parties (para. 9 and 10).

21      78.    Defendants also retaliated and caused Plaintiff to be terminated from and

22  denied other employment opportunities by falsely reporting in his personnel file that

23  Plaintiff's reason for separation was dismissal instead of retirement. Attached as Exhibit

24  "L" is a true and correct copy of the January 15, 2016 Personnel Action Form Plaintiff

25  received stating Plaintiff had been dismissed from DEPARTMENT. Defendants were

26  aware that Plaintiff was employed by that time as a contract employee with Stanislaus

27  County and was seeking a position as a Stanislaus deputy sheriff. Plaintiff learned of

28  these actions when he was denied the sought after employment based on the wrongful

1   reporting of his retirement. This also illustrates the real and foreseeable consequences of

2   the threats made initially by the DEPARTMENT when it wrongfully sustained the IA

3   investigation against Derby and stated their intention to terminate him. The threats were

4   real and the consequences are demonstrated by the refusal of Stanislaus County to hire

5   Derby.

6         79.     Defendants knew and understood the adverse consequences of a personnel

7   file designation of dismissal versus retirement on Plaintiff's ability to maintain and obtain

8   employment in the law enforcement field. Defendants wrongful designation of the cause

9   of Plaintiff's separation from their employment caused Plaintiff to be terminated from his

10   teaching position at Stanislaus County Sheriff's office and also caused Plaintiff to be

11   removed from the background process to be a Stanislaus deputy sheriff.

12         80.     Neither the continued employment or additional employment opportunities

13   discussed above, any promotion, or other rights or benefits were precluded by the 2012

14   stipulated agreement. The requested employment would have been permitted but for the

15   retaliation by defendants.

16         81.     By its express terms, the 2012 stipulated agreement did not limit plaintiff's

17   rights, or release any claims or causes of action, in any events occurring after the date of

18   its execution (para. 9 and 10), and therefore does not preclude any of the causes of action

19   raised herein.

20         82.     In addition, any release entered into by plaintiff in the 2012 stipulated

21   agreement, and any release contained therein, is unenforceable because plaintiff's

22   agreement was the product of fraud, duress, menace, mistake and undue influence.

23         83.     The conduct engaged in by defendants prior to and subsequent to the signing

24   of the stipulated agreement was engaged in by defendants to discourage Plaintiff's

25   constitutionally protected whistle blowing activities. Defendants conduct was of the type

26   that would chill a person of ordinary firmness from continuing to engage in the protected

27   activity, discouraged whistle blowing by Plaintiff and other employees of the

28   DEPARTMENT and defendant CITY, and in fact jeopardized that public policy.

1       84.    Plaintiff was coerced into signing the stipulated settlement between Plaintiff

2  and defendants regarding the IA charges.  Prior to the signing of that agreement,

3  defendants, and each of them, failed to disclose that their actions were part of a larger

4  civil and/or criminal conspiracy by defendants to silence Plaintiff and discredit him for

5  whistle blowing activities predating the signing of the agreement.  Defendants failed to

6  inform, advice, or reveal at any time prior to execution of the agreement the material fact

7  that they intended to continue to engage in illegal conduct, including misleading the

8  Courts, following the execution of the agreement.

9       85.    Defendants further breached the agreement by continuing to harass and

10  retaliate against Plaintiff following the execution of the agreement, creating and

11  sustaining a hostile work environment, and by taking adverse employment actions against

12  Plaintiff all in contravention of the promises made to plaintiff, and the covenant of good

13  faith and fair dealing.

14       86.    The IA charges, fraudulent findings, and draconian penalties which were

15  used to coerce plaintiff's execution of the stipulated agreement were in substantial part

16  unfairly investigated, contrived, fabricated and exploited to silence Plaintiff.

17       87.    The settlement did not serve a legitimate public purpose, and was made in

18  violation of public policy, as evidenced by the fact that the "retirement" was not to take

19  place until four years hence and defendants used the threat of discipline to extract an

20  agreement from plaintiff against petitioning for redress for whistle blowing activities

21  preceding the signing of the agreement as a condition of the agreement.

22       88.    Defendant CITY and ADDINGTON knew that plaintiff was in an unequal

23  bargaining position, had no free choice of action, and that his assent was not voluntarily

24  and freely given.  Their tactics were overbearing, unlawful, and defendants knew or

25  should have known that under those circumstances defendants, Plaintiff would be forced

26  to sign the agreement.

27       89.    The conduct and threats include, but are not limited to, demotion and the

28  following:

1      A.     The IA findings and threat of termination would have cost Plaintiff in

2  excess of $ 1,000,000 in lost wages and pension benefits.

3      B.     The time, effort and expense of fighting the IA in the courts had to be borne

4  individually by Plaintiff as he had to pay for all expenses out of pocket and Plaintiff could

5  not effectively afford to litigate.

6      C.     At the time he entered into the agreement, defendants knew and failed to

7  disclose to Plaintiff that the IA investigation and its conclusions were part of a civil

8  and/or criminal conspiracy to undermine Plaintiff in terms of both his whistle blowing

9  and professional aspirations, and to further the ambitions of ADDINGTON in securing

10  the civil service position being competed for by Plaintiff.

11      D.     At the time he entered into the agreement, and all relevant periods thereafter,

12  Plaintiff was led to believe and justifiably relied on defendants following their own

13  standard policy and practices in the DEPARTMENT of setting aside any negative IA

14  findings that were subsequently proven false.   Such a policy was not followed in

15  Plaintiff's case even though Plaintiff's own allegations in his defense were adopted and

16  successfully used by defendant's to defend against the civil lawsuit filed by Wilkerson.

17      E.     At the time he entered into the agreement, and all relevant periods thereafter,

18  plaintiff was informed and believed that defendants would comply with their standard

19  policy and practive of purging IA findings after three years.

20      F.     Defendants knew that the allegations were untrue but sustained the findings

21  in order to punish Plaintiff for his previous conduct as a whistle blower and to discredit

22  him.

23      G.     The allegations were sustained against Plaintiff so that the person

24  conducting the investigation, ADDINGTON, could use those findings against Plaintiff as

25  they both competed for the role of Chief of Police.  The IA finding was political and not

26  fact based.  This was an abuse of the IA process and was done with the specific intention

27  of punishing Plaintiff's First Amendment protected conduct and speech made prior to the

28  point of signing the 2012 agreement.

1      H.     Defendants, and each of them, knew that Plaintiff was in an unequal

2  bargaining position and would be required to sign the agreement. Defendants at all times

3  knew that if plaintiff were demoted and then fired, he would have lost of a million dollars

4  in future wages and retirement benefits, and used this fact to overcome plaintiff's will.

5      90.    After a negative IA outcome, Plaintiff was told that he would be terminated

6  and demoted.  He was offered a few day suspension if he agreed to retire four years

7  hence.

8      91.    Plaintiff's IA findings were not reversed even though his accuser later

9  admitted to committing perjury, admitted that many of her allegations were written for her

10  by an attorney and were untrue when she claimed they were true (under penalty of

11  perjury).  This arose because the alleged victim sued Plaintiff, ADDINGTON, and

12  another Pittsburg Police officer.  The very defenses that Plaintiff raised at his IA hearing

13  which ADDINGTON personally rejected were then used by ADDINGTON in his own

14  defense.

15      92.    Plaintiff's IA findings were not reversed even though another officer,

16  equally and likewise accused by Ms. Wilkerson, was never investigated by the

17  DEPARTMENT, never had IA charges filed, and was soon promoted to Captain.

18      93.    Plaintiff's IA findings were not purged three years after they were sustained

19  in accordance with standard custom and practice.

20      94.    The sustaining of the unfounded IA and the coercion inherent in the

21  settlement agreement was a violation of the public trust as the allegations, if true,

22  warranted serious discipline that would not warrant letting Plaintiff continue to be

23  employed, particularly as an IA investigator, and if untrue, warranted a finding of

24  unsubstantiated.  The agreement was entered into solely to protect the criminal and civil

25  wrongdoing of defendants and each of them, to silence plaintiff, and not for any

26  legitimate public purpose.

27      95.    The agreement itself is unenforceable because of these substantial

28  violations.

1        96.    Defendants and each of them failed to honor and materially breached the

2    agreement after it was signed, and deprived plaintiff of material benefits of the agreement

3    following its execution.  Because of plaintiff's ongoing whistle blowing activities

4    subsequent to the signing of the 2012 agreement, defendants created and sustained the

5    hostile work environment, continued to harass, punish and discipline Plaintiff, and engage

6    in the adverse employment actions discussed infra.

7        97.    Plaintiff's whistle blowing activities were the cause of his being targeted and

8    ultimately dismissed.  They were also the cause of defendant's refusal to reinstate

9    Plaintiff, or allow Plaintiff to be employed on a per diem basis following the forced

10    retirement, be hired as a contract employee, or continue on as a reserve officer.

11        98.    There was no overriding justification for Plaintiff's dismissal other than his

12    protected whistle blowing activities.

13        99.    Plaintiff was deceived by defendant's misrepresentation, false statements,

14    concealment and non disclosure with regards to Plaintiff's continued employment with

15    DEPARTMENT, including, but not limited to, the DEPARTMENT's adherence to its

16    policies and procedures with regards to clearing unfounded IA complaints, the possibility

17    of a renegotiated contract, continued per diem employment following retirement, and

18    other the facts referenced infra.

19        100.    The 2012 stipulated agreement forbade defendants from taking or

20    considering any further discipline against defendant (para. 8), but defendants continued to

21    discipline plaintiff until his resignation in January 2016, and denied him promotion based

22    on those allegations in contravention of the agreement thus depriving plaintiff of the

23    benefits of the bargain.  Plaintiff was told by ADDINGTON that if he signed the

24    agreement there would be no further sanctions and that he would have the opportunity to

25    promote and remain as a police officer.  In fact, the plan by defendants was to obtain a

26    waiver and then drive plaintiff out of the DEPARTMENT thereby denying plaintiff of the

27    benefits of the agreement.

28        101.    Defendant's further denied plaintiff the benefit of his bargain (no demotion

1  - para. 5) by resuming plaintiff's employment under conditions that constituted a defacto

2  demotion in terms of job duties, working conditions, the seizure of his service weapon,

3  his demotion to trivial duties, his loss of a company vehicle, his isolation from other

4  officers, the deprivation of overtime and other conditions that materially denigrated his

5  employment as a police Lieutenant in unbargained for ways.

6       102.    Defendant's further denied plaintiff the benefit of his bargain (no demotion

7  - para. 5) by resuming plaintiff's employment under conditions which made him a pariah

8  including barring him from police social functions, staff meetings, funerals in order to

9  isolate him, create a hostile work environment, and contribute to and ensure his lack of

10 future promotion.

11      103.    Defendant's further denied plaintiff the benefit of his bargain (no

12 demotion - para. 5) by falsely and deliberately sabotaging plaintiff's attempts to advance

13 to Captain by providing false scoring of personal interviews.

14      104.    Defendants had knowledge of the falsity of those representations at the

15 time they were made, and knew or should have known that plaintiff's agreement was

16 produced by those false representations.

17                          **FIRST COUNT**

18                    **VIOLATION OF CIVIL RIGHTS**

19              **(42 U.S.C. § 1983 against defendant CITY)**

20      105.    Plaintiff hereby incorporates by reference as though fully set forth herein

21 paragraphs 1 through 104.

22      106.    Plaintiff's whistleblowing activities in speaking out about defendant's

23 withholding of evidence to the Contra Costa County Superior Court was an exercise of

24 plaintiff's First Amendment rights, and his notification to defendants, their employees,

25 their attorneys, and his supervisors regarding *Brady* violations occurring at *Pitchess*

26 hearings, and to inform the Courts of such violations, was constitutionally protected

27 activity.

28      107.    Defendant's adverse actions complained of were taken in response to

WADE DERBY v. CITY OF PITTSBURG, et al.                    Case No. 3:16-cv-05469-SI
SECOND AMENDED COMPLAINT                       22

1   plaintiff's whistleblowing activities and were taken for the purpose of stifling plaintiff

2   and others from speaking out.

3        108.    Defendant's adverse actions against plaintiff, including, but not limited to,

4   the cutting off of negotiations for continued employment, the failure to purge his IA file,

5   being denied the position of acting Captain, being denied per diem work, having his

6   retirement wrongfully classified as a dismissal, and being denied the opportunity to serve

7   as a reserve officer, were all adverse actions that would chill a person of ordinary

8   firmness from continuing to engage in the protected activity, and were taken for the

9   purpose of chilling plaintiff's whistleblowing activities.

10       109.    There is a substantial causal relationship between the adverse actions and

11   plaintiff's constitutionally protected activity.

12       110.    These wrongs done to plaintiff were done under color of state and local

13   law and authority.

14       111.    The above-alleged conduct by defendants was unwelcomed, directed

15   towards Plaintiff, and was part of an ongoing and continuing pattern of silencing the

16   whistle blowing activities of Plaintiff, and driving him out as an officer and employee of

17   DEPARTMENT.

18       112.    The above-alleged conduct was orchestrated by members of the

19   DEPARTMENT and defendant CITY, public entities and state actors.

20       113.    By virtue of the conduct set forth herein, defendants individually and in

21   their managerial capacity on behalf of DEPARTMENT made a determination to retaliate

22   against the Plaintiff by refusing to renew his employment contract based on Plaintiffs

23   exercise of protected speech, and by subjecting Plaintiff to the acts of retaliation and

24   adverse employment consequences as described throughout the Complaint herein. By

25   these acts, defendants have deprived Plaintiff of substantive due process rights secured by

26   the Fourteenth Amendment of the United States Constitution in violation of 42 U.S.C. §

27   1983.

28       114.    At all times stated herein, defendants knew or reasonably should have

1    known that their actions and/or failure to act violated Plaintiff's First Amendment rights,

2    his procedural, substantive, and due process rights, Plaintiff's right to be free from

3    retaliation for the exercise of those rights, and would impair Plaintiff's right to

4    employment and future employment.

5        115.   As a further direct and proximate result of the violation of Plaintiffs civil

6    rights, Plaintiff has and will continue to suffer severe mental anguish and emotional

7    distress in the form of anger, anxiety, embarrassment, humiliation, damage to his

8    professional reputation, and other incidental expenses; suffer loss of earnings and other

9    employment benefits and job opportunities. Plaintiff is thereby entitled to general and

10   compensatory damages in an amount according to proof at trial.

11       116.   The conduct of defendants and each of them was "arbitrary, or conscience

12   shocking, in a constitutional sense."   *Collins v. City of Harker Heights*, Texas, 503 U.S.

13   115, 128 (1992).

14       117.   As a result of defendants' retaliatory and discriminatory conduct, Plaintiff

15   has been compelled to retain legal counsel, and is entitled to reasonable attorneys' fees

16   and costs of suit, pursuant to 42 USC§ 1983, and 42 USC §1988.

17                          **SECOND COUNT**

18                           **RETALIATION**

19              **(Labor Code §1102.5 against Defendant CITY)**

20       118.   Plaintiff hereby re-alleges and incorporates by reference Paragraph 1

21   through 117, inclusive, as though fully set forth herein.

22       119.   At all times mentioned herein, California Labor Code §1102.5 was in

23   effect, and binding on Defendants.  California Labor Code §1102.5 provides that an

24   employer may not make, adopt, or enforce any rule, regulation, or policy preventing an

25   employee from disclosing information to a government or law enforcement agency, where

26   the employee has reasonable cause to believe that the information discloses a violation of

27   state or federal statute, or a violation or noncompliance with a state or federal rule or

28   regulation.

1       120.   California Labor Code § 1102.5 further provides that an employer may not

2  retaliate against an employee for disclosing information to a government or law

3  enforcement agency, where the employee has reasonable cause to believe that the

4  information discloses a violation of state or federal statute, or a violation or

5  noncompliance with a state or federal rule or regulation.

6       121.   Plaintiff, as stated throughout this Complaint, repeatedly communicated

7  improper government activities pursuant to his duties as a Lieutenant internally to

8  Defendants.  When Plaintiffs disclosures were ignored by ADDINGTON, Plaintiff

9  reported this conduct to defendant CITY, other employees, and ultimately to the Contra

10  Costa County Superior Court.  Plaintiff has engaged in protected activities under Labor

11  Code §1102.5 by reporting these events.

12      122.   As a direct and proximate result of engaging in the aforementioned

13  protected activities, the reporting of corruption and refusal to engage in unlawful activity

14  as alleged herein, Plaintiff has been subjected to a hostile work environment, and a

15  continuous and ongoing course of adverse employment actions, which actions include

16  plaintiff's initial disqualification for promotion to Captain in late 2014, and failure to be

17  promoted to acting Captain after plaintiff's October 6, 2015, and the other adverse actions

18  as set forth above following plaintiff's October 6, 2015 testimony, up to and including the

19  wrongful reporting of his retirement after January 2016.

20      123.  Said actions are unlawful, and retaliatory in violation of Labor Code §

21  1102.5, have resulted in damage and injury to Plaintiff, and Plaintiff is entitled to all

22  available categories of damages.

23      124.   Plaintiff's government claim was timely filed in March 2016.

24      125.   By reason of the conduct of Defendants and their directors, executives,

25  officers, employees and agents, Plaintiff has necessarily retained attorneys to prosecute

26  the within action.  Plaintiff is therefore entitled to reasonable attorney's fees and litigation

27  expenses, including expert witness fees and costs, incurred in bringing the within action.

28      126.   In light of Defendants' wrongful conduct against Plaintiff, Plaintiff seeks an

1   award of damages.

2       127.   The amount of the Plaintiffs' damages are not yet completely known, but

3   exceed the minimum jurisdiction of this court and will be amended at the time of trial

4   according to proof.

5                                 **THIRD COUNT**

6                                 **RETALIATION**

7                    **(California Government Code §12940 et seq.**

8                            **against defendant CITY**

9       128.   Plaintiff hereby re-alleges and incorporates by reference Paragraphs 1

10  through 127, inclusive, of this Complaint as though set forth in full.

11      129.   At all times mentioned herein, California Government Code §12940 was in

12  effect, and binding on Defendants. California Government Code §53298, subd. (a)

13  provides that it is unlawful, unless based on a bona fide occupational qualification, "for

14  an employer, because of the race, religious creed, color, national origin, ancestry, physical

15  disability, mental disability, medical condition, genetic information, marital status, sex,

16  gender, gender identity, gender expression, age, sexual orientation, or military and veteran

17  status of any person, to refuse to hire or employ the person or to refuse to select the

18  person for a training program leading to employment, or to bar or to discharge the person

19  from employment or from a training program leading to employment, or to discriminate

20  against the person in compensation or in terms, conditions, or privileges of employment."

21      130.   Further, pursuant to California Government Code §12940, subd. (h), it is

22  unlawful "for any employer, labor organization, employment agency, or person to

23  discharge, expel, or otherwise discriminate against any person because the person has

24  opposed any practices forbidden under this part or because the person has filed a

25  complaint, testified, or assisted in any proceeding under this part."

26      131.   Plaintiff repeatedly communicated both verbally and in writing to his

27  superiors his concerns about gross mismanagement, unlawful and unethical conduct in the

28  DEPARTMENT, including sex discrimination in employment and hiring practices,

1   instances of ongoing sexual and other harassment toward female officers, and in relation

2   to Defendant's handling of the "Suspicious Circumstances" cases, as well as its handling

3   of the *Pitchess* hearings.

4       132.   Following plaintiff's October 6, 2015 disclosure of defendant's

5   wrongdoing, ADDINGTON ultimately sent Plaintiff written communication indicating

6   defendant's refusal to further negotiate Plaintiff's continued employment.  They further

7   denied plaintiff the opportunity to work on a per diem basis following his retirement in

8   2016, to continue working as a contract employee, or as a reserve officer, failed to

9   promote plaintiff to the position of acting Captain, and caused him to lose employment by

10  mis-classifying his retirement as dismissal.

11      133.   Defendant's actions were causally connected to plaintiff's whistle blowing

12  activities, and as such violate California Government Code §12940 as reprisal to

13  Plaintiff's whistle blowing activities.

14      134.   Plaintiff was damaged by defendant's wrongful actions in an amount to be

15  determined at trial.

16                          **FOURTH COUNT**

17                       **BREACH OF CONTRACT**

18                     **(Against Defendant CITY)**

19      135.   Plaintiff hereby incorporates by reference as though fully set forth herein

20  paragraphs 1 through 134.

21      136.   Plaintiff was employed for a term of years pursuant to the terms of his 2012

22  stipulated agreement with defendant CITY.

23      137.   As part of the 2012 agreement, defendants agreed that it would not demote

24  plaintiff (para. 5), and that no further discipline would be considered or taken against

25  plaintiff (para. 8).  The agreement also left open the possibility for future promotion and

26  other forms of future employment, inasmuch as the agreement did not require, or seek

27  plaintiff's agreement, to forego any future promotions or employment.

28      138.   Plaintiff has fully performed all of the terms and conditions required of

1   Plaintiff by the terms of the agreement, except those waived, excused, or prevented by

2   defendant CITY, and defendant's performance has not been excused.   As part of that

3   performance, plaintiff forewent seeking lateral employment as a deputy in other law

4   enforcement agencies until November-December of 2015.

5        139.   Between the time of execution, and plaintiff's retirement in January of

6   2016, defendant breached, as set forth above, the terms of the contract.

7        140.   Plaintiff suffered damages as a result of defendant's breach to be proven at

8   trial.

9        141.   The defendant's breach was a substantial factor in causing plaintiff's

10  harm.

11                              **FIFTH COUNT**

12                      **BREACH OF THE COVENANT**

13                    **OF GOOD FAITH AND FAIR DEALING**

14                       **(Against Defendant CITY)**

15       142.   Plaintiff hereby incorporates by reference as though fully set forth herein

16  paragraphs 1 through 141.

17       143.   Plaintiff's 2012 stipulated agreement with defendant CITY contained an

18  implied covenant of good faith and fair dealing, pursuant to which defendant agreed to

19  deal in good faith and fairly with Plaintiff, and to avoid any act that would deprive

20  Plaintiff of the benefits of the agreement.

21       144.   Defendants fair and equitable treatment of plaintiff if he continued

22  working for the DEPARTMENT for the four years specified in the stipulated agreement

23  was an implied term of the agreement.

24       145.   Notwithstanding this implied covenant, by engaging in the acts stated in

25  this complaint, defendant CITY breached the implied covenant of good faith and fair

26  dealing agreement.

27       146.   Plaintiff has fully performed all of the terms and conditions required of

28  Plaintiff by the terms of the agreement, except those waived, excused, or prevented by

1 │ defendant CITY, and defendant's performance has not been excused.

2 │      147.    The actions of defendant CITY following the signing of the 2012

3 │ agreement, as set forth infra, constitute a breach of the implied covenant of good faith and

4 │ fair dealing.

5 │      149.    As a direct and proximate result of Defendant CITY's breach of the

6 │ implied covenant of good faith and fair dealing, and Plaintiff has suffered damages in an

7 │ amount to be proven at trial.

8 │      WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them,

9 │ as follows:

10 │ 1.    General and specific damages in an amount according to proof;

11 │ 2.    Attorney's fees and costs, as provided by prevailing party attorney's fees

12 │ provisions, and by any other statutory or other entitlement.

13 │ 3.    Injunctive relief in the form of an order that the Defendants reinstate Plaintiff

14 │ under the terms and conditions set forth herein.

15 │ 4.    Punitive damages as allowed under law.

16 │ 5.    Such other relief or orders as the Court may deem just and proper.

17 │ **DEMAND FOR JURY TRIAL**

18 │      Plaintiff hereby demands trial by jury in this action of all claims asserted against

19 │ all Defendants as permitted by law.

20 │

21 │ Dated: March 9, 2017           _____/s/_____

22 │                   DANIEL A. HOROWITZ, attorney for

Plaintiff

23 │

24 │

25 │

26 │

27 │

28 │

# EXHIBIT 2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WADE DERBY, an individual,           )

                                     )

            Plaintiff,               )

                                     )

    vs.                              ) No. 16-cv-05469-SI

                                     )

CITY OF PITTSBURG; BRIAN             )

ADDINGTON and DOES 1-10,             )

inclusive,                           )

                                     )

            Defendants.              )

                                     )

DEPOSITION OF BRIAN ADDINGTON

(Confidential Pages contained in separate booklet)

Friday, March 2, 2018

REPORTED BY:  CANDI LEON, CSR NO. 6364

1      BE IT REMEMBERED that pursuant to Notice, and on

2   Friday, the 2nd day of March 2018, commencing at the hour

3   of 8:41 a.m. thereof, at the Offices of PROFESSIONAL

4   REPORTING SERVICES, 1600 South Main Street, Suite 125,

5   Walnut Creek, California, before me, CANDI LEON, a

6   Certified Shorthand Reporter in and for the State of

7   California, there personally appeared,

8                    BRIAN ADDINGTON,

9   called as a witness herein, who, being by me first duly

10  sworn, was examined and testified as is hereinafter set

11  forth.

12                    ---oOo---

13

14             A P P E A R A N C E S

15

16      LAW OFFICE OF DANIEL A. HOROWITZ, P.O. Box 1547,

17  Lafayette, California 94549, represented by DANIEL A.

18  HOROWITZ, Attorney at Law, appeared as counsel on behalf

19  of the Plaintiff Wade Derby.

20      LAW OFFICE OF JACKSON LEWIS P.C., 50 California

21  Street, Ninth Floor, San Francisco, California 94702,

22  represented by CONOR DALE, Attorney at Law, appeared as

23  counsel on behalf of the Defendants.

24                    ---oOo---

25
                         2

1                    INDEX OF EXAMINATION

2                                                    PAGE

3    EXAMINATION BY MR. HOROWITZ              4

4    EXAMINATION BY MR. DALE                 91

5    FURTHER EXAMINATION BY MR. HOROWITZ     95

6

7

8                    ---oOo---

9                  INDEX OF EXHIBITS

10

11                                                   PAGE
     NO.    DESCRIPTION
12
     Exhibit 1   Photocopy of six-page document      4
13               reflecting it is a memo to
                 Pittsburg Police Department Bates
14               stamped WILK 00252.

15   Exhibit 2   Photocopy of two-page typed        33
                 memorandum to Chief Brian Addington
16               from Lieutenant Wade Derby, dated
                 May 4, 2016.
17
     Exhibit 3   One-page email form Wade Derby to  93
18               Brian Addington dated October 5,
                 2015, with attached two-page
19               document entitled, "First Amendment
                 to the Settlement Agreement and
20               Release."

21

22

23                    ---oOo---

24

25
                          3

1          Friday, March 2, 2018, 8:41 a.m.

2

3          (Deposition Exhibit 1 was marked for

4          identification.)

5                 EXAMINATION BY MR. HOROWITZ

6          MR. HOROWITZ:  Q.  All right.  Let me give you a

7   document that is mark as Exhibit 1.

8          I should give you the original.

9          If I ask any questions that are unclear at all,

10  you get the benefit of objecting and telling me,

11  "Horowitz, I don't know what you're talking about," which

12  you won't be able to do in court, so enjoy it today.  And,

13  of course, your counsel can object whenever necessary.

14         Have you ever seen Exhibit 1 before?

15     A.  I don't specifically recall.

16     Q.  Okay.  Do you recall ever reviewing any

17  allegations made by Cassie Wilkerson that related to the

18  conduct of then-Lieutenant Raman?

19     A.  Can you repeat that?  I'm sorry.

20     Q.  Yes.

21         Let me do it a different way.

22     A.  Okay.

23     Q.  I like when you ask me to repeat because it tells

24  me that I'm not focused.

25         All right.  In your hand is a document which

4

1   relates allegedly -- relates to contact that Lieutenant

2   Raman did towards Ms. Wilkerson that she felt was sexually

3   harassing.  So I can go through the specific allegations

4   in this document.  But, putting this document aside, but

5   in general, were you ever aware that she made certain

6   allegations against Lieutenant Raman?

7       A.  Yes.

8       Q.  Okay.  What were you aware of in that respect?

9   What allegations were you aware of?

10          MR. DALE:  Okay, vague.

11          You can answer.

12          MR. HOROWITZ:  Q.  Well, let me stop there.  I

13  appreciate those objections.

14          What I'm asking is, in terms of allegations that

15  Ms. Wilkerson made against Lieutenant Raman, tell me of

16  your personal knowledge what you heard when you were

17  working in the department.

18          Thank you for that.

19      A.  When I spoke to Ms. Wilkerson, there was some

20  allegations of a then-Lieutenant Raman talking about a

21  computer screen and making reference to the size of the

22  computer screen and making some sort of comment relative

23  to, "You'll get used to the size."  And then there was

24  some information relative to exchange of cellphone

25  numbers.

                              5

1        In general, that's kind of what I recall sitting

2   here today.

3        Q.  All right.  I'll get into the detail of that in a

4   minute.  Let me suggest some other things you may have

5   heard.  And, if it doesn't help, then just say, "I don't

6   remember it."

7        A.  Sure.

8        Q.  Do you recall her ever relating an incident where

9   she was looking at child pornography as part of a case,

10  and she was uncomfortable because he viewed it with her

11  and stood close to her while he viewed it?

12       A.  Vaguely, yes.

13       Q.  All right.  So since this is not a memory test,

14  let's focus on what you best relate from your knowledge.

15       You talked about the size of the computer screen

16  allegation.

17       A.  Um-hum.

18       Q.  What do you recall in terms of when you learned

19  about that allegation?  When did you first learn about it,

20  if you recall?

21       A.  To the best of my recollection, I learned about

22  it either in something in writing from Ms. Wilkerson or in

23  an interview that I conducted with her.

24       And relative to time-wise, it would have been in

25  2012.  The exact month I don't -- I don't recall.

6

1 don't mind us talking to each other.  But do we agree that

2 things like hearsay objections and relevance are sort of

3 off the table in this kind of deposition?

4      MR. DALE:  I'll raise them for the record, but I

5 don't think we have to go into an extended discussion.

6      MR. HOROWITZ:  Okay.  I guess my point is, my

7 view is, if you don't raise them now, you're not waiving

8 any right to limit the use of the depo at trail.

9      MR. DALE:  And I appreciate that.  I'll still be

10 raising them for the record.

11      MR. HOROWITZ:  Okay.

12   Q.  So, where were we?  I don't even remember where

13 we were.

14      Oh.  You've outlined the allegation.  And whether

15 it's precisely the way she made it, it's irrelevant.  You

16 did the best you could.  Thank you.

17      So the question I have is this:  Once you heard

18 that allegation, was it investigated, to your knowledge?

19   A.  Yes.

20   Q.  And tell me what you know about the investigation

21 of that allegation.

22   A.  Then-Chief Baker asked me to investigate it.  I

23 investigated it and submitted a report to Chief Baker.

24   Q.  Okay.  Was there actually an internal affairs

25 investigation opened, or was it done in a less formal

9

1 manner?

2    A.  I don't recall, for lack of better terms, an IA

3 number being assigned to it, but I did write a memorandum

4 and submit it, make a -- made a determination of sorts at

5 the end and then -- and gave it to Chief Baker.

6    Q.  Okay.  Is that memorandum still in existence as

7 far as you know?

8    A.  Yes.

9    Q.  Okay.  Has there ever been a Pitchess motion

10 filed with respect to then-Lieutenant Raman following the

11 time that you wrote that memorandum?

12    MR. DALE:  And, objection, lack of personal

13 knowledge.  This, again, is relevance.  And we're now

14 approaching into third-party privacy and Lieutenant

15 Raman's rights under the Peace Officer Bill of Rights.

16    You can answer.

17    THE WITNESS:  I am not aware of Pitchess motions

18 relative to Lieutenant Raman.  If he's had them, if he

19 didn't, I have no -- no knowledge of that as I sit here

20 today.

21    MR. HOROWITZ:  Q.  Okay.  Now let's look at one

22 of the other allegations.  There were several allegations,

23 or maybe one allegation relating to several incidents,

24 where Ms. Wilkerson indicated that Lieutenant Raman was

25 asking for not her work cellphone number but her personal

10

1 about that conversation?

2     A.  To the best of my knowledge, yes.

3     Q.  And is it, again, the same memo that included the

4 computer matter, the phone matter, the staring matter?

5 Would it have been the same memo?

6     A.  Yes, sir.

7     Q.  And, again, do you have any recollection one way

8 or the other as to whether an IA investigation -- let me

9 just distinguish.

10     We know the difference, right?  There's an

11 internal, you know, checking about things and memos, and

12 an IA investigation is where is a number is issued and a

13 formal process is initiated.  Is that your understanding

14 of what I've been saying when I ask, has there been an IA

15 investigation?

16     A.  I don't know what your definition of "IA

17 investigation" is.  You know, to me an IA investigation is

18 a general term.  You can conduct an investigation, it's

19 internally related.  Some people refer to that as an IA.

20     When I in my mind think of the formal version of

21 it, there would be an IA number assigned to it, if that

22 clarifies.

23     Q.  So let's assume that an IA number was not

24 assigned to the investigation of these four matters

25 relating to Lieutenant Raman.  What would have determined

15

1  whether an IA number was or was not issued?

2      MR. DALE:  Objection, foundation, incomplete

3  hypothetical.

4      You can answer.

5      THE WITNESS:  The chief makes a determination on

6  if he wants to assign it an IA number or not.

7      MR. HOROWITZ:  Q.  Okay.  Now, with respect to

8  Wade Derby, an IA number was assigned; is that right?

9      MR. DALE:  And, objection, vague as to time.

10      You may answer.

11      THE WITNESS:  Yes.

12      MR. HOROWITZ:  Q.  There's only been one IA

13  during Wade Derby's entire career, so far as you know,

14  right?

15      A.  I --

16      Q.  As far as you know.

17      A.  I don't know.  I'm only aware of this one.

18      Q.  Okay.  So do you know why an IA number was issued

19  with respect to Wade Derby's investigation and not with

20  respect to Lieutenant Raman's?  And I'm talking about the

21  allegations that Wilkerson made at that time.

22      A.  I do not.

23      Q.  Did you ever discuss that fact with Chief Baker?

24      A.  If I did, I don't recall.

25      Q.  Did you have any input as to whether or not an

16

1      A.  I would say it's an important job.  I don't --

2  high quality?  I guess that's subjective.

3      Q.  Is it called purgatory among officers?

4          MR. DALE:  Objection, lack of personal knowledge.

5          Answer if you can.

6          THE WITNESS:  The only officer I ever heard call

7  it purgatory is Wade Derby.

8          MR. HOROWITZ:  Q.  But by the time he left in

9  January 2016, you had him doing internal affairs

10 investigations; is that correct?

11     A.  That is correct.

12     Q.  And that's a high-level job with a lot of

13 responsibility; is that correct?

14         MR. DALE:  Objection, vague as to "high-level."

15         Answer if you can.

16         THE WITNESS:  You say, high level.  I don't --

17 it's a job with a lot of responsibility --

18         MR. HOROWITZ:  All right.

19         THE WITNESS:  -- absolutely.

20         MR. HOROWITZ:  Q.  So my point is, you said that

21 the disciplinary process is meant to have people conform

22 with the rules and follow them, right?

23     A.  Correct.

24     Q.  It appears that Derby not only followed the rules

25 after October 2012 but that you then trusted him with

72

1  investigating other officers who may or may not have

2  followed the rules.  So my question to you is, why then

3  terminate or allow to be terminated or allow to file a

4  resignation, whatever terms you want to use -- why have an

5  officer leave of that caliber if he's been following the

6  rules for four years?

7       MR. DALE:  And, objection, misstates testimony,

8  vague.

9       Answer if you can.

10      THE WITNESS:  Wade, to my knowledge, didn't

11 violate any policies.  And I did trust him to do internal

12 affairs investigations.  I then and to this day don't

13 think he fully grasped the seriousness of the allegations

14 that were sustained against him.  And I did have concern

15 that, you know, that type of behavior, especially if he

16 didn't acknowledge and/or accept some responsibility and

17 put it behind him, which I don't think he did, would

18 cause -- could potentially cause problems.

19      And I also was very concerned that he potentially

20 would be disruptive to the department by continuing to

21 bring the matter of these allegations and the lawsuit and

22 Wilkerson up on a regular basis any chance he got with

23 anyone who would listen to him.  Those were some of my --

24 some of my concerns.

25      MR. HOROWITZ:  Q.  But you told me earlier in

73

1  communicated that?

2      A.  I have no knowledge of that.

3      Q.  Were any documents ever requested by prospective

4  employers relating to the employment of Wade Derby at your

5  department?

6          MR. DALE:  Objection, foundation, lack of

7  personal knowledge.

8          Answer if you know.

9          THE WITNESS:  I have no knowledge either way.

10         MR. HOROWITZ:  Q.  You know, I forget if I asked

11 this.  And, if I did, I apologize.

12         Given the fact that Wade Derby had no complaints

13 of sexual misconduct starting in October 2012 until he

14 left and he seemingly was performing his job as required,

15 why didn't you vary from that agreement that you had

16 signed with him earlier and allow him to stay on as an

17 officer?

18     A.  I think I did make an offer to him to vary from

19 that, and he rejected it.

20     Q.  All right.  Five months is a pretty limited time

21 period.  Why not extend it two years or three years or

22 until he was too old to do the job properly, as I probably

23 am right now?

24     A.  Yeah.  We had a lot of conversations about it,

25 and I don't remember all of them.  But I do remember at

                              88

1 the end the -- what I thought he was requesting was

2 memorialized in the amendment to the agreement.  And he

3 rejected that.

4     Q.  So you thought all he ever wanted was a few extra

5 months on the job, not to stay indefinitely?

6     A.  No, I think he wanted to stay indefinitely.  And

7 I told him that wasn't going to happen.  You know, the

8 settlement agreement was going to stand.  And, you know,

9 he would make various attempts to sway me in another

10 direction, and I wasn't -- I wasn't -- I didn't feel it

11 was in the best interest of the department.

12          And ultimately he made the proposal where he

13 could stay on until -- until June and continue to do some

14 of the work that he was doing.  And I felt that was a --

15 that was a reasonable compromise.

16     Q.  But why not just let him stay on if he's doing

17 the job and doing your IAs, he's a qualified lieutenant?

18 He's not been accused of corruption ever; is that correct?

19          MR. DALE:  And, objection, foundation, lack of

20 personal knowledge.

21          Answer if you know.

22          THE WITNESS:  "Corruption" is a broad term.  But,

23 as I understand it, no, he hasn't been accused of that.

24          MR. HOROWITZ:  Okay.

25          THE WITNESS:  As I have testified, I felt that

                              89

1  there were some -- that he had entered into that

2  agreement.  It was, in my opinion, a lawful agreement that

3  he entered into.  I felt it was fair.

4      I do feel that there were some disruptions with

5  him within the department.  I think there's some other

6  non-related-to-him issues.  You know, a lot of people, you

7  know, knew that he was going to be retiring.  That would

8  create some promotional exams.

9      You know, if you look at it from a financial

10  standpoint, the City has done some things to reduce

11  overall costs.  He's a classic PERS employee.  That

12  position would be replaced with a current PEPRA employee.

13  There were some cost-saving factors that would be

14  associated with it.  I didn't -- I felt that staying as

15  close to the terms of that settlement agreement were

16  probably -- was probably best.

17      MR. HOROWITZ:  And, based on our agreement, there

18  are certain follow-ups I'm not going to do with that.

19      I think I'm done at this point.  I'm sure you

20  have --

21      MR. DALE:  Give us a couple of -- give us a

22  little break.  I want to make sure we've got everything we

23  would need.  And then we'll be back on the record.

24      MR. HOROWITZ:  Sure.  Thank you.

25      THE WITNESS:  Thank you.

# EXHIBIT 3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


WADE DERBY, an individual,

        Plaintiff,

     vs.               Case No. 3:16-cv-05469-SI

CITY OF PITTSBURG; PITTSBURG POLICE

DEPARTMENT; BRIAN ADDINGTON and

DOES 1-10,

        Defendants.

_____

AND ALL RELATED CROSS-ACTIONS.

_____




DEPOSITION OF WADE DERBY

FEBRUARY 26, 2018

9:15 a.m.



JACKSON LEWIS, P.C.
400 Capitol Mall, Suite 1600
Sacramento, California 95814



REPORTED BY:
Roberta Richardson
CSR No. 11337, RPR

1    A.  I don't have a specific recollection.  There

2  were other check boxes and it was my understanding that

3  I retired from the department.

4    Q.  After you communicated with Brian Addington

5  about that personal action form, a corrected personal

6  action form was issued, correct?

7    A.  That's my understanding, yes.

8    Q.  You received a copy of that corrected personal

9  action form, correct?

10   A.  Yes.

11   Q.  That corrective personal action form indicated

12 that you had retired, correct?

13   A.  I believe it did, yes.

14   Q.  That corrected personal action form did not

15 indicate that you had been terminated in some fashion

16 from the City of Pittsburg, correct?

17   A.  The correct form indicated what was properly my

18 reason for being gone.

19   Q.  Did you have any problem with the corrected

20 personal action form?

21   A.  Clarifying question.  As far as a problem with

22 the form itself or the result of what that form did?

23   Q.  The form itself.

24   A.  The corrected form I had no problem with.

25   Q.  The corrected form was accurate, to the best of

1    your knowledge; is that correct?

2        A.  As we sit here today, yes, sir.

3        Q.  Would you ever ask to resign your employment in

4    lieu of being fired from any employer you've ever had?

5        A.  There was a discussion about it with the City

6    of Pittsburg.

7        Q.  Other than this discussion you're referencing

8    with the City of Pittsburg, do you believe there's

9    anything else that might fall or be responsive to that

10   question, whether or not you've ever been asked to

11   resign in lieu of being fired?

12       A.  No.

13       Q.  Other than with the City of Pittsburg, have you

14   ever been accused of anything related to sexual

15   harassment?

16       A.  No.

17       Q.  Other than with the City of Pittsburg, have you

18   ever been accused of doing something that was offensive

19   towards females or a female?

20       A.  No.

21       Q.  Other than with the City of Pittsburg, have you

22   ever been accused in any way of engaging in conduct that

23   created a hostile work environment for somebody?

24       A.  No, sir.

25       Q.  When you worked for the City of Pittsburg, to

1  involvement in investigation of Officer Sibbitt and

2  Ingram began?

3       A.  Not really.

4       Q.  If I were to tell you that that investigation

5  began in 2014, would you have any reason to dispute

6  that?

7       A.  No, sir.

8       Q.  How much time prior to Officer Sibbitt and

9  Ingram resigning did the City's investigation into them

10 begin?

11      A.  Repeat that, please.

12      Q.  Sure.  Do you have an understanding that

13 Officer Sibbitt and Ingram resigned their employment?

14      A.  That's my understanding.

15      Q.  How much time prior to their resignation did

16 the investigation against the two of them begin with the

17 City?

18      A.  Given the timeline of 2014.  Now, I believe the

19 initial investigation was in March of 2014.

20      Q.  If I were to represent to you that Officers

21 Ingram and Sibbitt resigned on or about August 4th,

22 2014, would you have any reason to dispute that?

23      A.  I don't think so.

24      Q.  Hearing that Officer Sibbitt and Ingram

25 resigned on or about August 4th of 2014, does that help

1  you provide any answer to when you believe the

2  investigation related to them began?

3      A.  May I ask a clarifying question?

4      Q.  Sure.

5      A.  There were actually -- there were two

6  investigations of Sibbitt and Ingram.  There was an

7  early investigation and then there was a latter one

8  within perhaps a month, month and a half.  I don't want

9  to just blurt out things so I want to answer your

10  question.

11          That's why I'm saying March.  There were two

12  actual investigations.

13      Q.  And when you say two investigations, what's the

14  difference in the two investigations that you're

15  referring to?

16      A.  The first investigation had to do with

17  workplace harassment of a female officer named Sahar

18  Barkzi.  The second investigation dovetailed on to that

19  where we got into the issues of brutality and falsifying

20  police reports and things of that nature.

21      Q.  The first investigation regarding workplace

22  harassment related to another officer, you believe that

23  investigation began when?

24      A.  My estimate today is March 2014.

25      Q.  The second investigation as you referenced

1  related to brutality and falsifying police reports, as

2  you've described it, when did that investigation begin,

3  in your mind?

4      A.  My estimate today is somewhere in the time

5  frame of April or May 2014.

6      Q.  What was your involvement in those two

7  investigations that you've referenced regarding Sibbitt

8  and Ingram?

9      A.  I was assigned as the primary administrative

10 investigator.

11     Q.  And that would be on both investigations; is

12 that correct?

13     A.  Yes, sir.

14     Q.  Is it fair to say that these were Internal

15 Affairs investigations or IA investigations?

16     A.  They began as that, yes, sir.

17     Q.  In addition to the two IA investigations that

18 you're referencing regarding Sibbitt and Ingram --

19 strike that.  Let me clarify.

20         The first investigation that you said relates

21 to workplace harassment, did that relate to both Sibbitt

22 and Ingram?

23     A.  Sitting here today, I believe it did.  There

24 was also a third officer.

25     Q.  In that workplace harassment investigation,

1      A.   Yes.

2      Q.   What -- who did you make that request to?

3      A.   I made it through their legal counsel.

4      Q.   And what response did you receive?

5      A.   I didn't receive any.

6      Q.   You were not prevented from pursuing attempts

7   at interviewing Sibbitt and Ingram in your IA

8   investigation, correct?

9      A.   No.

10      Q.   No, that's not correct?  You were prevented?

11   Or no, you were not prevented?

12      A.   The way you phrased the question, again it's

13   ambiguous.

14      Q.   Okay.

15      A.   I need you to help clarify that for me.

16      Q.   Sure.  You indicated that you were able to

17   pursue getting statements from Ingram and Sibbitt.

18   You've just testified that you were able to make that

19   request to their counsel, correct?

20      A.   I indicated that they were noticed.

21      Q.   That you were not prevented in any way from an

22   attempt to get statements from Ingram and Sibbitt,

23   correct?

24      A.   I guess I need you to clarify.  Was I ordered

25   or physically prevented from doing it?

1    Q.  In any way prevented?

2    A.  Yes.

3    Q.  How were you prevented?

4    A.  I didn't ever interview them because they

5  resigned.

6    Q.  But your attempts to interview them, the City

7  never prevented you from attempting to interview Ingram

8  and Sibbitt, correct?

9    A.  Again, I don't want to be unresponsive to you

10  and I don't want to say something that you don't want to

11  hear.  I was told to not -- there was no need for me to

12  interview them.  It was over.

13    Q.  That was after you had already made attempts to

14  interview them, correct?

15    A.  Again, I noticed them for an interview.  That

16  was my only attempt.

17    Q.  And they did not respond, correct?

18    A.  Correct.

19    Q.  From the time you began any IA investigation

20  involving Sibbitt and Ingram sometime in 2014, until the

21  October 2015 Pitchess Hearing we've referenced, the

22  Easter Pitchess hearing, how many other Pitchess

23  Hearings, if any, did you attend related to Sibbitt

24  and/or Ingram?

25    A.  One for sure, and I believe a second one.

1    Pitchess Hearing, and I believe you answered yes; is

2    that correct?

3        A.   To the best of my recollection, that would be

4    the best timeframe I can estimate for you now.

5        Q.   So you've now testified to three Pitchess

6    Hearings that occurred related to Sibbitt or Ingram

7    prior to the October 2015 Pitchess Hearing.  Is that

8    your best recollection of all Pitchess Hearings that

9    occurred regarding Sibbitt and Ingram prior to the

10   October 2015 Pitchess Hearing?

11       A.   That I'm aware of, yes.

12       Q.   I think I asked you before, but just to be

13   clear; there was only one Pitchess Hearing related to

14   Sibbitt and Ingram in October of 2015, correct?

15       A.   That I am aware of.

16            MR. CHRISTIAN:  We've been going for a little

17   bit.  So why don't we go ahead and take a break.

18

19            (Recess)

20

21   BY MR. CHRISTIAN:

22       Q.   I'm going to ask you some questions now related

23   to the October 2015 Pitchess.  Okay?

24       A.   Yes, sir.

25       Q.   Are you aware that at the October 2015

1  Pitchess, the judge had directed the City to have you

2  appear?

3      A.  I know somebody did.  I don't know who it was.

4      Q.  Do you have any reason to dispute that the

5  judge requested the investigating officer, that being

6  you, to appear at the Pitchess Hearing that occurred in

7  October of 2015?

8      A.  The only reason why I would dispute it is

9  that's not how it was conveyed to me.

10     Q.  How was it conveyed to you?

11     A.  I received a phone call from Joyce Lowe.

12     Q.  And what did Joyce say?

13     A.  She said, "You need to get down here right

14  away."

15     Q.  And after she said you need to get down there

16  right away, you understood that the City was directing

17  you as part of your duties as the investigating officer

18  to go to the Pitchess Hearing, correct?

19     A.  I know that I was being directed to go down

20  there and appear.

21     Q.  And you knew that you were going down there to

22  discuss or because of your role in the Sibbitt or Ingram

23  investigation, correct?

24     A.  Yes.

25     Q.  After you received the phone call from Joyce

1    saying you needed to go to the Pitchess Hearing, you did

2    go to the Pitchess Hearing based on the request that you

3    were needed, correct?

4        A.   Yes.

5        Q.   When you went to the October 2015 Pitchess

6    Hearing, where was it at?

7        A.   The Superior Court in Martinez.

8        Q.   When you arrived at the 2015 October Pitchess

9    Hearing in Martinez, what happened?

10       A.   I met with the City Attorney and Joyce Lowe

11   outside of the courtroom.

12       Q.   You had the understanding that Pitchess

13   procedures dictated that if you were to discuss an

14   Internal Affairs investigation related to an officer, it

15   would be done in chambers, correct?

16       A.   If there's something to disclose, yes.

17       Q.   After you arrived at the Pitchess Hearing in

18   October of 2015, the judge recalled the Easter Pitchess

19   motion and directed you and the City to join the judge

20   in chambers; is that correct?

21       A.   That's not my recollection of the chain of

22   events that transpired.

23       Q.   Was there an in-camera hearing that occurred

24   when you attended the Pitchess Hearing in October of

25   2015?

1    A.   Yes.

2    Q.   There was not any discussion of the IA

3  investigation you had done in open court when you

4  attended the Pitchess Hearing in October of 2015,

5  correct?

6    A.   There was an announcement that was made by Dan

7  Horowitz in open court.

8    Q.   Who is Dan Horowitz?

9    A.   My attorney.

10    Q.   Dan Horowitz was your attorney at the time that

11  you were being investigated for the Wilkerson

12  allegations, correct?

13    A.   He represented me during that matter.

14    Q.   At the time of the October 2015 Pitchess

15  Hearing, you were represented by Dan Horowitz; is that

16  correct?

17    A.   Yes, sir.

18    Q.   And Dan Horowitz appeared with you as your

19  representation at the October 2015 Pitchess Hearing; is

20  that correct?

21    A.   Yes.

22    Q.   At some point when you arrived at the

23  October 2015 Pitchess Hearing, did the judge recall the

24  Easter Pitchess motion?

25    A.   At some point he must have.

1      Q.  Prior to going to the courthouse on

2  this October 2015, did you have a telephone call with

3  your attorney about the Pitchess Hearing?

4      A.  I made a phone call.

5      Q.  A phone call to Mr. Horowitz?

6      A.  Yes.

7      Q.  And how long did you have a conversation with

8  Mr. Horowitz about the Pitchess Hearing?

9      A.  A matter of a couple of minutes.

10     Q.  When you arrived at the courthouse in Martinez

11  in October 2015 Pitchess you referenced a conversation

12  you had with Joyce; is that correct?

13     A.  I'm sorry.  When?

14     Q.  Sure.  When you first arrived at the courthouse

15  in October of 2015 for the Pitchess Hearing, were Joyce

16  and the City Attorney in the courtroom?

17     A.  No.

18     Q.  Where were they at?

19     A.  In the hallway.

20     Q.  Did you engage them in conversation in the

21  hallway?

22     A.  I did.

23     Q.  And this conversation occurred before your

24  attorney Mr. Horowitz arrived, correct?

25     A.  Correct.

1  to arrive and do whatever we need to do.

2      Q.  Other than the City Attorney asking you about

3  what you meant, were there any other comments made by

4  Joyce or the City Attorney after you conveyed what you

5  would do in-camera?

6      A.  Not that I recall at this time.

7      Q.  How long did this conversation with Joyce and

8  the City Attorney last in the hallway before

9  Mr. Horowitz arrived?

10     A.  Estimation, less than five minutes.

11     Q.  Did Joyce and the City Attorney go into the

12  courtroom before Mr. Horowitz arrived?

13     A.  No.

14     Q.  Were you all three still in the hallway when

15  Mr. Horowitz arrived?

16     A.  Yes.

17     Q.  What was said, if anything, after Mr. Horowitz

18  arrived before any of you went into the courtroom?  Was

19  anything said at that point?

20     A.  Horowitz introduced himself to the City

21  Attorney and to Joyce and said that he was there

22  representing me and he told him that this was a

23  whistleblowing matter.

24     Q.  You say he told them it was a whistleblowing

25  matter?

1    A.  Yes, sir.

2    Q.  Is that exactly what he said or can you recall

3 exactly what he said?

4    A.  I'm paraphrasing to the best of my recollection

5 for you here today.

6    Q.  Did you ask Mr. Horowitz to come with you to

7 court on that Pitchess Hearing because you needed to

8 explain what had transpired with the Pitchess process

9 and your IA investigation?

10   A.  I'm sorry.  You are going to need to either

11 break the question down or give me a different version,

12 please.  I don't really understand.

13       MR. CHRISTIAN:  Sure.  Let's have that read

14 back, please.

15

16       (Record read)

17

18       THE WITNESS:  As far as -- I have to answer

19 that, no.

20 BY MR. CHRISTIAN:

21   Q.  You were called to the court that day to

22 address the Pitchess Motion, correct?

23   A.  That -- I can't answer that question that that

24 was the only reason I was called to court that day, no.

25   Q.  You don't know why you were called to court, I

1    this was a whistleblowing matter?

2        A.   I recall him saying that -- asking some sort of

3    clarification question, has Derby gone over what, you

4    know, he has to say about this.  And that was an

5    explanation from him as to what he was referring to.

6    That's my understanding.

7        Q.   So outside of the courtroom other than

8    Mr. Horowitz saying he was there to represent you and he

9    told them that it was a whistleblower matter, and he

10   asked whether or not you had gone over with what you had

11   to say, other than those items, did Mr. Horowitz convey

12   anything else to anyone prior to entering the courtroom?

13       A.   Not that I recall today.

14       Q.   Did all of you go in the courtroom together at

15   that time?

16       A.   Yes.

17       Q.   When you entered the courtroom, what

18   transpired?

19       A.   There was some kind of proceeding going on.  It

20   wasn't an open trial for sure because there was no jury

21   there, that I recall.

22            I don't recall the exact chronology of each

23   event, but in summary, we entered the courtroom, the --

24   Horowitz walked up to the bailiff, I believe, with our

25   City Attorney and they garnered the judge's attention

1  and made an announcement that we were there to disclose

2  information.

3      Q.  When you guys entered the courtroom on this

4  October 2015 Pitchess, you saw the City Attorney and

5  Mr. Horowitz go up to the bailiff, correct?

6      A.  That's my recollection.

7      Q.  You do not know what exactly the City Attorney

8  and Mr. Horowitz said to the bailiff, correct?

9      A.  No.

10     Q.  At that particular time, you saw the judge then

11  halt the current proceedings?

12     A.  Yes.

13     Q.  Okay.  And did the bailiff convey something to

14  the judge after the City Attorney and Mr. Horowitz had

15  spoke to the bailiff?

16     A.  I'm assuming that he must have because that's

17  how the judge got, I believe, notice that they were

18  there.

19     Q.  Once the judge stopped the proceedings that

20  were going on, what, if anything, did he say about going

21  in-camera or otherwise?

22     A.  He made a comment to the judge openly and then

23  that's when the judge said to go in-camera.

24     Q.  When the judge halted the proceedings, did he

25  say anything about the Easter Pitchess motion that all

1  of you were there for?

2      A.  I don't recall specifically.

3      Q.  You said Horowitz made a comment to the judge.

4  What comment did Horowitz make to the judge at that

5  time?

6      A.  He, again to paraphrase, made an announcement

7  using the term whistleblowing matter or whistleblowing

8  activity.

9      Q.  To your best recollection, exactly what did he

10  say?

11      A.  I don't recall exactly.  I just know that that

12  was the context that he had stated that this was

13  regarding.

14      Q.  And he said it related to a whistleblowing

15  matter or words to that effect?

16      A.  Something to that effect.

17      Q.  But you don't know exactly what he said?

18      A.  No, sir, I'm sorry, I don't.

19      Q.  After the judge stopped the proceeding, other

20  than Mr. Horowitz making this one comment that you're

21  referencing, did any of the other parties related to the

22  Easter matter say anything?

23      A.  Not that I recall.

24      Q.  At this point did the judge invite the parties

25  to come back in chambers for the in-camera hearing?

1    A.  Yes.

2    Q.  Who went back in chambers?

3    A.  The judge, court reporter, the City's attorney,

4  Joy Lowe, and myself.

5    Q.  Mr. Horowitz did not go in chambers; is that

6  correct?

7    A.  Correct.

8    Q.  Did not go -- did not participate in the

9  in-camera hearing; is that correct?

10    A.  Correct.

11    Q.  What transpired in the in-camera hearing?

12    A.  I went over the case in great detail with the

13  judge.

14    Q.  When you say you went over the case in great

15  detail, you're referring to the Internal Affairs

16  investigation that you had done related to Sibbitt and

17  Ingram; is that correct?

18    A.  Yes, sir.

19    Q.  In addition to you going over the Internal

20  Affairs investigation that you had done, were your

21  Internal Affairs documents presented by Joyce or the

22  City in that in-camera hearing?

23    A.  They were presented by me.

24    Q.  When did you get the documents from Joyce?

25    A.  I didn't.  I got them from the City Attorney.

1  recognized it was there, no.

2      Q.  Did you have any concern going into the

3  in-camera that you didn't have a full copy of all of

4  your notes and documents related to that IA

5  investigation?

6      A.  I can't sit here today and say I had any grave

7  concern about it, no.

8      Q.  When you were in chambers in the in-camera

9  hearing you said you gave the judge all those IA

10  documents.

11          You said you went over in great detail your

12  Internal Affairs investigation.  What else, if anything,

13  did you say while in-camera in that October 2015

14  Pitchess Hearing?

15      A.  I would have to give you a narrative summary of

16  what transpired in there as far as -- unless you have a

17  specific question about something that you believe I

18  said or --

19      Q.  Right now -- that's fine.  The question is

20  just, I understand that you went over in detail your

21  Internal Affairs investigation.

22          So aside from anything you said about your

23  internal -- what you did in that Internal Affairs

24  investigation, what else, if anything, did you say in

25  that in-camera hearing?

1    A.   I provided him, the judge, a chronology from

2  beginning to end of what he was reviewing.  And then if

3  he had specific questions as to what he was reviewing or

4  clarity that he needed made, I did it.

5    Q.   And I understand.  So that's a discussion about

6  your actual Internal Affairs investigation, correct?

7    A.   To some degree.  Other things might have been

8  about what is this document.  Is it a police report?  Is

9  it a notice of IA or something like that.

10   Q.   So there were documents -- there were questions

11 and comments made by you about what was in your IA

12 documents, correct?

13   A.   Yes.

14   Q.   So other than comments you made about what was

15 in your IA documents and comments that you made about

16 how you actually did the Internal Affairs investigation,

17 what else -- I just want to make sure I'm being

18 complete.  Is there anything else you said or discussed

19 in that in-camera hearing in October of 2015?

20   A.   I believe at some point the conversation came

21 up about whether or not there had been disclosure of

22 these documents at anytime previously.

23   Q.   You said you think that topic came up.  As you

24 sit here today, do you have a recollection that topic

25 did come up?

1    A.  It did definitely come up.  I just -- I believe

2  at this time right now that is where I'm basing my

3  recollection, that it did take place.

4    Q.  And who raised this topic of whether the

5  documents had previously been disclosed?

6    A.  The judge.

7    Q.  And what, if anything, did you say related to

8  that?

9    A.  I told him it was my understanding that they

10  had not been previously disclosed.

11    Q.  Did you have the understanding that those

12  documents had not been disclosed in any Pitchess Hearing

13  prior to that date?

14    A.  Yes.  Can I clarify one thing?

15    Q.  Sure.

16    A.  When we're talking about that, in fairness,

17  they had been disclosed to the City Attorney at the very

18  first Pitchess that there was a file.  So I just don't

19  want to give you a conflicting answer.

20    Q.  But you're indicating that the -- your

21  investigation documents were never disclosed to the

22  court in any fashion prior to this October 2015 Pitchess

23  Hearing.  Is that your understanding?

24    A.  Yes.

25    Q.  And you're saying you conveyed that to the

1  court?

2      A.  Yes.

3      Q.  What else, if anything, did you say in that

4  in-camera hearing in October of 2015?

5      A.  There were discussions again about, like, for

6  example, the mobile data computer messages about

7  flashlight parties clarifying who was this call sign and

8  who is responding to that call sign, who is reading it,

9  who is seeing it.

10     Q.  So that would be another question related to

11  your actual IA investigation, correct?

12     A.  I guess that would be true.

13     Q.  Have you now told me everything that you

14  conveyed in that in-camera hearing in October of 2015?

15     A.  I certainly haven't told you everything I've

16  conveyed because I can't remember everything and I don't

17  want to speculate.

18     Q.  As you sit here today, have you conveyed to me

19  everything that you can recall you said in that

20  October 2015 in-camera Pitchess Hearing?

21     A.  Phrased that way related to the IA, I believe

22  so.

23     Q.  And you say related to the IA.  I want to make

24  sure I've covered anything you said in that in-camera

25  hearing?

1     A.  I'm sorry.  I answered it that way because

2  obviously there was an introduction.  There was hello.

3  There was goodbye.  I didn't want to fluff the

4  conversation.

5     Q.  Sure.  So other than the introductory hello and

6  goodbye and what you've already told me, does that

7  complete your best recollection of everything that you

8  said in that October 2015 in-camera hearing?

9     A.  At this time, yes, sir.

10     Q.  Do you recall anything that was said by either

11  Joyce or the City Attorney in that 2015 in-camera

12  hearing?

13     A.  As I sit here today, no.

14     Q.  Did they -- did either Joyce or the City

15  Attorney make comments in the in-camera hearing and you

16  just don't recall what they are or you don't recall that

17  they even made any comments?

18     A.  I don't recall them making any comments.

19     Q.  What else other than what you've conveyed do

20  you recall the judge said in the 2015 in-camera hearing?

21     A.  I do recall him saying at some point that he

22  was separating out things that he felt were potential

23  discovery versus things that were potentially

24  superfluous or not extraordinary to him.

25     And he -- as he would do that, he would

1  separate it out and he would say, "This is disclosable,"

2  something to that regard.

3      Q.  Do you recall anything else conveyed or said by

4  the judge in the in-camera 2015 October hearing?

5      A.  I again recall him saying that he was going to

6  go back out into the courtroom and disclose to counsel

7  that there were in fact items of discovery that were an

8  issue or could potentially be an issue in the matter.

9  And he thanked me and that was it.

10     Q.  Then all of you went out of chambers and went

11  back on the record for the Easter matter; is that

12  correct?

13     A.  We did.

14     Q.  And what was said by the judge, if anything,

15  when the Easter matter resumed on public record?

16     A.  I was starting to leave the courtroom.  I

17  didn't remain, wasn't asked to remain.  I do recall

18  before we left the judge going on record saying they

19  were back on record in the matter and advising the

20  district attorney and defense counsel that there was

21  significant or -- I don't want to put -- I'm using that

22  word.  That's my word -- significant material there that

23  was discoverable and I do recall him telling the

24  district attorney representative to file their own

25  Pitchess in order to see what it is.

1      Q.  Do you recall anything else that was said by

2  the judge before you left the courtroom on that

3  occasion?

4      A.  He said some opening comment to segue to that,

5  that new information has surfaced, you know, something

6  qualifying why he was going to move to the next step.

7  Other than that, I walked out the door.

8      Q.  Do you know whether or not the City Attorney or

9  Joyce made any comments when leaving or after the

10  in-camera portion of the Pitchess Hearing concluded?

11     A.  No.  As I recall, he walked out with Horowitz

12  and I.

13     Q.  When you were done with the in-camera portion

14  of the hearing, you believed you were done with your

15  responsibilities there for the City?

16     A.  I guess that would be an assumption.  I was

17  still there present with the City Attorney if somehow I

18  was needed or subject to recall.

19     Q.  So you felt like at anytime that you were there

20  at the courthouse, you had some responsibility, were

21  there to satisfy your responsibilities of working with

22  the City relevant to the Pitchess motion?

23     A.  Absolutely.

24     Q.  When you left the in-camera portion, you said

25  you, Joyce, and the City Attorney walked out of the

1    officer would be subject to discharge for his or her

2    conduct?

3        A.   You're asking me to speculate on something that

4    I have disputed because I know other facts.  If there

5    were no other facts that said that -- that didn't say

6    yeah, the officer didn't do this, yes.

7        Q.   When you were going through the Internal

8    Affairs investigation, you were aware that before any

9    action could formally be taken against you, you had

10   certain due process rights, correct?

11       A.   Yes.

12       Q.   In addition to due process rights, you also had

13   specific rights pursuant to POBAR, Public Safety

14   Officers' Bill of Rights, correct?

15       A.   Yes.

16       Q.   Before any formal disciplinary process

17   proceeded against you, you had discussions with the City

18   about agreeing on a level of discipline against you

19   based on the findings in the report, correct?

20       A.   I had discussions with Chief Addington.

21       Q.   And based on those discussions that you had

22   with Chief Addington about a level of discipline for the

23   findings against you in the Internal Affairs

24   investigation, a settlement agreement was presented to

25   you, correct?

1    A.  Yes, sir.

2    Q.  At the time the settlement agreement was

3  presented to you, you were represented by your attorney

4  in the action here today, Mr. Horowitz, correct?

5    A.  Yes.

6    Q.  You consulted with Mr. Horowitz about that

7  settlement agreement that was provided to you by the

8  City, correct?

9    A.  Yes.

10    Q.  Did you consult with any other attorneys other

11  than Mr. Horowitz related to the settlement agreement

12  that was presented to you?

13    A.  No.

14    Q.  I'm showing you what's been marked as Exhibit

15  No. 2 for purposes of the deposition.

16

17        (Exhibit 2 marked)

18

19  BY MR. CHRISTIAN:

20    Q.  I'm showing you what's been marked Exhibit No.

21  2.  Do you recognize this as a true and correct copy of

22  the settlement agreement that was provided to you by

23  Chief Addington?

24    A.  It appears to be so, yes.

25    Q.  When Mr. Horowitz was representing you related

1    expense, and that's how has I met Mr. Horowitz.

2        Q.  So after seeking out your own attorney, you

3    retained Mr. Horowitz to represent you, correct?

4        A.  Yes.

5        Q.  Looking at what's been marked Exhibit No. 2 and

6    the document is entitled Settlement Agreement and

7    Release.  And for the record, it's a six-page document

8    and then there's one additional page attached to it as

9    well.

10            Referring you to page 6 of the document,

11   there's a date there written in of 10-29-12, and there's

12   a signature above the typed name Wayne Derby.

13            Is that your signature?

14       A.  Just to clarify, Wade Derby.

15       Q.  Wade Derby.

16       A.  Yes, it is mine.

17       Q.  And the date written in there, 10-29-12 next to

18   your signature, did you write that in there as well?

19       A.  Looks like my writing, yes, sir.

20       Q.  At the time that you signed this document, you

21   were a sworn police officer, correct?

22       A.  Yes.

23       Q.  The next page of the document, the last page of

24   Exhibit No. 2 --

25       A.  I'm sorry.  I have to strike the last answer I

1 gave you.

2     Q.  Sure.  I think to my question whether or not

3 you were a sworn police officer at the time you signed

4 the settlement agreement and release, you said "yes"

5 before.  That's not accurate?

6     A.  I did not have full peace officer powers.  I

7 had my powers removed.  So I just want to clarify.  I

8 had been a sworn officer and, honestly, that's a legal

9 determination I guess on your part.  I just want to be

10 fair.  At that point when I signed that, I believe I was

11 a sworn officer; but technicality wise, I had not been

12 given my credentials and my weapon back.

13     Q.  At the time that you signed the document, do

14 you believe you had a duty not to sign false documents?

15     A.  Sworn or not, yes, but I just wanted --

16     Q.  I just wanted to clarify.  Thank you.

17     So referring to the last page of the document.

18     A.  Yes, sir.

19     Q.  This last page, "I, Wade Derby, hereby tender

20 my voluntary resignation from employment with the City

21 of Pittsburg effective January 8, 2016.  I understand

22 and agree that this resignation is irrevocable upon

23 acceptance by the City."

24     And it's typed "Wade Derby" and there's a

25 signature above it.  Is that your signature?

1      A.  Yes.

2      Q.  This signed settlement agreement and this

3  signed resignation you presented to the City of

4  Pittsburg on or about October 29th, 2012, correct?

5      A.  No.  Again, no, I did not present it.

6      Q.  After you signed the document, was it given to

7  the City of Pittsburg?

8      A.  I gave it to Chief Addington.

9      Q.  And when you say you gave it to

10  Chief Addington, that includes the resignation on the

11  last page of this exhibit, your signed resignation you

12  gave to Chief Addington, correct?

13      A.  Yes.

14      Q.  And you gave it to him on or about October 29,

15  2012, correct?

16      A.  Yes.

17      Q.  Let me refer you to the first page of Exhibit

18  No. 2.  The third recital down it says, "Whereas

19  employee has acknowledged and/or admitted to much of the

20  conduct alleged and found to be sustained in the

21  investigation and whereas the primary dispute between

22  the parties in the level of discipline that should be

23  imposed for employee's misconduct."

24          You read this document in full before you

25  signed it, correct?

1  the terms of what you were representing in this

2  agreement?  Is that what you're saying?

3      A.  I'm saying that there's other -- there was

4  other factors that made that question ambiguous to me.

5      Q.  What other factors make this an ambiguous

6  statement that you are irrevocably resigning effective

7  January 8, 2016?  What other factors make that

8  ambiguous?

9      A.  Because of the conversation he had at the table

10  with me together.

11      Q.  What was that conversation that you believe

12  makes ambiguous this explicit statement in the document?

13      A.  That he was going to be the next chief of

14  police, that he was going to help me with my career and

15  my future.  And that if I followed through and I could

16  prove some form of innocence in this matter with

17  Wilkerson, that this all could potentially be overturned

18  and I could regain and retain further employment with

19  the City, especially after the lawsuit was over.

20      Q.  Paragraph 4 under the terms says, "The City

21  hereby accepts employee's irrevocable resignation."

22          You understood that by signing this document

23  and the City signing it, it was accepting your

24  irrevocable resignation, correct?

25      A.  I'm sorry, sir.

1    Was there a sidebar -- there was no sidebar conversation

2    in which you said you objected to paragraph 15 being

3    included in the agreement, correct?

4        A.   He and I had a lengthy -- Chief Addington and I

5    had a lengthy discussion before I signed this at that

6    table.   And I more than expressed that I was doing this

7    under duress.   I understand what I signed.   I understand

8    and I've explained to you why I signed it.   Okay.

9    That's the best answer I can give you.   I understand

10   what you're asking.   Yes, I signed it.

11           MR. CHRISTIAN:   Okay.   Let's go ahead and take

12   our lunch break at this time and go off the record.

13

14           (Luncheon recess taken)

15

16   BY MR. CHRISTIAN:

17       Q.   Going back on the record after lunch.   Just a

18   reminder that the admonitions that I gave you at the

19   beginning of the day still apply, most importantly that

20   you're still under oath.

21           Do you understand?

22       A.   Yes.

23       Q.   Thank you.   In this case you're claiming that

24   you were subject to retaliation for your October 2015

25   Pitchess court appearance, correct?

 1        A.   Yes.

 2        Q.   One of the ways in which you claim you were

 3   subject to retaliation for that October 2015 Pitchess

 4   Hearing is your claim that the City ended negotiations

 5   with you regarding continuing your employment with the

 6   City; is that correct?

 7        A.   Yes.

 8        Q.   I'm showing you a document which we're going to

 9   have marked as Exhibit No. 3 for purposes of the

10   deposition here today.

11

12             (Exhibit 3 marked)

13

14   BY MR. CHRISTIAN:

15        Q.   Showing you what's been marked as Exhibit No.

16   3, and for the record, I'll reference that this is a

17   three-page document and on the first page appears to be

18   two distinct e-mails.  And the second and third page

19   appear to be attachments to the first e-mail.

20             Referring you to the first page of Exhibit No.

21   3, you can see that -- does this appear to you to be a

22   true and correct e-mail exchange between you and Brian

23   Addington on October 5th, 2015?

24        A.   I believe so.

25        Q.   The first e-mail, October 5th, 2015, at

1   10:13 from Brian Addington to you, it reads, "Wade, per

2   our conversation last week I've attached a copy of the

3   signed original settlement agreement and attached is a

4   draft of the amendment we discussed for your review."

5           This e-mail is referencing that as early -- at

6   a minimum of a week prior to October 5, 2015 you and the

7   chief were discussing an amendment to your settlement

8   agreement; is that accurate?

9       A.  Yes.

10      Q.  When you've indicated that the City ended

11  negotiations with you regarding continuing your

12  employment, are you referring to these discussions that

13  are referenced in this e-mail marked as Exhibit No. 3?

14      A.  To answer your question, this was a form of

15  those negotiations.

16      Q.  So the negotiations that you're claiming ended.

17  You're saying this was a form of those negotiations.

18          When did those negotiations that you claim were

19  ongoing regarding your continuing employment, when did

20  those negotiations first begin?

21      A.  At the table at Applebee's in Antioch when I

22  signed the settlement agreement.

23      Q.  And what negotiations are you claiming was

24  going on at Applebee's when you signed the settlement

25  agreement?  What negotiations were happening?

1  investigation that I offered as proof of my innocence

2  and used it to impeach or at least blow holes in

3  Wilkerson's allegations.

4       When she admitted that she had perjured

5  herself, I had asked the chief when can we revisit this,

6  reopen the IA, put some finalization to it.  I want to

7  still work here.

8      Q.  And what, if anything, did the chief say in

9  response to that?

10      A.  He told me that we need to wait and see what

11  happens with the finalization of the lawsuit and that he

12  needs to talk to some people.

13      Q.  After that point in time where you say you had

14  that discussion with the chief, after Wilkerson's

15  deposition, when is the next time, if at any point, you

16  had discussions with him about continuing your

17  employment with the City?

18      A.  I can't give you specific dates, sir.  I can

19  tell you that he and I had frequent conversations.  I

20  was probably a bother about it to him, but we had

21  frequent conversations.

22      Q.  Although you had conversations about your

23  desire to continue employment with the City, was the

24  week before this October 5th, 2015 e-mail the first time

25  that a specific amendment was discussed?

1    A.  As far as a written document.  We had discussed

2  other provisions about what he and I had originally

3  started talking about when we were in Applebee's in

4  2012.  And we got down to where, you know, he was going

5  to try and see what other provisions the City could

6  allow or would allow in regards to the settlement

7  agreement.

8    Q.  If you look at the document attached to the

9  e-mail on Exhibit No. 3, it's entitle First Amendment to

10  the Settlement Agreement and Release.

11    Do you recognize this as a true and correct

12  copy of the proposed amendment to the settlement

13  agreement that Chief Addington provided to you on or

14  about October 5th, 2015?

15    A.  It appears to be, yes, sir.

16    Q.  If you look down under the number 1, it says,

17  "Paragraph 3 is replaced with the following."

18    That paragraph indicates that your resignation

19  date would be changed to a date that you use up your

20  available leave or to June 3rd, 2016.

21    You understood that that was the amendment

22  being proposed to you?

23    A.  Yes.  I had a basic understanding that if I

24  used -- they would extend my time of departure up to the

25  point that I exhausted all of my leave.

1   after everything that we've all been through, if it

2   wasn't written down, I didn't want to sign it.

3     Q.  To be clear, the document was indicating that

4   your resignation shall be the earlier of those two

5   dates.  So either when your leave expires or June 3rd,

6   2016, you understood at least that is what the amendment

7   was proposing, yes?

8     A.  Exactly, yes.

9     Q.  What you're saying is you wanted a guarantee

10  that your employment would continue to June 3rd, 2016;

11  is that correct?

12     A.  I wanted the chief to put in writing what he

13  told me verbally.

14     MR. CHRISTIAN:  Objection; nonresponsive.

15  Move to strike.

16     Q.  My question to you was, did you want the

17  agreement to indicate that your employment would

18  continue to June 3rd, 2016, regardless of whether you

19  had enough leave to make it there or not?

20      Do you understand my question.

21     A.  I'm sorry, sir, I really don't.

22     Q.  Sure.  We've acknowledged that the agreement

23  offered to you didn't guarantee that your employment

24  would continue to June 3rd, 2016, correct?

25     A.  That's not what my understanding was.

1    was going to stay.  So unless I'm just completely

2    misunderstanding you, that's what I'm getting at.  I

3    don't recall having a specific discussion about that

4    date.  I recall being surprised when I saw it.

5         Q.  Okay.  That's different than your prior

6    testimony but --

7         A.  And I told you I was confused.  That's why I

8    wanted to revisit it with you.

9         Q.  So the amendment that you received was not

10   inconsistent with any prior communication you had with

11   the chief about guaranteeing your employment through

12   June 3rd, 2016, correct?

13        A.  I guess we're stuck on this one because again,

14   I'm not understanding -- you just -- I answered you and

15   I think you just asked me the same question again.

16        Q.  I asked you something different.  That's okay.

17   We're going to go ahead and move on.

18             In response to the chief sending you the

19   amendment on October 5th, you responded, "Thanks.  I

20   will review and advise."  Correct?

21        A.  I did.

22        Q.  At some point thereafter you rejected the

23   chief's proposed amendment to you, correct?

24        A.  Yes.

25        Q.  At some point after you rejected the chief's

1   amendment to you, you also had a conversation with the

2   chief about the topic, correct?

3      A.  Can you identify a date and time or something

4   more specific, please?

5      Q.  Well, I'm just saying, did you have a

6   conversation?  Do you recall -- you received the offer.

7   At some point you rejected the offer.  Then you also had

8   some oral conversation with the chief in which he told

9   you he was not going to let you work beyond your

10   resignation date, correct?

11      A.  At some point I had a conversation with him and

12   he presented -- he had that form in his hand that you

13   have here marked as Exhibit 3 and we talked about it in

14   his office.

15        I had already shown that to my attorney and we

16   talked about it and that's when he gave me the assurance

17   that if I did sign this he would make sure that I worked

18   until that date.  The specific date that we had that

19   conversation, I don't know.

20      Q.  The chief also communicated to you orally that

21   he was going to expect you to resign as agreed in the

22   original settlement agreement.  At some point the chief

23   communicated that to you, correct?

24      A.  Can you at least specify what point we're

25   talking about?

1  when.  Isn't it true that he told that you were going to

2  have to resign on the date specified in your settlement

3  agreement?

4      A.  At some point I'm sure he probably did.  I

5  don't know specifically when.

6

7          (Exhibit 4 marked)

8

9  BY MR. CHRISTIAN:

10     Q.  I've been handed what's been marked as Exhibit

11  No. 4.  This document has two -- one page.  It has two

12  e-mails on it.  The top e-mail appears to be an e-mail

13  from you to Brian Addington.  It's also copied to your

14  attorney Horowitz regarding the amendment.

15         Do you recognize this as a true and correct

16  copy of an e-mail you sent to Brian Addington?

17     A.  It appears to be my e-mail, yes.

18     Q.  And this is the e-mail in which you

19  communicated back to Brian and the City that you were

20  rejecting his proposed amendment, correct?

21     A.  Yes.

22

23          (Exhibit 5 marked)

24

25  ///

1  BY MR. CHRISTIAN:

2      Q.  I've handed you what's marked as Exhibit No. 5.

3  It appears to be an e-mail from Wade Derby to Brian

4  Addington dated October 12th, and attached to it is a

5  memo that appears to be from Wade Derby to

6  Chief Addington.

7          Do you recognize this e-mail in this memo as

8  true and correct copies of documents that you submitted

9  to Chief Addington on or about October 12th, 2015?

10     A.  Yes, sir.

11     Q.  If you look at the memo which is on the second

12  page, when you created this memo, was everything in the

13  memo accurate?

14         Asked another way, would you have created a

15  memo that had false information in it?

16     A.  Could you repeat the question, sir?  I'm sorry.

17  I was reading this.

18     Q.  Yes.  When you sent this memo to

19  Chief Addington, was it your intent that everything in

20  the memo be accurate?

21     A.  Yes.

22     Q.  And to your knowledge, is everything contained

23  in the memo accurate?

24     A.  I believe it is.

25     Q.  If you look at the first sentence, it says,

1  "Chief, per our meeting on 10-6-15, you informed me that

2  the City of Pittsburg is expecting my resignation from

3  service effective 1-8-16."

4      A.  Yes, sir.

5      Q.  Does this refresh your recollection that you

6  had a conversation with Chief Addington after you

7  rejected the proposed amendment in which Chief Addington

8  told you the City was expecting your resignation

9  effective 1-8-16?

10     A.  It appears to be the date and time that would

11  be consistent with what I couldn't remember a minute

12  ago.

13     Q.  So this meeting on 10-6-15 is when

14  Chief Addington effectively ended negotiations with you

15  and told you despite your desire, you had to resign from

16  service effective 1-8-16; is that correct?

17     A.  That's what the memo says.

18     Q.  Do you have any reason to dispute what's in the

19  memo?

20     A.  I believe there is another conversation in an

21  e-mail that was sent to me later on.

22     Q.  Although there was a later e-mail or

23  conversation, again, you don't dispute that it was on

24  10-6-15 that the chief told you he was expecting your

25  resignation on 1-8-16, so effectively ending his prior

1  negotiations with you about continuing your employment?

2     A.  I'm assuming that that's accurate but I can't

3  tell you specifically beyond any reasonable doubt that

4  there's not a typographical error there.

5     Q.  You are not aware of any facts that would

6  suggest it's not accurate?  Let me ask it that way.

7     A.  Like I told you, I wasn't sure of a specific

8  date.  That could be accurate.  It might be inaccurate,

9  but I don't know.

10    Q.  The only written proposed amendment to the

11  settlement agreement provided to you was the one we

12  reviewed as Exhibit No. 3, correct?

13    A.  Yes.

14    Q.  You did resign from the City effective

15  January 8th, 2016, correct?

16    A.  I don't believe that's correct.

17    Q.  Why not?

18    A.  Because I retired.

19    Q.  Other than that terminology "resign" versus

20  "retired" -- so let me rephrase it.

21        Your employment ended with the City effective

22  1-8-16, correct?

23    A.  Yes, sir.

24    Q.  And when your employment ended on 1-8-16, that

25  was consistent with the terms of the original settlement

1   agreement you signed with the City, correct?

2      A.  Yes, sir, it was.

3      Q.  When Chief Addington conveyed to you that the

4   City was not -- was going to require you to resign

5   effective 1-8-16 effectively ending the negotiations

6   with you, do you believe Chief Addington made that

7   decision or anyone else to end the negotiations with

8   you?

9      A.  Honestly, I don't know who.  I -- I can't

10  really answer that.

11     Q.  You claim that the City ended those

12  negotiations with you because of your statements at the

13  Pitchess Hearing in October of 2015.  Why do you believe

14  your statements at the October 2015 Pitchess Hearing was

15  the reason for the City ending those negotiations with

16  you?

17     A.  Well, to clarify, I believe that it began

18  before I went to that October 15 Pitchess Hearing.

19     Q.  When you say it began before the October 2015

20  Pitchess, what do you mean by "it" began?

21     A.  The City blockading any change to my

22  resignation date or retirement date.

23     Q.  When do you believe the City, as you referred

24  to it, started a blockade of you continuing your

25  employment?

1      Q.  As a result of the IA investigation, the

2  settlement agreement you entered into indicated that you

3  would remain in the position doing the function

4  described in the settlement agreement, correct?

5      A.  That wasn't my understanding.

6      Q.  The settlement agreement, do you recall that it

7  specified that you were going to do certain functions as

8  a lieutenant?

9      A.  It said I was going to do managerial duties at

10  the discretion of the chief.

11      Q.  The -- and it said you would remain in that

12  position, your settlement agreement did?  It never said

13  anything about you being allowed to promote to captain,

14  correct?

15      A.  It didn't say anything about the fact that I

16  couldn't be.

17      Q.  The document speaks for itself.  So we'll

18  review that as necessary.

19          You've indicated that the City blocked your

20  ability to have continued employment even prior to

21  October 2015.

22          You've indicated that this, being disqualified

23  for the captain's position was one way.

24          Is there any other circumstance prior to

25  October 2015 that you believe the City also blocked you

1    from continuing your employment?

2         A.   Yes.

3         Q.   What else?

4         A.   We were having a leadership problem with the

5    sergeants and the lieutenants and patrol speaking out

6    against our two newly promoted captains.  The two

7    captains actually approached the chief with a suggestion

8    that they move me back out into the field to try and

9    help instill some leadership within the organization.

10        The chief and I had a conversation, as did the

11   two captains, with me.  And out of deference to them I

12   felt as if they did that and they left me at the same

13   rank, that it would undermine their ability as leaders.

14   And that if I was to effectively make a change, that

15   somehow they had to put me in a status that had

16   authority over those lieutenants that were causing some

17   of the issues with the sergeants.

18        I asked the chief is it possible to be able to

19   be made an acting captain.  He thought that was possibly

20   a plausible idea.  He told me he presented that to the

21   City manager and the City manager shot it down because

22   he referred to it as retirement spiking.

23        Q.   When did this occur, this discussion about you

24   possibly being acting captain, as you've described?

25        A.   I believe it was sometime in -- and I'm

1   estimating -- summer of 2015.

2       Q.  Was there only one time in which you had

3   discussions with the City about possibly becoming an

4   acting captain?

5       A.  I had had that -- when you refer to the City,

6   I'm assuming, and I don't want to do this, the City is

7   the chief to me, also.  I never spoke to anybody outside

8   of my organization about it.

9       Q.  And when I say the City, I'm referring to any

10  agent that you perceive as an agent for the City.  So

11  certainly the chief would be included within that.  But

12  I wasn't limiting it to the chief.

13          So I understand you're saying that you had this

14  discussion summer of 2015 about possibly being an acting

15  captain.  I just want to make sure, regardless of who it

16  was with, was there ever any other discussions with

17  anyone at the City about becoming an acting captain at

18  any other time?

19      A.  Besides the chief --

20      Q.  Besides the chief as you've described in the

21  summer of 2015.

22      A.  I had the same discussion with the two captains

23  that I've identified.

24      Q.  And that discussion was about the same

25  situation and it was also in the summer of 2015,

1    correct?

2        A.  Yes, sir.

3        Q.  So I view that as one situation in which you

4    were discussing with the chief and others about becoming

5    an acting captain.  I just want to make sure there's no

6    other time or situation in which there was a discussion

7    about you becoming an acting captain.

8            So no other occasion but summer of 2015,

9    correct?

10       A.  To the best of my recollection, that was the

11   tine.

12       Q.  To your knowledge, who made that decision that

13   you couldn't be an acting captain?

14       A.  Chief Addington told me that the City manager

15   did.

16       Q.  And once again, what was communicated to you as

17   to why you couldn't be an acting captain?

18       A.  That we thought it might be a good idea that it

19   would be possibly retirement spiking and could be

20   problematic.

21       Q.  Do you have any reason to dispute that that was

22   the City manager's true belief, that you shouldn't

23   become an acting captain because of concerns about it

24   being considered retirement spiking?

25       A.  I -- I have never spoken with him about it.  I

 1 | <u>don't know what his feelings were.</u>

 2 |     Q.  Is there any other situation prior to October

 3 | of 2015 that you believe the City blocked you continuing

 4 | your employment with the City?

 5 |     A.  Yes.

 6 |     Q.  What?

 7 |     A.  Throughout the time after this IA was -- even

 8 | during the IA process itself, I had been providing

 9 | information as part of the IA and then part of the

10 | lawsuit demonstrating that Wilkerson had lied, had

11 | possibly fabricated the truth about things, that there

12 | were other people that she had accused of misconduct in

13 | the form of sexual harassment where no investigation was

14 | done.

15 |        And the chief and I certainly had enough active

16 | conversations about how I was very much in favor and

17 | wanting to have this thing -- this case reopened and

18 | overturned.  I provided, when I came back to work and

19 | got my work cell phone back, I provided the chief a text

20 | message that Wilkerson had sent me that I had forgotten

21 | about because when I turned in my equipment when I was

22 | on suspension and on administrative leave, I had also

23 | turned in my phone.

24 |        When I turned my phone on, the text message was

25 | still there.  We used that text message to help impeach

1  some of her testimony during the depositions regarding

2  her relationship with me.  There -- my very last day of

3  work I cleaned out my locker and I walked into the

4  chief's office because I found a picture.  I hadn't been

5  up on the second floor in years because I wasn't allowed

6  to go there.

7       I cleaned out my locker and there was a

8  picture, a Polaroid photo in my locker.  And it says,

9  "Sergeant Derby trying to hide the whopper."  And I

10  hadn't seen it, hadn't remembered it.

11       And I walked into Chief Addington's office to

12  say goodbye to him and I said to him, I go, "Here's just

13  another reminder of why this was wrong."

14       And he said, "I wish you had this thing four

15  years ago."

16       Q.  You gave him that text message when?

17       A.  I gave him that shortly after I returned back

18  to work.  Probably within a day of two of coming back to

19  work.

20       Q.  That was in January of 2013?

21       A.  Yes, sir.

22       Q.  If I understand you correctly, you're

23  indicating that you made requests that the IA

24  investigation be reopened and overturned and ultimately

25  purged completely from your file and records.  You made

1  that request regarding the investigation you're claiming

2  as early as January of 2013?

3      A.  Yes.

4      Q.  And at that point in time when you made this

5  request for your case to be reopened, for the IA to be

6  overturned, for the findings to be purged in January of

7  '13, are you saying Chief Addington at that point

8  refused to do so?

9      A.  He refused to re-open the case.  I do want to

10  clarify in fairness the issue of purging at that point,

11  to use your terminology, was not in effect.  The purging

12  aspect came later.

13      Q.  When did the purging aspect come up?

14      A.  When the case was to the point that it had been

15  held in the chief's possession for the time limit

16  required by law and that we had past that and he was

17  purging some various IA files, I requested mine be

18  purged.

19      Q.  And when specifically was this?

20      A.  Sir, I don't recall the specific date.  I had

21  been in his office and I know he was purging IA files

22  because he told me he was.

23      Q.  What is your understanding of this specific

24  time limit that you referenced in which files are to be

25  purged?

1  you asked him to purge your IA file; is that correct so

2  far?

3      A.  That's not the first conversation that he and I

4  had about purging the IA file.

5      Q.  Okay.  When was the first time you had a

6  conversation with him about purging the IA file?

7      A.  In Applebee's in Antioch before I signed the

8  settlement agreement.

9      Q.  And what specifically did you discuss with him

10 at that point regarding purging your IA file?

11     A.  No matter what happened with this whole

12 situation when I came back to work, that when I left the

13 department, that that IA filed would be purged.

14     Q.  Who said that?

15     A.  He and I made that agreement to each other.

16     Q.  What was your understanding as to why the IA

17 file would be purged?

18     A.  Because one, definitely it would have timed out

19 as far as being in our files to begin with.  And

20 secondly, I made it very clear to the chief that I

21 wanted to continue my career in law enforcement.  And if

22 I couldn't prove to him that this whole case needed to

23 be overturned and reinvestigated, that at least grant me

24 the opportunity to be able to have control over that

25 document and not have it randomly somewhere else.

1    Q.  And when you had this conversation you're

2  alleging in Applebee's no one else was present, correct?

3    A.  No, sir.

4    Q.  You took no notes of this conversation that you

5  had with the chief in Applebee's about signing the

6  agreement, correct?

7    A.  No, I didn't.

8    Q.  And the discussion about purging the document

9  at that point in time, you indicating that it was

10  discussed that it would be purged consistent with the

11  City's practice of purging IA files after a certain

12  period of time; is that correct?

13    A.  That's how he phrased it to me because he knew

14  that he could.

15    Q.  And then you testified a minute ago when I was

16  asking you about purging files that that conversation

17  actually didn't happen until the time for purging files

18  arose.

19       So between the time of the Applebee's

20  conversation you described about purging files and then

21  this conversation you've described in which the time was

22  up in your mind to purge the file, were there any other

23  conversations about purging the file in between?

24    A.  Yes, sir.

25    Q.  How many other conversations did you have about

1   purging the file as opposed to what you were talking

2   about further about reopening the file and overturning

3   the investigation?

4       A.  I can recall two other conversations about that

5   IA file regarding purging or releasing it.

6       Q.  And when you say "releasing," what do you mean

7   relevant to purging it?

8       A.  There was another lawsuit that I had nothing to

9   do with.  And somehow it -- the attorneys involved in it

10  were trying get copies of other IA's that weren't really

11  related or germane to anything.

12          And I was told by Captain Raman and Captain

13  Perry that they were going to release my IA to this law

14  firm without my consent.  And I objected to that because

15  it was a protected document.

16          And at that point I believe is when we realized

17  that it could be purged.  And so in that same

18  conversation that I had with the chief, I said, "Why

19  can't we purge this now?"

20          And he told me that because Wilkerson still had

21  an open lawsuit, though I had been dismissed from it,

22  that he wasn't able to do it just yet.  So I think that

23  brings the timeline together when later on I revisited

24  it with him because I found out that he was purging

25  documents and the Wilkerson lawsuit was over now.

1    Q.  When you requested he purge the file and he

2  said he couldn't because Wilkerson was still pending, is

3  it true the Wilkerson lawsuit was still pending at that

4  time?

5    A.  I don't know personally.  I don't have any

6  reason to disbelieve him.

7    Q.  Would you agree it was a -- it would be a valid

8  reason that your IA file could not be purged while the

9  Wilkerson lawsuit was still pending?

10    A.  I understood that.

11    Q.  Later when you had the conversation but

12  sometime short of October of 2015, when the time limit

13  was up and the chief had conveyed he couldn't purge the

14  file because you had threatened a lawsuit, was that

15  correct that by that time when you were having the

16  conversation with the chief that you had in fact

17  threatened a lawsuit?

18    A.  I had in fact through my attorney filed a

19  notice that we were considering doing that, yes.

20    Q.  Would you agree that the chief could not purge

21  your file at that point in time because you had

22  threatened to file a lawsuit related to that IA

23  investigation?

24    A.  I didn't agree.

25    Q.  Do you believe that it was still appropriate to

1  That's the time I'm talking about.

2      A.  Clear as mud to me, but go ahead.

3      Q.  So at that particular time, what did

4  Chief Addington say in response to you when you asked to

5  purge the file?

6      A.  I believe that his answer to me was the

7  Wilkerson lawsuit was not yet finalized somehow.

8      Q.  And at that particular time where

9  Chief Addington made the comment to you that Wilkerson

10  was not finalized, you have no reason to dispute that

11  statement that it was not finalized, correct?

12      A.  I don't know if it was finalized or not.

13      Q.  At some later point in time you're saying that

14  the chief also communicated to you he couldn't purge

15  your file because you had made a threat of filing a

16  lawsuit, correct?

17      A.  Yes.

18      Q.  And at that point in time when the chief

19  conveyed that to you, you had in fact already made a

20  threat to file a lawsuit against the City, correct?

21      A.  Yes.

22      Q.  Thank you.

23      MR. CHRISTIAN:  Counsel, I don't know if you

24  still want to take a break.

25

1  that's coming to mind.

2      Q.  When you say that you were pointing out they

3  were not disclosing facts they should, what exactly do

4  you believe they were doing wrong or that they should

5  have been disclosing?

6      A.  That there was an Internal Affairs file.  There

7  was an investigation of misconduct of those officers and

8  that file should have been made available for all the

9  Pitchess Hearings.  And that the records manager was

10  potentially putting herself in a position, and the

11  department, by not disclosing those things, potentially

12  perjury or something else.

13      Q.  At the October 2015 Pitchess Hearing, you've

14  indicated the City did bring the IA documents you were

15  referring to, correct?

16      A.  They did.

17      Q.  And prior to the October 2015 Pitchess Hearing,

18  you were asked to come to other Pitchess Hearings to

19  discuss the investigation that you had conducted,

20  correct?

21      A.  The one that we discussed.

22      Q.  Do you have any understanding as to why as you

23  believe, the IA file was not disclosed at some Pitchess

24  Hearings?

25      A.  I'm sorry?

1      Q.   Sure.  Let me ask it a couple different ways.

2  Number one, did anyone ever convey to you any reason why

3  your IA documents were not disclosed at some Pitchess

4  Hearing?

5      A.   Chief Addington provided me an explanation.

6      Q.   What did he say in that regard?

7      A.   That he had spoken with his legal counsel and

8  they felt as if my Internal Affairs investigation was

9  not a completed investigation and that it didn't

10  constitute a personnel record.

11      Q.   On how many occasions did Chief Addington

12  convey that to you as a reason why the IA investigation

13  was not being disclosed?

14      A.   I don't recall how many.

15      Q.   Was it more than once?

16      A.   I don't know.  I know it was at least once.

17      Q.   Do you recall anything you said in response to

18  Chief Addington when he conveyed that as a reason why

19  the IA investigation was not being disclosed?

20      A.   I remember discussing with him that he and I

21  both had training in what a personnel record was.  And

22  these clearly were personnel files.

23      Q.   On how many times did you ever convey to

24  Chief Addington any concern about the IA documents not

25  being disclosed?

1      A.   Through face-to-face contact or memorandum or

2  all?

3      Q.   In any way.  How many communications did you

4  ever have with the chief when you conveyed to him any

5  concern you had about the IA documents not being

6  disclosed?

7      A.   Possibly five or more.  I don't know.  That's

8  an estimate.

9      Q.   On how many occasions, if any, did you put your

10 concern in writing?

11     A.   I believe that, again an estimate, at least

12 three.

13     Q.   When is the first time you provided any concern

14 to Chief Addington in writing regarding the IA

15 documents?

16     A.   I would have to estimate.

17     Q.   What is that estimate?

18     A.   Shortly after the very first Pitchess Motion in

19 2014 that got continued.

20     Q.   Did you receive any response from

21 Chief Addington to this first documentation of your

22 concerns about the IA not being produced?

23     A.   I don't recall any written correspondence from

24 him.

25     Q.   Whether it was written or oral, did you receive

1    A.   I told you it was an estimate.

2    Q.   So you're not sure if it was three.  So you

3  don't have a recollection of when any additional memo

4  might have been; is that correct?

5    A.   I just know that chronologically there was a

6  first, a second and some other number that were sent in

7  writing, either memos or e-mails to the chief.

8    Q.   Were you satisfied with the response you got

9  from the chief when you sent the memos?

10   A.   Satisfied with what?

11   Q.   The response you got from the chief.

12   A.   I -- I can't frame it that I was satisfied or

13  dissatisfied with it.  Sorry.

14   Q.   You testified that the City refused to purge

15  your IA records, as you desired.  Do you claim that the

16  failure to purge the IA files was motivated by the

17  October 2015 Pitchess Hearing?

18   A.   I claim that it all leads to the same process,

19  not specifically about a hearing, but the fact that I

20  came forward on these -- in these areas of concern and,

21  as a result of that, things that were promised to me

22  were not done.

23   Q.   So I understand you're saying -- you're

24  describing some process.  I just want to be clear.

25       You're not aware of anything that would support

1   that the October 2015 Pitchess Hearing in particular was

2   the reason why your IA files were not purged; is that

3   correct?

4       A.   I can't speculate about that.  I'm not going

5   to.  I'm sorry.

6       Q.   Are you claiming that you were unfairly denied

7   the ability to work per diem following your retirement

8   with the City?

9       A.   Yes.

10      Q.   And when you reference not being allowed to

11  work per diem, what do you mean by that?

12      A.   We have a -- we have or had when I was an

13  employee with the City of Pittsburg, a pattern and

14  practice that began under Chief Baker and extended

15  through Chief Addington's tenure to allow retirees to

16  come back and work as retirees being fully paid and due

17  to the timing of the per diem, they go for the first six

18  months of that fiscal year and then the final six months

19  of the second fiscal year, basically giving them a

20  one-year entitlement to double-dip, if you will, as a

21  retiree.

22      Q.   The per diem, what's the difference, I'm sorry,

23  between the first and second six months?

24      A.   It's just about fiscal cycles.

25      Q.   So were you claiming again they were allowed to

1  work per diem for six months during the first fiscal

2  year and six months during the second fiscal year?

3      A.  Yes, sir, 980.

4      Q.  And you're saying that was work as a retired

5  annuitant per CalPERS; is that correct?

6      A.  That was work as a retired annuitant and still

7  being able to have a CalPERS pension and not interfere

8  with it.

9      Q.  How many other individuals do you believe were

10 allowed to work in this per diem fashion as you

11 described?

12     A.  When?

13     Q.  At any point in time for the City of Pittsburg.

14     A.  Again, it started with Aaron Baker when he was

15 chief.  I -- go ahead.  I'm sorry.

16     Q.  My only question was on how many other -- on

17 how many occasions do you believe that an officer with

18 the City of Pittsburg was allowed to work per diem as

19 you described?

20     A.  I thought you wanted me to name names.

21     Q.  No.  Right now I'm just saying how many.

22     A.  Several.

23     Q.  Can you give me your estimate as to a number?

24 How many as you sit here today, how many do you recall

25 specifically that were allowed to work per diem?

1    A.  Probably at least ten.

2    Q.  The ten that you believe were allowed to work

3  per diem, how many of those were under Chief Addington,

4  if any?

5    A.  Four, maybe five.

6    Q.  Nothing in your settlement agreement with the

7  City indicated you would be allowed to work per diem,

8  correct?

9    A.  Not that I recall.

10    Q.  Out of the ten other individuals that you

11  believe were allowed to work per diem, how many of those

12  individuals, if any, to your knowledge were accused of

13  sexual harassment and entered into settlement agreements

14  specifying irrevocable resignations of their employment

15  with the City?

16    A.  I don't know.

17    Q.  Do you know if any of those ten ever had sexual

18  harassment charges against them resulting in a

19  settlement agreement that required an irrevocable

20  resignation of their employment with the City?

21    A.  I don't have specific knowledge of what's in

22  their personnel files.

23    Q.  What facts, if any, are you aware of that --

24  strike that.

25        Did you ever ask the chief for the explanation

1   as to why in your mind you were not allowed to work per

2   diem?  Strike that.

3         In the amendment that you were provided, it

4   indicated that you would be allowed to work for the City

5   and get paid after your retirement or up until your June

6   date; is that correct?

7      A.  No, sir.

8      Q.  Did you ask the chief ever to be allowed to

9   work per diem?

10      A.  Yes, sir.

11      Q.  When did you ask him that?

12      A.  I don't recall the first time, but I asked him

13   multiple times.

14      Q.  Could you give me your estimate as to

15   approximately when it was the first time you asked him

16   to be allowed to work per diem?

17      A.  When we sat in Applebee's and I signed the

18   settlement agreement.

19      Q.  Did you also ask him to work per diem the week

20   prior to you receiving the amendment to the settlement

21   agreement?

22      A.  I don't -- I know we had been discussing it,

23   but I don't know if it was that week prior.

24      Q.  When is the first time that it was conveyed to

25   you you would not be allowed to work per diem?

1    A.   When the chief sent whatever notice he sent

2    me -- I don't know the date -- saying that everything

3    was -- there was no more negotiation, everything was

4    irrevocable.

5    Q.   At that same time when he told you you had to

6    resign on that date certain; is that correct?

7    A.   That's what was conveyed to me in the -- in

8    writing.

9    Q.   He also conveyed that to you orally; is that

10   correct?

11   A.   At some point.

12   Q.   We previously looked at a document that

13   referenced you had a conversation on a particular date

14   which he conveyed that you were going to resign on a

15   certain date and you knew there was no more

16   negotiations.  It was at that point also that you

17   understood he was denying you the ability to go per

18   diem?

19   A.   I don't know if that's the exact time but I

20   know at some point I was denied the opportunity to go

21   per diem.

22   Q.   Did the chief ever give you any indication as

23   to why you were being denied the ability to go per diem?

24   A.   I don't recall specifically.

25   Q.   Did you ask?

1    A.  I don't know.

2    Q.  The denial of per diem work that you're

3  describing, this would be per diem work after your

4  employment with the City would end; is that correct?

5    A.  Per diem work would be after I retired.

6    Q.  After you retired after your employment with

7  the City ended; is that correct?

8    A.  Yes.

9    Q.  Are you aware of any facts that would support

10  that the City's denial of your ability to work per diem

11  was motivated in any way by the October 2015 Pitchess

12  Hearing?

13    A.  As I've testified, I believe it's a factor.

14    Q.  And why do you believe the October 2015 hearing

15  was a factor in you being denied the ability to work per

16  diem?

17    A.  It's not that specific date alone.  Again, it's

18  the progression of what was taking place and I was not

19  playing ball.  And I was coming forward about something

20  that for whatever reason, nobody else was coming forward

21  about.

22        The date of the deposition -- I'm sorry -- the

23  date of the Pitchess Motion in October is -- you're

24  using that as a point.  There were things that led up to

25  that that potentially is where it came to a head, as

1  I've testified.

2      Q.  And my only question to you, I understand what

3  you're saying, that you believe it was things -- correct

4  me if I'm wrong -- things prior to the October 2015

5  hearing that you believe were motivating factors in you

6  not being allowed to work per diem, correct?

7      A.  Correct.

8      Q.  I just want -- I was asking specifically about

9  the October 2015 hearing and whether or not, regardless

10  of you believing there were prior things, were there any

11  facts that would suggest the October 2015 Pitchess

12  Hearing was a motiving factor for denying you per diem?

13      A.  I think that that hearing is part of the -- the

14  ongoing facts that I've disclosed already.  And that

15  hearing is where the documents were finally revealed in

16  full to the court.

17      Q.  You're referring to everything you described

18  that took place at the -- that you described earlier in

19  your testimony today that took place at the October 2015

20  Pitchess Hearing, correct?

21      A.  Yes, sir.

22      Q.  The personal action form that you've testified

23  to that you received that was marked dismissal instead

24  of retirement, do you recall what I'm referring to?

25      A.  Yes, sir.

1    Q.  Do you know -- you said they saw that document.

2  You're saying Stanislaus County saw the document that

3  indicated you had been dismissed, the personal action

4  form; is that what you're alleging?

5    A.  That's my understanding.

6    Q.  And why -- what facts are you aware of that

7  would suggest Stanislaus County actually saw the

8  personal action form that marked you as dismissed?

9    A.  Because they were doing my background

10  information to be a full-time deputy and they dropped my

11  background, and they stated to me that the reason why

12  was because I had not disclosed that I had been

13  dismissed from duty.

14    Q.  Who communicated that to you?

15    A.  Whoever it was from their personnel background

16  people.

17    Q.  Did they specify to you, Stanislaus County,

18  ever that they had seen a personal action form

19  indicating you had been dismissed?

20    A.  What I stated is I was told because I was

21  dismissed.

22    Q.  And my question to you was -- I just want to

23  clarify -- no one ever told you from Stanislaus County

24  that they ever saw a personal action form that

25  designated you as being dismissed?

1    A.  I can't testify to that.

2    Q.  Did you convey to Stanislaus County that you

3    had retired and that you had not been dismissed?

4    A.  I remember talking to a background

5    investigator, but I -- at that point, I don't recall

6    what we specifically talked about, just that they

7    weren't going to proceed any longer.

8    Q.  How do you know or what facts are you aware of

9    that the reason that you did not get a job with

10   Stanislaus County was because of the mistake on the

11   personal action form designating you as dismissed?

12   A.  They sent me a letter saying that -- that I was

13   released from my job as a contract employee, which I

14   held while I was still working for the City of

15   Pittsburg.  And I got a second letter on the same day

16   saying that they were no longer proceeding with me as a

17   deputy and I was to turn in my identification.

18   Q.  And that letter that you received indicating

19   that you were no longer being considered, that's the

20   notice to you, in your mind, whereby they had made their

21   decision not to offer you employment; is that correct?

22   A.  Not to offer me employment and to terminate my

23   contract employment.

24   Q.  Do you recall the date in which you received

25   that letter from Stanislaus County indicating they were

1 A. I am.

2 Q. So my only question is about the form. So

3 that's my question. The form could not have been the

4 motiving factor if it had not been prepared yet, agreed?

5 A. I assume that would be correct.

6 Q. Do you claim that you were denied the ability

7 to be a reserve officer as a result or as retaliation in

8 some form?

9 A. I was denied the opportunity to be one when I

10 asked.

11 Q. And are you claiming that the denial of your

12 ability to be reserve officer was in retaliation for

13 something you did?

14 A. Yes.

15 Q. And the denial for being reserve officer was in

16 retaliation for what in your mind?

17 A. Everything that we've been talking about here

18 today; my whistleblowing activity within the department

19 throughout my career and specifically into the matter of

20 Pitchess. It was made very clear to me that, you know,

21 at one point from the chief, that there was no

22 opportunity to do anything.

23    I offered to come and work as a unpaid reserve

24 for my organization like is the practice in multiple

25 agencies and come and still volunteer, and I was even

1  denied that.

2  Q. Are you aware of any practice in the City of

3  Pittsburg or any agency when an officer has been accused

4  of sexual harassment and those allegations have been

5  confirmed and they've signed a settlement agreement for

6  an irrevocable resignation, are you aware of any such

7  circumstance where such an officer has been allowed to

8  work in such a reserve status?

9  A. I'm not aware of people's personnel files. I'm

10  aware that it is a pattern and practice of multiple

11  police departments in California, including the City

12  we're sitting in now, to reemploy their officers as

13  reserves and they are actually paid.

14  Q. And are you aware of any circumstance where

15  anyone who's worked as a reserve officer after

16  allegations of sexual harassment has been sustained

17  against that individual?

18  A. I don't know. You're asking me to speculate

19  about personnel files. I'm sure people have been

20  disciplined in their career severely and they're still

21  working.

22  Q. Can you cite to me any situation where someone

23  has worked as a reserve officer after allegations of

24  sexual harassment have been sustained against them?

25  A. I can't cite anything for you, sir.

1    Q.   Thank you.  When was it that you inquired about

2  working as a reserve officer for the City of Pittsburg?

3    A.   Just before Christmas.

4    Q.   Before Christmas of what year?

5    A.   2015.

6    Q.   What do you recall the request was at that

7  time?

8    A.   I asked the chief.  I said, "If I can't do

9  anything else, can I stay on as a reserve?"

10    Q.   What response did you receive?

11    A.   He smiled and he said, "No."

12    Q.   Other than saying no, did he give you any

13  explanation as to why no?

14    A.   I didn't press him.

15    Q.   There was nothing in your settlement agreement

16  with the City that indicated you would be allowed to

17  work as a reserve officer after your irrevocable

18  resignation, correct?

19    A.   No, there was not.

20    Q.   Did you want -- strike that.

21         Why did you want to work as a reserve officer?

22    A.   Because believe it or not, I really enjoyed

23  working for the City and I enjoyed being a police

24  officer.  And I enjoyed making a contribution that I

25  made there.  And I felt as if my career was not

1  complete.  And I wanted to leave on a positive note.

2  Q.  Did you indicate to anyone that you wanted to

3  continue reserve officer status so you could keep your

4  post certification for a longer period?

5  A.  Yes.  That was also another reason.

6  Q.  You never proposed to the chief that you would

7  actually do volunteer work for the City as a reserve

8  officer, correct?

9  A.  Yes, I did.

10  Q.  What are the requirements, to your knowledge,

11  to work as a reserve officer for the City of Pittsburg?

12  A.  That I'm qualified to do it based on my -- on

13  post and training, and our reserves in Pittsburg are

14  unpaid.  So it's always been a voluntary position.

15  Q.  Are you aware of any other requirements that a

16  reserve officer has to do to maintain that status with

17  the City of Pittsburg or any city?

18  A.  I would have to look at our department policy

19  because each one is different.  And I don't recall what

20  it was under Chief Addington.  I know you had to work X

21  number of days, perhaps a month or within a cycle.

22  Q.  Are you aware of any facts that the chief's

23  denial of your request to work as a reserve officer was

24  motivated by anything that happened at the October 2015

25  Pitchess Hearing?

1    A.  It's still per my ongoing testimony here that

2  the same factors apply to per diem, reserve and the

3  opportunity to stay within the organization.

4    Q.  And I'm being very specific here now as to the

5  reserve officer and I'm being very specific to the

6  October 2015 Pitchess Hearing.

7         You're not aware of any facts that something

8  particular to the 2015 Pitchess Hearing was a motivation

9  for your denial of reserve officer status; is that

10  correct?

11    A.  Beyond what we've discussed already, no, sir.

12    Q.  In your responses to interrogatories directed

13  to you in this case you were asked to identify what

14  acts, if any, the City did towards you that you were

15  claiming were adverse acts or retaliation.

16         I'll represent you made reference to that, "On

17  December 4th, 2015, Chief Addington sent a memo saying

18  that the City was prepared to terminate you due to your

19  misconduct."

20         Do you recall the memo that you were referring

21  to when you provided that answer?

22    A.  I do recall a memo or an e-mail response from

23  the chief stating that.

24    Q.  Okay.  And what you're complaining about in the

25  memo was rearticulation from the chief that you weren't

1  signed the settlement agreement?

2      A.  I had four more years left minimum before I

3  turned 50.  I had a family of four.  I had people in my

4  life that I was supporting.  I had a career, a very

5  promising one.  And it was all being taken away from me.

6          On top of that, I had to support my family.  I

7  was accused of something that I've demonstrated is not

8  factually what occurred.  And I wanted to have the

9  opportunity to tell people that story or to make it

10  right.  I wanted to go back and work and work in a

11  profession that I love and care about obviously because

12  I'm still doing it.

13          I wasn't ready to leave but this was the best

14  means of being able to take care of my family and to

15  take care of my obligations without losing that.

16      Q.  You claim that you made a request to have your

17  IA reopened, correct?

18      A.  I did.

19      Q.  And at some point prior to October of 2015,

20  Chief Addington conveyed to you that the IA would not be

21  reopened, correct?

22      A.  More than once, yes.

23      Q.  And why did he convey to that you the IA would

24  not be reopened?

25      A.  I don't know.

1    Q.  My question to you is did he ever convey to you

2    why the IA would not be reopened?

3    A.  He never gave me an answer.

4    Q.  Why do you believe the IA should have been

5    reopened?

6    A.  Because I provided evidence to my innocence in

7    the matter more than once.  That evidence was used to

8    successfully defend the case against Wilkerson in a

9    trial, but virtually ignored during the IA when I turned

10   it over, and then additional evidence that I testified

11   to already like phone text message and even photographs

12   in my locker, and even the comments made by the chief,

13   including "And I wish you had shown me this four years

14   ago."

15   Q.  So this additional evidence or photo in the

16   locker, can you be very specific with me what additional

17   evidence are you referring to that you ever submitted to

18   the City of Pittsburg?

19   A.  I submitted evidence of Ms. Wilkerson and her

20   whatever he is, brother, Kurt Sullivan, using the City

21   server and e-mails to send sexually explicit derogatory

22   e-mails, racial e-mails and committing general

23   misconduct.

24       I submitted evidence stating that Ms. Wilkerson

25   by her own former husband's admission, said that

1   lieutenant Raman and Chief Baker were sexual harassing

2   her and he didn't even know who I was. And there was

3   other evidence from other witnesses that was brought

4   forward in the IA investigation.

5       Q. Okay. Right now I'm asking you about after the

6   IA investigation, I just want to be clear. You've

7   indicated that these messages of her use of the server

8   for inappropriate messages and then you've referenced

9   her husband indicating that there was a reference to

10   Raman and Baker and not you.

11       Is there any other evidence that you believe

12   defends you that was presented to the City after the IA

13   investigation?

14       A. Yes. There was the text message that I had

15   testified to earlier that I found on my phone that was

16   used in the litigation of the lawsuit.

17       Q. Anything else?

18       A. Yes. The photograph that I found in my locker

19   even to the last day.

20       Q. So the photograph, the text message, this

21   alleged evidence of her using the server for

22   inappropriate messages and these comments by her

23   husband, anything else that you believe was additional

24   evidence that you presented to the City after your IA

25   that would have justified reopening your investigation?

1    Q.  You've indicated that you offered various

2  additional evidence that you think helps defend the

3  allegations against you, correct?

4    A.  In the IA or in the lawsuit, sir?

5    Q.  At any point in time.  You said after the IA

6  you offered various evidence to the City that you

7  believe justified reopening the investigation, correct?

8    A.  Yes.

9    Q.  None of that evidence that you offered would

10  contradict any admissions that you made in the

11  investigation itself, correct?

12    A.  I can't say it's correct.  I would have to sit

13  down line by line and review that and see what they've

14  recorded, meaning the City during the IA, and then look

15  at the information that I've provided.

16    Q.  You didn't lie in the IA investigation,

17  correct?

18    A.  No, I did not.

19    Q.  So any admissions you made are true, correct?

20    A.  I did not lie in the IA.

21    Q.  So any admissions you made in the Internal

22  Affairs investigation would be true?

23    A.  They were offered as the truth.

24    Q.  Prior to the October 2015 Pitchess Hearing, you

25  said there were several times you talked to the chief

1  about reopening the investigation; is that correct?

2      A.  Yes.

3      Q.  It was clear to you prior to October 2015 the

4  chief was not going to re-open the IA investigation,

5  correct?

6      A.  Prior to the October date?

7      Q.  Correct.  You said you had already had several

8  conversations with him about reopening the IA

9  investigation and he had denied your request, correct?

10     A.  He had not changed his position.

11     Q.  He had denied your request several times prior

12 to the October 2015 Pitchess Hearing?  Let me ask it

13 that way.  Is that correct?

14     A.  The clear denial that he made was when I first

15 returned back and I showed him the text message.  That

16 was clearly denied.

17     Q.  And that was in 2013, correct?

18     A.  Yes.

19     Q.  And there were other times prior to October of

20 2014 where he also rejected your request to re-open the

21 file; is that correct?  Re-open the investigation.

22     A.  He -- I don't recall where he actually rejected

23 it.  He just wasn't really responsive to it.  The last

24 time he clearly rejected it was on the last day when I

25 showed him the document -- or showed him the photograph.

1    Q.  At some point you believe that you were

2  inappropriately banned from department photos; is that

3  correct?

4    A.  Yes.

5    Q.  Was that when you were on suspension following

6  the IA investigation?

7    A.  No, sir.

8    Q.  When was it that you believe you were

9  inappropriately banned from department photos?

10    A.  It began in approximately 2009 when we started

11  to have the department photos after the allegation was

12  made against me by Tony Valdazo.

13    Q.  You said it began in 2009.

14    A.  I'm estimating that date.

15    Q.  Sure.  When was the last time you believe you

16  were inappropriately banned from a department photo?

17    A.  The department photo where Chief Addington

18  takes office, he and I sat down and had a discussion and

19  I asked him -- because we have a police appreciation

20  dinner, we have the photos.  And I said, "Do you want me

21  to go to this?"  And, "May I?"  And he told me he

22  preferred I do not come to the police appreciation

23  dinner because politically it would not look good for

24  him.

25          And I understood, because regardless of these

1    proceedings, we were friends.  And I wanted to respect

2    the fact that he was an outlaw chief in starting his

3    career.

4        Q.  And so you're saying at that point you believe

5    that was banning you from department photos, at that

6    point in time when he became chief; is that correct?

7        A.  He is my executive officer and he's asking me

8    not to come.  I consider that an order.

9        Q.  That was when he became the Chief of Police,

10   correct?

11       A.  Prior to that it was Aaron Baker.

12       Q.  Was there any later point where you were banned

13   from department photos?

14       A.  We didn't have anymore.

15       Q.  Were you damaged in any way by not being part

16   of department photos?

17       A.  I feel I was.

18       Q.  How?

19       A.  Because those are on the wall in the police

20   department that I served almost three decades in.

21   They're up there on the wall along with officers who

22   were killed in the line of duty that were friends and

23   it's part of my career.  So yes, I was harmed.

24       Q.  Why do you believe that you were banned from

25   department photos as any sense of retaliation?

1    A.   There's no other reason.  I was a member of the

2   command staff.  I have the uniform.  I am a member of

3   the department.  I'm a sworn officer.  There's no reason

4   for me not to be there other than what we've discussed,

5   which are politics and perception.

6    Q.   These various things that you were believing

7   were retaliation, when they happened to you, did you

8   believe they were retaliatory at the time?

9    A.   Yes, sir.

10    Q.   Did you complain to anyone that you believe you

11   were being subject to retaliation?

12    A.   I spoke to people about it.  I spoke with the

13   chief about it.

14    Q.   When is the first time you ever complained to

15   the chief that you believe you were being subjected to

16   retaliation?

17    A.   Prior to him becoming the chief.

18    Q.   And what did you believe you were being

19   retaliated for at that time?

20    A.   The situation that had occurred with me

21   speaking out about how we were padding crime stats.

22    Q.   In your interrogatory responses again when you

23   were asked to identify potential adverse actions against

24   you that were retaliatory, you identified you were

25   dissuaded from attending ceremonies.

```
 1          Is that lumped together with what you described
 2    the conversation you had with Chief Addington when he
 3    became a chief?  Or what are you referring to when you
 4    reference dissuaded from attending ceremonies?
 5          A.  Yes, swearing in ceremonies.  I was not present
 6    when he entered office as chief.  I worked for the
 7    department but I was not there when he was sworn in.
 8          Q.  Other than the ceremony when he was sworn in,
 9    are there any other ceremonies that you believe you were
10    dissuaded from attending as a form of retaliation?
11          A.  Yes.  There were multiple promotions and
12    swearing in ceremonies, people that I either helped hire
13    with the department or people that I mentored and
14    trained that moved up through the ranks and I was part
15    of their career, but I was not welcome to be at the
16    swearing in of those officers.
17          Q.  And when you say you were not welcome, were you
18    directed not to attend these ceremonies?
19          A.  Yes.
20          Q.  And when were you directed so?
21          A.  Initially with Chief Baker, and then later on
22    for not the entire tenure but for a brief period of time
23    with Chief Addington.  I did approach him at one point
24    and asked him -- I told him that it was bothering me and
25    he did grant me the opportunity to start attending
```

1  certain functions.

2      Q.  When was that point in time when he granted you

3  the ability to attend certain functions?

4      A.  I don't know specifically.  I believe the first

5  one that I attended was when Captain Perry was sworn in.

6      Q.  Do you recall what year that would have been?

7  2014 or before?

8      A.  I think it was '15, but I'm not sure, sir.

9      Q.  Let me ask it a different way.  When do you

10  think the last ceremony was that you were denied

11  attending as a form of retaliation that you wanted to

12  attend?

13      A.  Probably the most recent one still.  We have a

14  retired officers qualification shoot every year.  I'm

15  actually the one who Chief Addington assigned to

16  organize it and plan it before I retired because I still

17  had contact with all of the, for lack of a better term,

18  old guys.

19          And I helped organize that that first year and

20  then it was taken over by another lieutenant when I

21  left.  I have never received an e-mail or a

22  correspondence from my own organization inviting me to

23  come to that since I've left the department, though they

24  have my e-mail, they have every way to contact me.

25      Q.  That's since you left.  When is the -- what's

1    the last time you believe you were dissuaded from

2    attending a ceremony when you were employed with the

3    City prior to January of 2016?

4       A.  I don't recall a specific date.  There was a

5    memorial for a fallen officer named Lassiter where we

6    were doing a dedication.  And I -- I don't even recall

7    what it was we were doing the dedication for.  I don't

8    know if it was the anniversary date of his death or if

9    it was the overpass where there was another dedication

10   of a memorial in front of the department.

11      Q.  Do you have any idea roughly when that

12   occurred?  Was it 2014, 2015?

13      A.  Sir, I'm sorry, I don't know.

14      Q.  Who denied you the ability to attend the

15   Lassiter dedication or memorial that you're referencing?

16      A.  It was part of that same ongoing order from the

17   chief.

18      Q.  That order that you received when he became the

19   chief?

20      A.  It was an ongoing order that I had reiterated

21   to him -- he had reiterated to me that he felt as if

22   politically it was best that I did not attend.

23      Q.  You said he conveyed that to you when he became

24   the chief.  Did he reiterate that to you at some later

25   point as well?

1    Q.  It upset you that you weren't able to attend

2  the ceremonies; is that a fair characterization?

3    A.  It hurt me deeply.

4    Q.  What facts are you aware of that would suggest

5  you were dissuaded from attending ceremonies as a form

6  of retaliation?

7    A.  I feel as if it all is retaliatory towards

8  things that -- perceptions that were created about me

9  that were not necessarily the truth.

10   Q.  Once again your interrogatory asked to identify

11 anything potentially adverse or retaliatory to you.

12       You mentioned that Addington and Raman warned

13 you that you had enemies.  Is that a correct statement,

14 that they warned you that you had enemies?

15   A.  Yes.

16   Q.  When did that occur that they warned you in

17 that regard?

18   A.  After Addington became the chief.  We had a

19 chance to sit down and talk.  I had that conversation

20 with Chief Addington.  In fact --

21   Q.  So right now I was just asking when that

22 conversation occurred.

23       So you said after Chief Addington became chief.

24 Within a week of him becoming chief?  Within a month?

25 Shortly thereafter?  When did you recall that this

1    conversation occurred where you were warned about having

2    enemies?

3        A.  The first time, and I can't specifically recall

4    the date, but I -- it was literally within a day or two

5    of me returning to work.

6        Q.  Okay.  So that would be sometime in 2013?

7        A.  Yes.

8        Q.  Was there any other time other than that first

9    occasion you're recalling in which Addington or Raman

10   warned you about having enemies?

11       A.  Later on that same year I remember having a

12   conversation with him.

13       Q.  Other than this second time later in 2013, was

14   there any other time that you recall being warned about

15   you having enemies?

16       A.  Specifically not from the chief, but from

17   Raman.  The chief had asked me to try not to speak to

18   people about the situation unless it was command staff.

19   And Raman and I had several conversations that year

20   about this.

21       Q.  When was the last time Raman warned you about

22   you having enemies?

23       A.  It was probably somewhere in 2015.  And I'm

24   completely estimating or guesstimating for that matter.

25       Q.  And in the beginning of 2015?  The spring?  The

1  summer?  Any recollection?

2      A.  I'm sorry.  I don't know.

3      Q.  Is there anything that you tie it to?  Do you

4  have a specific recollection of when that last time was

5  he warned you about having enemies?

6      A.  I'm not sure if the phrase "warning me" at that

7  point warrants it, but while we were all going through

8  the lawsuit with Wilkerson, we all had an active

9  discussion about that because he and I had been sued

10  previously because of our role in the administration.

11      Q.  When you guys were involved in that Wilkerson

12  lawsuit, that is when you believe probably was the last

13  time Raman had discussions with you about you having

14  enemies; is that correct?

15      A.  I'm estimating that.  There could have been

16  more later.

17      Q.  What specifically did Raman say to you in

18  regards to warning you you had enemies?

19      A.  "There are particular people in this department

20  that though you think they're your friends, they are not

21  and they do not like you.  And there is a perception of

22  you that is now bad that you're not going to overcome."

23      Q.  In what way were you harmed by Addington and

24  Raman warning you about you having enemies?

25      A.  I was harmed in the fact that, number one, how

1  did I create those enemies.  And are they created by

2  perception because people are allowed to talk about it

3  and I can't.  And the fact that these are people that I

4  had worked side by side with, but now there's this

5  perception again that I'm somehow this pervert or this

6  guy that can't keep his hands off women and I'm not

7  allowed to say or defend anything but other people

8  involved are speaking freely about it.

9      Q.  And is there anything about the fact that

10  Addington or Raman warned you that you had such enemies,

11  is there anything about them warning you in that respect

12  that harmed you?

13      A.  Yes.  The specific fact that here we are as

14  part of the administration, the most ranking officer in

15  the department and second in command are telling me that

16  this retaliation could happen against me again.  And

17  that I need to watch what I do, watch what I say because

18  I'm basically walking on a tight rope.

19      Q.  Did you -- is it possible that Addington and

20  Raman were trying to help you to avoid you having future

21  problems by telling you you had enemies?

22      A.  I don't know specifically what the intent was.

23      Q.  You can't say that Addington or Raman warned

24  you about having enemies as a form of retaliation for

25  anything you did, correct?

1    A.   Retaliation in the form of warning me, like

2  telling me to back off because I was quite open with

3  them about my dissatisfaction with what had happened.

4  Potentially, you know, I was causing a problem for them

5  in their eyes and that I needed to be told to back off

6  as a form of, you know, hey, you better look out because

7  more could happen to you and, you know, you have no more

8  chances here.

9    Q.   At one point in time you testified about trying

10  to get an acting captain position, correct?

11    A.   It was suggested, yes.

12    Q.   And then there was another point in time where

13  you actually have said that you applied for a captain

14  position and were told you were disqualified, correct?

15    A.   Yes.

16    Q.   Other than those two situations, is there any

17  other situation in which you believe that some higher

18  level leadership position was planned but not

19  implemented as a form of retaliation against you?

20    A.   Yes.

21    Q.   What else?

22    A.   When Aaron Baker was the chief I took a

23  captain's test with Chief Addington.  Per his custom as

24  the chief, Baker called me in that morning after the

25  test, he informed me that I came out number one on the

1  test but he was not going to promote me to captain.

2        He told me that he was going to promote Brian.

3  He told me that he didn't feel as if I was going to play

4  ball as the chief.  He had decided that Brian was the

5  best fit.  He did tell me that he was going to still

6  promote me to captain, but his plan was to make him

7  captain, send him to the FBI National Academy and then

8  see him become the chief.

9        Q.  So what you're saying is that Baker had

10  suggested another captain position would be created for

11  you and Baker never did so; is that correct?

12        A.  No.  In fact, what happened was an allegation

13  was made against me for sexual harassment of Wilkerson

14  after I reported overhearing that Lieutenant Raman was

15  sexually harassing her.

16        Q.  But --

17        MR. CHRISTIAN:  Objection; nonresponsive.

18  Move to strike.

19        Q.  My only question was this other situation where

20  you say a leadership position was planned and not

21  implemented, that was something that Baker did that he

22  was going to -- he planned some position and never

23  followed through with it; is that correct?

24        A.  Yes.  To answer that question specifically,

25  Aaron Baker told me I was going to be the next chief.  I

1    spoke out against Aaron Baker in his practices of the

2    suspicious circumstance cases and how we were

3    classifying the crime stats.  After that is when this

4    whole situation began occurring with the promotions.

5        Q.  And I just want to make sure I fully encompass.

6    I think I have.  But when you put in your discovery

7    responses that a form of retaliation may have been job

8    assignments to higher levels of leadership were planned,

9    but not implemented.

10        So you've just described a situation with Baker

11    talking about making you a captain.  You previously

12    testified to a situation of becoming an acting captain

13    and then you've talked about another situation where you

14    applied to be a captain and were not qualified.

15        Is there any other situation to which you

16    referred by this language of job assignments to higher

17    levels of leadership planned, but not implemented other

18    than those three that we've already testified about?

19        A.  At this time, I don't recall any other.

20        Q.  What facts, if any, are you aware of that your

21    failure to get any of those three positions that you've

22    advertised about, what facts are you aware of that those

23    positions you were not allowed to get as a form of

24    retaliation?

25        A.  Well, Aaron Baker told me that he didn't feel

1  as if he could trust me or count on me because, you

2  know, I wouldn't play ball, and he felt as if Brian

3  would.  We had a very candid conversation in his office.

4      Q.  Does that complete your answer?

5      A.  To that question.

6      Q.  In your interrogatory response about potential

7  adverse actions that you claim retaliatory, you

8  identified not being invited to meetings merited by your

9  rank.

10     A.  Yes.

11     Q.  You previously testified to this meeting

12  shortly after Chief Addington became the chief.  In that

13  meeting, is that when you received some direction about

14  not attending certain meetings?

15     A.  No, sir.  What that's in reference to is we

16  would hold regular command level staff meetings.  And

17  several times I would come to find out that there was a

18  meeting, but I was not told that there was a meeting

19  until after the fact.  Or I would walk up to the

20  administrative wing to do something and realize there's

21  a meeting in progress.

22         I remember bringing it to Brian's attention and

23  he even told me he was embarrassed by it and he didn't

24  know how it happened.  It happened again, like I said,

25  more than once, and I spoke to Raman about it, Captain

1   scheduling that training.  And I saw that I was not

2   asked to attend the training even though it was

3   mandatory.

4        I asked him about it and Albanese said, "Well,

5   you know, you've already been through enough with sexual

6   harassment.  I figured they would do something else with

7   you."

8        Q.  And you sent a memo complaining about not being

9   invited to the sexual harassment training, correct?

10       A.  I did, because after I had talked to him, I

11  also talked to Captain Perry.

12       Q.  And that sexual harassment training was in

13  December of 2014 that you were not invited to, correct?

14       A.  Sir, I don't recall if -- I would have to look

15  at the complaint.

16       Q.  Do you have any reason to dispute that that was

17  the date of the sexual harassment training you

18  complained about not attending?

19       A.  I don't know.  No.

20       Q.  You complained in a memo in January 2015 about

21  being excluded from command staff lunches.

22            Do you recall that?

23       A.  Lunches only or command staff meetings that

24  revolved around lunchtime.

25       Q.  Let me just ask do you recall in January 2015

1  submitting a memo about complaining about being excluded

2  from some meetings or lunches?

3      A.  Yes.

4      Q.  You never made any complaints after February of

5  2015 about being excluded from any meetings, correct?

6      A.  I don't know.

7      Q.  Do you recall when was the last time you were

8  excluded from any meeting that you thought was

9  inappropriate?

10      A.  I don't recall specific dates.

11      Q.  Do you believe you were excluded from meetings

12  as a form of retaliation?

13      A.  Yes.

14      Q.  Why do you believe you were excluded from

15  meetings as a form of retaliation?

16      A.  Because I had been told that I have enemies in

17  the department, I had been told that, you know, people

18  didn't like me, including some of the people that I

19  worked with on the command staff.  And there were people

20  that were able to manipulate schedules and conveniently

21  forget that I was someplace.

22          When I brought it up to my captain on the

23  sexual harassment issue of that class, he looked at me

24  and he laughed and he said, "Really?  You should be able

25  to teach that class."  That was his response to me.

1    Q.  How many times do you believe that you were not

2   invited to a meeting as a form of retaliation?

3    A.  I don't know.

4    Q.  Can you give me your estimate?

5    A.  Sir, I don't know.

6    Q.  Is it more than once?

7    A.  I believe it's more than once.

8    Q.  Is it more than twice?

9    A.  I know we have discussed at least three or four

10  things here.  So it's probably five or more.

11   Q.  And do you know if it's more than seven times

12  that you were not invited to a meeting as a form of

13  retaliation?

14   A.  My best estimate would be five or more, sir.

15   Q.  You say five or more.  Can you say whether it

16  was more than seven times that you were not invited to

17  meetings as a form of retaliation?

18   A.  I gave you my best estimate.

19   Q.  How were you harmed in any way by not being

20  invited to these meetings which you claim is a form of

21  retaliation?

22   A.  There's critical training in some of these

23  that's involved.  There's the aspect of networking and

24  finding out what is going on within the organization,

25  communication.  And then personally, again, I feel as if

1    about it.

2         Q.   And when did that occur?

3         A.   The entire time that I was housed in the

4    evidence room, which I don't recall the specific dates.

5         Q.   I'm going to show you what we're going to mark

6    as Exhibit No. 6 for purposes of the deposition.

7

8              (Exhibit 6 marked)

9

10   BY MR. CHRISTIAN:

11        Q.   I'm showing you Exhibit No. 6.  It's a document

12   entitled Plaintiff's Responses and Objections to

13   Defendant's First Set of Interrogatories.

14        A.   Yes, sir.

15        Q.   You can see there's a last page on the document

16   that there's something that's a verification that

17   appears to be signed by you.

18        A.   Yes, sir.

19        Q.   My question is, do you have any reason to

20   dispute this is a fair and accurate copy of the

21   interrogatory responses you provided to us in this case?

22        A.   Without reviewing it right now, no.

23        Q.   The last page, the verification I'm referring

24   to, is that your signature on the verification?

25        A.   Yes, sir, it is.

1       Q.   It indicates that you were making the

2    verification under penalty of perjury.

3            You understood that at the time you signed it?

4       A.   Yes, sir.

5       Q.   When you provided these responses to

6    interrogatories, you understood by signing this

7    verification, you were claiming that the information

8    contained in your responses were true and correct and

9    you were claiming that under penalty of perjury.  You

10   understood that?

11      A.   I do.

12      Q.   Let me refer you to page 7 of the document.

13   Interrogatory number 5 says, "State all facts that

14   support your contention as alleged in paragraph 122 of

15   the Second Amended Complaint that you were subjected to

16   a continuous and ongoing course of adverse actions

17   following your October 6th, 2015 testimony."

18           And then you see it says response.  And the

19   following adverse actions all took place after

20   October 6th.

21           Then if you see on page 7 and 8 and 9, there's

22   letters A through N.  I believe you testified to

23   everything contained in A through N.  All I want to do

24   is verify that as you represented by your verification,

25   your A through N was a complete and accurate response to

1  interrogatory number 5.

2      A.  I'm trying to just briefly review A through N.

3      Q.  Sure.  And we can even go through it together

4  if it makes it easier.

5          A says, "Negotiations for continued employment

6  had been ongoing shortly after they told me in person we

7  would not be negotiating new terms."

8          That's something we discussed here today,

9  correct?

10     A.  Yes.

11     Q.  B on next page that says, "Addington stated

12  that because I came forward, there would be no purging

13  of IA files."

14         So purging of IA files, that's something we

15  have discussed here today, correct?

16     A.  We did.

17     Q.  C says that there was an acting captain

18  position that was discussed.  That's something that

19  you've testified about here today, correct?

20     A.  I did.

21     Q.  D refers to per diem work.  That's something

22  you've testified about here today, correct?

23     A.  It is.

24     Q.  E refers to the personal action form that

25  designated you as dismissed.  That's something you

1    testified about here today, correct?

2        A.  Yes.

3        Q.  F refers to reserve officer status.  That's

4    something you've testified about in deposition today,

5    correct?

6        A.  Yes, sir.

7        Q.  G, referring to December 4, 2015

8    Chief Addington memo.  That's something you testified

9    about here today, correct?

10       A.  Yes.

11       Q.  H refers to the settlement being purged from

12   your personnel file.  That's something we've talked

13   about here today in your deposition, correct?

14       A.  I don't know if we talked about the 8-page

15   settlement agreement not being purged.

16       Q.  You talked about your IA file not being purged.

17   Was there a separate request about the settlement

18   document being purged?

19       A.  Yes, sir.

20       Q.  When did you make that request for your

21   settlement document to be purged?

22       A.  The very first time was in Applebee's in 2012.

23       Q.  When was the last time that you made any

24   request about purging your settlement document?

25       A.  Before I left the department, there was a

1   holiday there, Christmas, and before the chief left for

2   holiday, I asked him or reminded him that he was going

3   to purge the settlement agreement from my personnel

4   file.

5        Q.  And that was you said the holiday.  So was that

6   in what month?

7        A.  I -- it was in December or it was right after

8   Christmas.  I believe it was just prior to.

9        Q.  And that was in what year?

10       A.  2015.

11       Q.  And what response did you get from the chief?

12       A.  He said that he would.

13       Q.  Did the chief convey to you that the settlement

14   agreement would be kept in a separate file than your

15   personnel file, but it would still be maintained?

16       A.  Not initially.  That was his final response to

17   me later in, I believe, January.

18       Q.  And do you have any knowledge whether or not

19   that was done?

20       A.  It was initially not done.

21       Q.  How do you know it was initially not done?

22       A.  Because my background investigator for

23   Sacramento County told me the settlement agreement was

24   in there.

25       Q.  Why do you believe the settlement agreement

1   should not have been in your personal file?

2       A.  Because we agreed that it wouldn't be.

3       Q.  When did you enter into such an agreement?

4       A.  Initially in Applebee's in 2012.

5       Q.  So this is this oral conversation again prior

6   to when you signed the settlement agreement is when you

7   said that agreement was reached, correct?

8       A.  That, and then I reiterated it throughout the

9   time over the years that we talked.  And then the last

10  time that I said that to him was just prior to the

11  holidays because I told him my background investigator

12  was coming.

13      Q.  And to your knowledge, he did take the

14  settlement agreement out of your personnel file,

15  correct?

16      A.  He ultimately did do it.  And like you said, it

17  was to be kept in a separate place.

18      Q.  Are you aware of any facts that would support

19  you were harmed by the settlement agreement being

20  maintained in your personnel file before it was removed?

21      A.  I don't know.

22      Q.  The -- does that discuss the circumstances

23  regarding H in your response to interrogatory number 5?

24          Does that cover the circumstances regarding

25  item H in your response to interrogatory number 5?

1      A.   I believe.

2      Q.   I says, "The IA investigation was never

3  reopened despite new evidence."

4           We've discussed that here in the deposition

5  today?

6      A.   Yes.

7      Q.   J refers to being banned from department

8  photos.

9           We've discussed that in your deposition here

10 today, correct?

11     A.   Yes.

12     Q.   K says, "Dissuaded from attending police events

13 such as swearing in ceremonies."

14          We have discussed that in the deposition today?

15     A.   Yes.

16     Q.   L refers to your being told you have enemies.

17          We've discussed that in the deposition here

18 today, correct?

19     A.   Yes.

20     Q.   M refers to job assignments at a higher level

21 planned but not implemented.

22          We've discussed that here today, correct?

23     A.   Correct.

24     Q.   "N" refers to meetings that you did not attend.

25          We've discussed that here today, correct?

1    A. Yes.

2    Q. The interrogatory response to interrogatory

3  number 5 is a complete response that you provided under

4  oath when you verified your answer, correct?

5    A. Yes.

6    Q. So A through N, in other words, identifies

7  everything that you're claiming was retaliation after

8  your October 2015 Pitchess Hearing that you attended,

9  correct?

10    A. I believe that's what it says.

11    Q. And that's correct, that that's what you

12  intended to put down?  Everything that -- that was what

13  the question was asking and that's what you put down,

14  everything that you believed was retaliation after your

15  October 2015 Pitchess Hearing that you attended,

16  correct?

17    A. I believe so.

18

19        (Exhibit 7 marked)

20

21  BY MR. CHRISTIAN:

22    Q. We've marked Exhibit No. 7 for purposes of the

23  deposition.  It's a docket that was obtained from the

24  Contra Costa Superior Court.

25    A. Yes, sir.

1      Q.  It's a two-page document.  It says Department

2    13.  It references the docket in the lower right-hand

3    corner of People v. Kevin Easter.

4         Under the nature of the proceedings, you'll see

5    that it's referencing there in this document that this

6    was the date in which the Pitchess Hearing was held in

7    the Kevin Easter matter.

8         You'll see that this document -- you see where

9    I'm referring to, references the date as October 16th,

10   2015.

11        Do you see where I'm referring to in the top

12   left-hand corner?

13      A.  I do.

14      Q.  First of all, have you ever seen a copy of this

15   docket sheet?

16      A.  No, sir, I have not.

17      Q.  We've been talking about the October 2015

18   Pitchess Hearing that you and your counsel attended.

19        Do you have any reason to dispute that the

20   Pitchess Hearing in October of 2015 that you've

21   referenced occurred on October 16th, 2015 as indicated

22   in this docket sheet?

23      A.  I -- I don't know what the date was when we

24   originally talked about it.  We've talked about

25   October 15th or 16th.  I don't know specifically the

1    date.  Like I said, it's the first time I've seen this

2    document.

3        Q.  In that this document reflects October 16th,

4    2015, in which you appeared at a Pitchess Hearing in the

5    Easter matter, and you've indicated there was only one

6    such day in October that you attended a Pitchess Hearing

7    for Easter, I just want to make sure, you have no facts

8    that would dispute that October 16th, 2015 is the exact

9    date you attended that Easter Pitchess Hearing; is that

10   correct?

11       A.  I don't know.  I don't think so.

12       Q.  You don't think you have any facts to dispute

13   that; is that correct?

14       A.  Not that I'm aware of.

15

16       (Exhibit 8 marked)

17

18   BY MR. CHRISTIAN:

19       Q.  We have marked Exhibit No. 8 for purposes of

20   the deposition.  It's titled Claim Presented to the City

21   of Pittsburg.

22           Prior to you filing a lawsuit against the City

23   of Pittsburg in this action, you were aware that a claim

24   was filed with the City of Pittsburg known as a

25   government claim.  Are you aware of that?

1    Q.  Did you review the complaint that was filed on

2  your behalf in federal court in this action against the

3  City of Pittsburg?

4    A.  I went over the complaint with my attorney.

5    Q.  And part of the reason you went over it was to

6  verify the accuracy of it; is that correct?

7    A.  I assume that's why we did it.

8    Q.  You had at least an understanding that the

9  complaint that you reviewed that was going to be filed

10  was accurate; is that fair?

11    A.  Yes, sir.

12    Q.  I'm going to hand you what we are going to mark

13  as Exhibit No. 9 for purposes of the deposition.

14

15         (Exhibit 9 marked)

16

17  BY MR. CHRISTIAN:

18    Q.  I'm showing you what's been marked as Exhibit

19  No. 9.  I'll represent this is a copy of the Second

20  Amended Complaint that was filed in federal court.  You

21  can see that there's a stamp above showing it was filed

22  March 9th, 2017.

23         This is a complaint that you reviewed and

24  verified the accuracy of before you filed it; is that

25  correct?

1      A.   Just to clarify, I did not file this.   The

2   attorney filed it.

3      Q.   Although you didn't file this, you understood

4   this was a complaint on your behalf, correct?

5      A.   Yes, sir.

6      Q.   And you reviewed this second amended complaint

7   for accuracy before it was filed, correct?

8      A.   Yes, sir.

9      Q.   If you look on page 3 of the document,

10   paragraph number 9, line 14, it says that "On March 21st

11   plaintiff filed a timely claim for damages with the City

12   and has complied with all applicable government claims

13   statutes for those claims governed by claims statutes.

14   A true and correct copy of plaintiff's governmental

15   claim filed March 21st, 2016 is attached hereto as

16   Exhibit A-1.   A true and correct copy of this attachment

17   to claim detailing the systematic and continuous course

18   of harassment or retaliation up and to including the

19   date of his course.   Retirement is attached as Exhibit

20   A-2."

21          Do you see that?

22      A.   I do.

23      Q.   I'm going to refer you back to Exhibit No. 8 as

24   well.   Do you see Exhibit No. 8 is the claim that I

25   referred to you before.   You see at the top of it, it

1   has the file March 21st, 2016 with the clerk.  That

2   corresponds with paragraph number 9 in the second

3   amended complaint, correct?

4        A.  Yes, sir.

5        Q.  Now on Exhibit No. 9, if you turn to Exhibit

6   No. A and A-1 -- excuse me, A-1 and A-2.

7        A.  A-2?

8        Q.  If you look at A-1 to start with.

9        A.  Yes, sir.

10       Q.  If you look at the claim A-1 on the Second

11  Amended Complaint and if you compare that to Exhibit No.

12  8, the claim actually filed with the City, would you

13  agree that the claim document attached to your Second

14  Amended Complaint is different than the claim actually

15  filed with the City on March 21st, 2016?

16            For example, do you see any City clerk

17  "received" sticker or stamp on the document attached?

18  You also see that under number 4 on the Second Amended

19  Complaint document there is a description which is not

20  contained in Exhibit No. 8, the actual claim filed with

21  the City.

22            Do you see the differences I'm referring to?

23       A.  I see it's a different form.

24       Q.  So you would agree that the document attached

25  as the claim which is attached to the Second Amended

1  Complaint is different than Exhibit No. 8, the actual

2  claim that was submitted to the City, correct?

3      A.  As you presented it here, it appears to be.

4      Q.  I'll also represent to you if you go to the end

5  of the document of A-2, which is page 33, and you look

6  at the end -- similar end of the document of Exhibit No.

7  8, Exhibit No. 8, the claim actually filed with the City

8  ends on page 32 and has a signature of Daniel Horowitz.

9          Do you see where I'm referring to?

10     A.  Yeah.

11     Q.  The claim that's actually attached to the

12  Second Amended Complaint has a typed named Daniel

13  Horowitz on page 33 of the claim form.

14     A.  Okay.

15     Q.  Do you see where I'm referencing?

16     A.  I do.

17     Q.  So that's another example that the claim form

18  actual attached to the Second Amended Complaint and

19  represented to be the actual claim filed with the City

20  is not the actual claim filed with the City, correct?

21  It's different than Exhibit 8?

22     A.  It's -- you're showing me what appears to be

23  different documents.  That's --

24     Q.  I'll represent to you that there are additional

25  difference in the claim form attached to the Second

1  Amended Complaint as opposed to Exhibit No. 8, the

2  actual claim filed with the City.

3        Do you have any knowledge as to why the

4  accurate claim form filed with the City and marked as

5  Exhibit No. 8 was not attached to the Second Amended

6  Complaint as referenced in that complaint?

7     A.  I have no explanation.

8        MR. CHRISTIAN:  Let's go ahead and go off the

9  record for a minute.

10

11        (Recess)

12

13  BY MR. CHRISTIAN:

14     Q.  Mr. Derby, you are claiming that you suffered

15  some emotional distress as a result of what you believe

16  was retaliation by the City.

17        Have you ever seen any healthcare providers for

18  any of that emotional distress you're claiming you

19  suffered?

20     A.  No.

21     Q.  Other than emotional distress, are there any

22  other damages that you're claiming you suffered as a

23  result of alleged retaliation from the City of

24  Pittsburg?

25     A.  Other than the monetary aspects of what I lost,

1               REPORTER'S CERTIFICATE

2

3   I, ROBERTA RICHARDSON, CSR No. 11337, Certified

4 Shorthand Reporter, certify:

5   That the foregoing proceedings were taken before me

6 at the time and place therein set forth, at which time

7 with witness was put under oath by me;

8   That the testimony of the witness, the questions

9 propounded, and all objections and statements made at

10 the time of the examination were recorded

11 stenographically by me and were thereafter transcribed;

12   That a review of the transcript by the deponent was

13 requested;

14   That the foregoing is a true and correct transcript

15 of my shorthand notes so taken.

16   I further certify that I am not a relative or

17 employee of any attorney of the parties, nor financially

18 interested in the action.

19   I declare under penalty of perjury under the laws of

20 California that the foregoing is true and correct.

21

22   Dated this 12th day of March, 2018

23

24 _____

    ROBERTA RICHARDSON, CSR No. 11337

25



EXHIBIT 2
WIT: Derby
DATE: 2-26-18
Roberta Richardson

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement ("Agreement") is entered into between Wade Derby ("Employee"), and the City of Pittsburg ("City").

### RECITALS

WHEREAS, on or about March 12, 2012, the City received a complaint in which it was alleged that Employee engaged in harassing and/or inappropriate conduct;

WHEREAS, the City commenced an investigation into the allegations and said investigation, identified as Pittsburg Police Department Internal Investigation CI12-01 ("Investigation), determined that the allegations are sustained;

WHEREAS, Employee has acknowledge and/or admitted to much of the conduct alleged and found to be sustained in the Investigation and whereas the primary dispute between the parties is the level of discipline that should be imposed for Employee's misconduct;

WHEREAS, the Parties want to enter into this Agreement providing for a final disposition of this matter and certain future terms of employment for Employee; and

NOW, THEREFORE, for and in consideration of the mutual promises and covenants and consideration set forth herein, the Parties agree that all of the recitals are material provisions of this Agreement and also as follows:.

### TERMS

1.      The purpose of this Agreement is to provide Employee with an opportunity to continue his City employment notwithstanding the misconduct that was sustained as described in the Investigation.

2.      This Agreement is in no way intended to restrict rights guaranteed to the City under State or Federal law. This Agreement is based on the unique facts of this situation and does not establish a precedent or past practice to govern any other case involving any other City employee.

3.      Employee hereby tenders his irrevocable resignation, effective January 8, 2016. A copy of this resignation is attached hereto as Exhibit A.

4.      City hereby accepts Employee's irrevocable resignation. In accepting said resignation, City does not guarantee that Employee will remain employed until January 8, 2016, as Employee continues to be subject to the same terms and conditions as other employees in the Police Management bargaining unit and future instances of misconduct and/or reductions in force may result in Employee's separation from employment before this date.

5. City agrees that it will not terminate or demote Employee for the sustained findings set forth in the Investigation. In exchange for the City's agreement not to demote or terminate, Employee agrees to accept the discipline outlined below:

    a. Suspension. Employee agrees to accept a suspension of fifteen (15) working days. This suspension shall be served on the following dates: November 9, November 13 through November 16, November 19 through November 21, November 26 through November 29, and December 3 through December 5. While suspended from City service Employee shall forfeit all rights, privileges and salary or other fringe benefits while on such suspension, except that employee will receive paid holiday time off on the following dates: November 12, 2012, November 22, 2012 and November 23, 2012.

    b. Reassignment. Effective January 7, 2013 and until the effective date of Employee's resignation, Employee will be reassigned to perform Lieutenant level duties of an administrative nature. Employee will no longer be responsible for supervising a bureau or division within the Police Department. Employee will perform such administrative tasks as assigned by the Chief of Police or designee, including but not limited to implementing the terms of an evidence audit and assisting the Pittsburg Police Department with obtaining accreditation from the Commission on Accreditation of Law Enforcement Agencies ("CALEAL"). Employee will be excluded from any further watch commander duties, except as determined by the Chief of Police.

    c. Training. On November 8, 2012, Employee shall attend a training seminar that is compliant with the requirements of AB 1825.

6. Employee acknowledges and agrees as follows: (a) that by agreeing to the terms of this Agreement, including paragraph 5 of this Agreement, he is waiving certain rights under the Public Safety Officers Procedural Bill of Rights in California Government Code sections 3300 et seq. ("POBR"); (b) that Employee has discussed his waiver of POBR rights with his legal counsel; (c) that Employee's waiver of POBR rights are limited to the waiver set forth in this Agreement; (d) that Employee's waiver of POBR rights is knowing and voluntary; and (e) Employee agrees and acknowledges he is signing this Agreement and agreeing to a limited waiver of his POBR rights in connection with the actions proposed in this Agreement, in exchange for the City not demoting him from the position of Lieutenant or terminating his employment at the present time based on the misconduct set forth in the Investigation.

7. Employee further acknowledges and agrees as follows: (a) that by agreeing to the terms of this Agreement, including paragraph 5 of this Agreement, he is waiving his rights to due process and a disciplinary appeal hearing under City policy, City or Police Department rule, and the Memorandum of Understanding between the City and the Pittsburg Police Manager's Group; (b) that Employee has discussed his waiver of any due process rights and disciplinary appeal rights with his legal counsel; (c) that Employee's waiver of his due process and disciplinary appeal rights are limited to the waiver set forth in this Agreement; (d) that Employee's waiver of due process rights and disciplinary appeal rights is knowing and voluntary; and (e) Employee

agrees and acknowledges he is signing this Agreement and agreeing to a waiver of any due process rights and disciplinary appeal rights in connection with the actions proposed in this Agreement, in exchange for the City not demoting him from the position of Lieutenant or terminating his employment at the present time based on the misconduct set forth in the Investigation.

8.    In consideration of the above, the City agrees that no further discipline shall be considered or taken by the City towards Employee in response to the allegations set forth in the Investigation.

9.    Employee has requested and the City agrees to provide Employee with a leave of absence as set forth in this paragraph. Employee will be required to use any accrued paid time off while on leave. Employee is authorized to be absent from work and use the specified accrued leave as follows:

- November 1, 2012 through November 7, 2012, which absence will be charged to Employee's vacation bank;
- November 30, 2012, which absence will be charged to Employee's floating holiday bank; and
- December 6, 2012 through January 4, 2012, which absence will first be charge to employee's floating holiday bank followed by Employee's vacation bank.

If Employee does not have a sufficient number of hours of accrued leave to provide pay for the entire length of Employee's absence, Employee's absence will be unpaid. Employee is not eligible to use sick leave on the dates identified above, as Employee's request for a leave of absence has not been identified as being related to an illness or for a medical purpose.

9.    Employee, on behalf of himself, his heirs, representatives, successors, and assigns, hereby irrevocably and unconditionally releases and discharges the City from:

Any and all claims, charges, complaints, lawsuits, liabilities, claims for relief, obligations, promises, agreements, contracts, interests, controversies, injuries, damages, actions, causes of actions, suits, rights, demands, costs, losses, debts, liens, judgments, indebtedness, and expenses (including attorneys' fees and costs actually incurred), and all other claims and rights of action of all kinds and descriptions, whether known or unknown, suspected or unsuspected, actual or potential, which Employee now has, owns or holds, or claims to have, own or hold against the City, at common law or under any statute, rule, regulation, order or law, whether federal, state, or local, or on any grounds whatsoever, with respect to any act, omission, event, matter, claim, damage, loss, or injury arising out of the employment of, and/or the resignation of employment by Employee from the City, and/or with respect to any other claims, matter, or event arising prior to the execution of this Agreement by the Parties.

10.    Employee understands and agrees that he is waiving any rights he has, may have had, or may have, to pursue any and all remedies available to him under any employment-related

cause of action against the City, including, without limitation, any claims for discrimination, harassment and/or retaliation, claims under the Ralph M. Brown Act (California Government Code § 54950, et seq.), the California Fair Employment and Housing Act (California Government Code § 12900, et seq.), the California Family Rights Act (California Government Code § 12945.2), the Unruh and George Civil Rights Acts (California Civil Code § 51, et seq.), all provisions of the California Labor Code and any wage orders or similar directives or authorities issued by any federal or state authority having enforcement powers, the Constitution of the United States, the Constitution of the State of California, Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e, et seq.), the Age Discrimination in Employment Act (29 U.S.C. § 621, et seq.), the Equal Pay Act (29 U.S.C. § 206(d)), the Fair Labor Standards Act (29 U.S.C. § 201, et seq.), the Family and Medical Leave Act (29 U.S.C. § 2601, et seq.), the Employment Retirement Income Security Act of 1974 (29 U.S.C. § 1001, et seq.), Sections 1981-88 of Title 42 of the United States Code (42 U.S.C. § 1981, et seq.), the American with Disabilities Act (42 U.S.C. § 12101, et seq.), claims of retaliation or whistle-blowing (including but not limited to California Labor Code § 1102.5, et seq. and Government Code § 12653), claims for breach of any type of contract, including written, oral or implied, breach of any covenant, promise or representation pertaining to Employee's employment and/or the resignation of employment by Employee from the City, whether expressed or implied, and all other claims arising in contract, tort or equity or under any other statute, federal, state or local up to the date of execution of this Agreement.

11.　　Employee, on behalf of himself, and his assigns, successors, agents and representatives, hereby waives any and all rights that he may have pursuant to California Civil Code section 1542, which reads as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

12.　　Employee waives any rights he might have to invoke section 1542 now or in the future with respect to the releases set out in this Agreement. Employee recognizes and acknowledges that factors which have caused him to enter into this Agreement may turn out to be incorrect or different from what he had previously anticipated, and Employee expressly assumes all of the risks of this waiver of Section 1542.

13.　　Specific Acknowledgment of Waiver of Claims Under ADEA and OWBPA. The Age Discrimination in Employment Act of 1967 ("ADEA"; 29 U.S.C. §§ 621-634) makes it illegal for an employer to discharge any individual or otherwise discriminate with respect to the nature and privileges of an individual's employment on the basis that the individual is age forty or older. The Older Workers Benefit Protection Act ("OWBPA"; 29 U.S.C. §§ 626, et seq.) augments the ADEA and prohibits the waiver of any right or claim under the ADEA unless the waiver is knowing and voluntary. By entering into this Agreement, Employee acknowledges that, in exchange for consideration stated herein, he knowingly and voluntarily waives and releases any rights that he may have under the ADEA and/or OWBPA. Employee further

acknowledges that he has been advised and understands, pursuant to the provisions of the ADEA and OWBPA that:

    a.    This waiver/release is written in a manner in which Employee understands.

    b.    Employee is aware of, and has been advised by a representative or legal counsel of his own choosing, of his rights under the ADEA and OWBPA and the legal significance of his waiver of any possible claims he currently may have under the ADEA, OWBPA, or similar age discrimination laws.

    c.    Employee is entitled to a reasonable time of at least twenty-one (21) days within which to review and consider this Agreement, and the waiver and release of any rights he may have under the ADEA, the OWBPA, or similar age discrimination laws, but he may, in the exercise of his own discretion, sign or reject this Agreement at any time before the expiration of the twenty-one (21) day period and Employee expressly waives this 21-day review period.

    d.    The waivers and releases set forth in this Agreement shall not apply to any rights or claims that may arise after the effective date of this Agreement.

    e.    Employee has had an opportunity to discuss this waiver and release with, and to be advised with respect thereto, by an attorney of his choice, and agrees that he does not need any additional time within which to review and consider this Agreement.

    f.    Employee has seven (7) days following his execution of this Agreement to revoke it and the Agreement shall not become enforceable until the seven-day revocation period expires. Any notice of revocation must be in writing and must be received by the City, through its Chief of Police, Aaron Baker, at 65 Civic Avenue, Pittsburg, CA, 94565, no later than the seventh day after Employee executes the Agreement.

EMPLOYEE ACKNOWLEDGES BY HIS SIGNATURE THAT HE FULLY UNDERSTANDS HIS RIGHT TO DISCUSS THIS WAIVER WITH LEGAL COUNSEL, THAT HE HAS CAREFULLY READ AND FULLY UNDERSTANDS THE WAIVER, AND THAT HE IS VOLUNTARILY AGREEING TO WAIVE ANY CLAIMS THAT HE HAS OR MAY HAVE UNDER THE AGE DISCRIMINATION IN EMPLOYMENT ACT, THE OLDER WORKERS BENEFIT PROTECTION ACT, AND ANY OTHER LAWS PROHIBITING AGE DISCRIMINATION IN EMPLOYMENT ARISING FROM OR RELATED OR ATTRIBUTABLE TO THE PARTIES' ALLEGATIONS OR CLAIMS.

    14.    This Agreement shall constitute a single integrated contract expressing the entire agreement between the Parties. Any prior agreements, promises, negotiations or representations written or oral, express or implied, relating to the subject matter of this Agreement, not expressly set forth in this Agreement, are of no force or effect between the Parties concerning the subject matter set forth herein.

    15.    Each Party hereto represents and agrees that he or it has carefully read and fully understands all of the provisions of this Agreement, that he or it has had the chance to consult with a representative (including, but not limited to, an attorney), and that he or it is voluntarily,

without any duress or undue influence on the part of or on behalf of any Party, entering into this Agreement.

16. Should any of the provisions or terms of this Agreement be determined illegal, invalid, or unenforceable by any court or governmental agency of competent jurisdiction, validity of the remaining parts, terms, or provisions, shall not be affected thereby and said illegal, invalid, or unenforceable part, term, or provision shall be deemed not to be a part of this Agreement.

17. This Agreement is made and entered into in the State of California, and shall be governed, interpreted, and enforced under the laws of the State of California. The Parties agree that jurisdiction and/or venue of any action involving the validity, interpretation, or enforcement of this Agreement or any of its terms, provisions, or obligations, or claiming breach thereof, shall exist exclusively in a court located within the County of Contra Costa, State of California. The Parties further agree that this Agreement may be used as evidence in any subsequent proceeding in which any of the Parties allege a breach of this Agreement or seek to enforce its terms, conditions, provisions, or obligations.

18. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. A photocopy or facsimile transmission of the Agreement, including signatures, shall be deemed to constitute evidence of the Agreement having been executed.

IN WITNESS WHEREOF, the parties hereto have executed the SETTLEMENT AGREEMENT AND RELEASE.

Dated: 10·29·12 _____     _____
                                     Wade Derby

Dated: 10/30/12 _____     _____
                                     Aaron Baker
                                     Chief of Police
                                     On behalf of the City of Pittsburg

4851-8284-6225, v. 1

I, Wade Debry, hereby tender my voluntary resignation from employment with the City of Pittsburg, effective January 8, 2016. I understand and agree that this resignation is irrevocable upon acceptance by the City.

_____
Wade Derby

**From:**  Wade Derby [/O=CITY OF PITTSBURG/OU=CITYHALL/CN=RECIPIENTS/CN=WDERBY]
**Sent:** .  Monday, October 05, 2015 11:01:44 AM
**To:**  Brian Addington
**Subject:**  Re: Amendment

Thanks I will review and advise. Regards, Wade

Sent from my iPhone



On Oct 5, 2015, at 10:13 AM, "Brian Addington" <BAddington@ci.pittsburg.ca.us> wrote:

> Wade:
>
>
> Per our conversation last week, I have attached a copy of the signed original Settlement
> Agreement, and attached is a draft of the Amendment we discussed for your review.
>
>
> Chief
>
> <Derby Agreement2012.pdf>
>
> <DerbyAmendment.pdf>

EXHIBIT  3
WIT: Derby
DATE: 2-26-18
Roberta Richardson

# FIRST AMENDEMENT TO THE SETTLEMENT AGREEMENT AND RELEASE

This document constitutes the First Amendment to the Settlement Agreement and Release ("Agreement") entered into between Wade Derby ("Employee") and the City of Pittsburg ("City") on or about October 29, 2012 (copy attached).

## RECITALS

WHEREAS, as part of the Agreement, Employee tendered his irrevocable resignation, effective January 8, 2016, and the City accepted Employee's irrevocable resignation.

WHEREAS, Employee has requested to amend the effective date of his irrevocable resignation.

WHEREAS, the Parties want to enter into a mutually agreed upon revision to the Agreement to amend Employee's date of resignation to be effective as described below and no later than June 3, 2016.

WHERAS, the Parties mutually agree that all other terms, conditions and waivers in the Settlement Agreement remain unchanged.

NOW, THEREFORE, based upon the foregoing Recitals, the Parties agree to amend the Agreement as follows:

1. Paragraph 3 is replaced with the following:

By signing below, Employee hereby tenders his irrevocable resignation, to be effective on the earlier of either: (1) the date that employee exhausts his accrued vacation, administrative leave, Floating Holidays, and up to 32 hours of personal necessity leave hours, but not sick leave; or (2) June 3, 2016. By signing below, the City hereby accepts Employee's irrevocable resignation.

The Parties agree that, effective January 8, 2016, Employee will be placed on a Leave of Absence (Other than Family Medical Leave) pursuant to Rule 26 of the City's Personnel Rules. This leave will be unpaid, except that Employee may use any accrued vacation, administrative leave, Floating Holidays, and up to 32 hours personal necessity leave, during the period of January 8, 2016 through the effective date of his resignation. The Parties agree that Employee is not permitted to use sick leave or any personal necessity leave hours in excess of 32 hours during this period. Employee will continue to accrue vacation credits, sick leave credits, holiday pay, health and welfare benefits, salary advancement and other similar benefits while on leave. Employee will be permitted to participate in City benefit programs to the same extent as any other employees.

While on leave, Employee shall not perform any work on behalf of the City, unless specifically directed to do so by the City in writing. If Employee is assigned work to be performed after his placement on leave on January 8, 2016, Employee will be required to complete time cards detailing the number of hours worked and will be compensated for the hours worked at his hourly rate of pay.

Upon his effective date of resignation, Employee will receive compensation for any unused, accrued leave time pursuant to City policies and the applicable Memorandum of Understanding.

2.    Except as reflected in paragraph 1 above, the Parties agree that all other provisions of the Agreement remain unchanged.

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment to the Settlement Agreement and Release entered into on or about October 29, 2012.

Dated: _____    _____
                            Wade Derby

Dated: _____    _____
                            Joe Sbranti
                            City Manager
                            On behalf of the City of Pittsburg

## Brian Addington

EXHIBIT 4
WIT: Derby
DATE: 2-26-16
Roberta Richardson

| | |
|---|---|
| **From:** | Wade Derby |
| **Sent:** | Monday, October 5, 2015 1:30 PM |
| **To:** | Brian Addington |
| **Cc:** | Horowitz@whitecollar.us |
| **Subject:** | Re: Amendment |

Chief, I had my attorney Dan Horowitz review the amendment offer you sent today. Dan said it will not work as there are no written assurances and suggested both interested sides go to a confidential mediation to resolve this. Dan is copied on this email should anyone wish to contact him. Please advise how you wish to proceed. Respectfully, Lt. Derby

Sent from my iPhone

On Oct 5, 2015, at 10:13 AM, "Brian Addington" <BAddington@ci.pittsburg.ca.us> wrote:

> Wade:
>
>
> Per our conversation last week, I have attached a copy of the signed original Settlement Agreement, and attached is a draft of the Amendment we discussed for your review.
>
>
> Chief
>
> <Derby Agreement2012.pdf>
> <DerbyAmendment.pdf>

1

| From: | Wade Derby [/O=CITY OF PITTSBURG/OU=CITYHALL/CN=RECIPIENTS/CN=WDERBY] |
|---|---|
| Sent: | Monday, October 12, 2015 8:48:30 AM |
| To: | Brian Addington |
| Subject: | ResignationDerby.doc |
| Attachments: | ResignationDerby.doc; ATT00001.htm |



EXHIBIT 5
WIT: Derby
DATE: 2-26-18
Roberta Richardson

Sent from my iPhone

Begin forwarded message:

**Subject: Fwd: ResignationDerby.doc**



[Time]

<u>MEMORANDUM</u>

TO: Chief Brian Addington/ City Manager Joseph Sbranti

FROM: Lt. Wade Derby

SUBJECT: Resignation

---

Chief,

Per our meeting on 10-6-15 you informed me that the City of Pittsburg is expecting my resignation from service effective on 1-8-16.

With the greatest respect I want to convey to all stakeholders involved that I am not resigning on that date. I, absent an act of termination by the department, intend to fully perform my duties with excellence after that date as I always have throughout my career.

As you know from Chief Addington's/City's defense to the Wilkerson lawsuit, the allegations against me were proven false and the IA findings should have been reversed. Just as the department would never contribute to the false conviction of another person, I am certain that the Department and the City of Pittsburg would never expect me to resign given the fact that my defense to the IA was substantially used in the Chief's/City's defense and was proven correct.

The real question is not whether I would resign in the light of charges proven to be false. The issue is whether the City and Department are using the now proven to be false allegations as an excuse, when the real purpose is to punish me for "Whistleblowing" dating back to times prior to Chief Addington's tenure and continuing to this date.

My loyalty to this Department is such that I hope that this matter is resolved professionally and without retaliation by the Department and City. Thank you for you consideration.

Lt. Derby

CC: Daniel Horowitz
CC: Pittsburg City Attorney

1   DANIEL A. HOROWITZ     SBN 92400
    P.O. Box 1547
2   Lafayette, CA 94549
    (925) 283-1863
3   Email: bdega@earthlink.net

4   CARMELA CARAMAGNO SBN 139279
    P.O. Box 1811
5   Lafayette, CA 94549
    (925) 299-1904
6   Email: caramagnolaw@comcast.net

7   Attorney for plaintiff
    WADE DERBY

8

9                UNITED STATES DISTRICT COURT

10              NORTHERN DISTRICT OF CALIFORNIA

11

12  WADE DERBY, an individual,

            Plaintiff,                    No. 16-cv-05469-SI
13  v.

14
    CITY OF PITTSBURG; BRIAN ADDINGTON
15  and DOES 1-10, inclusive,

16
            Defendants.
17  _____/

18
    *PLAINTIFF'S RESPONSES AND OBJECTIONS TO DEFENDANT'S*
19
                *FIRST SET OF INTERROGATORIES*
20

21

22

23

24

25

26

27

28

EXHIBIT 6
WIT: Derby
DATE: 2-26-08
Roberta Richardson

Plaintiff, by and through his attorneys, and pursuant to Rules 33 and 34 of the Federal
Rules of Civil Procedure and the Local Rules of this Court, responds and objects to Defendant's
Interrogatories to Plaintiff, Set One, as follows:

## *GENERAL OBJECTIONS*

1. Plaintiff objects to each instruction, definition, and interrogatory to the extent that it
purports to impose any requirement or discovery obligation greater than or different from those
under the Federal Rules of Civil Procedure and the applicable Rules and Orders of the Court.

2. Plaintiff objects to each interrogatory that is overly broad, unduly burdensome, or not
reasonably calculated to lead to the discovery of admissible evidence.

3. Plaintiff objects to each instruction, definition, and interrogatory to the extent that it
seeks documents protected from disclosure by the attorney-client privilege, deliberative process
privilege, attorney work product doctrine, or any other applicable privilege. Should any such
disclosure by Plaintiff occur, it is inadvertent and shall not constitute a waiver of any privilege.

4. Plaintiff objects to each instruction, definition, and interrogatory as overbroad and
unduly burdensome to the extent it seeks documents or information that are readily or more
accessible to Defendant from Defendant's own files, from documents or information in
Defendant's possession, or from documents or information that Defendant previously produced to
Plaintiff. Responding to such requests and interrogatory would be oppressive, unduly
burdensome, and unnecessarily expensive, and the burden of responding to such requests and
interrogatory is substantially the same or less for Defendant as for Plaintiff.

5. To the extent any of Defendant's interrogator(ies) seek documents or answers that
include expert material, Plaintiff objects to any such requests and interrogatory as premature and
expressly reserves the right to supplement, clarify, revise, or correct any or all responses to such
requests, and to assert additional objections or privileges, in one or more subsequent

1

1 supplemental response(s) in accordance with the time period for exchanging expert reports set by
2 the Court.

3

4     6. Plaintiff incorporates by reference every general objection set forth above into each
5 specific response set forth below. A specific response may repeat a general objection for
6 emphasis or some other reason. The failure to include any general objection in any specific
7 response does not waive any general objection to that request. Moreover, Plaintiff does not waive
8 its right to amend its responses.

9

10 **<u>OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS</u>**

11     1. Plaintiff objects to defendant's definition 4 regarding "document" or "documents" to
12 the extent that it purports to impose obligations greater than those set forth in the Federal Rules
13 of Civil Procedure. Plaintiff further objects to the definition to the extent that it calls for
14 documents protected from disclosure by the attorney-client privilege, deliberative process
15 privilege, attorney work product doctrine, or any other applicable privilege. This objection is
16 further supported by production request 19 of defendant which seeks all documents referenced in
17 answers to this set of interrogatories. Once these documents are produced, defendants can
18 categorize them, label them, enter them into a database or throw them into a big box, but this
19 work cannot be assigned by interrogatories, to the other side. To extent that the discovery is not
20 discovery but a delegation of clerical work, plaintiff's object.

21     2. Plaintiff objects to all interrogatories that call for legal opinions or expositions and
22 responds to them in the context of general questions directed to the plaintiff and are answered
23 from his non-legal perspective.

24     3. Plaintiff objects to the definition of "Identify" as used in paragraph 6 (a-j) as
25 boilerplate and in that it requires an excessive amount of make work regarding the contents of
26 documents, many of which are in defendant's possession.

27

28                                         2

1   4. The interrogatories further call speculation as to what each person knew, heard or did

2   not hear. (See par. 5 "Identify" subpart a-e in reference to "Communications")

3       As it requests information regarding what was heard, said and otherwise compounds the

4   interrogatory, the question is in fact, compound, unintelligible and conflates multiple

5   interrogatories into a single objectionable question. Without waiving objection, plaintiff

6   attempts to answer in a manner responsive to the point of the question.

7       5. Plaintiff notes that FRCP Rule 33 states that "Unless otherwise stipulated or ordered by

8   the court, a party may serve on any other party no more than 25 written interrogatories, including

9   all discrete subparts." The definitions often create multiple subparts. Plaintiff may choose to

10  attempt to respond even as the definitions create subparts. This is done without waiving

11  objection and in the interests of promoting the orderly exchange of information.

12

13  **INTERROGATORY NO. 1:**

14

15  State all facts that support YOUR contention as alleged in paragraph 62 of the SAC that YOU
    engaged in "whistle blowing activities" by disclosing information "to the Contra Costa Superior
16  Court" on "October 6, 2015.

17

18  **RESPONSE TO INTERROGATORY No. 1:**

19

20      On October 6, 2015 I was in chambers with Joyce Lowe, Judge Lewis Davis, a court

21  reporter. In that hearing I disclosed information relating to Officers Sibbett & Sibbitt. Just prior

22  to entering chambers, I met with Joyce Lowe and the City Attorney whose name I do not

23  presently recall. In that meeting I ascertained that relevant materials that had previously been

24  withheld were in their possession. In chambers, I truthfully answered all questioned posed to me

25  by the court. Materials were then released to the defense. The materials were previously

26  withheld from disclosure despite, in my view, being required for production under the laws of the

27  State of California and under the due process clause of the United States constitution. Previous

28                                          3

1  attempts had been made to have other parties disclose this material when asked but this failed. I
2  had informed Chief Addington, Lt. Raman, and others in the department that if called, I would
3  disclose the material. Therefore, this incident was the culmination of an ongoing dispute about
4  the withholding of this material and my presence was a disclosure to the court of materially
5  previously wrongfully withheld.

6

7

8  **INTERROGATORY NO. 2**

9  State all facts that support YOUR contention as alleged in paragraph 108 of the SAC that
10  DEFENDANT took a series of "adverse actions against" YOU "including ... the cutting off of
   negotiations for continued employment, the failure to purge" YOUR "IA file," denial of ."the
   position of acting Captain ... per diem work ... and... the opportunity to serve as a reserve
11  officer", and having YOUR "retirement wrongfully classified as a dismissal[.]"

12

13  **RESPONSE TO INTERROGATORY No. 2:**

14     Prior to October 6, 2015 there were both verbal and written offers to modify the prior
15  terms of resignation. These changed after October 6, 2015 with the specifics as follows:

16     A.     Negotiations for continued employment had been ongoing prior to October 6,
17  2015. Shortly after that date, Chief Addington told me in person that the City would not be
18  negotiating any new terms of my employment, e.g. extending it or modifying the previous terms
19  of resignation. On November 16, 2015 I sent Chief Addington a memorandum asking him to
20  help me as he had promised prior to October 6, 2015. He responded negatively.

21

22     B.     After the October 6, 2015 court hearing, Chief Addington stated that because I
23  came forward at the hearing there would be no purging of my IA records.

24     C.     The Acting Captain position had been discussed with Chief Addington, Captain
25  Perry and Captain Raman prior to October 6, 2015. After October 6, 2015, during the same

26

27

28                                    4

1 meeting where the purging of records was discussed, I asked about the Captain position. Chief
2 Addington changed his prior position and stated that he would not be considering this.

3      D.     Per Diem work is standard for retired officers in good standing. I was promised
4 this prior to the October 6, 2015 meeting. In November 16, 2015 I sent a letter to Chief
5 Addington as referenced above. He responded negatively and I then approached him to discuss.
6 In that meeting, Chief Addington reiterated is negative comments and positions and added that
7 no per diem employment would be offered post termination.

8
9      E.     In January 2016, I was seeking new employment. I received a personnel action
10 form from the City of Pittsburg effective January 8th stating I was "Dismissed" from service. In
11 fact, the correct classification was retirement. About that time, I received 2 letters from
12 Stanislaus County Sheriff's Department stating I was disqualified from their deputy sheriff testing
13 process and released as an instructor from their police academy. I contacted Chief Addington
14 and HR about the personnel action form showing up and Chief Addington and Neville Vania HR
15 Director agreed to correct this. However it was not corrected for a period of time.

16      F.     The reserve officer status was requested as a way to keep my peace officer status
17 as I sought new employment and to allow me to serve Pittsburg PD if needed. This was flatly
18 denied.

19
20
21 **INTERROGATORY NO.3.**

22 State all facts that support YOUR contention as alleged in paragraph 108 of the SAC that
DEFENDANT'S "adverse actions against" YOU "were taken for the purpose of chilling" YOUR
23 "whistleblowing activities."

24
25 **RESPONSE TO INTERROGATORY No. 3:**

26
27
28                               5

All of the matters denied to me were being negotiated and/or promised prior to my honesty participation at the court hearing. There was a long history of my sending memos to Chief Addington, speaking with Joyce Lowe, speaking with Captain Raman, Captain Perry, Lisa Thompson (secretary), Officer Gerald Lombardi, Officer David Zuniga, Claudia Leed, the firm of Bowles & Verna, Deputy City Attorney of Pittsburg and others about the unlawful hiding of information and perjury to the courts. When the matter went public and was reported in the press and to Judge Davis, all of the discussions, negotiations and agreements, ceased and vanished.

Chief Addington in November, 2015, specifically referenced this conduct as the basis for his change of position. This pattern of retaliation against me for whistle blowing was part of an ongoing pattern as set forth in the SAC and attached exhibits. The conduct post October 6, 2015 was consistent with that ongoing carrot and stick behavior by the defendants which reflects established policy and practice by defendants.

**INTERROGATORY NO. 4:**

State all facts that support YOUR contention as alleged in paragraph 121 of the SAC-that YOU "engaged in protected activities under Labor Code § 1102.5[.]

**RESPONSE TO INTERROGATORY No. 4:**

Plaintiff objects as this calls for legal opinions and conclusions which are both work product and otherwise privileged. Answering, from plaintiff's personal perspective the answer is as follows:

I believe that the law prevents "An employer, or any person acting on behalf of the employer, shall not make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency". The history of my disclosures throughout my career defined who I was in the organization. The particular

6

matters concerning Sibbet & Igram were long standing and I continually pressured for disclosure in a lawful setting. I believe that the employment modifications were justified factually and by law and that they were being used as a type of "hostage" to keep my silence. When I not only vocalized but also this resulted in public disclosure and vindication of my position, the punishment was inflicted. This pattern of retaliation against me for whistle blowing was part of an ongoing pattern as set forth in the SAC and attached exhibits. The conduct post October 6, 2015 was consistent with that ongoing carrot and stick behavior by the defendants that reflects established policy and practice by defendants.

**INTERROGATORY NO.5:**

State all facts that support YOUR contention as alleged in paragraph 122 of the SAC that YOU were "subjected to a continuous and ongoing course of adverse employment actions following" YOUR "October 6, 2015 testimony[.]"

**RESPONSE TO INTERROGATORY No. 5:**

The following adverse actions all took place after October 6, 2015.

A.      Negotiations for continued employment had been ongoing prior to October 6, 2015. Shortly after that date, Chief Addington told me in person that the City would not be negotiating any new terms of my employment, e.g. extending it or modifying the previous terms of resignation. On November 16, 2015 I sent Chief Addington a memorandum asking him to help me as he had promised prior to October 6, 2015. He responded negatively.

7

B.    After the October 6, 2015 court hearing, Chief Addington stated that because I came forward at the hearing there would be no purging of my IA records.

C.    The Acting Captain position had been discussed with Chief Addington, Captain Perry and Captain Raman prior to October 6, 2015. After October 6, 2015, during the same meeting where the purging of records was discussed, I asked about the Captain position. Chief Addington changed his prior position and stated that he would not be considering this.

D.    Per Diem work is standard for retired officers in good standing. I was promised this prior to the October 6, 2015 meeting. In November 16, 2015 I sent a letter to Chief Addington as referenced above. He responded negatively and I then approached him to discuss. In that meeting, Chief Addington reiterated is negative comments and positions and added that no per diem employment would be offered post termination.

E.    In January 2016, I was seeking new employment. I received a personnel action form from the City of Pittsburg effective January 8th stating I was "Dismissed" from service. In fact, the correct classification was retirement. About that time, I received 2 letters from Stanislaus County Sheriff's Department stating I was disqualified from their deputy sheriff testing process and released as an instructor from their police academy. I contacted Chief Addington and HR about the personnel action form showing up and Chief Addington and Neville Vania HR Director agreed to correct this. However it was not corrected for a period of time.

F.    The reserve officer status was requested as a way to keep my peace officer status as I sought new employment and to allow me to serve Pittsburg PD if needed.

G.    On December 4, 2015 Chief Addington sent a memo saying that the City was prepared to terminate me due to my misconduct.

8

1    H.    The eight page settlement was not purged from my personnel file which hurt
2    future employment. On December 16, 2015 I put the request to do this in writing.

3    I.    The IA investigation was never reopened despite new evidence.

4

5    J.    I was banned from department photos.

6    K.    I was dissuaded from attending police events such as swearing in ceremonies.

7    L.    Chief Addington and Lt. Raman told me I had "enemies" and had to "watch
8    myself" or I would be terminated.

9    M.    Job assignments to higher levels of leadership were planned but not implemented.

10

11    N.    Meetings that my rank and position dictated that I should attend, were scheduled
12    and I was not provided notice.

13

14

15

16    **INTERROGATORY No. 6:**

17    State all facts that support YOUR contention as alleged in paragraph 123 of the SAC that
18    DEFENDANT'S "actions" against YOU were "unlawful[] and retaliatory in violation of Labor
       Code § 1102.5(.]"

19

20    **RESPONSE TO INTERROGATORY No. 6:.**

21        Plaintiff objects as this calls for legal opinions and conclusions which are both work

22    product and otherwise privileged. Answering, from plaintiff's personal perspective the answer is

23    as follows:

24

25        I believe that the law prevents "An employer, or any person acting on behalf of the

26    employer, shall not make, adopt, or enforce any rule, regulation, or policy preventing an

27    employee from disclosing information to a government or law enforcement agency". The history

28                                                  9

of my disclosures throughout my career defined who I was in the organization. The particular matters concerning Sibbet & Igram were long standing and I continually pressured for disclosure in a lawful setting. I believe that the employment modifications were justified factually and by law and that they were being used as a type of "hostage" to keep my silence. When I not only vocalized but also this resulted in public disclosure and vindication of my position, the punishment was inflicted. This pattern of retaliation against me for whistle blowing was part of an ongoing pattern as set forth in the SAC and attached exhibits. The conduct post October 6, 2015 was consistent with that ongoing carrot and stick behavior by the defendants that reflects established policy and practice by defendants.

**INTERROGATORY NO. 7:**

State all facts that support YOUR contention as alleged in paragraph 133 of the SAC that YOU engaged in "whistle blowing activities" pursuant to "California Government Code § -12940[.]"

**RESPONSE TO INTERROGATORY No. 7:**

Plaintiff objects as this calls for legal opinions and conclusions which are both work product and otherwise privileged. Answering, from plaintiff's personal perspective the answer is as follows:

The history of my disclosures throughout my career defined who I was in the organization. The particular matters concerning Sibbet & Igram were long standing and I continually pressured for disclosure in a lawful setting. I believe that the employment modifications were justified factually and by law and that they were being used as a type of "hostage" to keep my silence. When I not only vocalized but also this resulted in public disclosure and vindication of my position, the punishment was inflicted. This pattern of

retaliation against me for whistle blowing was part of an ongoing pattern as set forth in the SAC and attached exhibits. The conduct post October 6, 2015 was consistent with that ongoing carrot and stick behavior by the defendants that reflects established policy and practice by defendants.

**INTERROGATORY NO.8:**

State all facts that support YOUR contention as alleged in paragraph 132 of the SAC that Chief Brian Addington sent YOU a "written communication indicating defendant's refusal to further negotiate Plaintiffs continued employment" and that DEFENDANT "denied plaintiff the opportunity to work on a per diem basis following his retirement in 2016, to continue working as a contract employee, or as a reserve officer, failed to promote plaintiff to the position of acting Captain, and caused him to lose employment by mis-classifying his retirement as dismissal(sic]."

**RESPONSE TO INTERROGATORY No. 8:**

It is contained in the memorandum sent by Addington to me on December 4, 2015.

**INTERROGATORY NO. 9:**

State all facts that support YOUR contention as alleged in paragraph 133 of the SAC that DEFENDANT'S "adverse actions against" YOU "were causally connected to" YOUR "whistle blowing activities[.]"

**RESPONSE TO INTERROGATORY No. 9:**

A. Prior to October 6, 2015 the negotiations were ongoing and they terminated afterward.

B. All of the matters denied to me were being negotiated and/or promised prior to my honesty participation at the court hearing.

11

C. There was a long history of my sending memos to Chief Addington, speaking with Joyce Lowe, speaking with Captain Raman, Captain Perry, Lisa Thompson (secretary), Officer Gerald Lombardi, Officer David Zuniga, Claudia Leed, the firm of Bowles & Verna, Deputy City Attorney of Pittsburg and others about the unlawful hiding of information and perjury to the courts. When the matter went public and was reported in the press and to Judge Davis, all of the discussions, negotiations and agreements, ceased and vanished.

D. Chief Addington in November, 2015, specifically referenced this conduct as the basis for his change of position.

E. The December 4, 2015 letter contains statements in support of this contention.

F. Lt. Raman stated that because I was going forward with my complaints my IA file would not be purged.

G. Lt. Raman who did not whistleblow did not even have an IA on the same allegations that led to my termination.

H. Lt. Raman was promoted because he did not whistleblow despite having the same allegations that led to my termination.

I. Lt. Raman and Chief Addington used my IA investigation as part of their civil lawsuit defense and yet my IA file was not purged.

J. Chief Addington sent an October 19, 2015 memo that agreed that Ms. Wilkerson had committed perjury in her lawsuit but despite this fact, failed to revisit any of her prior allegations against me. In addition, he falsely claimed that the materials were "perjury" did not impact evidence submitted against me in the IA findings/investigation.

**INTERROGATORY NO. 10:**

12

IDENTIFY all persons YOU contend had knowledge of YOU engaging in whistle blowing activities by disclosing information to the Contra Costa Superior Court on "October 6, 2015[.]"

**RESPONSE TO INTERROGATORY No. 10:**

Plaintiff objects to the definition of "Identify" as it requires speculation as to what each person knew, heard or did not hear. As it requests information regarding what was heard, said and otherwise compounds the interrogatory, the question is in fact, compound, unintelligible and conflates multiple interrogatories into a single objectionable question. Without waiving objection, plaintiff attempts to answer in a manner responsive to the point of the question.

On October 6, 2015, present in court were:

A.    Joyce Lowe, employed at City of Pittsburg. Home address unknown.

B.    City Attorney (do not recall name)

C.    Court staff (names unknown)

D.    Public defender on case (name unknown)

E.    Daniel Horowitz
      3650 Mt. Diablo Blvd.
      Suite 225
      Lafayette, California 94549

F.    Other attorneys in court.

Less personally, Chief Addington indirect knowledge as he was told that this was going to happen, prior to the court hearing. Post hearing, the matters gained broad dissemination. I believe that there were press articles and many motions relating to this material. Lisa Thompson was present (prior to the court appearance) when I asked for the "IA file" relating to Sibbitt & Ingram.

13

Prior to the hearing, Officer Jerry Lombardi was told by me that I was going to make disclosures. This was prior to going to court. Captain Raman and Captain Perry knew prior to this date that I was pressuring for this disclosure. I told all of them that if I were called into court that I would be honest (meaning I would disclose).

**INTERROGATORY NO. 11:**

State all facts that support YOUR contention as alleged in paragraph 38 of the SAC that YOU were "coerced into signing ... an agreement" in 2012 "to resign four year hence in January 12 2016."

**RESPONSE TO INTERROGATORY No. 11:**

The factors that forced my signing the agreement were:

    A. I was paying for my own legal counsel (my LDF benefits did not cover this actions)

    B. Captain Addington told me that he would help clear my name and welcome me back in good graces if I signed

    C. I was well vested into a career there and not far from retirement (roughly 4-6 years). A loss of job would have major adverse retirement effects.

    D. I had a previous on the job injury and that might hamper my attempts at alternate employment.

    E. I had a family of four to support, I was the primary money earner

    F. I wanted to clear my name as Addington promised.

    G. I wanted to go back to work and be a viable employee as I was heavily (personally) connected to the department and city.

    H. I was contributing financially to the support of my mother.

I. I was contributing financially to the support of my wife's parents.

J. I had a financial investment in obtaining a Masters degree so that I could promote in the department and I was told that I was promotable if I signed the agreement.

K. There was major on the job harassment that I believed would end if I signed the agreement.

L. If I lost my job I would have financial pressures that would have been severe in the short term.

M. I was told by Addington that after signing my IA file would be purged.

N. Addington told me that once I signed the document I would resume my place in the department without further harassment, pressures or degrading behaviors.

O. Signing was the only way to preserve my rank

P. The settlement agreement required me to serve unpaid suspension which Addington explained could be avoided by using paid vacation time in its place

Q. Addington said that in doing so, by the time I was able to work he would be Chief

R. Not signing meant not only would I not be employable as a police officer but at the time was 4 years away from my pension and would have few income options.

S. Captain Addington told me that If I did not sign that they were going to terminate me or demote me.

**INTERROGATORY NO. 12:**

State all facts that support YOUR contention as alleged in paragraph 70 of the SAC that the internal affairs claims alleged against YOU were proven false[.]"

15

**RESPONSE TO INTERROGATORY No. 12:**

During the IA investigation we proved that the complainant had made similar unfounded allegations against then Chief Baker. Wilkerson had made similar complaints against Raman which were never investigated On January of 2013 Addington saw a text message to me from Wilkerson evidencing a normal friendly platonic relationship. Wilkerson's former Husband had no knowledge of Wade Derby in any context. He was aware of alleged sexual harassment against Ms. Wilkerson by Chief Baker. Officer Randy Watkins said that Wilkerson instigated sexual harassment towards Lt. Raman. Maria Derby provided testimony as a witness in the IA investigation as to our platonic relationship with Wilkerson. She stated that statements which were the subject of the IA investigation were made to Ms. Wilkerson in front of her in a lighthearted manner and that no offense was taken by Ms. Wilkerson. She testified that the statements were off duty at a dinner at the Derby household. It was revealed that after the alleged wrongdoing, Ms. Wilkerson asked Wade Derby to mentor her son.

It was established that on police property and when on duty, Ms. Wilkerson's brother had harassed Derby using foul language in public. Ms. Wilkerson was present and supported her brother's foul conduct. It was shown that Ms. Wilkerson and her brother were sending sexually explicit material using police/public e-mail.

In her civil lawsuit Ms. Wilkerson admitted that her allegations regarding an incident in the parking lot were based solely on her suppositions as to what I was thinking and not demonstrable facts that she or anyone else saw. (Other than I was in the parking lot)

Ms. Wilkerson also admitted that any civil lawsuit allegations relating to conduct prior to 2010 were in fact not offensive to her. She admitted falsehoods which have been called perjury by many, in matters directly pertaining to her allegations against me in the civil lawsuit.

16

1    Ms. Wilkerson did not make a direct claim of harassment against me. These allegations
2  came from a third party. When deposed in the civil lawsuit about these allegations, this
3  individual invoked his 5th Amendment rights and terminated the deposition.

4    I provided Chief Addington a photograph I found inside my locker on my final day that
5  was indicative of my innocence, and Addington said "too bad you didn't have this three years
6  ago".

7    The civil lawsuit by Wilkerson, the party(ies) responses to that lawsuit, all document the
8  unfounded nature of the allegations.

9

10 **INTERROGATORY NO. 13:**

11 State all facts that support YOUR contention as alleged in paragraph 78 of the SAC that
12 DEFENDANT was "aware that Plaintiff was employed ... as a contract employee with Stanislaus
13 19' County" and was "seeking a position as a Stanislaus deputy sheriff."

14

15 **RESPONSE TO INTERROGATORY No. 13:**

16    Chief Addington signed a moonlighting agreement per department policy.

17 Chief Addington wrote me a letter of recommendation to work at Stanislaus as an academy
18 instructor. In November of 2015 I told Addington that I was applying for different jobs post
19 retirement and specifically one of them as a position as a Stanislaus deputy sheriff.

20

21

22 **INTERROGATORY NO. 14:**

23 State all facts that support YOUR contention in paragraph 78 of the SAC that YOU were
24 "denied" the "sought after" employment with "Stanislaus County[.]"

25 **RESPONSE TO INTERROGATORY No. 14:**

26

27

28                                        17

On January 11th 2016 I received a letter from Stanislaus County Sherriff's Department informing me that I had not been selected from the eligibility list for the Deputy Sheriff position. It also informed me that effective January 25th 2016 I would no longer be employed as a Personal Services Contractor.

**INTERROGATORY NO. 15:**

IDENTIFY all persons who have personal knowledge of facts supporting YOUR contention that DEFENDANT is liable for violation of 42 U.S.C. section 1983 as alleged in the First Cause of Action in YOUR SAC.

**RESPONSE TO INTERROGATORY No. 15:**

Plaintiff objects to the definition of "Identify" as it requires speculation as to what each person knew, heard or did not hear. As it requests information regarding what was heard, said and otherwise compounds the interrogatory, the question is in fact, compound, unintelligible and conflates multiple interrogatories into a single objectionable question. Without waiving objection, plaintiff attempts to answer in a manner responsive to the point of the question.

Joe Sibrani, Diana Garrito (PDO), Dan put names of all defendants whose cases were set aside (we believe the following is a correct list)

Camell Linda 4-177067-6

Dials Sean 4-180326-1

Edwards Rita 4-177355-5

Freeney Robert 4-178883-5

Holloman Benjamin 4-178504-7

18

Martinez Emilio 4-180365-9

Martinez Hilario 4-178018-8

Moss Michael 5-140750-1

Nguyen Duyen 4-180184-4

Schoppe Carl 5-141408-5

Scotland Finau 5-151403-3

Stingley Warren 4-178159-0

Takai Makoto 5-141572-8

Tompkins Casandra 4-178981-7

Wenger Braden 4-180710-6

All witnesses on Plaintiff's initial disclosures. All defendants to this case.

**INTERROGATORY NO. 16:**

IDENTIFY all DOCUMENTS that support YOUR contention that DEFENDANT is liable for violation of 42 U.S.C. section 1983 as alleged in the First Cause of Action in YOUR SAC.

**RESPONSE TO INTERROGATORY No. 16:**

Plaintiff objects to the definition of "Identify" as it requires speculation as to what each person knew, heard or did not hear. As it requests information regarding what was heard, said and otherwise compounds the interrogatory, the question is in fact, compound, unintelligible and conflates multiple interrogatories into a single objectionable question. Without waiving objection, plaintiff attempts to answer in a manner responsive to the point of the question.

19

1   All documents produced in support of defendant's first production request product
2   support this allegation.   The entire case files for the following persons supports this allegation.
3   (Contra Costa County Superior Court case numbers follow the names).

4   Camell Linda 4-177067-6

5
6   Dials Sean 4-180326-1

7   Edwards Rita 4-177355-5

8   Freeney Robert 4-178883-5
9
10  Holloman Benjamin 4-178504-7

11  Martinez Emilio 4-180365-9

12  Martinez Hilario 4-178018-8
13
14  Moss Michael 5-140750-1

15  Nguyen Duyen 4-180184-4

16  Schoppe Carl 5-141408-5
17
18  Scotland Finau 5-151403-3

19  Stingley Warren 4-178159-0

20  Takai Makoto 5-141572-8
21
22  Tompkins Casandra 4-178981-7

23  Wenger Braden 4-180710-6

24

25
26  2. All pleadings, discovery and depositions in the Wilkerson v. City of Pittsburg case in
27  Contra Costa County, Case No. 13-00941.

28                                        20

3. All documents identified in Plaintiff's initial disclosures.

4. All documents submitted in Response to Defendant's Request for Production, Set One.

5. Wage loss documentation would include pay stubs and personnel records relating to earnings, pension and other material. These are in the possession of the City of Pittsburg.

6. All Pittsburg IA files relating to Sibbitt, Ingram, Derby, Raman. Policy statements, criminal investigation files for Sibbitt and Ingram.

## INTERROGATORY NO. 17:

IDENTIFY all persons who have personal knowledge of facts supporting YOUR contention that DEFENDANT is liable for retaliation in violation of Cal. Labor Code § 1102.5 as alleged in the Second Cause of Action in YOUR SAC.

## RESPONSE TO INTERROGATORY No. 17:

Plaintiff objects to the definition of "Identify" as it requires speculation as to what each person knew, heard or did not hear. As it requests information regarding what was heard, said and otherwise compounds the interrogatory, the question is in fact, compound, unintelligible and conflates multiple interrogatories into a single objectionable question. Without waiving objection, plaintiff attempts to answer in a manner responsive to the point of the question.

Joe Sibrani, Diana Garrito (PDO), Dan put names of all defendants whose cases were set aside (we believe the following is a correct list)

Camell Linda 4-177067-6

Dials Sean 4-180326-1

Edwards Rita 4-177355-5

Freeney Robert 4-178883-5

Holloman Benjamin 4-178504-7

21

1  Martinez Emilio 4-180365-9

2  Martinez Hilario 4-178018-8

3
4  Moss Michael 5-140750-1

5  Nguyen Duyen 4-180184-4

6
   Schoppe Carl 5-141408-5
7
8  Scotland Finau 5-151403-3

9  Stingley Warren 4-178159-0

10
   Takai Makoto 5-141572-8
11
12 Tompkins Casandra 4-178981-7

13 Wenger Braden 4-180710-6

14
       All witnesses on Plaintiff and defendant's initial disclosures. All defendants to this case.
15

16

17 **INTERROGATORY NO. 18:**

18
   IDENTIFY all DOCUMENTS that support YOUR contention that DEFENDANT is liable
19
   10 for retaliation in violation of Cal. Labor Code § 1102.5 as alleged in the Second Cause of
20 Action in YOUR SAC.

21
   **RESPONSE TO INTERROGATORY No. 18:**
22
23     Plaintiff objects to the definition of "Identify" as it requires speculation as to what each

24 person knew, heard or did not hear. As it requests information regarding what was heard, said

25 and otherwise compounds the interrogatory, the question is in fact, compound, unintelligible and

26 conflates multiple interrogatories into a single objectionable question. Without waiving

27 objection, plaintiff attempts to answer in a manner responsive to the point of the question.

28                                                    22

1   .All documents produced in support of defendant's first production request product support this

2   allegation.   The entire case files for the following persons supports this allegation. (Contra

3   Costa County Superior Court case numbers follow the names).

4   Camell Linda 4-177067-6

5

6   Dials Sean 4-180326-1

7   Edwards Rita 4-177355-5

8   Freeney Robert 4-178883-5

9

10  Holloman Benjamin 4-178504-7

11  Martinez Emilio 4-180365-9

12  Martinez Hilario 4-178018-8

13

14  Moss Michael 5-140750-1

15  Nguyen Duyen 4-180184-4

16  Schoppe Carl 5-141408-5

17

18  Scotland Finau 5-151403-3

19  Stingley Warren 4-178159-0

20  Takai Makoto 5-141572-8

21

22  Tompkins Casandra 4-178981-7

23  Wenger Braden 4-180710-6

24          All witnesses on Plaintiff and defendant's initial disclosures.  All defendants to this

25  case.

26

27

28                                           23

**INTERROGATORY NO. 19**:

IDENTIFY all persons who have personal knowledge of facts supporting YOUR contention that DEFENDANT is liable for retaliation in violation of Cal. Govl. Code § 12940 as alleged in the Third Cause of Action in YOUR SAC

**RESPONSE TO INTERROGATORY NO. 19**:

Plaintiff objects to the definition of "Identify" as it requires speculation as to what each person knew, heard or did not hear. As it requests information regarding what was heard, said and otherwise compounds the interrogatory, the question is in fact, compound, unintelligible and conflates multiple interrogatories into a single objectionable question. Without waiving objection, plaintiff attempts to answer in a manner responsive to the point of the question.

Joe Sibrani, Diana Garrito (PDO), Dan put names of all defendants whose cases were set aside (we believe the following is a correct list)

Camell Linda 4-177067-6

Dials Sean 4-180326-1

Edwards Rita 4-177355-5

Freeney Robert 4-178883-5

Holloman Benjamin 4-178504-7

Martinez Emilio 4-180365-9

Martinez Hilario 4-178018-8

Moss Michael 5-140750-1

Nguyen Duyen 4-180184-4

Schoppe Carl 5-141408-5

1  Scotland Finau 5-151403-3

2  Stingley Warren 4-178159-0

3
   Takai Makoto 5-141572-8
4

5  Tompkins Casandra 4-178981-7

6  Wenger Braden 4-180710-6

7
       All witnesses on Plaintiff's initial disclosures. All defendants to this case.
8

9

10  **INTERROGATORY NO. 20:**

11
   IDENTIFY all DOCUMENTS that support YOUR contention that DEFENDANT is liable
12
   for retaliation in violation of Cal. Govt. Code § 12940 as alleged in the Third Cause of Action in
13  YOUR SAC.

14

15  **RESPONSE TO INTERROGATORY No. 20:**

16
       Plaintiff objects to the definition of "Identify" as it requires speculation as to what each
17
   person knew, heard or did not hear. As it requests information regarding what was heard, said
18
   and otherwise compounds the interrogatory, the question is in fact, compound, unintelligible and
19
   conflates multiple interrogatories into a single objectionable question. Without waiving
20
   objection, plaintiff attempts to answer in a manner responsive to the point of the question.
21

22

23  Camell Linda 4-177067-6

24  Dials Sean 4-180326-1

25  Edwards Rita 4-177355-5

26
   Freeney Robert 4-178883-5
27

28                                    25

Holloman Benjamin 4-178504-7

Martinez Emilio 4-180365-9

Martinez Hilario 4-178018-8

Moss Michael 5-140750-1

Nguyen Duyen 4-180184-4

Schoppe Carl 5-141408-5

Scotland Finau 5-151403-3

Stingley Warren 4-178159-0

Takai Makoto 5-141572-8

Tompkins Casandra 4-178981-7

Wenger Braden 4-180710-6

2. All pleadings, discovery and depositions in the Wilkerson v. City of Pittsburg case in Contra Costa County, Case No. 13-00941.

3. All documents identified in Plaintiff's initial disclosures.

4. All documents submitted in Response to Defendant's Request for Production, Set One.

5. Wage loss documentation would include pay stubs and personnel records relating to earnings, pension and other material. These are in the possession of the City of Pittsburg.

6. All Pittsburg IA files relating to Sibbitt, Ingram, Derby, Raman. Policy statements, criminal investigation files for Sibbitt and Ingram.

26

**INTERROGATORY NO. 21:**

A. Have YOU or anyone acting on YOUR behalf obtained a written or recorded statement from any individual concerning the incidents alleged in YOUR SAC? If so:

(B) For each statement state the name, address, and telephone number of the individual from whom the statement was obtained.

(C) For each individual, state the name, address, and telephone number of the person who obtained the statement;

(D) For each individual state the date the statement was obtained;

**RESPONSE TO INTERROGATORY No. 21:**

No. (Other than depositions and discovery in the Wilkerson case.)


**INTERROGATORY NO. 22:**

IDENTIFY every PERSON, company, or government entity with whom YOU have applied for employment from January 8, 2016 to the present.

**RESPONSE TO INTERROGATORY No. 22:**

Sacramento County Regional Parks(Address: 4040 Bradshaw Road, Sacramento, 94522) /Prior to my departure Contra Costa County Sheriff(Address: 651 Pine Street, Martinez, CA, 94553)

Stanislaus County(Address: 250 East Hackett Road, Modesto, 95358)

,Delta Tactical( Address: 2504 Verne Roberts Circle, #103, Antioch California, 94509),

Marin County Sheriff, (Address: 1600 Los Gamos Drive, #200, San Rafael, 94903)

UCSF (Address: 654 Minnesota Street, #180, San Francisco, 94107)

27

San Francisco Police Department (Address: 1251 3rd Street, San Francisco, 94107)

Rio Vista Police Department (Address: 50 Poppy House Road, Rio Vista, 94571)

**INTERROGATORY NO. 23:**

Describe in detail any and all actions YOU have taken to attempt to mitigate any damages YOU seek in this case.

**RESPONSE TO INTERROGATORY No. 23:**

1.) Signed settlement agreement

2.) Sought new employment

3.) Attempted to negotiate

4.) Attempted to revise IA

5.) Submitted memorandums to the Chief of Police requesting name clearing

6.) Submitted memorandums to the Chief of Police requesting his withdrawal of my resignation

7.) Submitted memorandum to the Chief of Police requesting re-structuring of the settlement agreement to allow me to stay

8.) Verbally requested to Chief Addington to see the City manager,

9.) Verbally requested to Chief Addington to see the city council members

10.) Sought support from the 2nd in command captains in attempting to negotiate restructuring of my settlement contract, and re-opening of my internal affairs investigation

11.) Verbally and written request to Addington that my IA file be purged, per department orders on file retention

12.) Sought legal representation to assist me with this process

### INTERROGATORY NO. 24:

Have YOU seen any health care providers or received any treatment for any damages
YOU seek in this case? If so, identify any health care providers YOU have seen or anyone who
has provided YOU treatment.

### RESPONSE TO INTERROGATORY No. 24:

No.

Dated: September 7, 2017

_____
Daniel Horowitz
Attorney for Plaintiff

# VERIFICATION

I, Wade Derby, of my personal knowledge state as follows:

The answers to Interrogatories 1-24 are true and correct of my personal knowledge except as to those matters stated on information, belief or otherwise qualified and as to those answers I believe them to be true.

I make this verification under penalty of perjury.

Executed on August 24, 2017 at Lafayette, California.

_____
Wade Derby

# SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF CONTRA COSTA
### HONORABLE LEWIS A. DAVIS
### DEPARTMENT 13



EXHIBIT 7
WIT: Derby
DATE: 3.20.18
Roberta Richardson

DATE: October 16, 2015
C. YACOVETTI, CSR #11304

S. WENDLAND, COURT CLERK
A. SERRANO, BAILIFF

PEOPLE OF THE STATE OF
CALIFORNIA,

VS.

KEVIN JEROME EASTER,
DEFENDANT.

PRESENT:
COLLEEN GLEASON,
DEPUTY DISTRICT ATTORNEY

MICHAEL KELLY,
DEPUTY PUBLIC DEFENDER

ACTION NO: 05-140725-3

NATURE OF PROCEEDINGS: JURY TRIAL – DAY FOUR

Colleen Gleason, Deputy District Attorney, appears on behalf of the People. Michael Kelly, Deputy Public Defender, appears on behalf of the Defendant, Kevin Jerome Easter, who is NOT present and IN custody.

8:33 a.m. On the record, all counsel are present. The Defendant's appearance has previously been waived. Mr. Nicholaus Norvell is present on behalf of the City of Pittsburg. The Court and counsel discuss the Defense Pitchess Motion as on the record. The parties agree to an In-Camera Review hearing.

### CLOSED-SESSION: IN-CAMERA REVIEW HEARING

8:38 a.m. On the record and in chambers, Mr. Norvell, Pittsburg Custodian of Records, Joyce Lowe, and Lieutenant Derby are present outside the presence of the parties. The Court hears an In-Camera Review Hearing as on the record.

The Court orders that the transcript of these proceedings be SEALED and not opened except by a Judicial Officer for purposes of review of these proceedings, as on the record.

In-Camera Hearing Concluded.

9:03 a.m. On the record, all counsel and Mr. Norvell are present. The Court and counsel discuss scheduling.

Peo. vs. Kevin Easter
Docket #05-140725-3
Page 1 of 3

9:06 a.m. The Court is in recess.

Off the record, Reporter B. Crow, CSR #10503, replaces Reporter C. Yacovetti.

## CLOSED-SESSION: IN-CAMERA REVIEW HEARING

10:20 a.m. On the record and in chambers, Mr. Norvell, Pittsburg Custodian of Records, Joyce Lowe, and Lieutenant Derby are present outside the presence of the parties. The Court hears an In-Camera Review Hearing as on the record.

The Court orders that the transcript of these proceedings be SEALED and not opened except by a Judicial Officer for purposes of review of these proceedings, as on the record.

**In-Camera Hearing Concluded.**

11:11 a.m. On the record, all counsel and Mr. Norvell are present. The Court addresses the Defense counsel regarding Pitchess Discovery as on the record. Mr. Kelly agrees to the Proposed Protective Order and the Court signs it on the record. Mr. Kelly is provided with a copy of the Protective Order and the Pitchess Discovery.

11:17 a.m. The Court is in recess.

4:03 p.m. On the record, all parties are present. The Court addresses the People's Pitchess Motion as on the record. Ms. Gleason agrees to the Protective Order and the Court signs it on the record. Ms. Gleason is provided with a copy of the Protective Order and the Pitchess Discovery.

4:06 p.m. The Court and counsel discuss the issue of the new circumstances relating Defendant's competency as on the record.

4:20 p.m. The matter is submitted. **The Court finds that there is not a substantial change in circumstances and criminal proceedings will NOT be suspended, as set forth on the record.** Ms. Gleason leaves the courtroom for the Court to hear the Defendant's Marsden motion.

## CLOSED-SESSION: MARSDEN HEARING

4:21 p.m. On the record and outside the presence of the District Attorney, the defendant and counsel are present. The defendant makes a Marsden Motion.

**The Marsden Motion is DENIED as set forth on the record.**

The Court orders that the transcript of these proceedings be SEALED and not opened except by a Judicial Officer for purposes of review of these proceedings, as on the record.

**Marsden Hearing Concluded.**

4:52 p.m. Ms. Gleason returns to open court. The Court confirms the Jury Trial as on the record.

The Jury Trial in this matter is continued to Monday, October 19, 2015 at 9:00 a.m. in Department 13 of the Superior Court.

Defendant Easter is remanded to the custody of the Sheriff and ordered to appear on Monday, October 19, 2015 at 9:00 a.m. in Department 13.

4:53 p.m. Court is adjourned.

Date:  October 16, 2015

S. Wendland, Courtroom Clerk

# EXHIBIT 4

JOHN BURRIS ESQ., SBN #69888
DEWITT LACY ESQ., SBN # 258789
THE LAW OFFICE OF JOHN L. BURRIS
AIRPORT CORPORATE CENTER
7677 OAKPORT STREET, SUITE 1120
OAKLAND, CALIFORNIA 94621
TELEPHONE: (510) 839-5200
FACSIMILE: (510) 839-3882
JOHN.BURRIS@JOHNBURRISLAW.COM
DEWITT.LACY@JOHNBURRISLAW.COM



FILED

2013 MAY -1 A 11: 5%

K. TORRE CLERK OF THE SUPERIOR COURT
COUNTY OF CONTRA COSTA STATE
BY_____

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF CONTRA COSTA

33

| | |
|---|---|
| Cassandra WILKERSON, an individual<br><br>    Plaintiff,<br><br>v.<br><br>CITY OF PITTSBURG, a municipal corporation; BRIAN ADDINGTON, individually and in his official capacity as a Captain with the City of Pittsburg Police Department; RATHNESH RAMAN, individually and in his official capacity as a Lieutenant with the City of Pittsburg Police Department; WADE DERBY, individually and in his official capacity as a Lieutenant with the City of Pittsburg Police Department and DOES 1-25, inclusive; individually and in their capacities at Pittsburg Police Department,<br><br>    Defendants. | Case No.: C 13-00941<br><br>COMPLAINT FOR DAMAGES<br>(Fair Employment and Housing Act and pendant tort claims)<br><br>JURY TRIAL DEMANDED |

Summons NOT issued about does not match Fall?

## JURISDICTION

1.    This action arises under the Fair Employment and Housing Act and various tort claims. Jurisdiction is conferred upon this Court by pursuant to the California Constitution. The Superior Court of Contra Costa County is the proper venue in that all the acts complained of occurred in the Pittsburg, California, which is within this judicial district, the defendants are situate within this judicial district and the plaintiff resides in this district. Plaintiff has filed suit within the time periods prescribed within Notice of Right to Sue by the State of California Department of Fair Employment and Housing. All administrative requirements precedent to bringing suit against these defendants and upon the causes of action set forth herein have been fulfilled.

## PARTIES

2.    At all times relevant to this complaint, CASSANDRA WILKERSON (hereinafter "Plaintiff") was a resident of the state of California at the time of the incident, is now a resident of the state of California and is a United States Citizen.

3.    Defendant CITY OF PITTSBURG (hereinafter "CITY") is and at all times herein mentioned a municipal corporation. Under its supervision, the CITY OF PITTSBURG operates the Pittsburg Police Department.

4.    Defendant RATHNESH RAMAN (hereinafter "RAMAN") was and is at all times mentioned an individual person. RAMAN is sued in his individual and official capacity as a Lieutenant with the City of Pittsburg Police Department.

5.    Defendant WADE DERBY (hereinafter "DERBY") was and is at all times mentioned an individual person. DERBY is sued in his individual and official capacity as a Lieutenant with the City of Pittsburg Police Department.

6.    Defendant BRIAN ADDINGTON (hereinafter "ADDINGTON") was and is at all

times mentioned an individual person. ADDINGTON is sued in his individual and official capacity as a Captain with the City of Pittsburg Police Department.

7.     Plaintiff is ignorant of the true names and/or capacities of defendants sued herein as DOES 1 through 25, inclusive, and therefore sue said defendants by such fictitious names. Plaintiff will amend this complaint to allege their true names and capacities when ascertained. Plaintiff believes and alleges that each of the DOE defendants is legally responsible and liable for the incident, injuries and damages hereinafter set forth. Each defendant proximately caused injuries and damages because of their negligence, breach of duty, negligent supervision, management or control and/or violation of public policy. Each defendant is liable for his/her personal conduct, vicarious or imputed negligence, fault, or breach of duty, whether severally or jointly, or whether based upon agency, employment, ownership, entrustment, custody, care or control or upon any other act or omission. Plaintiff will ask leave to amend this complaint subject to further discovery.

8.     In doing the acts alleged herein, Defendants, and each of them acted within the course and scope of their employment.

9.     In doing the acts and/or omissions alleged herein, Defendants, and each of them, acted under color of authority and/or under color of law.

10.     Due to the acts and/or omissions alleged herein, Defendants, and each of them, acted as the agent, servant, and employee and/or in concert with each of said other Defendants herein.

11.     For State causes of action related to Federal claims, Plaintiff is required to comply with an administrative claim requirement under California law. Plaintiff has complied with all applicable requirements.

## FACTS COMMON TO ALL CAUSES OF ACTION

12.     The latest of these ongoing incidents occurred in December 2012, in the City of Pittsburg, California. Plaintiff Cassandra Wilkerson has worked as a police officer with the

Pittsburg Police Department, in Pittsburg, California for 10 years. Ms. Wilkerson has an impecable employment record. During December 2011, Plaintiff was working as a detective.

13. Defendant Lieutenant Rathnesh RAMAN has a history of making sexual advances toward Ms. Wilkerson. Ms. Wilkerson has continually and overtly rejected RAMAN's unwanted sexual advances.

14. RAMAN continually insisted on obtaining Ms. Wilkerson's personal cell phone number. Ms Wilkerson has a department issued cell phone and RAMAN had no reason to obtain Ms. Wilkerson's personal phone number. RAMAN was not Ms. Wilkerson's supervisor.

15. RAMAN would call Ms. Wilkerson on her department issued cell phone and force other department personnel to call her on his behalf. RAMAN had no legitimate, professional reason to call Ms. Wilkerson.

16. RAMAN would stand over Ms. Wilkerson's shoulder while she was viewing sexually explicit evidence for child pornography investigations. RAMAN was not working in Ms. Wilkerson's unit and had no legitimate, professional reason to be overseeing her work or viewing the sexually graphic child pornography evidence.

17. RAMAN ordered Ms. Wikerson a department issued laptop and asked how she liked it. Ms. Wilkerson stated the computer screen was a little big for her small work area. RAMAN then stated, "Don't worry, you'll get use to the size," with a sexual undertone that made Ms. Wilkerson embarassed, humiliated and uncomfortable.

18. During department meetings RAMAN would chastise and embarrassed Ms. Wilkerson in front of other employees. He would stand and stare at Ms. Wilkerson for long periods of time and bother her continually to the point that she was forced to avoid RAMAN and his constant, unwanted advances.

19.     Ms. Wilkerson made complaints to Defendant Captain Brian ADDINGTON on several occasions. During her last complaint, Ms. Wilkerson was in tears and pleaded with ADDINGTON to help her stop the harassment.

20.     ADDINGTON's solution to Ms. Wilkerson's complaints of harassment was to demote her from an esteemed detective position back to working patrol.

21.     Back on patrol, Ms. Wilkerson was under the supervision of Defendant Lieutenant Wade DERBY. DERBY has received prior complaints for sexual harassment of female officers and has been accused of touching female officers inappropriately.

22.     During her contact with DERBY, Ms. Wilkerson experienced ongoing inappropriate comments. DERBY asked Ms. Wilkerson if she wore thong underwear, under the guise that he was trying to order feminine hygiene supplies for the female officers.

23.     DERBY made comments about wanting to make Ms. Wilkerson his polygamist wife. DERBY made comments about the size of his genitals and often referred to his penis as "the whopper" when speaking to Ms. Wilkerson. Ms. Wilkerson was disguisted and embarassed by having to hear these inappropriate comments from her supervisor.

24.     During Ms Wilkerson's employment background investigation with ADDINGTON, she revealed she was divorcing her husband for infedelity. DERBY on one instance told Ms. Wilkerson that if he were her husband she wouldn't have a problem with infedelity.

25.     When Ms. Wilkerson was trying to promote to Sergeant, DERBY told her that he would be on her oral board. During that time DERBY told Ms. Wilkerson that he was in love with her and loved her for more than her 'tits.'

26.     In March 2012, Ms. Wilkerson was searching for equipment in the trunk on her patrol car for several minutes. When Ms. Wilkerson stood up she saw DERBY standing staring at her buttocks in a lewd manner that made her ashamed, embarrased and uncomfortable.

27. Ms. Wilkerson expressed her concerns about DERBY to ARRINGTON on numerous occassions. When Ms. Wilkerson tried exlpaining how DERBY nicknamed his genitals and spoke to her about it, ARRINGTON told her, "Let's keep that between us."

28. In order to protect Lieutenants DERBY and RAMAN, ADDINGTON began to lie to other employees and tell them that Ms. Wilkerson was returned to patrol because she could not handle the stress of her child pornography assignments, which was blatantly untrue.

29. After having her complaints and concerns completely ignored, Ms. Wilkerson was reluctant to report the numerous other incidents of ongoing sexual harrassment because she was in fear of losing her job. The Defendants ADDINGTON, RAMAN and DERBY were Ms. Wilkerson's ranking superiors within the City of Pittsburg Police Department.

30. On March, 16, 2012, Ms. Wilkerson went out on stress leave due to the ongoing harassment and managements refusal to intervene. Ms. Wilkerson filed a complaint with the Department of Fair Employment and Housing and received a right to sue letter on May 1, 2012.

31. While on leave the City of Pittsburg Police Department continued to retaliate against Ms. Wilkerson by refusing to allow other employees to donate leave to her, in contradiction of department policy. The City of Pittsburg Police Department also refused to allow Ms. Wilkerson to be part of the yearly photograph that is taken of the entire department.

32. Only after filing a second complaint with the EEOC and DFEH did the City of Pittsbug Police Department allow leave donations for Ms. Wilkerson.

DAMAGES

33. As a proximate result of defendants' conduct, and each of them, Plaintiff suffered severe emotional and mental distress, anxiety, humiliation, embarrassment, and loss of her sense of security, dignity, and pride as an American citizen.

34. As a further proximate result of defendants' conduct, Plaintiff claims general damages, including but not limited to: damage to professional reputation, substantial losses of earnings, bonuses, deferred compensation, other employment benefits which he would have received had defendants not terminated his employment and lost time from his usual occupation.

35. The conduct of defendants was oppressive, and carried out with reckless disregard and indifference to Plaintiff's rights. Plaintiff is therefore entitled to an award of punitive damages against the culpable defendants.

36. Plaintiff found it necessary to engage the services of private counsel to vindicate her rights under the law. Plaintiff is therefore entitled to an award of all attorneys' fees incurred in relation to this action for violation of her civil rights.

### FIRST CAUSE OF ACTION
### Discrimination under the California F.E.H.A
(Retaliation)
(Against DEFENDANTS, CITY, RAMAN, DERBY, ADDINGTON and DOES 1-25, inclusive)

37. Plaintiff hereby incorporates paragraphs 1 through 36 by reference, as though fully set forth.

38. Plaintiff opposed unlawful practices by verbally complaining of discriminatory treatment and sexual harassment.

39. After Plaintiff opposed and protested unlawful practices, Defendant took retaliatory actions against Plaintiff by transferring Plaintiff back to patrol and later refusing to allow other employees to donate leave to her.

40. Plaintiff filed a complaint with DFEH and received a right to sue letter.

41. There is a causal link between Plaintiff's complaints and protests, and the adverse employment action she was subjected to, because Defendant, its managers and supervisors were

aware of, or reasonably should have been aware of Plaintiff's complaint. Defendants demoted Plaintiff in a way that differed from its ordinary policy and practices.

## SECOND CAUSE OF ACTION
### Discrimination under the California
### Fair Employment and Housing Act
(Against CITY, ADDINGTON, RAMAN, DERBY and DOES 1-25, inclusive)

42. Plaintiff hereby incorporates paragraphs 1-41 by reference, as though fully set forth herein.

43. The fact that Plaintiff complained about discriminatory remarks and exposed the Company to embarrassment and negative publicity had her conduct become known was a substantial factor in defendant's decision to deprive Plaintiff of the terms, conditions and privileges of employment which similarly situated persons enjoyed.

44. Plaintiff filed a charge concerning discriminatory conduct and the retaliatory conduct of defendants alleged herein with the Department of Fair Employment and Housing and received a right-to-sue letter from said agency with respect to the charges herein.

45. Plaintiff is informed and believes, and thereon alleges that defendants follow a policy and practice of covering up misconduct and sexual harassment which constitutes disparate treatment in violation of the FEHA due to Defendants DERBY, ADDINGTON AND RAMAN intentionally denied Plaintiff equality in the terms, conditions and privileges of employment.

46. Plaintiff has been damaged by the defendant's conduct and is entitled to recover as set forth below.

47. Plaintiff has been required to retain counsel to redress the wrongful conduct by defendants alleged herein and is consequently entitled to an award of reasonable attorney's fees.

48. The conduct of defendants described herein was done with a conscious disregard of Plaintiff's rights such as to constitute oppression, fraud or malice entitling Plaintiff to punitive damages in an amount appropriate to punish or set an example of defendants for the public good.

WHEREFORE, Plaintiff prays for judgment against defendants, and each of them as hereinafter set forth.

### THIRD CAUSE OF ACTION
**Defamation**
(Against ADDINGTON and DOES 1-25, inclusive)

49. Plaintiff hereby incorporates paragraphs 1 through 48 by reference, as though fully set forth herein.

50. By the above described acts incorporated herein, defendants, and each of them, individually and in concert with others acting within the scope of their employment, caused to be communicated false information which injured Plaintiff in her professional reputation. Specifically, defendants communicated Plaintiff's inability to handle the stress related to her assigned when, in fact, prior to the ongoing sexual harassment and failure to act complained of herein, the file of Plaintiff was completely positive and showed that she was at all material times a qualified and competent individual for the position she held.

51. The statements set forth above were made with express and implied malice on the part of all defendants, and each of them, and with design and intent to injure Plaintiff in her good name, reputation and employment.

52. As a proximate result of the defamatory and factually incorrect statements made by defendants, and each of them, as aforesaid, Plaintiff has suffered injury to her personal,

business and professional reputation, and further has suffered and continues to suffer embarrassment, humiliation and anguish all to her damage in an amount according to proof.

53. As a Captain with the Pittsburg Police Department, ADDINGTON was supposed to safeguard Plaintiff's rights, but instead contributed to the violation of Plaintiff's rights by failing to adequately investigate Plaintiff's claims and by concocting a false reason for transferring her back to patrol.

54. Defendants, and each of them, committed the acts alleged herein maliciously, fraudulently and oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of Plaintiff's rights. Plaintiff thus is entitled to recover punitive damages from defendants, and each of them, in an amount according to proof.

WHEREFORE, Plaintiff prays for judgment against defendants, and each of them, as hereinafter set forth.

### FOURTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)
#### (Against ADDINGTON, DERBY, RAMAN and DOES 1-25)

55. Plaintiff re-alleges and incorporates by reference herein paragraphs 1 through 54 of this Complaint.

56. The conduct of Defendants and DOES 1 through 25, inclusive, as set forth herein, was extreme and outrageous and beyond the scope of conduct which should be tolerated by citizens in a democratic and civilized society. Defendants committed these extreme and outrageous acts with the intent to inflict severe mental and emotional distress upon Plaintiff.

57. As a proximate result of Defendants' willful, intentional and malicious conduct,

plaintiff suffered severe and extreme mental and emotional distress. Therefore, Plaintiff is entitled to an award of punitive damages as against said defendants. Plaintiff has suffered damages as hereinafter set forth.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as hereinafter set forth.

## JURY DEMAND

58.     Plaintiff hereby demands a jury trial in this action.


## PRAYER

WHEREFORE, Plaintiff prays for relief, as follows:

1.     For general damages in a sum according to proof;

2.     For special damages in a sum according to proof;

3.     For punitive damages in a sum according to proof;

4.     For reasonable attorney's fees in a sum according to proof;

5.     For cost of suit herein incurred; and

6.     For such other and further relief as the Court deems just and proper.

Dated: May 1, 2013



DeWitt M. Lacy, Esq.,
Attorney at Law

# EXHIBIT 5



FILED

DEC 26 2014

STEPHEN H. NASH CLERK OF THE COURT
SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF CONTRA COSTA

By_____, Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF CONTRA COSTA

|  |  |
|---|---|
| CASSANDRA WILKERSON,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF PITTSBURG, et al.,<br><br>Defendants. | CASE NO.  C13-00941<br><br><br>ORDERS RE: MOTIONS FOR<br>SUMMARY JUDGMENT AND<br>SUMMARY ADJUDICATION |

On October 1, 2014, five separate Motions for Summary Judgment and/or Summary Adjudication were heard in Dept. 33 of this court. The following are the orders related to each of these motions:

**Defendant Raman's motion for summary judgment is GRANTED.**

Plaintiff cannot maintain an action for money or damages against a public employee acting within the scope of employment, unless she timely submits a written claim to the public employer. (Government Code § 910, et seq.) Plaintiff must file a written claim with the government within 6 months of accrual of the action.

1  (Government Code § 911.2.)

2

3      Plaintiff has alleged that Raman was acting within the scope of employment.

4  (FAC ¶4 on page 2 and ¶6.) The evidence shows that the last acts of harassment or

5  discrimination by Raman were before Plaintiff was transferred to Patrol. (Facts 33 and

6  34 and P's responses.) Plaintiff transferred to patrol in September 2011. (Plaintiff

7  Depo at 258:25-259:1.) Plaintiff did not file her government claim until December

8  2012. (Vania decl ¶3 and exhibit A.) Therefore, Plaintiff P's claim as to Raman is not

9  timely.

10

11      Plaintiff has requested leave to amend to plead a new cause of action based on

12  sexual harassment. It is apparent from Plaintiff's arguments that this new claim would

13  allege that Raman was not acting within the scope of his employment and directly

14  conflict with Plaintiff's current allegations. A party may "contradict a previous judicial

15  admission by amending the pleading, provided the request to do so is supported by a

16  'showing … of mistake or other excuse for changing the allegations of fact.' " (*Dang

17  v. Smith* (2010) 190 Cal. App. 4th 646, 659, quoting 5 Witkin, Cal. Procedure (5th ed.

18  2008) Pleading § 1198, p. 630.) Here, Plaintiff has not made a showing of mistake or

19  excuse for changing the allegations in her complaint. Therefore, Plaintiff's request for

20  leave to amend is denied.

21

22

23  The Court rules on the objections filed by the City, Raman and Addington on

24  August 29, 2014, as follows:

25      Objections 1 to 3 apply to Raman's motions. Objections 4 to 9 apply to the

26  City's motions. Objections 10 to 13 apply to Raman's, the City's and Addington's

27

28

motions.

Objections 1, 2 and 3 are sustained as impermissible hearsay.

Objection 4 is overruled.

Objection 5 is sustained as impermissible hearsay.

Objection 6 is overruled as an authorized admission.

Objection 7 is sustained it is unclear whether Lt. Perry was authorized to speak on behalf of the City.

Objection 8 is sustained as oral testimony offered to prove the contents of a writing.

Objection 9 is overruled as an authorized admission.

Objections 10 to 13 are sustained as Plaintiff's attorney has not provided sufficient authentication for these documents.

**Defendant City of Pittsburg's motion for summary judgment and motion for summary adjudication as to cause of action 3 are DENIED. The motion for summary adjudication as to cause of action 4 is GRANTED with leave to amend.**

As to cause of action 3, the City has not shifted the burden. Plaintiff alleges retaliation by the City "by transferring Plaintiff back to patrol and later refusing to allow other employees to donate leave to her." (FAC ¶45.)

The City's arguments that Plaintiff's only claim for retaliation is based on the donated leave are not well taken. For example, the City relies on fact 9 to argue that plaintiff did not suffer a loss of pay, assignment or promotional opportunity. However,

1  the section cited by the City clearly excluded Plaintiff's transfer to patrol. (Plaintiff's

2  Depo at 371:14-25.) The City also relies on fact 31 and plaintiff's deposition at

3  218:12-219:9 and 233:16-234:4. However, elsewhere in plaintiff's deposition she

4  states that she was transferred to patrol. (See, e.g., Plaintiff's Depo at 366:7-17.)

5

6      The Court will not consider the City's arguments regarding Plaintiff's transfer to

7  patrol not being a retaliatory action since these arguments were first raised by the City

8  in their reply.

9

10      As to cause of action 4, the City argues that Plaintiff has not sufficiently pleaded

11  her claim for discrimination under FEHA. The Court agrees.

12

13      "[W]here a defect appears on the face of the complaint, a trial court may elect to

14  treat the hearing of the summary judgment motion as a motion for judgment on the

15  pleadings and grant the opposing party an opportunity to file an amended complaint to

16  correct the defect." (*Hobson v. Raychem Corp.* (1999) 73 Cal. App. 4th 614, 625

17  [disapproved on another point].) Therefore, summary adjudication as to cause of action

18  4 is granted with leave to amend for Plaintiff to allege a claim for discrimination under

19  FEHA, if she can do so in good faith.

20

21

22      In addition, Plaintiff is given leave to amend to add their claim for hostile work

23  environment / sexual harassment against the City, if she can do so in good faith. The

24  City is not barred from challenging the sufficiency of the amended pleadings at a later

25  date.

26

27

28

**Defendant Addington's motion for summary judgment is GRANTED.**

Plaintiff's section 1983 claims (causes of action 1 and 2)

Addington argues that both claims are barred by the applicable statute of limitations. (CCP §335.1.) Plaintiff argues that these claims relate back to the filing of the original complaint, which was filed before the expiration of the statute of limitations. Plaintiff's original complaint included allegations relating to Plaintiff's transfer to patrol and ignoring Plaintiff's complaints about Raman and Derby. (Complaint ¶¶ 20 and 29.) Both causes include allegations on Plaintiff's transfer to patrol and cause of action 2 includes allegations on ignoring Plaintiff's complaints. (FAC ¶¶ 37 and 41.) The Court finds that the relation back doctrine applies as to claims 1 and 2, and therefore these claims are not barred by the applicable statute of limitations. (See, e.g., *Smeltzley v. Nicholson Mfg. Co.* (1977) 18 Cal. 3d 932.)

Plaintiff's primary argument is that causes of action 1 and 2 are based on Plaintiff's transfer to patrol, which she believes was a demotion because of her complaints about Raman and Derby. Addington has shifted the burden by showing that a transfer to patrol is not a demotion and that he did not have knowledge of sexual harassment complaints by Plaintiff prior to her transfer.

Addington has presented evidence that transferring from investigations to patrol is a lateral move and not a demotion (Addington Decl. ¶ 3, and Plaintiff's Depo. 489:7-490:2.) Plaintiff has not cited to facts that create a triable issue on this point. Plaintiff testified that she believes investigations is a tougher and more prestigious assignment

1  than patrol, however, she cites to no source beyond her own speculation to support this

2  claim. (See Plaintiff's Depo. at 139:8-15, and 471:21-23.) Similarly, Plaintiff's

3  argument that her chances for promotion have been hurt by her transfer to patrol is

4  based solely upon her speculation. (See, Plaintiff's Depo. at 468:1-7.)

5

6          Addington also presented evidence that he did not know about the sexual

7  harassment complaints from Plaintiff before she was transferred to patrol. (Addington

8  Decl. ¶¶ 5, 7, 8, 10, and 11, and Plaintiff's Depo. at 317:21-318:10.) Plaintiff argues

9  that Addington had knowledge of Plaintiff's complaints prior to her transfer to patrol.

10  However, Plaintiff does not cite evidence that creates a triable issue. Plaintiff testified

11  that she told Addington that Raman made her uncomfortable and micromanaged her,

12  but she could not state that she told Addington that Raman was sexually harassing her.

13  (Plaintiff's Depo. at 216:9-218:5.) Plaintiff also talked to Addington in 2009 and 2011

14  about Derby, but she did not clearly tell Addington that Derby was sexually harassing

15  her. (Plaintiff's Depo. at 195:5-198:3, and 318:6-10, and Addington's Decl. ¶ 5.)

16

17          In cause of action 2, Plaintiff also claims that her complaints of harassment were

18  ignored by Addington. Addington has shifted the burden showing the complaints by

19  Plaintiff were either not sexual harassment complaints or the complaints were not

20  ignored by Addington.

21

22

23          Plaintiff complained to Addington about Raman in 2011, however, she did not

24  tell Addington that Raman was sexually harassing her. (Plaintiff's Depo. at 216:9-

25  218:5.) In addition, Addington investigated this incident and determined that he

26  believed Plaintiff's complaints regarding Raman were related to Raman's management

27

28

style. (Addington's Decl. ¶10.)

Plaintiff complained to Addington about Derby in 2009 and 2011. Again, she did not clearly tell Addington that Derby's behavior was sexual harassment. (Plaintiff's Depo. at 195:5-198:3, and 318:6-10, and Addington's Decl. ¶ 5.) Finally, Plaintiff argues that the March 5, 2012, Derby incident was ignored. However, Addington did not ignore this incident as he me with Plaintiff and other personnel to discuss it on March 29, 2012. (Plaintiff's Depo. at 186:19-22.)

The Court finds that Plaintiff has not cited facts create triable issues on several material facts in causes of action 1 and 2. Therefore, summary judgment should be granted as to these causes of action.

Plaintiff's cause of action 5 for defamation is untimely.

Plaintiff cannot maintain an action for money or damages against a public employee acting within the scope of employment, unless she timely submits a written claim to the public employer. (Government Code § 910, et seq.) P must file a written claim with the government within 6 months of accrual of the action. (Government Code § 911.2.) In addition, a claim for defamation must be filed within one year. (CCP §340(c).)

Plaintiff has alleged that Addington was acting within the scope of employment. (FAC ¶4 on page 3.) Plaintiff learned of Addington's alleged defamatory statements within approximately 60 days of September 18, 2011. (Facts 19, 71, and 72, which are all technically undisputed by Plaintiff due to her failure to respond to them; Plaintiff's

Depo at 258:18-262:6.)

In order to timely file a government tort claim, Plaintiff would have needed to file in mid-May 2012. P did not file her government claim until December 2012. (Vania decl ¶3 and exhibit A.) In order to timely file a complaint under the Code of Civil Procedure, Plaintiff would have needed to file in mid- November 2012. Plaintiff's claim for defamation is time barred.

<u>Plaintiff's cause of action 6 for intentional infliction of emotion distress is untimely.</u>

As with her defamation claim, Plaintiff was required to timely file a government claim within 6 months of accrual of the action. Plaintiff has alleged that Addington was acting within the scope of employment. (FAC ¶4 on page 3.) The last potentially actionable conduct by Addington was in 2011. (Fact 92.) Fact 92 is one of the facts Plaintiff did not respond too. In addition, the Court did not find any references to actionable conduct after 2011 in Plaintiff's opposition papers to this motion. P did not file her government claim until December 2012. (Vania decl ¶3 and exhibit A.) Therefore, P's claim as to intentional infliction of emotional distress is not timely.

Plaintiff has requested leave to amend to plead a new cause of action based on sexual harassment. It is apparent from Plaintiff's arguments that this new claim would allege that Addington was not acting within the scope of his employment and directly conflict with Plaintiff's current allegations. A party may "contradict a previous judicial admission by amending the pleading, provided the request to do so is supported by a

'showing … of mistake or other excuse for changing the allegations of fact.' " (*Dang v. Smith* (2010) 190 Cal. App. 4th 646, 659, quoting 5 Witkin, Cal. Procedure (5th ed. 2008) Pleading § 1198, p. 630.) Here, Plaintiff has not made a showing of mistake or excuse for changing the allegations in her complaint. Therefore, Plaintiff's request for leave to amend is denied.

Other Issues

Plaintiff's request for a continuance to conduct additional discovery is denied. Plaintiff did not submit an affidavit as required by Code of Civil Procedure 473c(h).

Code of Civil Procedure 473c(b)(3) requires an opposing party to include a separate statement that responds to each material fact. "Failure to comply with this requirement of a separate statement may constitute a sufficient ground, in the court's discretion, for granting the motion." (CCP 473c(b)(3).) Plaintiff failed to include such a statement in response to this motion. The Court is not granting Addington's motion on this failure, however, the Plaintiff and her attorneys should make sure to comply with CCP 473c(b)(3), and all other appropriate code sections in the future.

The Court rules on the objections filed by Addington on September 16, 2014, as follows:

Objection 1 is sustained as impermissible hearsay.

Objection 2 is overruled as a party admission.

Objections 3 to 6 are duplicates of objections 10 to 13 filed on August 29, 2014. See other tentative for ruling on those objections.

Objection 7 is sustained for lack of authentication.

1
2
3  **Defendant Derby's motion for summary judgment is GRANTED. Derby's**
4  **request for judicial notice is GRANTED.**
5
6      Plaintiff cannot maintain an action for money or damages against a public
7  employee acting within the scope of employment, unless she timely submits a written
8  claim to the public employer. (Government Code § 910, et seq.) Plaintiff must file a
9  written claim with the government within 6 months of accrual of the action.
10  (Government Code § 911.2.)
11
12      Plaintiff has alleged that Derby was acting within the scope of employment.
13  (FAC ¶ 3 on page 3 and ¶6.)  The last acts of harassment or discrimination by Derby
14  were in March 2012. (Fact 5, Plaintiff Depo at 477:6-16.) Plaintiff did not file her
15  government claim until December 2012. (Vania decl ¶3 and exhibit A.)
16
17      Plaintiff has requested leave to amend to plead a new cause of action based on
18  sexual harassment. It is apparent from Plaintiff's arguments that this new claim would
19  allege that Derby was not acting within the scope of his employment and directly
20  conflict with Plaintiff's current allegations. A party may "contradict a previous judicial
21  admission by amending the pleading, provided the request to do so is supported by a
22  'showing ... of mistake or other excuse for changing the allegations of fact.' " (*Dang*
23  *v. Smith* (2010) 190 Cal. App. 4th 646, 659, quoting 5 Witkin, Cal. Procedure (5th ed.
24  2008) Pleading § 1198, p. 630.) Here, Plaintiff has not made a showing of mistake or
25  excuse for changing the allegations in her complaint. Therefore, Plaintiff's request for
26
27
28

leave to amend is denied.

The Court rules on the objections filed by Derby as follows:

Objection to evidence submitted to dispute fact 6 is sustained.

Objection to evidence submitted to dispute fact 8 is sustained as impermissible hearsay.

Objection to evidence submitted to dispute facts 9 and 21 are overruled. The evidence is irrelevant to those facts, however, it is not irrelevant to the motion. The testimony regarding what Derby said is a party admission. The objection as to Conaty's declaration is sustained as the filed copies of Plaintiff's opposition did not include these pages.

Objections to evidence submitted to dispute facts 7, 11, 13, 14, 15, 16, 19, 20, and 22 are unnecessary as Plaintiff did not cite to any evidence to dispute these facts as required by California Rule of Court 3.1350(f).

**Defendant Addington's motion for summary adjudication based qualified immunity is MOOT. Addington's motion for summary judgment is granted and therefore the Court need not address this separately filed motion.**

Dated: December 26, 2014

_____

Steven K. Austin

Judge of the Superior Court

SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF CONTRA COSTA

Case No. C13-00941

CERTIFICATE OF MAILING

I, the undersigned, certify under penalty of perjury that I am a citizen of the United States, over 18 years of age, employed in Contra Costa County, and not a party to the within action; that my business address is Court House, Martinez, California, that I served the attached Notice, order, or Paper by causing to be placed a true copy thereof in an envelope addressed to the parties or attorneys for the parties, as shown below, which envelope was then sealed and postage fully prepaid thereon, and thereafter was deposited in the United States Mail at Martinez, California, on date shown below; that there is delivery service by the United States Mail between the place of mailing and the place addressed.

Dewitt Lacy, Esq.
LAW OFFICES OF JOHN L. BURRIS
677 Oakport St., Ste. 1120
Oakland, CA 94621

Claudia Leed, Esq.
STUBB & LEONE
2175 N. California Blvd., Suite 900
Walnut Creek, CA 94596

Kathleen Maylin, Esq.
JACKSON/LEWIS, P.C.
50 California Street, 9th Floor
San Francisco, CA 94111

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Martinez, California, on _____12/26/14_____.

S. NASH, CLERK OF THE COURT


BY:_____DEPUTY
ANNIE YOUNG  MARILYN JONES

# EXHIBIT 6

**ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):*
John L. Burris (SBN 39888)
DeWitt M. Lacy (SBN 258789)
The Law Office of John L. Burris
7677 Oakport Street, Suite 1120
Oakland, CA 94621
TELEPHONE NO.: 510.893.5200 FAX NO. *(Optional):*
E-MAIL ADDRESS *(Optional):* dewitt.lacy@johnburrislaw.com
ATTORNEY FOR *(Name):* Cassandra Wilkerson

*FOR COURT USE ONLY*

F I L E D
SEP 10 2015
STEPHEN H. NASH CLERK OF THE COURT
SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF CONTRA COSTA
By A. Adams , Deputy Clerk

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Contra Costa
STREET ADDRESS: 725 Court Street
MAILING ADDRESS:
CITY AND ZIP CODE: Martinez, CA 94553
BRANCH NAME:

PLAINTIFF/PETITIONER: CASSANDRA WILKERSON

DEFENDANT/RESPONDENT: CITY OF PITTSBURG, et al.

| REQUEST FOR DISMISSAL | CASE NUMBER:<br>C13-00941 |
|---|---|

A conformed copy will not be returned by the clerk unless a method of return is provided with the document.

This form may not be used for dismissal of a derivative action or a class action or of any party or cause of action in a class action. (Cal. Rules of Court, rules 3.760 and 3.770.)

1. TO THE CLERK: Please **dismiss** this action as follows:
   a. (1) [x] With prejudice (2) [ ] Without prejudice
   b. (1) [ ] Complaint (2) [ ] Petition
   (3) [ ] Cross-complaint filed by *(name):*     on *(date):*
   (4) [ ] Cross-complaint filed by *(name):*     on *(date):*
   (5) [x] Entire action of all parties and all causes of action
   (6) [ ] Other *(specify):*\*

2. *(Complete in all cases except family law cases.)*
   The court [ ] did [ ] did not waive court fees and costs for a party in this case. *(This information may be obtained from the clerk. If court fees and costs were waived, the declaration on the back of this form must be completed).*
   Date:

   John L. Burris (SBN 39888)
   (TYPE OR PRINT NAME OF [x] ATTORNEY [ ] PARTY WITHOUT ATTORNEY)

   \*If dismissal requested is of specified parties only of specified causes of action only, or of specified cross-complaints only, so state and identify the parties, causes of action, or cross-complaints to be dismissed.

   ▶ *(Signature)* John T. Burris
   (SIGNATURE)
   Attorney or party without attorney for:
   Cassandra Wilkerson
   [x] Plaintiff/Petitioner [ ] Defendant/Respondent
   [ ] Cross-Complainant

3. TO THE CLERK: Consent to the above dismissal is hereby given.\*\*
   Date:

   (TYPE OR PRINT NAME OF [ ] ATTORNEY [ ] PARTY WITHOUT ATTORNEY)

   \*\* If a cross-complaint – or Response (Family Law) seeking affirmative relief – is on file, the attorney for cross-complainant (respondent) must sign this consent if required by Code of Civil Procedure section 581 (i) or (j).

   ▶
   (SIGNATURE)
   Attorney or party without attorney for:
   [ ] Plaintiff/Petitioner [ ] Defendant/Respondent
   [ ] Cross-Complainant

*(To be completed by clerk)*
4. [x] Dismissal entered as requested on *(date):* SEP 10 2015
5. [ ] Dismissal entered on *(date):* as to only *(name):*
6. [ ] Dismissal **not entered** as requested for the following reasons *(specify):*

7. a. [ ] Attorney or party without attorney notified on *(date):*
   b. [ ] Attorney or party without attorney not notified. Filing party failed to provide
   [ ] a copy to be conformed [ ] means to return conformed copy

Date SEP 10 2015     Clerk, by A. Adams , Deputy

Form Adopted for Mandatory Use
Judicial Council of California
CIV-110 [Rev. Jan. 1, 2013]

**REQUEST FOR DISMISSAL**

Legal
Solutions
Plus

Code of Civil Procedure, § 581 et seq.;
Gov. Code, § 68637(c); Cal. Rules of Court, rule 3.1390

| PLAINTIFF/PETITIONER: CASSANDRA WILKERSON | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: CITY OF PITTSBURG, et al. | C13-00941 |

**COURT'S RECOVERY OF WAIVED COURT FEES AND COSTS**

If a party whose court fees and costs were initially waived has recovered or will recover $10,000 or more in value by way of settlement, compromise, arbitration award, mediation settlement, or other means, the court has a statutory lien on that recovery. The court may refuse to dismiss the case until the lien is satisfied. (Gov. Code, § 68637.)

## Declaration Concerning Waived Court Fees

1. The court waived court fees and costs in this action for *(name):*

2. The person named in item 1 is *(check one below):*
   a. ☐ not recovering anything of value by this action.
   b. ☐ recovering less than $10,000 in value by this action.
   c. ☐ recovering $10,000 or more in value by this action. *(If item 2c is checked, item 3 must be completed.)*

3. ☐ All court fees and court costs that were waived in this action have been paid to the court *(check one):* ☐ Yes ☐ No

I declare under penalty of perjury under the laws of the State of California that the information above is true and correct.

Date: _____

_____    ▶ _____
(TYPE OR PRINT NAME OF ☐ ATTORNEY ☐ PARTY MAKING DECLARATION)          (SIGNATURE)

# CERTIFICATE OF SERVICE

*Wilkerson v. City of Pittsburg, et al*

**STATE OF CALIFORNIA, COUNTY OF ALAMEDA:**

I am a citizen of the United States and employed in the county aforesaid; I am over the age of eighteen years, and not a party to the within action; My business address is 7677 Oakport Street, Suite 1120, Oakland, California 94621. On the date below, I served on the named parties and /or counsel of record:

**Michael J. Christian**
**Connor Dale**
Jackson Lewis
50 California Street, 9th Floor
San Francisco, CA 94111

The following documents in the manner checked below: **ENDORSED COPY OF WILKERSON REQUEST FOR DISMISSAL FILED 9/10/2015.**

☒ **(VIA MAIL -- CCP §§ 1013(a), 2015.5)** By placing a true copy thereof enclosed in a sealed envelope(s), addressed as above, and placing each for collection and mailing on that date following ordinary business practices. I am readily familiar with my firm's business practice of collection and processing of correspondence for mailing with the U.S. Postal Service and correspondence placed for collection and mailing would be deposited in the U.S. Postal Service at Oakland, California, with postage thereon fully prepaid, that same day in the ordinary course of business.

☐ **(VIA PERSONAL DELIVERY -- CCP §§ 1011, 2015.5)** By placing a true copy thereof enclosed in a sealed envelope(s), addressed as above, and causing each envelope(s) to be hand delivered on that day by Russ Taylor, in the ordinary course of my firm's business practice.

☐ **VIA E-MAIL or ELECTRONIC TRANSMISSION -- CCP §§ 1013(e), 2015.5, CRC 2008)** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document to be sent to the persons at the e-mail address(es) or the facsimile number listed above. I am readily familiar with my firm's business practice of collection and processing of correspondence via facsimile transmission(s) and any such correspondence would be transmitted in the ordinary course of business. The facsimile transmission(s) was reported as complete and without error, and a copy of the transmission report is attached..

☐ **(VIA OVERNIGHT MAIL/COURIER -- CCP §§ 1013(c), 2015.5)** By placing a true copy thereof enclosed in a sealed envelope(s), addressed as above, and placing each for collection by overnight mail service or overnight courier service. I am familiar with my firm's business practice of collection and processing of correspondence for overnight mail or overnight courier service, and my correspondence placed for collection for overnight delivery would, in the ordinary course of business, be delivered to an authorized courier or driver authorized by the overnight mail carrier to receive documents, with delivery fees paid or provided for, that same day, for delivery on the following business day.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made. Executed on **September 21, 2015**, at Oakland, California.

_____
Angelina Austin



$ 000.70⁵

**CALENDARED**

DATE _____

INT _____

LAW OFFICES OF
**JOHN L. BURRIS**
AIRPORT CORPORATE CENTRE
7677 OAKPORT STREET, SUITE 1120
OAKLAND, CA 94621

**Michael J. Christian**
**Connor Dale**
Jackson Lewis
50 California Street
9th Floor
San Francisco, CA 94111

# EXHIBIT 7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WADE DERBY,

    Plaintiff,

    v.

CITY OF PITTSBURG and DOES 1-10,

    Defendants.

Case No.  16-cv-05469-SI

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**

Re: Dkt. No. 33

    Defendant's motion to dismiss plaintiff's second amended complaint is scheduled for a hearing on April 28, 2017.  The Court finds this matter suitable for resolution without oral argument and VACATES the hearing.  For the reasons set forth below, the Court GRANTS defendant's motion to dismiss certain claims in the second amended complaint without leave to amend.

**BACKGROUND**

    This lawsuit arises out of plaintiff Wade Derby's employment with the City of Pittsburg ("the City").  The following is taken from the Second Amended Complaint ("SAC").  Derby was hired by the City as a police officer with the Pittsburg Police Department ("PPD") in 1998.  SAC (Dkt. No. 32) ¶ 14.  He was employed by the City for twenty-eight years in various roles.  *See id.* ¶¶ 14-21.  By 2009, Derby was the lead investigator in charge of the PPD's professional standards, or internal affairs ("IA") investigations.  *Id.* ¶¶ 21, 32.  He continued in this role until his separation from the City in January 2016.  *Id.* ¶ 21.

    The SAC alleges that in March 2012, "plaintiff alerted ADDINGTON, then a Captain in the command chain who was competing with plaintiff for the position of Chief, of potential sexual harassment of [a female employee] Wilkerson by Lieutenant Raman.  No internal investigation was done of Raman."  *Id.* ¶ 33.  However, "the allegations then turned against plaintiff, and

United States District Court
Northern District of California

United States District Court
Northern District of California

1  plaintiff, the whistle blower, became the focus of mistreatment of Wilkerson." *Id.* ¶ 34. Plaintiff

2  alleges that Addington was assigned the IA investigation against plaintiff, and that he sustained

3  the sexual harassment allegations "in order to destroy plaintiff as a competitor for the desired

4  position." *Id.* Wilkerson also filed a civil lawsuit against plaintiff, the City, and Raman. *Id.* ¶ 35.

5  Derby was granted summary judgment in the civil lawsuit. *Id.*[1]

6           In October 2012, plaintiff "was coerced into signing, at the threat of an undeserved adverse

7  employment action such as termination or demotion," a Settlement Agreement and Release with

8  the City, where he tendered an "irrevocable resignation," effective January 8, 2016, in exchange

9  for the City's agreement to not terminate or demote plaintiff. *Id.* ¶ 38; Dkt. No. 32-1, Ex. F (the

10 "Agreement"). The Agreement stated,

11       [O]n or about March 12, 2012, the City received a complaint in which it was
12       alleged that [plaintiff] engaged in harassing and/or inappropriate conduct;

         . . . the City commenced an investigation into the allegations and . . . determined
13       that the allegations are sustained;

14       . . . [plaintiff] has acknowledge[d] and/or admitted to much of the conduct alleged
15       and found to be sustained in the Investigation and whereas the primary dispute
         between the parties is the level of discipline that should be imposed for [plaintiff's]
16       misconduct; [and]

17       . . . the Parties want to enter into this Agreement providing for a final disposition
         of this matter and certain future terms of employment for [plaintiff] . . .

18 Agreement, p.1. In executing the Agreement, plaintiff stated,

19       Employee understands and agrees that he is waiving any rights he has, may have
20       had, or may have, to pursue any and all remedies available to him under any
         employment-related cause of action against the City, including, without limitation,
21       any claims for discrimination, harassment, and/or retaliation, . . . the California Fair
         Employment and Housing Act (California Government Code § 12900 et seq.), . . .
22       all provisions of the California Labor Code, . . . the Constitution of the United
         States, . . . claims of retaliation or whistle-blowing (including but not limited to
23       California Labor Code § 1102.5, et seq., and Government Code § 12653), claims
         for breach of any type of contract, including written, oral, or implied, breach of any
24       covenant, promise, or representation pertaining to [plaintiff's] employment and/or
         the resignation of employment by [plaintiff] from the City, whether expressed or

25

26

27       [1] Defendant's motion to dismiss the SAC states that "the summary judgment motion was
granted on purely procedural grounds because that accuser failed to comply with the Government
28 Claims Act." Motion at 1:17-18 (Dkt. No. 33).

                                          2

United States District Court
Northern District of California

1  implied, and all other claims arising in contract, tort or equity or under any other
statute, federal, state or local up to the date of execution of this Agreement.

2  *Id.* ¶ 10. The Agreement further established,

3  Each party hereto represents and agrees that he or it has carefully read and fully
understands all of the provisions of this Agreement, that he or it has had the chance
4  to consult with a representative (including, but not limited to an attorney), and that
he or it is voluntarily, without any duress or undue influence on the party of or on
5  behalf of any Party, entering into this Agreement.

6  *Id.* ¶ 15. Pursuant to the Agreement, in exchange for the City's agreement not to demote or

7  terminate plaintiff, plaintiff agreed to accept certain discipline, including suspension, reassignment

8  to performing Lieutenant level duties of an administrative nature for the remainder of his

9  employment, and to undergo training. *Id.* ¶ 5. The City also agreed that "no further discipline

10  shall be considered or taken by the City towards Employee in response to the allegations set forth

11  in the Investigation." *Id.* ¶ 8.

12  After execution of the Agreement, plaintiff continued in his role as the primary investigator

13  for professional standards investigations and was assigned to conduct almost all IA investigations

14  for the PPD. SAC ¶ 40. In 2014, he was assigned to conduct an IA investigation regarding PPD

15  Officers Ingram and Sibbitt, and continued working on this investigation until his separation in

16  January 2016. *Id.* ¶ 41. Plaintiff made multiple requests to interview Officers Ingram and Sibbitt,

17  draft a report or summary of findings, and finalize the IA investigation, in accordance with

18  established PPD policy and custom, so that the materials could be produced in response to

19  *Pitchess* motions.[2] *Id.* ¶¶ 42-44. However, Chief Addington repeatedly ordered plaintiff not to

20  finalize the IA report. *Id.* ¶¶ 44-45.

21  Plaintiff was ordered to attend a May 2014 *Pitchess* hearing but was only permitted to

22  bring a single document from his IA investigation that indicated Officer Ingram had been placed

23  on administrative leave. *Id.* ¶ 46. Plaintiff requested permission to bring the entire IA file to the

24

25  ───────────────

[2] Under *Pitchess v. Superior Court*, criminal defendants may compel the discovery of
26  evidence in the arresting law enforcement officer's personnel file that is relevant to the
defendant's ability to defend against a criminal charge. 11 Cal. 3d 531, 536-40 (1974). To obtain
27  such information, a defendant must file a written motion with the appropriate court or
administrative body and provide written notice to the government agency which has custody and
28  control of the records. *Alford v. Superior Court*, 29 Cal. 4th 1033, 1038 (2003) (citing Cal. Evid.
Code § 1043).

3

hearing and repeatedly informed City employees, including City attorneys, that he would not comply with Chief Addington's order and withhold information ordered to be disclosed by the court. *Id.* ¶¶ 47-48. The *Pitchess* hearing was continued to a later date and plaintiff was unable to attend because the hearing was rescheduled to a date plaintiff was known to be on vacation. *Id.* ¶¶ 49-50. Plaintiff learned upon his return from vacation that his investigation and the contents of his IA file were not disclosed at the *Pitchess* hearing. *Id.* ¶ 51. Plaintiff then wrote a memo to Addington again requesting permission to draft a summary of his IA investigation which would be available to the court on review of a *Pitchess* motion, and Addington again ordered plaintiff not to draft such a summary. *Id.* ¶ 52.

The SAC alleges that in the midst of these events, toward the end of 2014, plaintiff took the captain's promotional examination. *Id.* ¶ 53. Plaintiff alleges, "[t]his time, instead of placing as the top candidate as he had when he took the examination in 2011, plaintiff was told he was not 'qualified' for the promotion based on the prior sexual harassment allegations." *Id.* Plaintiff alleges that the designation as "unqualified" was contrary to the 2012 settlement agreement stating that no further discipline would be taken against plaintiff as a result of those allegations, and was taken in retaliation for plaintiff speaking out about the Sibbitt and Ingram IAs. *Id.*

On or about March 3, 2015, plaintiff learned that once again the Contra Costa County courts had been misinformed regarding the existence and contents of the Sibbitt and Ingram IAs, and plaintiff again advised employees of the City and Department of the need to disclose such information. *Id.* ¶ 54. Addington refused to allow plaintiff permission to appear in court to correct the record, and in or around March 15, 2015, Addington told plaintiff to consider the investigation of officers Ingram and Sibbitt closed. *Id.* ¶¶ 55-56.

On or about October 6, 2015, plaintiff appeared in court and testified that the PPD had withheld IA information and files from the court. *Id.* ¶ 57. The SAC alleges that plaintiff's whistleblowing activities recently resulted in the setting aside of 15 convictions that were wrongfully obtained by defendants' illegal actions and Addington's withholding *Brady* material during *Pitchess* hearings. *Id.* ¶ 58, Dkt. No. 32-1, Ex. M (December 14, 2016 newspaper article regarding dismissal of 15 convictions).

4

Prior to his appearance in court, plaintiff and the City had been in negotiations to continue plaintiff's employment beyond his January 2016 resignation date depending on the outcome of the civil case filed by Wilkerson. *Id.* ¶ 60. Plaintiff was also advised that he could continue working per diem following any retirement from the Department as was standard policy, practice and procedure for retirees. *Id.* Plaintiff alleges that the City prepared a draft "First Amendment to the Settlement Agreement and Release" that would have permitted plaintiff to continue working for the department after January 2016. *Id.* ¶ 61, Dkt. No. 32-1, Ex. G (draft amendment).

On October 19, 2016, however, Chief Addington informed plaintiff that the employment negotiations were being terminated. SAC ¶¶ 62-69; *see also* Dkt. No. 32-1, Ex. K. After his separation from the City, plaintiff alleges that he was not allowed to work for the PPD on a per diem basis, as was standard policy and practice for retirees. SAC ¶ 69. Plaintiff also contends that the City and Chief Addington failed to remove the allegations of sexual harassment from his IA file in violation of departmental custom and practice. *Id.* ¶¶ 70-72.

Plaintiff contends that he has exhausted all available administrative remedies. *Id.* ¶ 13. On March 21, 2016, he filed a claim for damages with the City pursuant to the California Government Claims Act. *Id.* ¶ 9; *see also* Dkt. No. 32-1, Exs. A-1, A-2. On April 22, 2016, the City denied his claim as untimely. SAC ¶ 10; *see also* Dkt. No. 32-1, Ex. B. On May 2, 2016, plaintiff filed a complaint with the California Department of Fair Employment and Housing ("DFEH"). SAC ¶ 11; *see also* Dkt. No. 32-1, Ex. D. On May 18, 2016, he received three letters from the DFEH, including a document titled "Notice of Case Closure and Right to Sue." SAC ¶ 12; *see also* Dkt. No. 32-1, Exs. E-1, E-2, E-3.

Plaintiff filed this lawsuit against the City and Chief Addington (collectively "defendants") on September 26, 2016. On December 9, 2016, defendants filed a motion to dismiss. Dkt. No. 8. On December 21, 2016, plaintiff filed a first amended complaint, Dkt. No. 10, and a corrected first amended complaint. Dkt. No. 11. Defendants filed a new motion to dismiss with respect to the first amended complaint on January 4, 2017. Dkt. No. 20.

In an order filed February 23, 2017, the Court granted in part and denied in part defendants' motion. As relevant here, the Court held that plaintiff had alleged sufficient facts to

1    state a First Amendment retaliation claim under 42 U.S.C. § 1983 with respect to his October 2015

2    testimony in court. The Court found that plaintiff had alleged that he engaged in protected activity

3    by testifying in court about defendants' failure to disclose the existence and contents of the

4    internal affairs investigation against Officers Ingram and Sibbitt, and that plaintiff alleged that

5    defendants took several adverse actions against him by terminating negotiations to extend

6    plaintiff's employment with the City, refusing to provide plaintiff with per diem employment

7    following his retirement, falsely reporting that plaintiff's reason for separation was dismissal, as

8    opposed to retirement, and failing to purge plaintiff's internal affairs file of the prior sexual

9    harassment allegations in violation of standard policy and practice.

10    However, the Court held that to the extent that plaintiff's First Amendment retaliation

11    claim was based on alleged adverse employment actions that occurred before October 2012, such

12    as defendants' investigation of the sexual harassment complaint and execution of the Agreement,

13    those claims are no longer actionable due to the statute of limitations.  To the extent that plaintiff's

14    § 1983 retaliation claim was based on other actions that defendants took prior to plaintiff's

15    resignation in January 2016, such as excluding plaintiff from meetings and departmental

16    photographs, the Court dismissed the claim with leave to amend because the FAC did not specify

17    how these acts were retaliatory and when these acts occurred.

18    The Court engaged in a similar analysis with regard to plaintiff's claims for statutory

19    retaliation under Labor Code § 1102.5 and Government Code § 12940 *et seq*.  The Court held that

20    plaintiff had stated a claim to the extent plaintiff claimed that defendants retaliated against him

21    after his October 2015 testimony in court, and granted leave to amend to allege additional

22    instances of retaliation provided plaintiff could allege facts to support a claim. The Court also

23    instructed plaintiff to allege when the retaliation occurred as well as compliance with the

24    Government Claims Act (for claims under § 1102.5) and administrative exhaustion (for claims

25    under § 12940).

26    With respect to plaintiff's claim for breach of the implied covenant of good faith and fair

27    dealing, the Court dismissed that claim without leave to amend to the extent it was based on

28    conduct that occurred before the 2012 Agreement.  As to the remainder of plaintiff's claim, the

United States District Court
Northern District of California

6

1     Court found that plaintiff had not alleged how defendants' alleged conduct in "creating and

2     sustaining a hostile work environment" and "taking adverse employment actions against Plaintiff"

3     breached the covenant of good faith and fair dealing.  Plaintiff was granted leave to amend to

4     elaborate on those allegations, and also to allege a claim for breach of contract if plaintiff wished.

5          On March 9, 2017, plaintiff filed the SAC against the City of Pittsburg and Does 1-10.

6     Plaintiff asserts five causes of action against the City in his SAC: (1) violation of federal civil

7     rights under 42 U.S.C. § 1983; (2) retaliation in violation of California Labor Code § 1102.5; (3)

8     retaliation in violation of California Government Code § 12940 *et seq.*; (4) breach of contract;  and

9     (5) breach of the covenant of good faith and fair dealing.

10

11                                              **LEGAL STANDARD**

12          Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint

13    if it fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to

14    dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its

15    face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  This "facial plausibility" standard

16    requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant

17    has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While courts do not require

18    "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to

19    relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

20          In deciding whether the plaintiff has stated a claim upon which relief can be granted, the

21    court must assume that the plaintiff's allegations are true and must draw all reasonable inferences

22    in the plaintiff's favor.  *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).

23    However, the court is not required to accept as true "allegations that are merely conclusory,

24    unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536

25    F.3d 1049, 1055 (9th Cir. 2008).

26          If the Court dismisses the complaint, it must then decide whether to grant leave to amend.

27    The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no

28    request to amend the pleading was made, unless it determines that the pleading could not possibly

United States District Court
Northern District of California

1    be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000)

2    (citations and internal quotation marks omitted).

3

4                                   **DISCUSSION**

5    **I.    Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair**
        **Dealing**

6
        Plaintiff's fourth and fifth causes of action are for breach of contract and breach of the

7    covenant of good faith and fair dealing.  The breach of contract claim alleges,

8
            137.    As part of the 2012 agreement, defendants agreed that it would not demote
9        plaintiff (para. 5), and that no further discipline would be considered or taken
        against plaintiff (para. 8). The agreement also left open the possibility for future
10       promotion and other forms of employment, inasmuch as the agreement did not
        require, or seek plaintiff's agreement, to forgo any future promotions or
11       employment.

12   SAC ¶ 137.  Plaintiff claims that defendants breached the 2012 Agreement, and breached the

13   implied covenant of good faith and fair dealing, by (1) in 2014, designating him as "unqualified"

14   for promotion to captain based on the prior sexual harassment allegations, (2) retaliating against

15   him after his October 2015 court testimony by, *inter alia*, cutting off employment negotiations and

16   not setting aside the prior negative IA finding, and (3) subjecting plaintiff to a hostile work

17   environment in retaliation for plaintiff's whistleblowing activity.  *Id.* ¶¶ 53, 60-75, 96, 100-103

18   The alleged hostile work environment includes all of the actions alleged in paragraphs 1-74 of the

19   SAC, as well as, *inter alia*, being excluded from Department photographs "so as to lessen his

20   recognition," being excluded from areas of employment, being given a gag order,[3] offensive

21   stickers being put on his door and desk, not being allowed to work per diem after retirement, a

22   pattern of ongoing threats of being fired, being left out of command staff meetings, and being

23   assigned internal affairs investigations which defendants knew would make plaintiff a target for

24   complaints by disgruntled employees, being excluded from City Council meetings attended by the

25   rest of command staff, being called a pariah, and being mocked by his Captain, "all of which

26

27

28
        ─────────────────────
        [3] The SAC does not explain how plaintiff was "given a gag order."

United States District Court
Northern District of California

1    contributed to plaintiff's being passed up for promotion to Captain, and which lessened his

2    chances of promotion and continued employment with the DEPARTMENT." SAC ¶ 75.

3         Defendant argues that plaintiff has failed to state a claim because the revised allegations do

4    not allege a breach of any terms of the 2012 Agreement.  Defendant notes that under the 2012

5    Agreement: (1) the City agreed it would "not terminate or demote" plaintiff "for the sustained

6    findings" of the City's sexual harassment investigation or further discipline plaintiff "in response

7    to the allegations set forth in the investigation"; (2) plaintiff could be subject to future discipline or

8    adverse employment actions "subject to the same terms and conditions as other employees";  and

9    (3) for the remainder of his employment, plaintiff could only perform "Lieutenant level duties of

10   an administrative nature" and "such administrative tasks as assigned by the Chief of Police or

11   designee" and would not supervise a "bureau or division" or perform "watch commander

12   duties[.]"  Dkt. No. 32-1 (Agreement §§ 4, 5, 5(b), 6-7, 8).  Defendant contends that the 2012

13   Agreement only protected plaintiff from potential discipline, demotion, or termination as a result

14   of the 2012 sexual harassment investigation results, while plaintiff alleges in the SAC that the City

15   took "adverse actions against plaintiff after plaintiff's signing of the 2012 agreement [that] were

16   designed to discourage, suppress, and punish plaintiff's whistle blowing activities."  SAC ¶ 75.

17   Defendant argues that because the 2012 Agreement did not address in any way plaintiff's

18   whistleblowing activities, the City could not have breached the Agreement through alleged

19   retaliation for those activities.  In addition, defendant argues that the City could not have breached

20   the 2012 agreement by disqualifying plaintiff for the promotion to captain in 2014 because

21   plaintiff expressly accepted "the discipline" of having his job responsibilities limited to the

22   performance of "Lieutenant level duties of an administrative nature" with no supervisory

23   responsibilities "until the effective date of [plaintiff's] resignation" in January 2016.  Dkt. No. 32-

24   1 (Agreement § 5(b)).

25        The Court concludes that plaintiff has failed to state a claim for either breach of contract or

26   breach of the implied covenant of good faith and fair dealing.  The alleged breaches involve

27   instances of alleged retaliation for plaintiff's whistleblowing, and do not allege any violations of

28   the express or implied terms of the 2012 Agreement.  Although plaintiff's opposition attempts to

United States District Court
Northern District of California

9

United States District Court
Northern District of California

characterize all of the alleged breaches as "discipline" or forms of *de facto* "demotion," the 2012 Agreement addressed the sexual harassment allegations against plaintiff and not any of his whistleblowing activities. As such, plaintiff has failed to allege a breach of paragraphs 5 or 8 of the 2012 Agreement. Further, the Court agrees with defendant that plaintiff cannot state a claim for breach of contract or breach of the implied covenant of good faith and fair dealing regarding the 2014 promotion in light of the provision in the 2012 Agreement stating that plaintiff agreed to perform "Lieutenant level duties of an administrative nature" with no supervisory responsibilities "until the effective date of [plaintiff's] resignation" in January 2016. Dkt. No. 32-1 (Agreement § 5(b)). *See Oasis West Realty, LLC v. Goldman*, 51 Cal.4th 811, 821 (2011) (requiring a plaintiff to prove "existence of a contract" and "defendant's breach" to establish a breach of contract action); *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 349 (2000) ("The covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made*.") (emphasis in original); *see also Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 690 (1988) ("The covenant of good faith is read into contracts in order to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purposes.").

Accordingly, the Court GRANTS defendant's motion to dismiss without leave to amend. Plaintiff has been provided several opportunities to amend the complaint, and thus the Court finds that further leave to amend would be futile.[4]

///

///

---

[4] Because the Court concludes that plaintiff has failed to state a claim, the Court finds it unnecessary to address defendant's additional arguments in favor of dismissal of these claims.

## II.     Retaliation Claims[5]

The SAC alleges claims for retaliation under 42 U.S.C. § 1983 (First Amendment Retaliation), California Labor Code § 1102.5, and California Government Code § 12940. The Court previously held that plaintiff stated a claim for retaliation based on his allegations that he engaged in protected activity by testifying in court in October 2015 and defendant took various adverse actions against him after his testimony, including cutting off employment negotiations, refusing to remove the negative IA finding, and not allowing plaintiff to work on a per diem basis after his January 2016 resignation.

Defendant has moved to dismiss any alleged retaliatory actions occurring before October 2015 as not being timely or actionable as retaliation. Defendant argues that the SAC fails to comply with the Court's instruction in the February 23, 2017 order to allege how any other alleged adverse actions were retaliatory and to allege when those acts occurred. In response, plaintiff asserts that defendant has interpreted the Court's prior order too narrowly, and plaintiff argues that he has stated a claim for retaliation based on *all* of the adverse actions that occurred after his October 2015 testimony. While it is unclear to the Court whether plaintiff has accurately stated defendant's position, the Court concludes that plaintiff has stated a claim for retaliation under § 1983 and California law based upon the October 2015 court testimony and all of the alleged adverse actions that occurred after that testimony.

Plaintiff's opposition generally focuses on alleged retaliation after the October 2015 testimony. Opp'n at 9-10 (Dkt. No. 34). However, plaintiff also appears to argue that the creation of and maintenance of a hostile work environment prior to October 2015 is actionable as retaliation. *Id.* However, as defendant notes, the SAC does not allege when the hostile work environment was created, nor does the SAC connect those allegations to specific protected activity. Instead, the SAC generally alleges that plaintiff was subjected to a pattern of harassment

---

[5]   The caption of the complaint states that plaintiff's § 1983 claim is based on First Amendment retaliation, while the body of the SAC also includes allegations regarding a deprivation of due process. Defendant has moved to dismiss the due process cause of action for failure to state a claim, and plaintiff's opposition does not address this claim. Accordingly, the Court finds that plaintiff has abandoned a due process claim and GRANTS defendant's motion to dismiss this claim without leave to amend.

United States District Court
Northern District of California

1   after he signed the 2012 Agreement "designed to discourage, suppress, and punish plaintiff's

2   whistle blowing activities."   SAC ¶ 75.   The Court previously provided guidance to plaintiff

3   regarding the applicable statutes of limitation for the retaliation claims, as well as the need to

4   allege a causal connection between protected activity and alleged retaliation in order to state a

5   claim.   Because the October 2015 court appearance is the only specific protected activity alleged

6   in the SAC that falls within the various statutes of limitations, the Court finds that plaintiff has not

7   stated a claim for retaliation prior to that court appearance.[6]

8

9                                           **CONCLUSION**

10          For the foregoing reasons, defendant's motion to dismiss certain claims in the plaintiff's

11   SAC is GRANTED without leave to amend.

12

13          **IT IS SO ORDERED**.

14

15   Dated: April 24, 2017                          _____

16                                                  SUSAN ILLSTON
                                                    United States District Judge
17

18

19

20

21

22

23

24

25          [6]   Aside from the general allegations regarding a hostile work environment, it appears that
     the only other pre-October 2015 alleged retaliation concerns the disqualification for promotion in
26   "late 2014."   SAC ¶ 122.   However, the SAC alleges that plaintiff was disqualified because of the
     prior sexual harassment allegations, and as discussed *supra*, the 2012 Agreement provided that
27   plaintiff agreed to accept the discipline of working at a Lieutenant level with no supervisory
     responsibilities for the remainder of his employment.   As such, the SAC has failed to allege facts
28   showing that the 2014 disqualification was retaliation for any protected activity.

*United States District Court*
*Northern District of California*

# EXHIBIT 8

#2278

# CLAIM PRESENTED TO THE CITY OF PITTSBURG

*Please read the instructions on the back before completing.*     FORM 4.1

| | |
|---|---|
| 1. Claimant's Name: (*Please Print*)     Wade Derby | Reserved for Filing Stamp |
| Claimant's Address:     c/o Law Office of Daniel Horowitz | **CITY CLERK** |
| City, State, Zip:     PO Box 1547, Lafayette, Ca. 94549 | **MAR 21 2016** |
| Law Office of Daniel Horowitz     Day Phone: (925) 283-1863     Eve: (925) 283-1863 | **RECEIVED**     City Claim No.: |

2. When did the damage or injury occur? Continuing injury, termination date listed below
   Month:        Day:        Year:        Time:        a.m. or p.m. See attached for full detail.

3. At which location did the damage or injury occur?     Police Report No.:
   Various locations, see attachment.  General location of continuing injuries

   were the City of Pittsburg, Ca.

4. a.  What happened and why is the City responsible?
   See attached.

   b.  Name and position of responsible City Employee(s), if known:
      See attached

5.  What damage or injury occurred?

      See attached

6.  Claim amount (only if less than $10,000):

   If the amount exceeds $10,000, please check the court for appropriate jurisdiction:
   _____ Municipal Court (claims up to $25,000)  _X_ Superior Court (claims over $25,000)

7.  How did you arrive at the amount claimed?  Please attach documentation.
   See attached.

8.  I declare under penalty of perjury under the laws of the State of California that the following information is true and correct, and that this declaration was executed on _3/21_, 20_16_, at _LAFAYETTE_ CA.

   _____
   *Signature of Claimant or Representative*     DANIEL Horowitz
                                                 ATTORNEY

9.  Official Notices and Correspondence
   *If represented by an insurance company or an attorney, please provide the information requested below:*
   Name and Capacity:(*please print*)

   Address:

   City, State, Zip:

   Daytime Phone: _____     Evening: _____

# ATTACHMENT TO WADE DERBY'S

# NOTICE OF CLAIM

**Claimant:**

Wade Derby

**Claim Submitted by:**

Daniel Horowitz, Attorney at Law

P.O. Box 1547

Lafayette, California 94549

(925) 283-1863

## A Connecticut Yankee in King Arthur's Court

Wade Derby was hired by Pittsburg PD in January 1988 having Honorably Discharged from the United States Army. Unknown to Wade Derby, the Pittsburg Police Department was systematically corrupt and unprofessional at that time.

Just two weeks into his employment, his supervisor Sgt. Bernie Lucido told officers to clear the scene of a violent barricaded subject, who was mentally unstable. His tactics were flawed and public complaints arose. This forced an internal investigation. The newly minted officer, Wade Derby was dragged into the internal investigation and was told that he should support his superiors. Wade Derby simply testified accurately which meant that his statement hurt his superior. He was ostracized at that time but his military and natural born stubbornness caused him to dig in and not quit.

In retaliation for not lying to back his supervisor during the Internal Affairs investigation Wade Derby was attacked. He was alleged to have committed off-duty misconduct at a store in Antioch. The person announcing the complaint was none other than Sgt. Lucido, the same Sergeant who had blown the operation and had been found derelict. Derby fought back and demanded a full investigation. The complaints were withdrawn. Sgt. Lucido then retired using a medical excuse in order to obtain the maximum retirement benefits.

This type of medical retirement and retaliation was part of the culture of corruption that the idealistic military veteran, Wade Derby had to confront. His personality and his military training prevented Derby from backing down from a fight an over time he developed a reputation as the honest officer and the "go to" officer when there a need to fight corruption.

2

## SAVING JOHN CONATY'S LIFE (1st Time)

In 1989, John Conaty (now an inspector with the Contra Costa County District Attorney's office) was dispatched with Wade Derby to a loud biker party on Bruno Ave. in Pittsburg. As Wade Derby arrived John Conaty was on the ground fighting with a biker surrounded by several others. A Hells Angel prospect named Anchar Urbain reached into his vest to remove a revolver and moved quickly toward Officer Conaty. Derby trapped the in Urbain's hand as he withdrew it, warned Conaty at the same time and also restrained Urbain over the hood of a parked car. Wade Derby took him into custody and together with Conaty stopped the disturbance. Urbain later admitted that he was possibly thinking of shooting Officer Conaty.

## PITTSBURG PD ON STEROIDS

In 1989 incident when Wade Derby was on a street drug team with Matt Wasteney and working under Lt. A. Baker, and Sgt. Evan Kohler. The detectives working undercover narcotics at the time were Jerry Sanchez and former chief of Tracy PD and Gary Hampton. While they were happy to arrest people for buying, using and selling drugs, it was also true that Matt Wasteney and several other department members to include Kohler, Zbacnik, Hartley, Batz and Hendricks all were themselves using drugs, specifically (but not exclusively), anabolic steroids. The drugs were prescribed by a corrupt physician (Copeland) from Antioch. This was common knowledge among the administration that turned a blind eye. Wasteney took Derby to the doctor's office while Wasteney got his injection. Derby, consistent with his policy and practice, refused an offer of an "introduction" to this doctor and declined to enter the office with

Wasteney. Consistent with Derby's whistleblowing background, he told Wasteney if he ever involved Derby in his improper activity at any level, he (Derby) would "take it further."

Later, the physician's office was raided by DEA, and there were concerns among the officers using steroids that they would be implicated. Police officers from all over the East County were named as steroid patients. Among the included offenders was the now convicted criminal, former officer Kevin Butler. [today Butler is in custody for masterminding the Central County Task Force scandal involving Norm Welch and others.] A number of years later Wasteney later suffered from serious medical issues (which Derby believes are related to his illegal steroid use) and retired from law enforcement.

## SEX, DRUGS & CORRUPTION

Day to day life at Pittsburg PD was like watching the Spring Break edition of "Girls Gone Wild". In 1990 a local Pittsburg prostitute named Susan Sheldon went on Geraldo Rivera and spoke nationally about having sex in a van with Pittsburg PD narcotic officers to work off criminal charges. Typical of Pittsburg PD, no investigation was ever started. Susan was murdered among a series of other prostitutes that year. The case was never solved and some officers of that era believe it was a police officer killing them.

Also in 1990, Officer Wasteney and Wade Derby were contacted by a parole agent Mike Mermelstein about a person who wanted to inform to help her brother. The woman met Wasteney, Mermelstein and Wade Derby at the Concord Parole office. The person was afraid because Pittsburg Officers were involved. She did not trust Pittsburg PD at all. The person stated that Derby's boss (Kohler), his detectives and Sgt. Zbacnik stole money from her brother

4

and his father. She said they paid the police off to let them sell drugs. Note: Sgt. Zbacnik was one of the people who systematically attacked Derby over the years. Derby and Wasteney reported this to Lt. Baker, and the new narcotics Sergeant, Nick Baker. Typical of Pittsburg PD, nothing was ever done.

## SOME ATTEMPTS TO CLEAN UP THE MESS

The corruption and crime at Pittsburg PD included the arrests of Sgt. George Elzie and Officer Eric Bergen who were charged with murder and kidnaping. George Elzie worked as a member of the county drug task force until his promotion to sergeant. He was replaced by now City Councilman Pete Longmire. Sgt. Elzie was arrested while attending supervisor's school at LAPD for lewd acts in a peep show parlor. He used his undercover ID during the arrest and concealed it for some time.

## DERBY STEPS FORWARD (Again)

Ever the whistle blower, Wade Derby provided evidence to the Sheriff's Office they used during the prosecution of George Elzie for murder. Elzie is on parole today. Eric Bergen remains in custody for life.

## PITTSBURG PD POLICY

## HANG OUT WITH PROSTITUTES

### OR "Are you a Fag?"

In 1990, Wade Derby was sent to an undercover drug school in Visalia in place of Jerry Sanchez. Then Detective Gary Hampton drove and as he and Derby car pooled to Visalia. On the

ride down Hampton told Derby that Hampton had arranged for a couple of girls to entertain them while away from home. Gary Hampton was married at the time, and Wade Derby had just gotten engaged. Derby declined. Hampton repeatedly criticized Derby for refusing to participate. When the officers returned from the trip, Sgt. Baker asked Wade Derby why he would not go out with the ladies. Sgt. Baker demanded to know if Wade Derby was "a Fag" and he implied that it must be true. He did this in a way that made it negative if in fact Wade Derby were Gay.

On the job sexual activity was part of the job perk at Pittsburg. It was common among the officers to have blatant public affairs. Officers bragged about having sex at the police station. Officers shared pictures of department staff that they had engaged with. Derby's refusal to participate made him an outsider and dangerous as he might then "snitch".

Officer Wasteney asked Wade Derby if Derby was gay because Sgt. Baker and Det. Hampton were telling other officers about Derby not engaging in sexual liaisons with prostitutes , citizens, informants, other police officers and staff. Lt. Baker teased Wade Derby about being Derby being gay. Derby told Lt. Baker that he was not happy with the harassment due to Wade Derby's choices. Nothing was ever done to prevent the harassment.

## BUY MY HOUSE

In 1991, Wade Derby had a falling out with Lt. A. Baker because Lt. Baker attempted to use his rank to force Wade Derby to purchase real estate from him (Baker) Wade Derby had agreed to leave the in house drug unit and go to the state drug task force after being offered the position by Chief Castiglione and Agent Ron Luna. At the same time, Wade Derby and another officer (Ming) leased a home from Lt. A. Baker. Baker believed that the officers (Derby and

6

Ming) would purchase the home from him when they could afford to. Instead, they decided not to purchase the house and shortly after that Ming was released/fired from probation, without cause. Ming also reported corruption to the department and a plot to kill a Pittsburg officer during this time. Lt. A. Baker was very upset with Derby and Ming over Ming's reporting and especially over their failure to buy the house from him. The fact that Derby had a male roommate and that they jointly considered purchasing Baker's house, led to additional fodder for the "Derby is a fag" attacks.

The home had serious structural defects and was an unwise investment. Lt. A. Baker had often asked for early rent payment and asked that Wade Derby prepaid months in advance. After the tenancy ended, Lt. A. Baker never returned the security deposit.

## DIRECT CORRUPTION AS POLICY

Prior to his departure from the in house narcotics unit, Wade Derby served multiple search warrants on a notorious drug dealer named Lorenzo Lee. George Elzie assisted. The officers staged at a fire station on Willow Pass called 86. As they prepared the raid team to go to his primary home on Clearland Cr. in then West Pittsburg, Elzie had to quickly make a phone call inside the fire station after the raid briefing. When they arrived at the dope dealer's house they were casually waiting for the police to arrive. All that was located was a cache of drugs discarded in the neighbor's yard. Lorenzo Lee later cooperated and told police George Elzie called him and warning him that the police were coming moments before. Lt. Baker, Sgt. Baker, Matt Wasteney among others were present, and also present when Lorenzo spilled his guts about Elzie. This matter was tape recorded and given to the supervisors as evidence.

7

As was standard at Pittsburg PD, nothing was done. However, separately, George Elzie was arrested by Pittsburg PD on a warrant issued through the county sheriff's department/DA's Office for murder. Absent the work of the CC County Sheriff, Elzie would be a free man.

In 1991, Wade Derby served a search warrant with Sgt. N. Baker, Matt Wasteney and others. Derby did an undercover bust on a heroin dealer in Pittsburg (Kelly Jones) and then served a roll over warrant in Concord on Northwood Dr. with Derby as the case agent. They seized a large amount of heroin, cocaine, methamphetamine, a blue Camero and several thousand dollars in cash. It was customary to have a beer in the back parking lot of Pittsburg PD, after a good case. Matt Wasteney and Derby were told by Sgt. Baker to get some beer and chips. Derby asked with what money, and Derby and Wasteney were told to take it from the seized assets and to replace it later. Neither Derby nor Wasteney would do this. Wade Derby went to the ATM at B of A on Railroad Ave. and took out his own money. He and Wasteney went to Pittsburg Liquor and Deli and purchased some chips and a 12 pack of beer. When they returned with the items, Sgt. Baker and another officer (Longmire), got mad and chastised them for not getting more items. They drove off in the seized Camero with all of the money and evidence. They returned with a case of beer and snacks.

Derby and Wasteney refused to drink or eat any of the food other than that which they purchased. Derby and Wasteney refused to do anything unethical with the drug proceeds and Derby made it known he was going to account for every dollar he had seized. As a result no money was taken that night, but it put Derby in a negative light with his peers.

## KICKING THE DRUGS OUT OF PEOPLE

Derby buried himself in his anti-narcotics work and tried to maintain a belief that the PD would be getting better. Also in 1991, he ran a series of street level reverse sale of rock cocaine on Diane Ave. in Pittsburg. Wasteney, Terrence Williams and Wade Derby all posed as drug dealers, and sold to buyers pulling up in cars. Lt. Baker and Sgt. Baker were all part of the arrest team. In one instance, Wade Derby made a sale to a young white male who tried to swallow the cocaine as he was being apprehended. Lt. A. Baker took the young man to the side of his van and kicked him in the stomach and then knee thrusted him several times in the abdomen, while calmly telling him not to struggle and to spit out the drugs before he died. There is no medical reason to have thought that swallowing the small item would cause any physical harm. Wade Derby witnessed the tail end of this incident and abruptly took the prisoner away from Lt. Baker to stop any further physical harm. This type of physical abuse was common in Pittsburg and while it has abated, it has not stopped. The cover up of this police initiated violence at the highest levels, continues.

## AFRICAN AMERICANS ARE "CRACK BABIES"

Physical abuse of citizens ran hand in hand with racism among a small group individual officers. The Chief of Police (Baker) referred to African Americans with criminal backgrounds

9

as "Crack Babies". This was not meant as a criticism of drug use and its harm to children, it was a way to paint a broad group people as subhuman and incapable of living as civilized human beings. The regular use of disparaging terms was not just tolerated, it was the lingua franca of many in the department. Derby and others refused to join in these racist conversations and they stuck together as reformers.

## VANISHING KILOS OF COCAINE

SFPD had loaned Pittsburg two kilos of high quality cocaine so that they could use them for undercover operations. Wade Derby had signed for the drugs. When SFPD asked for the drugs to be returned, Lt. Baker ordered Wade Derby to give the two kilos to him (Baker) so that Baker could arrange the turn over. Baker had other officers return the drugs. After the drugs were returned to SFPD Wade Derby received a call from Lt. Molinari. He told Wade Derby that one of the returned kilos was brown sugar and not cocaine. Derby knew that the kilos were that of high grade cocaine powder, as he had the drugs analyzed by the Contra Costa County Crime Lab in order to obtain a court order to use them in reverse sting operations. Wade Derby reported this to his superiors who did what Pittsburg PD always did - nothing.

## GRAND JURY

Wade Derby testified before the Grand Jury (1992) investigating Pittsburg corruption. He detailed one case, where an undocumented immigrant with probable fake ID, was arrested for a drug offense. He had a large amount of cash with him. He was asked to sign a disclaimer for the money seized. When he did, he was released. As Derby testified, at that time all of the command staff drove asset seized cars and all of the undercover cars were seizures, some of

10

which had not yet cleared for use or ownership transfer. Releasing people who signed money disclaimers was also commonplace.

## CHRISTMAS PRESENTS IN JULY

In 1992 Derby had a search warrant for a house at 300 Jimno Avenue in Pittsburg (One of the warrants Derby was ordered to leave in house before departing to the task force). There were kilos of cocaine and drug money in this house. They executed the warrant without Derby and located a cache of stolen guns and jewelry. The kilos of cocaine were gone but for the wrappers as was the money, over $100,000. The guns were exotic weapons used in Hollywood movies. In fact one of the guns was used by former governor Arnold S. in the movie, Predator. The Pittsburg PD department SWAT team was given this gun and a fun day at the range by Wayne's Gun Shop in thanks from the owner of the Hollywood Arms props. It was headline news as well as the untraceable jewelry found.

Several witness officers were aware Lt. Baker, and others were in the room with the doors closed for extended time until the FBI arrived to see the jewelry. It was all stolen from large heist in San Francisco. One of the officers in the room was Jim Hartley. Hartley was later charged with falsifying police reports in 2005. Hartley boasted that he and his bosses took items that day. He at one time showed his former spouse a ring he claimed he took. Until Hartley was charged with a criminal offense he was often in trouble but never was seriously disciplined.

The protection of bad applies like Hartley included covering up his beating of a handcuffed prisoner in front of then Sgt. Addington, who received a letter of reprimand for failing to take action as a supervisor. He also had sex with an underage cadet and was never

11

charged or disciplined. The difference between a "bad apple" and a standard Pittsburg PD officer was the degree of exposure that the conduct brought to the department and the presence of "wood" on superiors. Hartley always said he had "wood" on Lt. Baker and they could not touch him.

## HARTLEY DIDN'T HAVE "WOOD" ON DERBY

Derby again created bad feelings when he did an investigation into Hartley falsifying arrest reports. Hartley and Salgado (Deceased) were prosecuted for that in 2005/2006. Derby and Steiner did an independent audit of cases where officers template (wrote over) reports, then Sgt. Raman, (now Captain) and now Lt. Wentz were among those who had questionable cases. However, it was decided by the chief that their cases were not to the save level of severity as Hartley and Salgado. Derby was later was deposed in a lawsuit filed against members of Pittsburg PD administration about this. As always, Derby was truthful and this created resentment toward him. Nothing ever happened to those officers. They are now command staff.

## THE FAGGOTS IN CITY GOVERNMENT

This same disdain for the job carried over to disdain for members of City government. In 2005/2006, the chief and Captain Zbacnik often made make fun of the new City Manager (Marc Grisham). In front of staff and other officers, they called him "Sugar Shack" which to them implied that he was Gay and that this was a negative thing. Grisham was referred to as "the fag" and "the faggot". Derby and Grisham had a solid relationship and open communication and Derby resented the attempts to degrade Mr. Grisham. Derby strongly voiced his opposition to these terms but was laughed at for speaking out. Given Derby's history of not participate in the

sexual misconduct on the job and his former male roommate, Chief Baker implied that perhaps Derby defended Grisham because Derby too was a "faggot". Baker often had Derby deal with Marc Grisham directly because Chief Baker preferred not having to.

In 1992, Wade Derby was asked to go before the grand jury and tell them about corruption in the department. Derby went before the grand jury and testified. (Some details provided infra). Thereafter, Chief Castiglione and Lt. Dave Millicam, abruptly retired.

Lt. Baker and Wade Derby remained at odds with one another throughout these years. During this time, Derby a producer of the highest level but he constantly suffered from the sneers and insults of other officers.

### SAVING JOHN CONATY'S LIFE (Time 2)

In 1993/1994, Wade Derby returned to patrol work at the police department. That year, (1994), Derby again saved John Conaty from harm during a car stop on Railroad Ave. (in front of the Mar Rey motel).

Two white supremacists from Merced came to town to commit a possible hate crime for fun. When Derby and Conaty pulled over the car they did not know this. The driver and passenger were heavily armed. John Conaty was at the driver window and the occupants did not see Derby approach. The driver and passenger had their hands on the guns and were getting ready to possibly open fire on Conaty. Derby intervened striking the passenger in the head and grabbing him through the car window by the hair, while holding the driver at gunpoint as he warned John Conaty about the guns in his view.

13

**Then the Lord rained down burning sulfur on Sodom and Gomorrah**

In 1993/1994 Chief Casey came in after Castiglione was ousted. Casey brought with him promise of a new and better era. Many of the old school left, including Hampton, Don Allen and David Teague to name a few. Bill Hendricks was charged with sexual harassment of recently retired records manager Michelle Beyhan. She was paid an undisclosed settlement and then Hendricks was sent to oversee Code Enforcement as punishment by Chief Casey. Code Enforcement went on to be called the Penal Colony as anyone in trouble got sent there. This is documented in a lawsuit dismissed in federal court filed by former Officers Ron Huppert and Salgado.

Sgt. Zbacnik and Sgt. Kohler were disciplined after Zbacnik pulled down Kohler's pants during self defense class, exposing him to the only female officer at the time Patty Meyers. Patty left the department and went to Fairfield PD where she filed sexual harassment charges against other officers.

In 1994 [Name Omitted] began having relations with a married inspector and Sgt. Zbacnik. Derby at the time was single and when she was a civilian Derby and Gallagher became friends.

The forces of disrepute fought back. Lt. Hendricks had tried to get Derby in trouble by claiming he was spoken to in a disrespectful tone. This was dismissed by his superiors as Lt. Hendricks had no credibility with them. However, for a brief period of time, Derby then a

14

probationary Corporal was placed on weekly evaluations as the department was contemplating possible demotion of Derby as a Corporal. One of these men involved in sex scandals had previously been exposed for having sexual involvement with an informant named Diana Sivil and was reduced in rank. Others allegedly had sexual relations with this same woman when she was 17 years old and were disciplined internally. This was covered up as other lesser misconduct. She (Sivil) was the girlfriend of a notorious drug dealer named Theotis Stewart. She implicated several officers in corruption as well.

Chief Casey was faced with a department so full of corruption that he could only address the issue in pieces or chunks. He started the move towards change with many of the officers who survived Castiglione and his regime. Don Allen was arrested for stealing evidence after creditors constantly called about debts owed and a car dealership wanted him to pay late registration fees. Don Allen took a registration from the evidence in a homicide and placed it on his own car to disguise his late fees.

Officer David Teague was arrested for sex with a minor. Elzie and Bergen were charged with murder and kidnap. Wade Derby was promoted by Casey to Corporal in 1995.

## WADE DERBY SAVES KIRK SULLIVAN'S LIFE

In 1995, Kirk Sullivan, Cassandra Wilkerson's brother was working patrol in the El Pueblo Housing Projects. The PD were having an influx of Project Trojan Gang members from Richmond trying to establish them in Pittsburg. Sullivan made a traffic stop and the suspect car parked facing the officer's stop. The plate was registered out of Richmond. Knowing about the problems with Richmond gangs Derby rushed to assist Sullivan, and advised over the radio for

him to stage and await his cover car. When he arrived Sullivan was at the rear of the car searching a very large male (Floyd Hollins). Derby saw his cover officer Dupont, literally 20 yards away hiding himself behind a tree with Sullivan exposed. Derby quietly approached from the opposite direction focusing on the passenger. The passenger (Denzel Allison) did not see Wade Derby. The passenger had his hand on the grip frame of a semi-auto pistol and was looking back at Sullivan, about to open fire. Wade Derby recognized this and stopped Allison. It turned out Allison had committed a triple homicide in Richmond, the gun was stolen and he made a statement he was likely going to shoot Sullivan. Allison is currently serving a life sentence in prison.

## THE REFORM CHIEF PROMOTES WADE DERBY

Wade Derby was promoted to Sergeant. Raman was an officer on this crew and was having an affair with a female deputy who once worked for the sheriff's office. He and then Sgt. Addington later got in trouble after they left the city unsupervised and went to dispatch in Martinez to flirt with the ladies and take them donuts. It was later jokingly called Donut Gate, by many. Wade Derby was put in charge of a street gang unit consisting of Eric Gomez, Jim Hartley, Javier Salgado, Kirk Sullivan and David Zuniga. This group halted gang violence and took back the image of the community. Chief Casey had Derby testify before the grand jury regarding the PD's gang enforcement practices after Det. Ron Huppert claimed they were falsely reporting them. This was untrue and Derby was believed.

In 1997, Chief Casey ordered Wade Derby to go with him for a press conference in support of President Clinton's crime bill. He wanted Derby to be photographed with several local

16

Democrats, like George Miller. Derby was interviewed by KCBS. A counter group existed in the department. Lt. Zbacnik and the homicide team who wanted to say all gang murders were something other than gang murders. They were all carrying out the orders of Chief Casey and Lt. A. Baker was now a laterally appointed Commander. There was clashes over the random murder vs. ongoing gang murder labels.

## POOR CHOICES HURT A REFORMER

Sadly, the reform Chief made some bad choices. Chief Casey had a new way of reporting crimes that could be perceived as questionable cases due to lack of a credible witness, workable leads, no prosecution desired, or some other questionable circumstance. Example: a guy buying drugs or trying to pick up a prostitute gets beaten up and his money forcibly taken. Instead of it being a Strong-Arm Robbery/Aggravated Assault Felony, it became a suspicious circumstance information report. More importantly, it was no longer reported and statistically recorded as a part 1 crime to the FBI index.

Wade Derby and many line officers rejected this new reporting style but the supervisors were ordered to have the reports changed to the new methods. They even made a new reported manual about how to prepare the cases correctly to lower crime stats. This was written by Lt. Keeler who later resigned from the department after having a difference of opinion with those in charge. Wade Derby was warned by supervisors for voicing my opinion about non-factual reporting of crimes.

Once again, Wade Derby was on the outside.

In 1997 after Sgt. Wade Derby's supervisor Bill Stroup got into trouble with the command after allegations were made that he was having a relationship with another officer's girlfriend and cheating on his wife on duty. All other sergeants were promoted to Lieutenant except for Bill. Instead, he was banished code enforcement. Pittsburg PD was still cleaning house but it was still persisting in providing false crime statistics, a problem that would continue and worsen under Aaron Baker.

## DERBY MARGINALIZED

Wade Derby was again ostracized for his whistle blowing and his non-compliance with questionable practices. All other supervisors got to do specialty assignments but Derby remained in patrol. He became the senior street sergeant and finally went to day watch in 1998. Meanwhile, the Chief continued to target the corrupt officers. Lt Gomez got in trouble and was forced to medically retire after being caught in a gambling scandal. Bill Zbacnik was also implicated but nothing ever happened to him. This was later considered a cover up by Huppert and Salgado who filed a lawsuit about this and other matters.

## DERBY SUCCEEDS AT THE STREET LEVEL

In 1999 Lt. N. Baker was overseeing the in house Narc unit and was supervised by Commander A. Baker. It was rumored that the Commander caught Nick Baker at the movies in Antioch on duty with his mistress. The unit was non-productive and had seen its better days. Derby was called in to reform things and take command as a sergeant. Nick Baker and Aaron Baker covered it all up and made it look as if it was time to get a Lieutenant back to managing

and not working undercover. Aaron Baker was now to become interim Chief. When Wade Derby took over the unit and they immediately took staffing from four down to three and within 8 months two other detectives were promoted to sergeant. This left Derby with one guy, named David Zuniga. He and Derby became one of the highest producing and most respected Narc units in the region. They had record seizures of money and drugs. They won accolades from the DA, DEA and DOJ.

## 2000/2001 - THE CORRUPTION CONTINUES

In 2000/2001 Wade Derby worked directly for Commander Hendricks as the Narc Unit Supervisor. During this time Det. Zuniga and Derby raided a house in Pittsburg and arrested the dealer, Fred Nubert, for heroin and methamphetamine sales. He told Derby and Zuniga that he was arrested earlier in the day by the street team, Sgt. Barbanica and Officer Charles Blazer. He agreed to be their informant and they mistakenly let him keep his drugs and money. This was not proper protocol. Derby and Zuniga arrested the dealer and got his full statement. Derby notified Commander Hendricks, as well as Sgt. Barbanica. Detective Zuniga wrote the report and submitted it for review. The report written factually and recognized that the other officers meant no malice and it was a training issue. Hendricks ordered Zuniga and Derby to alter the report. They refused and instead, Hendricks pulled the report from secure records and altered it. He also destroyed the original. What he did not know is that to protect the truth, Derby gave an original copy to IA investigator Charles White and Zuniga and Derby kept copies. Derby brought this to

Chief Baker's attention and told him he would not compromise his badge for this. Chief Baker did nothing to Hendricks.

## COMMANDER HENDRICKS THE PHOTOGRAPHER

In 2001 Commander Hendricks regularly showed his staff photos that included an employee. Hendricks had a side business under his wife's name offering professional nude and sensual personal photography. He also ran a lingerie model service and used his own daughter as an employee model. Everyone knew the PD had this Commander with a proven prior for sexual harassment operating a nude photography business. He even asked Derby's sister in law if she might like to pose. His wife's twin sister. Chief Baker was well aware of this but no one stopped it. Hendricks was run out of the PD after his second sustained sexual harassment claim and lawsuit filed by a woman named Erin Janes.

## DERBY FIGHTS BACK USING SCHOOL

In 2002-2003, Wade Derby went back to school and obtained a B.A. in Business and an M.A. in Leadership. Casey left the city as Chief briefly; and Aaron Baker was hired as Chief and returned to work as City Manager. In December 2002 Commander Hendricks was forced to retire after his second sustained sexual harassment allegation.

Aaron Baker's reign started with hope. Wade Derby became Lieutenant and he started reforming all units he was in charge of. But this enlightened period was short lived. As Derby started to uncover high levels of tolerance to sexual harassment and criminal misconduct, he was targeted for retaliation. To humiliate Derby for cleaning house, he was instructed to query female employees as to what tampons they wanted in the women's rest room. The Chief then

publically "commended" his work. Derby was humiliated and this was what was intended.

Toni Baldazo was often the target of harassment. She reported that Officer Gianfala (a women), made racists remarks about some pictures of Toni's friends. Wade Derby immediately took action and Gianfala said she made some jokes about gang signs that Toni could have gotten offended about. Derby gave Gianfala a written reprimand at the request of Chief Baker. Had a male officer done the same thing, no reprimand would have been issued. Perhaps recognizing their precarious position in this department, with Derby's support, the parties then worked out their differences. While Gianfala was written up for her comment, the Chief at times commented to command staff in meetings about the size of Toni's breasts and how he admired them. There was no penalty for this.

During this time Derby had to investigate incidents occurring in our records division involving civilian staff. A female employee named Darcy Richards was stealing petty cash temporarily to fund an abortion. She was having an affair with an officer but would never come out and say it was his child. Everyone including the chief knew of her relationship with the officer. She was allowed to resign without charges being filed in order to protect the officer and department.

Lt. Barbanica spoke up against Pittsburg's African American female Mayor for political reasons and in his official capacity. This was clearly a racially biased statement and did not reflect any legitimate criticism. This placed the chief in a bad light because it exposed to the public the rampant racism in the department. Later a rumor was leaked that alleged Barbanica got caught using his department car to drive to Reno to gamble and go to a legal house of

21

prostitution with the POA President Charles Blazer. Barbanica retired on a medical as his back was hurt so that he could not perform his duties.

## DERBY GETS MONEY FOR LAW ENFORCEMENT

Wade Derby wrote grants at this time and often. Some of the grants were for equipment, some were for personnel and all required use reports. He had a grant that still exists today called CDBG (Community Block Development). This is a HUD federal grant for personnel. After it was discovered that two officers (Hartley/Salgado) were falsifying reports, the department went through an internal audit by a company called Matrix.

## PEOPLE WHO LIVE IN GLASS HOUSES

## SHOULDN'T THROW DILDOES

What others covered up, Wade Derby found as culpable conduct. Sgt Steiner allegedly tripped down the stairwell and had to retire on disability following a sustained finding (by Derby) of misconduct (in 2007/2008). Derby had sustained the finding that Steiner threw dildos at another officer and then made sexual comments poking fun at these officers in front of female staff. [Mr. Steiner is friends with friends with Cassandra Wilkerson, a fact that is important as will be explained later.]

At this time, doing IA work was considered being a traitor. This is still common in many departments. IA investigators were often harassed. Following these findings against Steiner, Steiner's friend and brother of Cassandra Wilkerson, began to send pornographic emails to PPD staff, and supervisors, as well as other law enforcement agencies using PD email. He used his self appointed "bully pulpit" to people his nickname for Derby's private part, calling it (in a loud

voice), "The Whopper". He did this in front of male and female officers and ignored Derby when Derby asked him stop.

Despite having some good policies, racism, sexism and discrimination pervaded the department. The opening gay HR director, Mark Fox, was the target of name calling by the Chief. Some of the Chief's favorite terms were "fairy", and "fag". Wade Derby shared office space with HR maintained a strong working relationship. Derby often invited them to holiday luncheons and hosted and naturally included Marc Fox and his team. The chief would challenge Derby as to why he did that and Derby told him he (Derby) had no problems with Mr. Fox. This was not well received by the Chief. Mr. Fox initiated an internal investigation against the chief's friend Toni Baldazo after she started speaking openly about her sister's involvement with the Assistant City Manager at the time Matt Rodriguez. Toni was reprimanded as a result despite the fact that her sister and Matt Rodriguez married and he became the City Manager of San Pablo.

### DERBY HAS MAJOR SURGERY

Wade Derby got sick in late 2007 and had to have major surgery. Wade Derby was out until April 2008. He returned and learned that Sgt. Raman was going to promote and take Wade Derby's job. Contrary to recent false allegations of sexism, it was Wade Derby who had reformed the Pittsburg PD recruiting program so that the number of female officers on both a numerical and percentage basis was the highest in department history.

Contrary to claims that Wade Derby engaged in sexism, this conduct was rampant in the department and not connected to Wade Derby. For example, Wade Derby participated in the hiring of a female officer (Officer Raychel Palfey) The Police Chief was smitten with her and

23

openly spoke about how she was "hot", and he would leave his wife for her if he were younger. He said this often in front of many male officers (including Raman, Addington, Zbacnik, Nick Baker, Callahan and others). Even rank and file officers knew about his feelings for Officer Palfey. While Officer Palfey dealt with this on the job harassment, she was unfairly treated by the Chief and others. The command structure repeatedly intimidated those such as Wade Derby, who would not go along with the sophomoric sex jobs and sexual harassment of female officers. It was easy to be set up for false charges and a cold shoulder that carried with it the fear of a "Serpico" type abandonment.

## OPPORTUNISTIC ATTACKS ON WADE DERBY

Attacks could be great or petty. For example, Callahan and Sgt. Dupont once started a rumor that Wade Derby said Cpt. Baker was incompetent and screwed up an officer's funeral planning. This was never stated by Wade Derby but the next day Wade Derby was called into the chief's office with Cpt. Zbacnik. The Chief was told that Wade Derby was "talking shit about the captain" and he wanted Derby reprimanded. Wade Derby stated that the allegations were false. The matter ended without further action but it became clear that the command structure would always make life miserable for someone who would not join the corrupt team.

Wade Derby pursued continuing educational opportunities, published articles, won awards, taught various continuing education programs, and achieved an excellent records of both arrests and convictions. His objective stats and achievements provided a high level of protection. Criticism were often petty as well as clearly unfounded. Captain Zbacnik wrote in Wade Derby's performance evaluation that Wade Derby micro managed the records supervisor

24

Michelle Beyhan. This was later retracted. Zbacnik became Derby's direct supervisor and all

their interactions of importance were leaked to his friends including Addington, Raman and

Callahan.

When training opportunities, prime assignments and promotional opportunities presented,

Wade Derby was overlooked and Captain Zbacnik supported now Chief Addington.     Despite

ignoring Derby's accomplishments, his work itself was used by Pittsburg PD. For example,

Derby designed a program called the "Total Policing Program". This was a highly successful

community based approach to police work.   Rather than allow Derby the credit for this program,

Captain Zbacnik falsely claimed that Wade Derby stole money and used a city credit card to buy

a personal gun. He claimed Wade Derby sold department guns to a barber shop in Texas.   There

was never any evidence of this and there could not be because they were invented. When Wade

Derby complained to the Chief, the Chief laughed and refused to stop the slander.

Wade Derby was undermined constantly. Members of his staff made small mistakes and

were chastised. Other supervisors and their team had broad latitude.  For no reason, Wade Derby

was removed from the SWAT team and range team and all other specialized duties.   At this

stage,  Derby's ethical standing was a known and established threat in the department. Derby's

tenacity had allowed him to move up the ranks but as he became potentially qualified for Chief,

he became an increasing threat to those who had for years if not more than a decade, promoted

moral corruption and legal wrongdoing.

Wade Derby had the idea to start doing crime analysis and shared it with now Chief

Addington. A clerk did the calculations the statistics were used in meetings.   They came into

25

play strongly with Total Policing and the articles Wade Derby wrote. Wade Derby also used them in presentations to the City Manager and command. Wade Derby was starting to push for accountability individually and as a department.

Addington seized the chance to showcase his analytical skills fully and started making Wade Derby's stats a monthly report. The chief used these everywhere, but the numbers were less than honest. Major crimes such as rape, were still reported as simple assaults or as suspicious circumstances. Wade Derby stood up in a staff meeting and solidified his fate by saying "we do not need to lie to the public about crime reduction because we honestly had." Wade Derby was looked upon by peers with the, "you just hung yourself look."

During this time Derby's father was diagnosed with terminal cancer. The PD started downsizing Derby's former unit and the chief no longer wanted Derby to go to city council meetings or other public functions. Wade Derby also was no longer asked to attend department head meetings. Addington and Raman were now in the limelight and Wade Derby was being moved out of the way. The investigations unit moved to the second floor and Derby's unit was put in a small space on the first floor. Callahan was put in charge with Addington overseeing the unit.

As Chief Baker prepared to retire, the thought of placing Derby in the Chief's spot was dangerous. With Derby at the top, the corruption would be exposed and arrests would be made. The sexism and racism would be dealt with. The under reporting of crime statistics at the instruction of Chief Baker would be exposed. The danger of Derby making chief was great. Derby's Total Policing concept had gone national and agencies were calling, coming to visit and

making inquiries. The first couple of inquiries the chief allowed Derby to speak. Then, Addington was assigned to discuss the program without Derby. Effectively, Derby's creation was being credited to the PD's new golden boy. Wade Derby was never returned to the jobs, some of which Wade Derby created and to all of which Wade Derby made hugely successful and meaningful to the department.

Wade Derby was gained weight after his surgery. The chief made disparaging comments to Derby about "porking up". Wade Derby added that after his surgery the doctor said it was expected and Wade Derby would likely have a protruding lower abdomen due to the open surgery incisions which destroyed all of my abdominal muscles. The mocking of his physical changes continued unabated.

Wade Derby was always outstanding academically and he signed up for the Captain's test. Three of Chief Baker's friends, all chiefs or former, sat on the panel along with Cpt. N. Baker who was retiring the next day. Callahan was saying the chief told him Wade Derby was not promotable and it was common knowledge Addington would prevail. During this time, Derby was openly and frequently objecting to the practice where Pittsburg would deliberately falsify crime reporting in order to make it appear that crime was dropping. During this time a stabbing was listed as a suspicious circumstance and later changed to murder when the victim died. The paperwork was destroyed to cover this up. Derby voiced his complaints to the Chief himself and to command staff.

Wade Derby took the test and was told by all panel members Wade Derby did an outstanding job. There were rampant rumors within hours Wade Derby had defeated Addington,

27

and Raman for the number #1 spot. The chief called all the competitors in and said he would

interview all three the next day. Everyone was saying Raman did not even pass. Raman later told

Derby that he (Raman) did not pass. Wade Derby even got a congratulatory phone call from HR

saying Wade Derby was rated Highly Qualified. The chief and Wade Derby met and the Chief

stated that Addington and Wade Derby tied and the Chief had chosen Addington. After some

discussion, the Chief admitted that Wade Derby had done better than Addington but that he had

the right to pick his best choice and that was Addington. He went on to say how he had to tell Lt.

Raman he did not even qualify and how he needed Wade Derby, his most experience command

member to help lead the department into the future. He added, he planned to have Addington

become chief and he would in fact promote Wade Derby to Captain next. Wade Derby made it

clear that he would like to still compete to be the next Chief but would accept the secondary spot

captain's spot. This displeased the Chief who asked Derby about his health and commented

(once again) on his weight gain. The chief told Derby he would be promoted in a few months

after Addington to Captain.

After being bypassed for promotion the chief offered him a overseeing Code Enforcement

and Records. Wade Derby accepted and the Chief stated that Wade Derby was to get the second

Captain's spot. Instead Wade Derby was taken further out of the loop.

Wade Derby still had the trusted but unenviable job of doing IA investigations. The

position led to greater resentment among the PD. Wade Derby was ordered by the Chief and

Addington to change the outcome of an investigation Wade Derby did on an officer who was also

being investigated for sexual assault and assault under color of authority by the

FBI. Specifically, Wade Derby found that officer at fault for misconduct and association with a

felon. After almost a year passed Wade Derby was ordered to change it from sustained and make it not sustained. At this point Wade Derby followed orders but saved a copy of the original as proof if needed.

Wade Derby was also assigned a case of 4 white officers beating an African American man at the Pittsburg Marina. Wade Derby worked on this case for over 8 months awaiting a trial outcome. The case became a federal lawsuit still pending. Derby was fair and objective and did not use his responsibility as a way to protect the department. s the Chief prepared to resign, the competition to replace him became heated. Sexually harassment charges were filed by a former officer who had moved to Harris County (Texas), resigned to leave police work, separated from her husband and who then leveled sexually harassment charges against various officers. This person was Cassandra Wilkerson. Lt. Raman her direct supervisor was the first person she accused of this. Later, Wade Derby was among those accused, but implicated by a third party not Wilkerson. The third party was among the group that Derby had challenged during his career.

During his defense to these charges, Derby's investigator spoke to the ex-husband of Ms. Wilkerson. He confirmed that Ms. Wilkerson had discussed sexually harassment. However, she had not mentioned Derby as the perpetrator, she had stated that it Pittsburg's police Chief, Baker. This information was provided by Derby to the IA investigators who completely ignored this in order to protect Chief Baker and in order to continue the attack on Wade Derby.

In the course of the IA investigation it came to light that this accuser was so trusting of Derby that when her son got in trouble, she referred him to Derby for help. She was friends with Derby's wife and one of the two main acts of alleged misconduct took place at a dinner with the

wife present. Wade Derby and his wife waived the spousal privilege and his wife related the incident and having no significance and just arising out of friends joking around. Months had passed and the now accuser had not said a word about it.

Her other main allegation had to do with alleged sexual stares in the police parking lot. Later, once the case was filed, she admitted, under oath, that she had no facts to support her allegation and just thought it to be true. She also admitted that a document that she had signed and submitted under penalty of perjury, was not in fact, true. She blamed this on her attorney, Stan Casper, claiming that he prepared the document and had her sign it.

Even though allegations were made against Raman and Addington, neither was ever disciplined and both were promoted even as the lawsuit was pending. Derby however was subjected to an IA investigation led by Addington. A mass of evidence was submitted by Derby which was ignored by Addington. Later, in the civil lawsuit, Raman and Addington relied upon this same material to attack Wilkerson in their defense.

Derby was told by Addington that the IA was going against Derby and that Derby would be demoted and likely terminated. He offered Derby a deal. Agree to resign in early 2016, take a few days off work and keep his rank. Derby accepted the deal rather than risk his pension and his reputation.

Upon return to work Derby was tormented. His gun was taken as was his police vehicle. He was put on quasi civilian status as a clerk in the records room. He was not allowed to fraternize with other officers. He could not attend, parties, funerals or even private events with

other officers. Meanwhile, his (false) accuser, was on medical leave and posting pictures of her partying at sporting events and having a great life.

Meanwhile, Addington became Chief and Raman Lieutenant. When the lawsuit was dismissed and Derby's innocence proven, the Chief failed and refused to purge the IA file or rescind the coerced retirement date. Meanwhile, despite her admitted false allegations, Cassandra Wilkerson was fast tracked for promotion.

Despite the pressures, Derby continued to act ethically and effectively. During this period of banishment, he learned that two police officers who had left the department, were to be witnesses in criminal cases in the Contra Costa County Superior Court. These former officers were terrible people. They had a practice of beating suspects and other Pittsburg officers had turned them in. A criminal case had been generated and a criminal case number computer generated as well. The Chief (Baker) ad then made a deal. Resign and all will be forgotten. The officers resigned and unlawfully, their criminal investigation was terminated and the very existence of the criminal investigation was purged. The files were kept, secretly, in the Chief's office.

The Public Defender's office got wind of the wrongdoing and filed a motion for a court review of the records of these officers. By law, the facts of the criminal investigation had to be turned over the Superior Court. Chief Addington instructed his staff to NOT disclose this material and to misrepresent the state of the file to the court. Criminal cases went forward with the evidence of the gross criminality of the officers, covered up.

31

More specifically, in May 2014 a Pitchess Motion was filed. Derby was asked to go to that Pitchess Motion but to only provide the administrative leave form he had and not the real material. Wade Derby went to court with records manager Joyce Lowe and met the City Attorney. Derby told her there was a file and if asked he was going to advise the court of its existence. The City Attorney did not instruct Derby to provide the file and therefore was criminally complicit in Chief Addington's misconduct. The City Attorney managed to get the hearing continued and reset it on a day when Wade Derby was on vacation. This is a further act in furtherance of a criminal conspiracy. When Wade Derby returned he found out they had the hearing and the records manager did not tell them there was file. Derby wrote a specific memorandum objecting to this fraud and also told the chief face to face that this conduct was wrongful. Among all of the matters, this was the straw that broke the camel's back and most specifically led up to Wade Derby not getting a per diem or having his discipline reversed.

Therefore, Wade Derby claims damages of $ 100 million dollars including lost wages, mental, emotional, physical damages, attorney's fees, statutory damages, reduction in retirement benefits, loss of promotions and other damages.

Dated: March 21, 2016

_____

Daniel Horowitz
Attorney for Wade Derby

# EXHIBIT 9

# EXHIBIT A-1

# CLAIM PRESENTED TO THE CITY OF PITTSBURG

*Please read the instructions on the back before completing.*                    FORM 4.1

| | |
|---|---|
| 1. Claimant's Name: *(Please Print)*<br>Wade Derby | Reserved for Filing Stamp |

Claimant's Address:   Law Office of Daniel Horowitz
                              PO Box 1547

City, State, Zip:   Lafayette, Ca. 94549

Day Phone: (925) 283-1863 _____ Eve: (  ) _____        City Claim No.:

---

2. When did the damage or injury occur?
   Month:                Day:          Year: 1988 to present   Time:   a.m. or p.m.

---

3. At which location did the damage or injury occur?                 Police Report No.:
      Various locations, see attached

---

4. a. What happened and why is the City responsible?
   See attached. Claim is for damages arising from discrimination based upon

    age, sex; whistle blowing and for ethical conduct contrary to department policy

   b.  Name and position of responsible City Employee(s), if known:
                              See attached

5. What damage or injury occurred?   Loss of promotion, unwarranted firing, unwarranted

    discipline, on the job harassment, loss of earnings, loss of pension.

---

6. Claim amount (only if less than $10,000):

   If the amount exceeds $10,000, please check the court for appropriate jurisdiction:
   _____ Municipal Court (claims up to $25,000) ___x_Superior Court (claims over $25,000)

---

7. How did you arrive at the amount claimed? Please attach documentation.
        Calculated loss of pay on promotion, loss of pay due to job loss

    and added costs of commute to new job, loss of pension benefits, emotional

     and physical injuries, statutory and attorney's fees.

---

8. I declare under penalty of perjury under the laws of the State of California that the following information is true and
correct, and that this declaration was executed on _____, 20____,   at _____ CA.

_____
*Signature of Claimant or Representative*

---

9. Official Notices and Correspondence
   *If represented by an insurance company or an attorney, please provide the information requested below:*
   Name and Capacity:*(please print)*


   Address:


   City, State, Zip:


   Daytime Phone: _____        Evening: _____

## PRESENTING A CLAIM TO THE CITY OF PITTSBURG

⇒ PLEASE TYPE OR PRINT CLEARLY ALL OF THE INFORMATION REQUESTED ON THE CLAIM FORM.
⇒ YOU MUST COMPLETE EACH SECTION OR YOUR CLAIM MAY BE RETURNED TO YOU AS INSUFFICIENT.
⇒ THE FOLLOWING PROVIDES SPECIFIC INSTRUCTIONS FOR COMPLETING EACH SECTION OF THE CLAIM FORM.

1. **NAME AND MAILING ADDRESS OF CLAIMANT** – State the full name and mailing address of the person(s) claiming damage or injury. Please include a daytime and evening telephone number.

2. **WHEN DID THE DAMAGE OR INJURY OCCUR?** – State the exact month, date, year, and approximate time (if known) of the incident which caused the alleged damage/injury.

   Under State law, claims relating to causes of action for personal injury, wrongful death, property damage, and crop damage must be presented to the City of Pittsburg no later than six months after the incident date. Please note that evidence of **"presentation"** includes a clear postmark date on an envelope, or a certification of personal service, or service by mail.

   When filing a claim beyond the six-month period, you must explain the reason the claim was not filed within the six-month period. This explanation is called "**application for leave to present a late claim**". In considering your claim, the City will first decide whether the late claim application should be granted or denied. (See Government Code Section 911.4 for the legally acceptable reasons a claim may be filed late.) Only if your late claim application is granted will the City then consider the merits of your claim.

   Claims relating to any cause of action other than personal injury, wrongful death, property damage, and crop damage must be presented no later than one year after the incident date. (See Government Code Section 911.2).

3. **AT WHICH LOCATION DID THE DAMAGE OR INJURY OCCUR?** – Please include street address, city, county, intersection, etc. If possible, also include the Police Report number.

4. **WHAT HAPPENED AND WHY IS THE CITY RESPONSIBILE?** – Please explain the circumstances that led to the alleged damage or injury. State all facts which support your claim with the City and why you believe the City is responsible for the alleged damage or injury. If known, identify the name of the City Department(s) and/or City employee(s) that allegedly caused the damage or injury.

5. **WHAT DAMAGE OR INJURY OCCURRED?** – Provide in full a detailed description of the damage/injury that allegedly resulted from the incident. (What specific damage or injury do you claim resulted from the alleged actions?)

6. **CLAIM AMOUNT:** - State the specific total dollar amount you are claiming as result of the alleged damage/injury. If damage/injury is continuing or is anticipated in the future, indicate with a "+" following the dollar figure if $10,000 or under. If the total dollar amount is unspecified or exceeds $10,000, designate the appropriate court jurisdiction for the claim.

7. **HOW DID YOU ARRIVE AT THE AMOUNT CLAIMED?** – Provide a breakdown of how the total amount that you are claiming was computed. You may declare expenses incurred and/or future anticipated expenses. If you have supporting documentation (i.e., bills, payment receipts, cost estimates) please attach copies of them to your claim.

8. **SIGNATURE:** - The claim must be signed by the claimant or by the attorney/representative of the claimant. The City will not accept the claim without a property signature. Government Code Section 910.2 provides: "The claim shall be signed by the claimant or by some person on his/her behalf."

9. **OFFICIAL NOTICES AND CORRESPONDENCE -** Provide the name and mailing address of the person to whom all official notices and other correspondence from the City should be sent, only if other than claimant. Please provide telephone numbers for the representative, if applicable.

⇒ SUBMIT COMPLETED AND RELATED DOCUMENTATION TO: The City Clerk of the City of Pittsburg, 65 Civic Avenue, Pittsburg, CA 94565. Personal service of claims can be accomplished during regular City business hours (8:00 a.m. to 5:00 p.m.), Monday through Friday (excluding City holidays) at the City of Pittsburg Civic Center, 65 Civic Avenue, 3rd Floor, Pittsburg, CA 94565.

⇒ If you wish to receive a stamped copy of your claim, return the form to the City Clerk with a cover letter along with a stamped, self addressed envelope informing the City of your request.

⇒ You will receive a letter from the Risk Management Office indicating your claim has been received and is being investigated. You will receive an explanation of the investigation results within 45 days in most instances.

If, after reading these instructions, you have questions or need additional information regarding the filing of a claim with the City Clerk of Pittsburg, please contact the City Clerk's staff at (925) 252-4850.

**Please return this claim form to: Office of the City Clerk, Attn: Alice Evenson, City of Pittsburg, 65 Civic Avenue, Pittsburg, CA 94565.**
### THANK YOU!

# EXHIBIT A-2

## ATTACHMENT TO WADE DERBY'S
### NOTICE OF CLAIM

**Claimant:**

Wade Derby

**Claim Submitted by:**

Daniel Horowitz, Attorney at Law
P.O. Box 1547
Lafayette, California 94549
(925) 283-1863

1

### A Connecticut Yankee in King Arthur's Court

Wade Derby was hired by Pittsburg PD in January 1988 having Honorably Discharged from the United States Army.  Unknown to Wade Derby, the Pittsburg Police Department was systematically corrupt and unprofessional at that time.

Just two weeks into his employment, his supervisor told officers to clear the scene of a violent barricaded subject, who was mentally unstable. His tactics were flawed and public complaints arose.  This forced an internal investigation.  The newly minted officer, Wade Derby was dragged into the internal investigation and was told that he should support his superiors. Wade Derby simply testified accurately which meant that his statement hurt his superior.  He was ostracized at that time but his military and natural born stubbornness caused him to dig in and not quit.

In retaliation for not lying to back his supervisor during the Internal Affairs investigation Wade Derby was attacked.  He was alleged to have committed off-duty misconduct at a store in Antioch.   The person announcing the complaint was none other than the same Sergeant who had blown the operation and had been found derelict.   Derby fought back and demanded a full investigation.  The complaints were withdrawn.  The sergeant then retired using a medical excuse in order to obtain the maximum retirement benefits.

This type of medical retirement and retaliation was part of the culture of corruption that the idealistic military veteran, Wade Derby had to confront.  His personality and his military training prevented Derby from backing down from a fight an over time he developed a reputation as the honest officer and the "go to" officer when there a need to fight corruption.

2

## SAVING JOHN CONATY'S LIFE (1st Time)

In 1989, John Conaty (now an inspector with the Contra Costa County District
Attorney's office) was dispatched with Wade Derby to a loud biker party on Bruno Ave. in
Pittsburg. As Wade Derby arrived John Conaty was on the ground fighting with a biker
surrounded by several others. A Hells Angel prospect named Anchar Urbain reached into his
vest to remove a revolver and moved quickly toward Officer Conaty. Derby trapped the in
Urbain's hand as he withdrew it, warned Conaty at the same time and also restrained Urbain
over the hood of a parked car. Wade Derby took him into custody and together with Conaty
stopped the disturbance. Urbain later admitted that he was possibly thinking of shooting Officer
Conaty.

## PITTSBURG PD ON STEROIDS

In 1989 incident when Wade Derby was on a street drug team with Matt Wasteney and
working under Lt. A. Baker, and Sgt. Evan Kohler. There were two detectives working
undercover narcotics at the time. While they were happy to arrest people for buying, using and
selling drugs, it was also true that several other department members to include supervisors all
were themselves using drugs, specifically (but not exclusively), anabolic steroids. The drugs
were prescribed by a corrupt physician (Copeland) from Antioch. This was common knowledge
among the administration that turned a blind eye. Derby was once taken to the doctor's office
while an officer went inside and got his injection. Derby, consistent with his policy and practice,
refused an offer of an "introduction" to this doctor and declined to enter the office with the
officer. Consistent with Derby's whistleblowing background, he told the officer if he ever

3

involved Derby in his improper activity at any level, he (Derby) would "take it further."

Later, the physician's office was raided by DEA, and there were concerns among the officers using steroids that they would be implicated. Police officers from all over the East County were named as steroid patients. Among the included offenders was the now convicted criminal, former officer Kevin Butler. [today Butler is in custody for masterminding the Central County Task Force scandal involving Norm Welch and others.]

## SEX, DRUGS & CORRUPTION

In 1990 a local Pittsburg prostitute named Susan Sheldon went on Geraldo Rivera and spoke nationally about having sex in a van with Pittsburg PD narcotic officers to work off criminal charges. Typical of Pittsburg PD, no investigation was ever started. Susan was murdered among a series of other prostitutes that year. The case was never solved and some officers of that era believed it was a police officer killing them.

Also in 1990, Officer Wasteney and Wade Derby were contacted by a parole agent Mike Mermelstein about a person who wanted to inform to help her brother. The woman met Wasteney, Mermelstein and Wade Derby at the Concord Parole office. The person was afraid because Pittsburg Officers were involved. She did not trust Pittsburg PD at all. The person stated that Derby's boss, his detectives and another sergeant stole money from her brother and his father. She said they paid the police off to let them sell drugs. Note: The sergeant identified as Sgt. Zbacnik was one of the people who systematically attacked Derby over the years. Derby and Wasteney reported this to Lt. Baker, and the new narcotics Sergeant, Nick Baker. Typical of Pittsburg PD, nothing was ever done.

4

**SOME ATTEMPTS TO CLEAN UP THE MESS**

The corruption and crime at Pittsburg PD included the arrests of Sgt. George Elzie and Officer Eric Bergen who were charged with murder and kidnaping. George Elzie worked as a member of the county drug task force until his promotion to sergeant. He was replaced by now City Councilman Pete Longmire. Sgt. Elzie was arrested while attending supervisor's school at LAPD for lewd acts in a peep show parlor. He used his undercover ID during the arrest and concealed it for some time.

### DERBY STEPS FORWARD (Again)

Ever the whistle blower, Wade Derby provided evidence to the Sheriff's Office they used during the prosecution of George Elzie for murder. Elzie is on parole today. Eric Bergen remains in custody for life.

### PITTSBURG PD POLICY

### HANG OUT WITH PROSTITUTES

### OR "Are you a Fag?"

In 1990, Wade Derby was sent to an undercover drug school in Visalia in place of one of the other detectives. Another detective drove and as he and Derby car pooled to Visalia. On the ride down Hampton told Derby that Hampton had arranged for a couple of stewardesses to entertain them while away from home. The other detective was married at the time, and Wade

5

Derby had just gotten engaged. Derby declined. The other detective repeatedly criticized Derby for refusing to participate. When the officers returned from the trip, his supervisor asked Wade Derby why he would not go out with the ladies. The sergeant even asked Wade Derby if he was "a Fag" and he implied that it must be true. He did this in a way that made it negative if in fact Wade Derby were Gay.

On the job sexual activity was part of the job perk at Pittsburg. It was common among the officers to have blatant public affairs. Officers bragged about having sex at the police station. Officers shared pictures of department staff that they had engaged with. Derby's refusal to participate made him an outsider and dangerous as he might then "snitch".

Even his partner Matt Wasteney jokingly asked Wade Derby if Derby was gay because he heard from their supervisor and the other detective telling other officers about Derby not engaging in sexual liaisons with the women in Visalia. Lt. Baker in turned also teased Wade Derby about being Derby being gay after this incident. Derby told Lt. Baker that he was not happy with the harassment due to Wade Derby's choices. Nothing was ever done to prevent the harassment.

## BUY MY HOUSE

In 1991, Wade Derby had a falling out with Lt. A. Baker because Lt. Baker attempted to use his rank to force Wade Derby to purchase real estate from him (Baker) Wade Derby had agreed to leave the in house drug unit and go to the state drug task force after being offered the position by Chief Castiglione and Agent Ron Luna. At the same time, Wade Derby and another officer (Ming) leased a home from Lt. A. Baker. Baker believed that the officers (Derby and

6

Ming) would purchase the home from him when they could afford to.  Instead, they decided not to purchase the house and shortly after that Ming was released/fired from probation, without cause. Ming also reported corruption to the department and a plot to kill a Pittsburg officer during this time. Lt. A. Baker was very upset with Derby and Ming over Ming's reporting and especially over their failure to buy the house from him.  The fact that Derby had a male roommate and that they jointly considered purchasing Baker's house, led to additional fodder for the "Derby is a fag" attacks.

The home had serious structural defects and was an unwise investment. Lt. A. Baker had often asked for early rent payment and asked that Wade Derby prepaid months in advance.  After the tenancy ended, Lt. A. Baker never returned the security deposit.

### DIRECT CORRUPTION AS POLICY

Prior to his departure from the in house narcotics unit, Wade Derby served multiple search warrants on a notorious drug dealer named Lorenzo Lee. George Elzie assisted.  The officers staged at a fire station on Willow Pass called 86. As they prepared the raid team to go to his primary home on Clearland Cr. in then West Pittsburg, Elzie had to quickly make a phone call inside the fire station after the raid briefing. When they arrived at the dope dealer's house they were casually waiting for the police to arrive. All that was located was a cache of drugs discarded in the neighbor's yard. Lorenzo Lee later cooperated and told police George Elzie called him and warning him that the police were coming moments before. Lt. Baker, Sgt. Baker, Matt Wasteney among others were present, and also present when Lorenzo spilled his guts about

7

Elzie. This matter was tape recorded and given to the supervisors as evidence.

As was standard at Pittsburg PD, nothing was done. However, separately, George Elzie was arrested by Pittsburg PD on a warrant issued through the county sheriff's department/DA's Office for murder.  Absent the work of the CC County Sheriff, Elzie would be a free man.

In 1991, Wade Derby served a search warrant with Sgt. N. Baker, Matt Wasteney and others.  Derby did an undercover bust on a heroin dealer in Pittsburg (Kelly Jones) and then served a roll over warrant in Concord on Northwood Dr. with Derby as the case agent. They seized a large amount of heroin, cocaine, methamphetamine, a blue Camero and several thousand dollars in cash. It was customary to have a beer in the back parking lot of Pittsburg PD, after a good case. Matt Wasteney and Derby were told by Sgt. Baker to get some beer and chips. Derby asked with what money, and Derby and Wasteney were told to take it from the seized assets and to replace it later. Neither Derby nor Wasteney would do this.  Wade Derby went to the ATM at B of A on Railroad Ave. and took out his own money. He and Wasteney went to Pittsburg Liquor and Deli and purchased some chips and a 12 pack of beer. When they returned with the items, Sgt. Baker and another officer (Longmire), got mad and chastised them for not getting more items. They drove off in the seized Camero with all of the money and evidence. They returned with a case of beer and snacks.

Derby and Wasteney refused to drink or eat any of the food other than that which they purchased. Derby and Wasteney refused to do anything unethical with the drug proceeds and Derby made it known he was going to account for every dollar he had seized. As a result no

money was taken that night, but it put Derby in a negative light with his peers.

## KICKING THE DRUGS OUT OF PEOPLE

Derby buried himself in his anti-narcotics work and tried to maintain a belief that the PD would be getting better. Also in 1991, he ran a series of street level reverse sale of rock cocaine on Diane Ave. in Pittsburg. Wasteney, Terrence Williams and Wade Derby all posed as drug dealers, and sold to buyers pulling up in cars. Lt. Baker and Sgt. Baker were all part of the arrest team.  In one instance, Wade Derby made a sale to a young white male who tried to swallow the cocaine as he was being apprehended.  Lt. A. Baker took the young man to the side of his van and kicked him in the stomach and then knee thrusted him several times in the abdomen, while calmly telling him not to struggle and to spit out the drugs before he died.  There is no medical reason to have thought that swallowing the small item would cause any physical harm. Wade Derby witnessed the tail end of this incident and abruptly took the prisoner away from Lt. Baker to stop any further physical harm.  This type of physical abuse was common in Pittsburg and while it has abated, it has not stopped. The cover up of this police initiated violence at the highest levels, continues.

## AFRICAN AMERICANS ARE "CRACK BABIES"

Physical abuse of citizens ran hand in hand with racism among a small group individual officers.  The Chief of Police (Baker) referred to African Americans with criminal backgrounds as "Crack Babies".   This was not meant as a criticism of drug use and its harm to children, it was a way to paint a broad group people as subhuman and incapable of living as civilized human

9

beings.  The regular use of disparaging terms was not just tolerated, it was the lingua franca of many in the department.   Derby and others refused to join in these racist conversations and they stuck together as reformers.

### VANISHING KILOS OF COCAINE

SFPD had loaned Pittsburg two kilos of high quality cocaine so that they could use them for undercover operations.  Wade Derby had signed for the drugs.  When SFPD asked for the drugs to be returned, Lt. Baker ordered Wade Derby to give the two kilos to him (Baker) so that Baker could arrange the turn over.   Baker had other officers return the drugs.  After the drugs were returned to SFPD Wade Derby received a call from Lt. Molinari. He told Wade Derby that one of the returned kilos was brown sugar and not cocaine. Derby knew that the kilos were that of high grade cocaine powder, as he had the drugs analyzed by the Contra Costa County Crime Lab in order to obtain a court order to use them in reverse sting operations.   Wade Derby reported this to his superiors who did what Pittsburg PD always did - nothing.

### GRAND JURY

Wade Derby testified before the Grand Jury (1992) investigating Pittsburg corruption. He detailed one case, where an undocumented immigrant with probable fake ID, was arrested for a drug offense. He had a large amount of cash with him.  He was asked to sign a disclaimer for the money seized.  When he did, he was released.   As Derby testified, at that time all of the command staff drove asset seized cars and all of the undercover cars were seizures, some of which had not yet cleared for use or ownership transfer.  Releasing people who signed money disclaimers was also commonplace.

10

## CHRISTMAS PRESENTS IN JULY

In 1992 Derby had a search warrant for a house at 300 Jimno Avenue in Pittsburg (One of the warrants Derby was ordered to leave in house before departing to the task force). There were kilos of cocaine and drug money in this house. They executed the warrant without Derby and located a cache of stolen guns and jewelry. The kilos of cocaine were gone but for the wrappers as was the money, over $100,000. The guns were exotic weapons used in Hollywood movies. In fact one of the guns was used by former governor Arnold S. in the movie, Predator. The Pittsburg PD department SWAT team was given this gun and a fun day at the range by Wayne's Gun Shop in thanks from the owner of the Hollywood Arms props. It was headline news as well as the untraceable jewelry found.

Several witness officers were aware Lt. Baker, and others were in the room with the doors closed for extended time until the FBI arrived to see the jewelry. It was all stolen from large heist in San Francisco. One of the officers in the room was Jim Hartley. Hartley was later charged with falsifying police reports in 2005. It was rumored that the officers in the room with the jewelry   took some of the items that day. Until Hartley was charged with a criminal offense he was often in trouble but never was seriously disciplined.

The protection of bad applies like Hartley included covering up his beating of a handcuffed prisoner in front of then Sgt. Addington, who received a letter of reprimand for failing to take action as a supervisor. He also had sex with an underage cadet and was never charged or disciplined.  The difference between a "bad apple" and a standard Pittsburg PD

11

officer was the degree of exposure that the conduct brought to the department and the presence of "wood" on superiors. Hartley always said he had "wood" on Lt. Baker and they could not touch him.

## HARTLEY DIDN'T HAVE "WOOD" ON DERBY

Derby again created bad feelings when he did an investigation into Hartley falsifying arrest reports. Hartley and Salgado (Deceased) were prosecuted for that in 2005/2006. Derby and Steiner did an independent audit of cases where officers template (wrote over) reports. There were other officers with somewhat questionable case, but Hartley and Salgado's cases were most egregious. However, it was decided by the chief that their cases were not to the save level of severity as Hartley and Salgado.    Derby was later was deposed in a lawsuit filed against members of Pittsburg PD administration about this. As always, Derby was truthful and this created resentment toward him.    Nothing ever happened to those officers. They are now command staff.

## THE FAGGOTS IN CITY GOVERNMENT

This same disdain for the job carried over to disdain for members of City government.  In 2005/2006, the chief and Captain Zbacnik often made make fun of the new City Manager (Marc Grisham). In front of staff and other officers, they called him "Sugar Shack" which to them implied that he was Gay and that this was a negative thing. Grisham was referred to as "the fag" and "the faggot".   Derby and Grisham had a solid relationship and open communication and Derby resented the attempts to degrade Mr. Grisham. Derby strongly voiced his opposition to these terms but was laughed at for speaking out.  Given Derby's history of not participate in the

12

sexual misconduct on the job and his former male roommate, Chief Baker disliked him

defending Grisham and not participating in the banter. Baker often had Derby deal with Marc

Grisham directly because Chief Baker preferred not having to.

In 1992, Wade Derby was asked to go before the grand jury and tell them about corruption in

the department. Derby went before the grand jury and testified. (Some details provided infra).

Thereafter, Chief Castiglione and Lt. Dave Millicam, abruptly retired.

Lt. Baker and Wade Derby remained at odds with one another throughout these

years. During this time, Derby a producer of the highest level but he constantly suffered from

the sneers and insults of other officers.

### SAVING JOHN CONATY'S LIFE (Time 2)

In 1993/1994, Wade Derby returned to patrol work at the police department. That year,

(1994), Derby again possibly kept John Conaty from harm during a car stop on Railroad Ave. (in

front of the Mar Rey motel).

Two white supremacists from Merced came to town to commit a possible hate crime for

fun. When Derby and Conaty pulled over the car they did not know this. The driver and

passenger were heavily armed. John Conaty was at the driver window and the occupants did not

see Derby approach. The driver and passenger had their hands on the guns and were getting

ready to possibly open fire on Conaty. Derby intervened by grabbing him through the car

window, while holding the driver at gunpoint as he warned John Conaty about the guns in his

view.

13

**Then the Lord rained down burning sulfur on Sodom and Gomorrah**

In 1993/1994 Chief Casey came in after Castiglione was ousted. Casey brought with him promise of a new and better era. With this change two officers were charged with criminal acts of sex with a minor and another for theft of evidence. Bill Hendricks was charged with sexual harassment of recently retired records manager Michelle Beyhan. She was paid an undisclosed settlement and then Hendricks was sent to oversee Code Enforcement as punishment by Chief Casey.   Code Enforcement went on to be called the Penal Colony as anyone in trouble got sent there. This is documented in a lawsuit dismissed in federal court filed by former Officers Ron Huppert and Salgado.

Sgt. Zbacnik and Sgt. Kohler were disciplined after Zbacnik pulled down Kohler's pants during self-defense class, exposing him to the only female officer at the time Patty Meyers. Patty left the department and went to Fairfield PD where she filed sexual harassment charges against other officers.

In 1994 a female reserve officer began having relations with a married inspector and a sergeant. Derby at the time was single and when she was a civilian Derby and this female became friends.

The forces of disrepute fought back.  Lt. Hendricks had tried to get Derby in trouble by claiming he was spoken to in a disrespectful tone. This was dismissed by his superiors as Lt. Hendricks had no credibility with them. However, for a brief period of time, Derby then a

14

probationary Corporal was placed on weekly evaluations as the department was contemplating possible demotion of Derby as a Corporal.  One of these men involved in sex scandals had previously been exposed for having sexual involvement with an informant named Diana Sivil and was reduced in rank. Others allegedly had sexual relations with this same woman when she was 17 years old and were disciplined internally. This was covered up as other lesser misconduct. She (Sivil) was the girlfriend of a notorious drug dealer named Theotis Stewart. She implicated several officers in corruption as well.

Chief Casey was faced with a department so full of corruption that he could only address the issue in pieces or chunks.  He started the move towards change with many of the officers who survived Castiglione and his regime. Don Allen was arrested for stealing evidence after creditors constantly called about debts owed and a car dealership wanted him to pay late registration fees. Don Allen took a registration from the evidence in a homicide and placed it on his own car to disguise his late fees.

Officer David Teague was arrested for sex with a minor.  Elzie and Bergen were charged with murder and kidnap. Wade Derby was promoted by Casey to Corporal in 1995.

### WADE DERBY SAVES KIRK SULLIVAN'S LIFE

In 1995, Kirk Sullivan, Cassandra Wilkerson's brother was working patrol in the El Pueblo Housing Projects.  The PD were having an influx of Project Trojan Gang members from Richmond trying to establish them in Pittsburg. Sullivan made a traffic stop and the suspect car parked facing the officer's stop. The plate was registered out of Richmond. Knowing about the problems with Richmond gangs Derby rushed to assist Sullivan, and advised over the radio for

15

him to stage and await his cover car.   When he arrived Sullivan was at the rear of the car searching a very large male (Floyd Hollins). Derby saw his cover officer Dupont, literally 20 yards away hiding himself behind a tree with Sullivan exposed. Derby quietly approached from the opposite direction focusing on the passenger. The passenger (Denzel Allison) did not see Wade Derby. The passenger had his hand on the grip frame of a semi-auto pistol and was looking back at Sullivan, about to open fire. Wade Derby recognized this and stopped Allison. It turned out Allison had committed a triple homicide in Richmond, the gun was stolen and he made a statement he was likely going to shoot Sullivan. Allison is currently serving a life sentence in prison.

**THE REFORM CHIEF PROMOTES WADE DERBY**

Wade Derby was promoted to Sergeant.  Raman was an officer on this crew and was having an affair with a female deputy who once worked for the sheriff's office. He and then Sgt. Addington later got in trouble after they left the city unsupervised and went to dispatch in Martinez to flirt with the ladies and take them donuts. It was later jokingly called Donut Gate, by many.  Wade Derby was put in charge of a street gang unit consisting of Eric Gomez, Jim Hartley, Javier Salgado, Kirk Sullivan and David Zuniga. This group halted gang violence and took back the image of the community. Chief Casey had Derby testify before the grand jury regarding the PD's gang enforcement practices after Det. Ron Huppert claimed they were falsely reporting them.

In 1997, Chief Casey ordered Wade Derby to go with him for a press conference in support of President Clinton's crime bill. He wanted Derby to be photographed with several local

16

Democrats, like George Miller. Derby was interviewed by KCBS. Derby told Casey he did not support the crime bill personally as he was a supporter of the 2nd Amendment. Casey told him he understood, but wanted him there anyway. Casey did not care for Derby's honesty about this matter and how it conflicted with his values and oath of to support and defend the constitution of the United States.

There was ongoing controversy about gang violence and what was investigated as a gang related matter   A counter group existed in the department. Lt. Zbacnik and the homicide team who wanted to say all gang murders were something other than gang murders. They were all carrying out the orders of Chief Casey and Lt. A. Baker was now a laterally appointed Commander.  There was clashes over the random murder vs. ongoing gang murder labels.

### POOR CHOICES HURT A REFORMER

Sadly, the reform Chief made some bad choices.  Chief Casey had a new way of reporting crimes that could be perceived as questionable cases due to lack of a credible witness, workable leads, no prosecution desired, or some other questionable circumstance. Example: a guy buying drugs or trying to pick up a prostitute gets beaten up and his money forcibly taken. Instead of it being a Strong-Arm Robbery/Aggravated Assault Felony, it became a suspicious circumstance information report. More importantly, it was no longer reported and statistically recorded as a part 1 crime to the FBI index.

17

Wade Derby and many line officers rejected this new reporting style but the supervisors were ordered to have the reports changed to the new methods. They even made a new reported manual about how to prepare the cases correctly to lower crime stats. This was written by Lt. Keeler who later resigned from the department after becoming frustrated with the profession. Wade Derby was warned by supervisors for voicing his opinion about non-factual reporting of crimes.

Once again, Wade Derby was on the outside.

In 1997 after Sgt. Wade Derby's supervisor got into trouble with the command after unproven allegations were made that he was having a relationship with another officer's girlfriend and cheating on his wife on duty. All other sergeants were promoted to Lieutenant except for him. Instead, he was banished code enforcement. Pittsburg PD was still cleaning house but it was still persisting in providing false crime statistics, a problem that would continue and worsen under Aaron Baker.

## DERBY MARGINALIZED

Wade Derby was again ostracized for his whistle blowing and his non-compliance with questionable practices. All other supervisors got to do specialty assignments but Derby remained in patrol. He became the senior street sergeant and finally went to day watch in 1998. Meanwhile, the Chief continued to target the corrupt officers. A lieutenant got in trouble and was forced to medically retire after being caught in a gambling scandal. Another lieutenant was also implicated but nothing ever happened to him. This was later considered a cover up by

18

Huppert and Salgado who filed a lawsuit about this and other matters.

## DERBY SUCCEEDS AT THE STREET LEVEL

In 1999 a lieutenant was overseeing the in house Narc unit and was supervised by Commander A. Baker. It was rumored that the Commander caught the lieutenant at the movies in Antioch on duty with his mistress. The unit was considered non-productive and had seen its better days. Derby was called in to reform things and take command as a sergeant. Aaron Baker covered it all up and made it look as if it was time to get a Lieutenant back to managing and not working undercover. Aaron Baker was now to become interim Chief. When Wade Derby took over the unit and they immediately took staffing from four down to three and within 8 months two other detectives were promoted to sergeant. This left Derby with one guy, named David Zuniga. He and Derby became one of the highest producing and most respected Narc units in the region. They had record seizures of money and drugs. They won accolades from the DA, DEA and DOJ.

## 2000/2001 - THE CORRUPTION CONTINUES

In 2000/2001 Wade Derby worked directly for Commander Hendricks as the Narc Unit Supervisor. During this time Det. Zuniga and Derby raided a house in Pittsburg and arrested the dealer, Name Withheld, for heroin and methamphetamine sales. He told Derby and Zuniga that he was arrested earlier in the day by the street team, staffed by an officer and another sergeant.

19

He told Derby and Zuniga he agreed to be their informant and they mistakenly let him keep his drugs and money. This was not proper protocol.   Derby and Zuniga arrested the dealer and got his full statement. Derby notified Commander Hendricks, as well as the street team sergeant. Detective Zuniga wrote the report and submitted it for review.   The report written factually and recognized that the other officers meant no malice and it was an unproven statement from a convicted felon. (Later Derby would testify before the Grand Jury about this) Hendricks ordered Zuniga and Derby to alter the report. They refused and instead, Hendricks pulled the report from secure records and altered it. He also destroyed the original. What he did not know is that to protect the truth, Derby gave an original copy to IA investigator Charles White and Zuniga and Derby kept copies. Derby brought this to Chief Baker's attention and told him he would not compromise his badge for this. Chief Baker did nothing to Hendricks.

### COMMANDER HENDRICKS THE PHOTOGRAPHER

In 2001 Commander Hendricks regularly showed his staff photos that included an employee. Hendricks had a side photography business offering professional nude and sensual personal photography. He and his wife also ran a lingerie model service Every one knew the PD had this Commander with a proven prior for sexual harassment operating a nude photography business. He even asked Derby's sister in law if she might like to pose. His wife's twin sister. Chief Baker was well aware of this but no one stopped it.  Hendricks was run out of the PD after his second sustained sexual harassment claim and lawsuit filed by a woman named Erin Janes.

### DERBY FIGHTS BACK USING SCHOOL

20

In 2002-2003, Wade Derby went back to school and obtained a B.A. in Business and an M.A. in Leadership. Casey left the city as Chief briefly; and Aaron Baker was hired as Chief and returned to work as City Manager. In December 2002 Commander Hendricks was forced to retire after his second sustained sexual harassment allegation.

Aaron Baker's reign started with hope. Wade Derby became Lieutenant and he started reforming all units he was in charge of. But this enlightened period was short lived. As Derby started to uncover high levels of tolerance to sexual harassment and criminal misconduct, he was targeted for retaliation. To humiliate Derby for cleaning house, he was instructed to query female employees as to what tampons they wanted in the women's rest room. The Chief then publically "commended" his work. Derby was humiliated and this was what was intended. Toni Baldazo was often the target of harassment. She reported that an officer (a women), made racists remarks about some pictures of Toni's friends. Wade Derby immediately took action and the female officer said she made some jokes about gang signs that Toni could have gotten offended about. Derby gave the officer a written reprimand at the request of Chief Baker. Had a male officer done the same thing, no reprimand would have been issued. Perhaps recognizing their precarious position in this department, with Derby's support, the parties then worked out their differences. While the female officer was written up for her comment, the Chief at times commented to command staff in office about the size of Toni's breasts and how he admired them. There was no penalty for this.

During this time Derby had to investigate incidents occurring in our records division involving civilian staff. A female employee was stealing petty cash temporarily to fund an

21

abortion. She was having an affair with an officer but would never come out and say it was his child. Everyone including the chief knew of her relationship with the officer. She was allowed to resign without charges being filed in order to protect the officer and department.

A fellow lieutenant spoke up against Pittsburg's African American female Mayor for political reasons and in his official capacity. The mayor alleged he made a racially biased statement which was deemed untrue. This placed the chief in a bad light because it exposed to the public the rampant racism in the department. Later a rumor was leaked that alleged the same lieutenant got caught using his department car to drive to Reno to gamble and go to a legal house of prostitution with another officer. The lieutenant retired medically.

### DERBY GETS MONEY FOR LAW ENFORCEMENT

Wade Derby wrote grants at this time and often. Some of the grants were for equipment, some were for personnel and all required use reports. He had a grant that still exists today called CDBG (Community Block Development). This is a HUD federal grant for personnel. After it was discovered that two officers (Hartley/Salgado) were falsifying reports, the department went through an internal audit by a company called Matrix.

### PEOPLE WHO LIVE IN GLASS HOUSES
### SHOULDN'T THROW DILDOES

What others covered up, Wade Derby found as culpable conduct. A sergeant allegedly

22

tripped down the stairwell and had to retire on disability following a sustained finding (by Derby) of misconduct (in 2007/2008). Derby had sustained the finding that the sergeant threw dildos at another officer and then made sexual comments poking fun at these officers in front of female staff. [The sergeant is friends with friends with Cassandra Wilkerson, a fact that is important as will be explained later.]

At this time, doing IA work was considered being a traitor. This is still common in many departments. IA investigators were often harassed. Following these findings against the sergeant. The sergeant's friend and brother of Cassandra Wilkerson, began to send pornographic emails to PPD staff, and supervisors, as well as other law enforcement agencies using PD email. He used his self-appointed "bully pulpit" to people his nickname for Derby's private part, calling it (in a loud voice), "The Whopper". He did this in front of male and female officers and ignored Derby when Derby asked him stop.

Despite having some good policies, racism, sexism and discrimination pervaded the department. The opening gay HR director, Mark Fox, was the target of name calling by the Chief. Some of the Chief's favorite terms were "fairy", and "fag". Wade Derby shared office space with HR maintained a strong working relationship. Derby often invited them to holiday luncheons and hosted and naturally included Marc Fox and his team. The chief would challenge Derby as to why he did that and Derby told him he (Derby) had no problems with Mr. Fox. This was not well received by the Chief. Mr. Fox initiated an internal investigation against the chief's friend after she started speaking openly about her sister's involvement with the Assistant City Manager .She was reprimanded as a result.

23

## DERBY HAS MAJOR SURGERY

Wade Derby got sick in late 2007 and had to have major surgery. Wade Derby was out until April 2008. He returned and learned that Sgt. Raman was going to promote and take Wade Derby's job. Contrary to recent false allegations of sexism, it was Wade Derby who had reformed the Pittsburg PD recruiting program so that the number of female officers on both a numerical and percentage basis was the highest in department history.

Contrary to claims that Wade Derby engaged in sexism, this conduct was rampant in the department and not connected to Wade Derby. For example, Wade Derby participated in the hiring of a female officer (Name Withheld). The Police Chief was smitten with her and openly spoke about how she was "hot", and he would leave his wife for her if he were younger. He said this often in front of many male officers (including Raman, Addington, Zbacnik, Nick Baker, Callahan and others). Even some rank and file officers knew about his feelings for this officer. While the female officer dealt with this on the job harassment, she was unfairly treated by the Chief and others. The command structure repeatedly intimidated those such as Wade Derby, who would not go along with the sophomoric sex jobs and sexual harassment of female officers. It was easy to be set up for false charges and a cold shoulder that carried with it the fear of a "Serpico" type abandonment.

## OPPORTUNISTIC ATTACKS ON WADE DERBY

Attacks could be great or petty. For example, a sergeant and officer once started a rumor that Wade Derby said his captain was incompetent and screwed up an officer's funeral planning. This was never stated by Wade Derby but the next day Wade Derby was called into the chief's

24

office with the other captain. The Chief was told that Wade Derby was "talking shit about the captain" and he wanted Derby reprimanded. Wade Derby stated that the allegations were false and demanded to talk to that captain directly. He was allowed to do so. The matter ended without further action but it became clear that the command structure would always make life miserable for someone who would not join the corrupt team.

Wade Derby pursued continuing educational opportunities, published articles, won awards, taught various continuing education programs, and achieved an excellent records of both arrests and convictions.  His objective stats and achievements provided a high level of protection. Criticism were often petty as well as clearly unfounded.  Captain Zbacnik wrote in Wade Derby's performance evaluation that Wade Derby micro managed the records supervisor. This was later retracted. Zbacnik became Derby's direct supervisor and all their interactions of importance were leaked to his friends including Addington, Raman and Callahan.

When training opportunities, prime assignments and promotional opportunities presented, Wade Derby was overlooked and Captain Zbacnik supported now Chief Addington.

Despite ignoring Derby's accomplishments, his work itself was used by Pittsburg PD. For example, Derby designed a program called the "Total Policing Program". This was a highly successful community based approach to police work.  Rather than allow Derby the credit for this program, Captain Zbacnik falsely claimed that Wade Derby stole money and used a city credit card to buy a personal gun. He claimed Wade Derby sold department guns to a barber shop in Texas.  There was never any evidence of this and there could not be because they were invented. When Wade Derby complained to the Chief, the Chief laughed and refused to stop the

25

slander.

Wade Derby was undermined constantly. Members of his staff made small mistakes and were chastised. Other supervisors and their team had broad latitude. For no reason, Wade Derby was removed from the SWAT team and range team and all other specialized duties. At this stage, Derby's ethical standing was a known and established threat in the department. Derby's tenacity had allowed him to move up the ranks but as he became potentially qualified for Chief, he became an increasing threat to those who had for years if not more than a decade, promoted moral corruption and legal wrongdoing.

Wade Derby and Brian Addington shared the idea to start doing crime analysis and shared it with Chief Baker. A clerk did the calculations the statistics were used in meetings. They came into play strongly with Total Policing and the articles Wade Derby wrote. Wade Derby and others also used them in presentations to the City Manager and command. Wade Derby was starting to push for accountability individually and as a department.
Addington seized the chance to showcase his analytical skills fully and started making Wade Derby's stats a monthly report. The chief used these everywhere, but the numbers were less than honest. Major crimes such as rape, were still reported as simple assaults or as suspicious circumstances. Wade Derby stood up in a staff meeting and solidified his fate by saying "we do not need to lie to the public about crime reduction because we honestly had." Wade Derby was looked upon by peers with the, "you just hung yourself look."

During this time Derby's father was diagnosed with terminal cancer. The PD started downsizing Derby's former unit and the chief no longer wanted Derby to go to city council

26

meetings or other public functions. Wade Derby also was no longer asked to attend department head meetings.   Addington and Raman were now in the limelight and Wade Derby was being moved out of the way. The investigations unit moved to the second floor and Derby's unit was put in a small space on the first floor. Callahan was put in charge with Addington overseeing the unit.

As Chief Baker prepared to retire, the thought of placing Derby in the Chief's spot was dangerous. With Derby at the top, the corruption would be exposed and arrests would be made. The sexism and racism would be dealt with. The under reporting of crime statistics at the instruction of Chief Baker would be exposed.   The danger of Derby making chief was great. Derby's Total Policing concept had gone national and agencies were calling, coming to visit and making inquiries. The first couple of inquiries the chief allowed Derby to speak. Then, Addington was assigned to discuss the program without Derby. Effectively, Derby's creation was being credited to the PD's new golden boy.   Wade Derby was never returned to the jobs, some of which Wade Derby created and to all of which Wade Derby made hugely successful and meaningful to the department.

Wade Derby was gained weight after his surgery. The chief made disparaging comments to Derby about "porking up". Wade Derby added that after his surgery the doctor said it was expected and Wade Derby would likely have a protruding lower abdomen due to the open surgery incisions which destroyed all of my abdominal muscles. The mocking of his physical changes continued unabated.

Wade Derby was always outstanding academically and he signed up for the Captain's

27

test. Three of Chief Baker's friends, all chiefs or former, sat on the panel along with Cpt. N. Baker who was retiring the next day. Callahan is saying the chief told him Wade Derby was not promotable and it was common knowledge Addington would prevail. During this time, Derby was openly and frequently objecting to the practice where Pittsburg would deliberately falsify crime reporting in order to make it appear that crime was dropping. During this time a stabbing was listed as a suspicious circumstance and later changed to murder when the victim died. The paperwork was destroyed to cover this up. Derby voiced his complaints to the Chief himself and to command staff.

Wade Derby took the test and was told by all panel members Wade Derby did an outstanding job. There were rampant rumors within hours Wade Derby had defeated Addington, and Raman for the number #1 spot. The chief called all the competitors in and said he would interview all three the next day. Everyone was saying Raman did not even pass. Raman later told Derby that he (Raman) did not pass. Wade Derby even got a congratulatory phone call from HR saying Wade Derby was rated Highly Qualified. The chief and Wade Derby met and the Chief stated that Addington and Wade Derby tied and the Chief had chosen Addington. After some discussion, the Chief admitted that Wade Derby had done better than Addington but that he had the right to pick his best choice and that was Addington. He went on to say how he had to tell Lt. Raman he did not even qualify and how he needed Wade Derby, his most experience command member to help lead the department into the future. He added, he planned to have Addington become chief and he would in fact promote Wade Derby to Captain next. Wade Derby made it clear that he would like to still compete to be the next Chief but would accept the secondary spot

28

captain's spot. This displeased the Chief who asked Derby about his health and commented (once again) on his weight gain. The chief told Derby he would be promoted in a few months after Addington to Captain.

After being bypassed for promotion the chief offered him a position overseeing Code Enforcement and Records. Wade Derby accepted and the Chief stated that Wade Derby was to get the second Captain's spot. Instead Wade Derby was taken further out of the loop.

Wade Derby still had the trusted but unenviable job of doing IA investigations. The position led to greater resentment among the PD. Wade Derby was ordered by the Chief and Addington to change the outcome of an investigation Wade Derby did on an officer who was also being investigated for sexual assault and assault under color of authority by the FBI. Specifically, Wade Derby found that officer at fault for misconduct and association with a felon. After almost a year passed Wade Derby was ordered to change it from sustained and make it not sustained. At this point Wade Derby followed orders but saved a copy of the original as proof if needed.

Wade Derby was also assigned a case of 4 white officers beating an African American man at the Pittsburg Marina. Wade Derby worked on this case for over 8 months awaiting a trial outcome. The case became a federal lawsuit still pending. Derby was fair and objective and did not use his responsibility as a way to protect the department. As the Chief prepared to resign, the competition to replace him became heated. Sexually harassment charges were filed by a former officer who had moved to Harris County (Texas), resigned to leave police work, separated from her husband and who then leveled sexually harassment charges against various

29

officers. This person was Cassandra Wilkerson. Lt. Raman her direct supervisor was the first person she accused of this. Later, Wade Derby was among those accused, but implicated by a third party not Wilkerson. The third party was among the group that Derby had challenged during his career.

During his defense to these charges, Derby's investigator spoke to the ex-husband of Ms. Wilkerson. He confirmed that Ms. Wilkerson had discussed sexually harassment. However, she had not mentioned Derby as the perpetrator, she had stated that it Pittsburg's police Chief, Baker and Lt. Raman. This information was provided by Derby to the IA investigators (Addington and Perry) who completely ignored this in order to protect Chief Baker and in order to continue the attack on Wade Derby.

In the course of the IA investigation it came to light that this accuser was so trusting of Derby that when her son got in trouble, she referred him to Derby for help. She was friends with Derby and his wife. One of the two main acts of alleged misconduct took place in Derby's home off-duty with his wife present. Wade Derby and his wife waived the spousal privilege and his wife related the incident and having no significance and just arising out of friends joking around. Years had passed and the now accuser had not ever said a word about it.

Her other main allegation had to do with alleged sexual stares in the police parking lot. Later, once the case was filed, she admitted, under oath, that she had no facts to support her allegation and just thought it to be true. She also admitted that a document that she had signed and submitted under penalty of perjury, was not in fact, true. She blamed this on her attorney, Stan Casper, claiming that he prepared the document and had her sign it.

30

Even though allegations were made against Raman and Addington, neither was ever disciplined and both were promoted even as the lawsuit was pending. Derby however was subjected to an IA investigation led by Addington. A mass of evidence was submitted by Derby which was ignored by Addington. Later, in the civil lawsuit, Raman and Addington relied upon this same material to attack Wilkerson in their defense.

Derby was told by Addington that the IA was going against Derby and that Derby would be demoted and likely terminated. He offered Derby a deal. Agree to resign in early 2016, take a few days off work and keep his rank. Derby accepted the deal rather than risk his pension and his reputation.

Upon return to work Derby was tormented. His gun was taken as was his police vehicle during the period he was being investigated. He was put on quasi civilian status as a clerk in the records room with little or no command. He was not allowed to fraternize with other officers. He was told could not attend, parties, funerals or even private events with other officers. This included memorials for fallen colleagues, and department dinners and he was told he could not be in the Department photo. In his place, they had an acting lieutenant sit in. Meanwhile, his (false) accuser, was on medical leave and posting pictures of her partying at sporting events and having a great life.

Addington became Chief and Raman a captain. When the lawsuit was dismissed and Derby's innocence proven, the Chief failed and refused to purge the IA file or rescind the coerced retirement date. Meanwhile, despite her admitted false allegations, Cassandra Wilkerson was fast tracked for promotion.

31

Despite the pressures, Derby continued to act ethically and effectively. During this period of banishment, he learned that two police officers who had left the department, were to be witnesses in criminal cases in the Contra Costa County Superior Court. These former officers were terrible people. They had a practice of beating suspects and other Pittsburg officers had turned them in. A criminal case had been generated and a criminal case number computer generated as well. The Chief (Addington) then made a deal. Resign and all will be forgotten. The officers resigned and unlawfully, their criminal investigation was terminated and the very existence of the criminal investigation was purged. The files were kept, secretly, in the Chief's office.

The Public Defender's office got wind of the wrongdoing and filed a motion for a court review of the records of these officers. By law, the facts of the criminal investigation had to be turned over the Superior Court. Chief Addington instructed his staff to NOT disclose this material and to misrepresent the state of the file to the court. Criminal cases went forward with the evidence of the gross criminality of the officers, covered up.

More specifically, in May 2014 a Pitchess Motion was filed. Derby was asked to go to that Pitchess Motion but to only provide the administrative leave form he had and not the real material. Wade Derby went to court with records manager Joyce Lowe and met the City Attorney. Derby told her there was a file and if asked he was going to advise the court of its existence. The City Attorney did not instruct Derby to provide the file and therefore was criminally complicit in Chief Addington's misconduct. The City Attorney managed to get the hearing continued and reset it on a day when Wade Derby was on vacation. This is a further act

32

in furtherance of a criminal conspiracy.   When Wade Derby returned he found out they had the

hearing and the records manager did not tell them there was file.   Derby wrote a specific

memorandum objecting to this fraud and also told the chief face to face that this conduct was

wrongful.   Among all of the matters, this was the straw that broke the camel's back and most

specifically led up to Wade Derby not getting a per diem or having his discipline reversed.

Therefore, Wade Derby claims damages of $ 100 million dollars including lost wages,

mental, emotional, physical damages, attorney's fees, statutory damages, and reduction in

retirement benefits, loss of promotions and other damages.


Dated: March 21, 2016


_____
Daniel Horowitz
Attorney for Wade Derby


33