UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WADE DERBY,

          Plaintiff,

   v.

CITY OF PITTSBURG, CALIFORNIA,

          Defendant.

Case No. 16-cv-05469-SI

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 55

On July 6, 2018, the Court held a hearing on defendant's motion for summary judgment. For the reasons set forth below, the Court GRANTS defendant's motion.

## BACKGROUND

This lawsuit arises out of plaintiff Wade Derby's employment with the City of Pittsburg ("the City"). Derby was hired by the City as a police officer with the Pittsburg Police Department ("PPD") in 1998. He was employed by the City for twenty-eight years in various roles. By 2009, Derby was the lead investigator in charge of the PPD's professional standards, or internal affairs ("IA"), investigations. He continued in this role until his separation from the City on January 8, 2016.

## I.    IA investigation of hostile work environment allegations against plaintiff and resulting Settlement Agreement

In March 2012, a female coworker named Cassie Wilkerson accused Derby of creating a hostile work environment based on her gender, and she filed an internal complaint against him. The allegations of the internal complaint were sustained after an IA investigation conducted by then-Police Captain Brian Addington[1] and then-Police Lieutenant Michael Perry.  Perry Decl. ¶¶ 3-5, Ex. 1 (IA report regarding Wilkerson's allegations) (Dkt. No. 60); Addington Decl. ¶¶ 5-11, Ex. C (transcript of IA interview with plaintiff regarding allegations) (Dkt. No. 57).  Perry and Addington state that they found Wilkerson's allegations sustained based upon their review of the evidence, including the fact that plaintiff admitted that he made certain comments to Wilkerson, such as "if polygamy were legal, he would want her to be one of his wives," that plaintiff loved Wilkerson, and a conversation during which plaintiff asked Wilkerson what kind of feminine hygiene products she used and whether she wore thong underwear.  Perry Decl., Ex. 1 at 39-42.[2]

At the conclusion of the IA investigation, the City determined that it was appropriate to discipline plaintiff.  Addington Decl. ¶ 12.  Plaintiff, represented by counsel,[3] and the City negotiated and entered into a Settlement Agreement and Release ("Settlement Agreement"), under which plaintiff tendered an "irrevocable resignation," effective January 8, 2016, in exchange for the City's agreement to not terminate or demote plaintiff.  Addington Decl., Ex. D ¶¶ 3, 8.  The Settlement Agreement stated,

> [O]n or about March 12, 2012, the City received a complaint in which it was alleged that [plaintiff] engaged in harassing and/or inappropriate conduct;

---

[1] Addington became the Chief of Police on or around December 2012.  Addington Decl. ¶ 14.

[2] Based on interviews with multiple police officers, Addington and Perry also sustained Wilkerson's allegation that Derby referenced Wilkerson's breasts during a March 2011 conversation regarding an upcoming promotional examination, and they found that there were conversations, at which plaintiff and Wilkerson were present, during which officers would discuss the nickname for plaintiff's genitalia.  *Id.* at 38-44.

[3] Plaintiff was represented by his current counsel, Daniel Horowitz, during the IA investigation and the subsequent negotiations regarding the settlement agreement.  Addington Decl. ¶ 7; Derby Depo. at 147:2-9 (Dale Decl., Ex. 3, Dkt. No. 56).

. . . the City commenced an investigation into the allegations and . . . determined that the allegations are sustained;

. . . [plaintiff] has acknowledge[d] and/or admitted to much of the conduct alleged and found to be sustained in the Investigation and whereas the primary dispute between the parties is the level of discipline that should be imposed for [plaintiff's] misconduct; [and]

. . . the Parties want to enter into this Agreement providing for a final disposition of this matter and certain future terms of employment for [plaintiff] . . .

*Id*. at p. 1. The Settlement Agreement also stated that "[t]he purpose of this Agreement is to provide Employee with an opportunity to continue his City employment notwithstanding the misconduct that was sustained as described in the Investigation." *Id.* In executing the Settlement Agreement, plaintiff affirmed the following:

Employee understands and agrees that he is waiving any rights he has, may have had, or may have, to pursue any and all remedies available to him under any employment-related cause of action against the City, including, without limitation, any claims for discrimination, harassment, and/or retaliation, . . . the California Fair Employment and Housing Act (California Government Code § 12900 et seq.), . . . all provisions of the California Labor Code, . . . the Constitution of the United States, . . . claims of retaliation or whistle-blowing (including but not limited to California Labor Code § 1102.5, et seq., and Government Code § 12653), claims for breach of any type of contract, including written, oral, or implied, breach of any covenant, promise, or representation pertaining to [plaintiff's] employment and/or the resignation of employment by [plaintiff] from the City, whether expressed or implied, and all other claims arising in contract, tort or equity or under any other statute, federal, state or local up to the date of execution of this Agreement.

*Id.* ¶ 10. The Agreement further provided:

Each party hereto represents and agrees that he or it has carefully read and fully understands all of the provisions of this Agreement, that he or it has had the chance to consult with a representative (including, but not limited to an attorney), and that he or it is voluntarily, without any duress or undue influence on the party of or on behalf of any Party, entering into this Agreement.

*Id.* ¶ 15. The Settlement Agreement also included an integration clause. *Id.* ¶ 14 ("This Agreement shall constitute a single, integrated contract expressing the entire agreement between the Parties. Any prior agreements, promises, negotiations or representations written or oral, express or implied, relating to the subject matter of this Agreement, not expressly set forth in this Agreement, are of no force or effect between the Parties concerning the subject matter set forth herein.").[4]

---

[4] Plaintiff's argument that Addington "sold" the Settlement Agreement to plaintiff by promising to later amend the Agreement is barred by the terms of the Settlement Agreement and

3

## II.   *Wilkerson* state court lawsuit

In May 2013, Ms. Wilkerson filed a lawsuit against, *inter alia*, the City, plaintiff and Addington.  Dale Decl., Ex. 4.  Contra Costa Superior Court Judge Steven Austin granted partial summary judgment against Wilkerson in December 2014.  *Id*., Ex. 5.  In that order, Judge Austin dismissed Wilkerson's claims against Derby on the ground that Wilkerson did not file a timely claim with the government regarding her claims against Derby.  *Id*. at 10.  Judge Austin made no findings regarding the merits of Wilkerson's claims against Derby.

Counsel for Wilkerson filed a request for dismissal of the lawsuit on September 10, 2015. *Id*., Ex. 6.  The lawsuit was dismissed on September 28, 2015.  *Id*.[5]

## III.   Plaintiff's IA investigation of PPD Officers Ingram and Sibbitt and related *Pitchess*[6] hearings

After execution of the Settlement Agreement, plaintiff continued in his role as the primary investigator for professional standards investigations and was assigned to conduct almost all IA

---

thus irrelevant.  Further, plaintiff's statements in his declaration regarding the conversations he and Addington had regarding the negotiations over the Settlement Agreement are hearsay.  *See* Derby Decl. ¶¶ 2-3.  Similarly, the Court SUSTAINS defendant's hearsay and best evidence rule objections to paragraphs 8, 19, 25 and 29 of plaintiff's June 8, 2018 declaration and paragraphs 6-7 of plaintiff's supplemental declaration.  The Court also sustains defendant's objections to paragraphs 7, 11, 20-24, and 27 of the June 8, 2018 declaration and paragraph 9 of the supplemental declaration on the grounds that those paragraphs lack foundation and/or contain speculation.

[5] Plaintiff's counsel, Daniel Horowitz, has filed a declaration in which he makes various statements regarding the *Wilkerson* lawsuit and Ms. Wilkerson.  Dkt. No. 72-3.  For example, Mr. Horowitz states, "At her deposition in the civil lawsuit against Wade Derby et al., Officer Wilkerson admitted that some of the claims that she filed were prepared by her attorney and signed by her even though they were not accurate. . . ."  *Id.* ¶ 1.  Defendant objects to the entirety of the declaration as hearsay and lacking evidence establishing personal knowledge.  The Court SUSTAINS these objections.  Further, the Court finds that Mr. Horowitz's statements about the *Wilkerson* lawsuit are irrelevant to the issues presented in this lawsuit, namely whether defendant retaliated against plaintiff for his October 16, 2015 court testimony.  Plaintiff may not attempt to relitigate the Wilkerson IA investigation or civil lawsuit in this case.

[6] Under *Pitchess v. Superior Court*, criminal defendants may compel the discovery of evidence in the arresting law enforcement officer's personnel file that is relevant to the defendant's ability to defend against a criminal charge.  11 Cal. 3d 531, 536-40 (1974).  To obtain such information, a defendant must file a written motion with the appropriate court or administrative body and provide written notice to the government agency which has custody and control of the records.  *Alford v. Superior Court*, 29 Cal. 4th 1033, 1038 (2003) (citing Cal. Evid. Code § 1043).

investigations for the PPD. In 2014, he was assigned to conduct an IA investigation regarding PPD Officers Elizabeth Ingram and Michael Sibbitt. Addington Decl. ¶ 15. These officers later resigned from their employment effective August 4, 2014, prior to the completion of plaintiff's IA investigation. *Id.*

Plaintiff states in his June 8, 2018 declaration[7] that when Sibbitt and Ingram left the department, the IA investigation was terminated. Derby Decl. ¶ 11 (Dkt. No. 72-2). Plaintiff states that he is aware that there was also a criminal investigation that was opened regarding Sibbitt and Ingram, and that when those officers left the department the "criminal investigation file number was purged from our system." *Id.* ¶¶ 10-11. Plaintiff states that after Sibbitt and Ingram left the department, there were still numerous active cases involving these officers. Derby Decl. ¶ 12. Plaintiff states, "I began to notice that when Sibbitt and Ingram were the subject of a *Pitchess* motion that the files [Joyce Lowe][8] brought did not include my work or the now purged criminal case." *Id.* ¶ 15. Plaintiff states that he sent memos dated February 27, 2015, March 3, 2015, and May 4, 2015, to Addington in which he described his concerns about the Department not fulfilling its obligations to produce materials in response to *Pitchess* motions.[9]

---

[7] Plaintiff also filed a supplemental declaration on June 10, 2018. Dkt. No. 83.

[8] Joyce Lowe is the Records Manger for the PPD, and her job responsibilities include bringing relevant police files to *Pitchess* hearings. Lowe Decl. ¶¶ 2-3 (Dkt. No. 58); Derby Decl. ¶ 14.

[9] Plaintiff's declaration states that some of these memos are attached as exhibits to his declaration. Derby Decl. ¶¶ 17, 19 (stating a February 27, 2015 memo is attached as Exhibit 4 and that a May 4, 2015 memo is attached as Exhibit 5). However, those memos are not attached to plaintiff's declaration, and in fact there are no exhibits attached to plaintiff's declaration. *See* Dkt. No. 72-2. These memos do appear to be included in the exhibits filed at Docket No. 72-1 (a memo dated May 4, *2016* found at Exhibit 13, and a memo dated August 11, 2017, with handwriting changing the date to February 27, 2015, found at Exhibit 14). As defendant notes, the exhibits filed at Dkt. No. 72-1 are not supported by a declaration establishing the authenticity of any of the exhibits. Most of those exhibits are portions of transcripts from plaintiff's and Addington's depositions. As defendant cannot seriously dispute the authenticity of the deposition transcripts, the Court will admit the transcripts submitted at Dkt. No. 72-1. However, Exhibits 13 and 14 have not been authenticated. Plaintiff states in his declaration that when he printed out copies of memos that he authored, the computer automatically inserted a new date in the place of the memo's original date. Derby Decl. ¶ 17. Thus, while Exhibit 13 at Dkt. No. 72-1 may be the May 4, *2015* memo that plaintiff references in his declaration, the Court cannot, on this record, admit into evidence the memo dated May 4, 2016, nor can the Court admit Exhibit 14, for the same reasons.

5

Addington states,

> 16. Sometime after officers Sibbitt and Ingram resigned, Mr. Derby raised concerns to me that documents related to his investigation of Sibbitt and Ingram were not being disclosed in *Pitchess* hearings. When Mr. Derby raised these concerns, I had a good faith belief that the City was not doing anything improper related to *Pitchess* hearings. On or around September 16, 2015, I received a memorandum from Mr. Derby specifically raising these concerns. In response, I took steps to make sure that the documents were brought to the next *Pitchess* hearing relating to this topic. It is my understanding that these documents were in fact brought to the next *Pitchess* hearing related to this topic.

Addington Decl. ¶ 16.

On October 16, 2015, Judge Lewis Davis held a hearing in a state criminal case in which a criminal defendant had filed a *Pitchess* motion regarding Officer Sibbitt. Lowe Decl. ¶¶ 3-4. Ms. Lowe appeared at the hearing, and Judge Davis directed Ms. Lowe to contact the Department officer who conducted the IA investigation into Sibbitt − plaintiff − so that officer could come to court to answer Judge Davis' questions regarding the investigation. *Id.* ¶ 5; Derby Depo. at 93:25-95:7 (found at Dale Decl., Ex. 3, Dkt. No. 56). Ms. Lowe then contacted plaintiff, and in response plaintiff appeared in court and testified in-camera regarding the Sibbitt IA investigation and file. Derby Depo. at 111:11-13, 113:2-114:13, 115:11-116:9, 116:18-117:9.

## IV. Negotiations regarding plaintiff continuing to work past January 8, 2016

At some point after plaintiff signed the Settlement Agreement, plaintiff asked Addington about the possibility of continuing his employment beyond January 8, 2016. Addington Decl. ¶ 17. Addington states in his declaration,

> 17. Under the terms of the agreement and resignation form Mr. Derby signed . . ., Mr. Derby had tendered an irrevocable resignation regarding his employment effective January 8, 2016. I thought that the agreement was legally enforceable and that it was appropriate to follow the agreement's terms. After his execution of this agreement and resignation form, Mr. Derby asked me if he could continue working beyond his January 8, 2016 resignation date. It is my understanding that the agreement did not permit Mr. Derby to continue working past January 8, 2016. I was the individual who made the decision on the City's behalf regarding whether Mr. Derby could continue working past his resignation date.
>
> 18. I made the decision to offer Mr. Derby the opportunity to continue his employment past January 8, 2016 under specific conditions generally tied to the amount of leave time he had accrued during his employment with the City. On October 5, 2015, I sent Mr. Derby an email which attached a proposed amendment

to his agreement. . . . The amendment contained the only terms under which I would allow Derby to have a working relationship of any sort after January 8, 2016.

Addington Decl. ¶¶ 17-18.  The proposed "First Amendment to the Settlement Agreement and Release," provided,

### FIRST AMENDMENT TO THE SETTLEMENT AGREEMENT AND RELEASE

This document constitutes the First Amendment to the Settlement Agreement and Release ("Agreement") entered into between Wade Derby ("Employee") and the City of Pittsburg ("City") on or about October 29, 2012 (copy attached).

### RECITALS

WHEREAS, as part of the Agreement, Employee tendered his irrevocable resignation, effective January 8, 2016, and the City accepted Employee's irrevocable resignation.

WHEREAS, Employee has requested to amend the effective date of his irrevocable resignation.

WHEREAS, the Parties want to enter into a mutually agreed upon revision to the Agreement to amend Employee's date of resignation to be effective as described below and no later than June 3, 2016.

WHEREAS, the Parties mutually agree that all other terms, conditions and waivers in the Settlement Agreement remain unchanged.

NOW, THEREFORE, based upon the foregoing Recitals, the Parties agree to amend the Agreement as follows:

1.  Paragraph 3[10] is replaced with the following:

By signing below, Employee hereby tenders his irrevocable resignation, to be effective on the earlier of either:  (1) the date that employee exhausts his accrued vacation, administrative leave, Floating Holidays, and up to 32 hours of personal necessity leave hours, but not sick leave; or (2) June 3, 2016.  By signing below, the City hereby accepts Employee's irrevocable resignation.

The parties agree that, effective January 8, 2016, Employee will be placed on a Leave of Absence (Other than Family Medical Leave) pursuant to Rule 26 of the City's Personnel Rules.  This leave will be unpaid, except that Employee may use any accrued vacation, administrative leave, Floating Holidays, and up to 32 hours personal necessity leave, during the period of January 8, 2016 through the effective date of his resignation.  The Parties agree that Employee is not permitted to use sick leave or any personal necessity leave hours in excess of 32 hours during this period.  Employee will continue to accrue vacation credits, sick leave credits,

---

[10]  Paragraph 3 of the Settlement Agreement provided, "Employee hereby tenders his irrevocable resignation, effective January 8, 2016.  A copy of this resignation is attached hereto as Exhibit A."  Addington Decl. Ex. D.

holiday pay, health and welfare benefits, salary advancement and other similar benefits while on leave. Employee will be permitted to participate in City benefit programs to the same extent as any other employees.

While on leave, Employee shall not perform any work on behalf of the City, unless specifically directed to by the City in writing. If Employee is assigned work to be performed after his placement on leave on January 8, 2016, Employee will be required to complete time cards detailing the number of hours worked and will be compensated for the hours worked at his hourly rate of pay.

Upon his effective date of resignation, Employee will receive compensation for any unused, accrued leave time pursuant to City policies and the applicable Memorandum of Understanding.

2. Except as reflected in Paragraph 1 above, the Parties agree that all other provisions of the Agreement remain unchanged.

Addington Decl., Ex. E.

On October 5, 2015, plaintiff responded by email to Addington. *Id.*, Ex. F. Plaintiff stated that his attorney Dan Horowitz had reviewed the proposed amendment and "said it will not work as there are no written assurances and suggested both interested sides go to a confidential mediation to resolve this." *Id.* Addington states, "Because Mr. Derby rejected the only terms under which I would permit him to have a working relationship with the City past January 8, 2016, I decided on October 5, 2015 that I would end all discussions with Mr. Derby regarding his potential continued employment with the City and the City would proceed with the terms of his signed agreement and his tendered resignation effective January 8, 2016." Addington Decl. ¶ 19.

Plaintiff and Addington met on October 6, 2015, and during that meeting Addington informed plaintiff that the City would proceed with the terms of plaintiff's irrevocable resignation effective January 8, 2016. *Id.* ¶ 20. On October 12, 2018, plaintiff sent Addington a memo documenting their conversation on October 6, including the fact that Addington had "informed me that the City of Pittsburg is expecting my resignation from service effective on 1-8-16." Addington Decl., Ex. G.

After October 6, 2015, plaintiff continued to ask Addington about whether he could stay on with the department after January 8, 2016, including requesting that he be permitted to work on a per diem basis and/or in a volunteer reserve capacity. Addington Decl. ¶ 21. Addington denied all of these requests. *Id.*

Plaintiff filed this lawsuit on September 26, 2016. The operative complaint is the second

amended complaint ("SAC"). Dkt. No. 32. In orders filed February 23, 2017 and April 24, 2017, the Court granted in part and denied in part defendant's motions to dismiss the first and second amended complaints. As relevant here, the Court held that plaintiff had alleged sufficient facts to state claims for retaliation claim under 42 U.S.C. § 1983 and California law with respect to his October 2015 testimony in court.[11] The Court found that plaintiff had alleged that he engaged in protected activity by testifying in court about defendant's failure to disclose the existence and contents of the internal affairs investigation against Officers Ingram and Sibbitt, and that plaintiff alleged that defendant took various adverse actions against him by, *inter alia*, terminating negotiations to extend plaintiff's employment with the City, refusing to provide plaintiff with per diem employment following his retirement, falsely reporting that plaintiff's reason for separation was dismissal, as opposed to retirement, and failing to purge plaintiff's internal affairs file of the prior sexual harassment allegations in violation of standard policy and practice. The Court also held that "[b]ecause the October 2015 court appearance is the only specific protected activity alleged in the SAC that falls within the various statutes of limitations, the Court finds that plaintiff has not stated a claim for retaliation prior to that court appearance." Dkt. No. 37 at 12.

Defendant has moved for summary judgment on plaintiff's First Amendment retaliation claim, and claims for retaliation under California's Fair Employment and Housing Act ("FEHA") and California Labor Code § 1102.5. Plaintiff opposes the motion with regard to his claims under the First Amendment and the Labor Code, and concedes that summary judgment on the FEHA claim is warranted.

## LEGAL STANDARD

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party

---

[11] The SAC alleged that the court appearance was on October 6, 2015, and that defendant ended negotiations regarding the possibility of extending plaintiff's employment on October 19, 2015. SAC ¶¶ 57, 63 (Dkt. No. 32).

bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to produce evidence showing the absence of a genuine issue of material fact. *Id.* at 325. Rather, the burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. *Id.*

Once the moving party has met its burden, the burden shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting then Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment . . . ." *Id.* However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elec. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). The evidence the parties present must be admissible. Fed. R. Civ. P. 56(c)(4).

## DISCUSSION

### I. First Amendment retaliation under 42 U.S.C. § 1983

The Court has previously held that plaintiff's alleged protected activity is the October 2015 court appearance, and that only those adverse acts that occurred after that court appearance are actionable. See Dkt. No. 37 at 11-12. The undisputed evidence shows that the court appearance was on October 16, 2015.

### A. The October 16, 2015 court testimony is not protected activity under the First Amendment

Defendant moves for summary judgment on plaintiff's First Amendment retaliation claim on the ground that plaintiff's testimony at the October 16, 2015 court appearance is not protected under the First Amendment. Defendant argues that when plaintiff spoke at the October 16, 2015 court appearance, it was in his capacity as a police officer and pursuant to his official job duties, and not in his capacity as a private citizen. Defendant cites cases holding that "[a] public employee's speech is not protected by the First Amendment when it is made pursuant to the employee's official job responsibilities." *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1071 (9th Cir. 2012); *see also Hagen v. City of Eugene*, 736 F.3d 1251, 1257-58 (9th Cir. 2013) (Speech "which owes its existence to an employee's professional responsibilities is not protected by the First Amendment.").

As support, defendant cites the declaration of Joyce Lowe as well as plaintiff's deposition testimony. Ms. Lowe is the Records Manager for the PPD, and she states,

> 3. As part of my job responsibilities, on October 16, 2015 I attended a hearing in the case *The People of the State of California v. Kevin Jerome Easter* in the Martinez courthouse of the Superior Court of California, County of Contra Costa before Judge Lewis A. Davis.
>
> 4. I attended an in chambers review with Judge Davis during this hearing. This review addressed former Department officer Michael Sibbitt, and partially addressed an investigation the Department had conducted regarding Mr. Sibbitt. I brought documents to this in-chambers review which I understood were related to the internal affairs investigation of Mr. Sibbitt.
>
> 5. Judge Davis had several questions regarding this investigation and the related documents, and directed me to contact the Department officer who conducted this investigation in order to provide additional information to Judge Davis.
>
> 6. I understood that Department Lieutenant Wade Derby had conducted the investigation of Mr. Sibbitt. As a result, I called Mr. Derby on October 16, 2015 and directed him to appear at the Martinez courthouse so he could provide additional information to Judge Davis regarding his investigation. I only contacted Mr. Derby because he was the individual who I understood had conducted the investigation of Mr. Sibbitt.

Lowe Decl. ¶¶ 3-6 (Dkt. No. 55).[12]   In his deposition, plaintiff testified that he provided the

---

[12] Although plaintiff's declaration suggests that he had decided prior to the October 16, 2015 hearing that he would attend the hearing and that "Joyce Lowe would not be alone," Derby Decl. ¶ 21, plaintiff testified at his deposition that Ms. Lowe called him on October 16 and told

following testimony at the October 16, 2015 hearing: (1) a detailed chronology of his documents and notes relating to his IA investigation of Sibbitt; (2) a summary of his "actual IA investigation"; (3) in response to a question from Judge Davis, a statement that it was "his understanding" that the documents he was providing had not been previously disclosed;[13] (4) explanations of what different documents were and of police terminology; and (5) an "introductory hello and goodbye." Derby Depo. at 111:11-13, 113:2-114:13, 115:11-116:9; 116:18-117:9.

The Supreme Court has held that public employees enjoy First Amendment protection when they "speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). But "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421 (holding that deputy district attorney who wrote memo to supervisor regarding misconduct by an officer in a criminal case did not engage in protected conduct). This rule applies "no matter how much a matter of public concern" the speech addresses. *Coomes v. Edmonds Sch. Dist. No. 15*, 816 F.3d 1255, 1260 (9th Cir. 2016).

Moreover, an employee's preparation "of a routine report, pursuant to normal departmental procedure, about a particular incident or occurrence" typically falls within that employee's job duties and is thus not entitled to First Amendment protection. *Dahlia v. Rodriguez*, 735 F.3d 1060, 1075 (9th Cir. 2013) (en banc); *see Karl*, 678 F.3d at 1071 (9th Cir. 2012). Even reports of corruption, abuse, or harassment fall into this "routine" category if the public "employee's regular job duties involve investigating such conduct, e.g., when the employee works for Internal Affairs or another such watchdog unit." *Dahlia*, 735 F.3d at 1075; *see also Freitag v. Ayers*, 468 F.3d 528, 546 (9th Cir. 2006) (corrections officer's reports, made on internal forms, documenting

---

him that he needed to attend the hearing because he had conducted the IA investigation into Sibbitt and Ingram. Derby Depo. at 93:25-95:7.

[13] Derby later clarified that it "had been disclosed to the City Attorney at the very first *Pitchess* that there was a[n IA] file." *Id.* at 115:16-18.

inmate sexual misconduct were not protected speech because reports were submitted "pursuant to her official duties as a correctional officer").

The Ninth Circuit has articulated the relevant First Amendment inquiry as "a sequential five-step series of questions":

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009). The plaintiff has the burden of satisfying the first three factors. *Karl*, 678 F.3d at 1068; *Eng*, 552 F.3d at 1071. If the plaintiff meets his burden, "the burden shifts to the government to escape liability by establishing either that: (4) the state's legitimate administrative interests outweigh the employee's First Amendment rights; or (5) the state would have taken the adverse employment action even absent the protected speech." *Karl*, 678 F.3d at 1062.

Plaintiff argues that his speech was protected under the First Amendment because he spoke on a matter of public importance. Plaintiff argues that his speech at the October 16, 2015 hearing is protected because he exposed government wrongdoing, namely the department's failure to comply with its obligations to provide Brady material at *Pitchess* hearings. Plaintiff also notes the fact that at the October 16, 2015 hearing, his attorney Dan Horowitz informed Judge Davis that the proceeding was a whistleblowing matter. Derby Depo. at 110:3-16 (Dkt. No. 72-2, Ex. 10).[14] Plaintiff argues that this case is similar to *Karl v. City of Mountlake Terrace*, 678 F.3d 1062 (9th Cir. 2012). In *Karl*, the Ninth Circuit affirmed the district court's ruling that it was clearly established in December 2008 that a supervisor cannot retaliate against a public employee for his or her subpoenaed deposition testimony offered as a citizen in the context of a civil rights lawsuit. Plaintiff cites the portion of *Karl* in which the Ninth Circuit agreed with the district court that the

---

[14] Plaintiff testified that after he received Ms. Lowe's phone call informing him that Judge Davis wanted to speak to him regarding the Sibbitt IA investigation, plaintiff called Mr. Horowitz and asked him to accompany him to the hearing. Mr. Horowitz did not accompany plaintiff into the in-camera portion of the hearing. *Id.* at 106:16-21.

employee spoke on matters of public concern. However, plaintiff's briefing does not address *Karl*'s separate holding that the employee in that case spoke as a private citizen and not pursuant to her official work duties. The Ninth Circuit noted,

> The Supreme Court has explained that "work product" which "owes its existence to a public employee's professional responsibilities" is not protected by the First Amendment because an employer may "exercise . . . control over what the employer itself has commissioned or created." [*Garcetti v. Ceballos*, 547 U.S.] at 421–22, 126 S.Ct. 1951; *see Eng*, 552 F.3d at 1075. "[I]f the public employee was paid for the speech—e.g., drafting a memorandum, creating a report, advising a supervisor—then that compensation might be indicative of the nature of the speech." *Huppert*, 574 F.3d at 704. Conversely, a public employee's speech on a matter of public concern is protected "if the speaker 'had no official duty' to make the questioned statements, . . . or if the speech was not the product of 'perform[ing] the tasks [the employee] was paid to perform.'" *Posey*, 546 F.3d at 1127 n. 2 (some internal quotation marks omitted; alterations added in Posey) (quoting, respectively, *Marable v. Nitchman*, 511 F.3d 924, 932–33 (9th Cir. 2007), and *Freitag v. Ayers*, 468 F.3d 528, 544 (9th Cir. 2006)).

*Id*. at 1071. The Ninth Circuit affirmed the district court's holding that the employee spoke as a private citizen when she provided testimony, pursuant to a subpoena, in a civil rights case. The court held, "[w]hile Karl's knowledge about certain work-related matters may owe its existence to her job as a confidential assistant, her testimony in the *Wender* litigation does not. That Karl was subpoenaed to testify on matters related to her employment is not dispositive. . . . Furthermore, though her employer may have paid her regular salary while she was being deposed, Karl's testimony in the *Wender* litigation was the product of a subpoena and cannot fairly be characterized as "commissioned or created" by the City." *Id*. at 1072; *see also Dahlia*, 735 F.3d at 1074-75 (discussing factors relevant to determining whether an employee spoke as a private citizen versus pursuant to his official duties).

The Court concludes that plaintiff's speech at the October 16, 2015 hearing is not protected under the First Amendment because plaintiff spoke in his capacity as a police officer and not as a private citizen. The evidence shows that plaintiff was responsible for conducting IA investigations and that he was assigned to investigate Sibbitt; that Judge Davis asked to speak with the officer who had conducted the IA investigation of Sibbitt; that plaintiff's testimony to Judge Davis pertained solely to his work on the IA investigation of Sibbitt as well as other routine police matters, such as identification of various documents. Derby Depo. at 111:11-119:7 (describing

14

substance of his testimony during hearing). In response to the question, "So you felt like at any time that you were there at the courthouse, you had some responsibility, were there to satisfy your responsibilities of working with the City relevant to the *Pitchess* motion?" Derby responded "Absolutely." *Id*. at 119:19-23.

Although it is plaintiff's burden to show that he spoke as a private citizen, plaintiff has not submitted any evidence suggesting that his court appearance was not pursuant to his official job duties.[15] Moreover, plaintiff does not dispute that all of his testimony pertained to his work on the Sibbitt IA investigation, and that he attended the hearing as part of his job duties. *See* Derby Depo. at 94:15-24 (testifying that he was directed to appear at the hearing because of his role in the Sibbitt IA investigation). Plaintiff suggests that his answer to Judge Davis that certain IA documents had not been previously provided constitutes protected speech. The evidence on this point comes from plaintiff's deposition:

> Q. So other than comments you made about what was in your IA documents and comments that you made about how you actually did the Internal Affairs investigation, what else -- I just want to make sure I'm being complete. Is there anything else you said or discussed in that in-camera hearing in October of 2015?
>
> A. I believe at some point the conversation came up about whether or not there had been disclosure of these documents at any time previously.
>
> Q. You said you think that topic came up. As you sit here today, do you have a recollection that topic did come up?
>
> A. It did definitely come up. I just -- I believe at this time right now that is where I'm basing my recollection, that it did take place.
>
> Q. And who raised this topic of whether the documents had previously been disclosed?

_____

[15] Plaintiff's opposition focuses on whether plaintiff spoke on a matter of public concern, and does not address whether plaintiff spoke as a private citizen or a public employee. At the hearing, however, plaintiff's counsel argued for the first time that plaintiff spoke as a private citizen because he spoke "outside the chain of command" by giving testimony to Judge Davis, and that his speech took place "outside the workplace" because it occurred in a courthouse. The Court finds that plaintiff has not submitted any evidence in support of the assertion that plaintiff spoke as a private citizen when he provided testimony to Judge Davis. To the contrary, the evidence shows that plaintiff was acting in his capacity as a police officer when he provided testimony about the IA investigation. The fact that Judge Davis was not plaintiff's supervisor does not show that plaintiff spoke as a private citizen because plaintiff appeared in court in response to Judge Davis summoning him because plaintiff was the officer responsible for the IA investigation of Officer Sibbitt.

A.      The judge.

Q.      And what, if anything, did you say related to that?

A.      I told him it was my understanding that they had not been previously disclosed.

Derby Depo. at 114:14-115:10. Thus, according to plaintiff, Judge Davis asked him whether the IA documents had been previously provided, and plaintiff said that they had not. The fact that plaintiff answered Judge Davis' question regarding the production of the documents during a court appearance that was required as part of his job shows that the testimony at issue was made in his capacity as a public employee.[16]

On this record, the Court finds that plaintiff has failed to meet his burden to show that his October 16, 2015 court testimony was given in his capacity as a private citizen, and accordingly that testimony is not protected under the First Amendment. As such, plaintiff's First Amendment retaliation claim, which is premised on the October 16, 2015 court testimony being protected, fails.[17]

**B.      Even if plaintiff engaged in protected activity, there is no causal connection to the alleged adverse actions**

Plaintiff claims the following 14 acts are retaliatory: (1) terminating negotiations regarding extending plaintiff's employment past January 8, 2016; (2) refusing to reopen plaintiff's IA investigation regarding the Wilkerson sexual harassment complaint; (3) banning plaintiff from department photos; (4) banning plaintiff from department ceremonies; (5) Addington and Raman

---

[16] The fact that Mr. Horowitz purportedly told Judge Davis that it a "whistleblowing" matter does not change the Court's analysis because the record shows that plaintiff provided testimony pursuant to his job duties.

[17] To the extent that plaintiff now claims that his "whistleblowing" activities throughout 2014 and 2015 but prior to the October 16, 2015 hearing (such as internal memos he wrote to Addington regarding disclosure of IA documents) are the protected activities for which he was retaliated against, that argument fails for a number of reasons. First, the Court previously held that the October 2015 court hearing was the only protected activity that was actionable. Second, because the internal memoranda that plaintiff references were prepared by plaintiff pursuant to his official job duties, it is doubtful whether those memos are protected under the First Amendment. Finally, even if those memos constituted protected speech, plaintiff has failed to show a causal connection between the memos and any alleged adverse action. For example, those memos were written months *before* Addington offered plaintiff the proposed amendment to the settlement agreement, and thus those memos cannot be the basis for the termination of the negotiations.

16

warning plaintiff he had "enemies"; (6) plaintiff not receiving anticipated promotions; (7) plaintiff not being invited to meetings; (8) failing to assign plaintiff to an acting captain position; (9) not allowing plaintiff to work for the PPD on a per diem basis past January 8, 2016; (10) failing to "purge" plaintiff's IA records; (11) denying plaintiff's request to assume reserve officer status upon his resignation on January 8, 2016; (12) Chief Addington's December 4, 2015 letter; (13) failing to remove the settlement agreement from plaintiff's personnel file; and (14) incorrectly reporting on a personnel action form that that plaintiff was "dismissed" and not retired.

Plaintiff's retaliation claim fails for the additional reason that there is no triable issue of fact as to causation. A plaintiff alleging First Amendment retaliation must show that the protected speech "was a substantial or motivating factor in the adverse employment action." *Eng*, 552 F.3d 1070. Here, a number of the alleged adverse actions occurred prior to the October 16, 2015 court appearance, and thus even if plaintiff's court testimony constitutes protected speech, that speech could not have been a motivating factor in actions that preceded the testimony. In addition, plaintiff has failed to raise a triable issue of fact regarding the adverse acts that occurred after the October 16, 2015 hearing.

### 1.     Adverse acts that occurred prior to the October 16, 2015 hearing

The primary adverse action that plaintiff challenges is Chief Addington ending the negotiations over the possibility of plaintiff extending his employment past the previously agreed-upon resignation date of January 8, 2016. The evidence shows that on October 5, 2015, Addington sent plaintiff an email containing a draft amendment to the settlement agreement that would have allowed plaintiff to "tender[] his irrevocable resignation, to be effective on the earlier of either (1) the date that employee exhausts his accrued vacation, administrative leave, Floating Holidays, and up to 32 hours of personal necessity leave hours, but not sick leave; or (2) June 3, 2016." Addington Decl., Ex. E; Addington Decl. ¶ 18. That same day, plaintiff responded to Addington in an email and rejected the proposed amendment because "there are no written assurances." Addington Decl. Ex. F; Addington Decl. ¶ 19; Derby Depo. at 190:10-21. Derby Depo. at 191:2-193:4. Addington states in his declaration that "[b]ecause Mr. Derby rejected the

17

only terms under which I would permit him to have a working relationship with the City past January 8, 2016, I decided on October 5, 2015 that I would end all discussions with Mr. Derby regarding his potential continued employment with the City and the City would proceed with the terms of his signed agreement and his tendered resignation effective January 8, 2016." Addington Decl. ¶ 19. Addington and Derby met on October 6, 2015, and during that meeting Addington informed plaintiff that the City would proceed with the terms of plaintiff's irrevocable resignation effective January 8, 2016. *Id.* ¶ 20.

The record shows that the negotiations ended on October 5-6, 2015, after *plaintiff* rejected Addington's proposed amendment to the settlement agreement. Although plaintiff attempts to characterize those negotiations as ongoing after the October 16, 2015 court appearance,[18] the parties' emails and memos demonstrate that the negotiations ended on October 5-6, and that on October 6, 2015, Addington told plaintiff that the City was proceeding with the terms of the Settlement Agreement and plaintiff's irrevocable resignation. Accordingly, plaintiff cannot show a causal connection between the termination of the negotiations and the October 16, 2015 court testimony.

Plaintiff asserts that there is a causal connection between his court testimony and the ending of negotiations because Addington "knew" that plaintiff would be testifying at the October 16, 2015 hearing, and thus that Addington sent plaintiff the proposed amendment as a "bribe"[19] to

---

[18] Plaintiff argues that Addington ended the negotiations in an October 19, 2015 memo from Addington to plaintiff. As an initial matter, plaintiff filed this memo as Exhibit 11 to the unauthenticated exhibits found at Dkt. No. 72-1, and thus the memo is inadmissible for the reasons stated *supra* in footnote 9. In any event, even if the memo was admissible, the memo states, *inter alia*, "While the City was willing to allow you to use leave from January 8, 2016 until your leave would have been exhausted, you rejected that offer." Dkt. No. 72-1, Ex. 11. Thus, Addington's October 19, 2015 memo shows, consistently with the rest of the record, that the negotiations ended after plaintiff rejected Addington's proposal on October 5, 2015 and Addington decided to proceed with the terms of the Settlement Agreement and plaintiff's irrevocable resignation.

[19] At the hearing, plaintiff's counsel asserted that the Proposed Amendment required plaintiff to waive his "whistleblowing" claims and that plaintiff refused to sign the proposal on that basis. The Court notes, however, that the Proposed Amendment did not contain such a waiver, and instead counsel's argument relied on the fact the Proposed Amendment would amend the original Settlement Agreement, which contained a waiver of all claims. Further, although plaintiff may now assert that he rejected the Proposed Amendment because he did not want to release whistleblowing claims, plaintiff's October 5, 2015 email to Addington stated that he was

18

coerce plaintiff into "staying silent" at the October 16, 2016 hearing. However, plaintiff has not submitted any evidence that Addington knew about the October 16, 2016 hearing or that plaintiff would be testifying at that hearing (and plaintiff's own deposition testimony suggests that he did not know he would be testifying at the hearing until the day of). Furthermore, even if Addington knew that plaintiff would be testifying at the October 16, 2016 hearing, the record shows that the negotiations ended because *plaintiff* rejected Addington's offer on October 5, 2015, and the City has submitted undisputed evidence that Addington's October 5, 2015 proposal to plaintiff "contained the only terms under which [Addington] would allow Derby to have a working relationship of any sort with the City after January 8, 2016." Addington Decl. ¶ 18. Addington was under no obligation to continue negotiating with plaintiff, and it is undisputed that in 2012 plaintiff had tendered an irrevocable resignation effective January 8, 2016. *Cf. Morris v. McHugh*, 997 F. Supp. 2d 1144, 1164 (D. Haw. 2014) ("Refusing to accept Plaintiff's rescission of the settlement agreement that Plaintiff signed on February 1, 2008, was not an adverse action. Here, Defendant simply refused to permit Plaintiff to withdraw his decision because it believed Plaintiff was irrevocably bound to the terms of the settlement agreement. An employee's commitment to resign under the terms of a settlement agreement is a valid reason for an employer to refuse to accept his withdrawal of that resignation.").

The following additional alleged adverse actions occurred prior to the October 16, 2015 court testimony, and therefore to the extent plaintiff's retaliation claim is based on these actions, the claim fails for the same reasons articulated above:

The denial of the acting captain job and another possible temporary acting captain job during the summer of 2015. Derby Depo. at 197:24-201:1; Addington Decl. ¶ 26. Further, the City has produced undisputed evidence that the reason for the denials was (1) the City Manager's concern that assigning plaintiff to the acting captain position would constitute "retirement spiking" and (2) the temporary position was ultimately not created. Addington Decl. ¶ 26.

Denial of per diem employment after January 8, 2016. Plaintiff testified that in 2015 he

rejecting the proposal because "there are no written assurances." Addington Decl., Ex. F.

19

asked Addington if he could work on a per diem basis after January 8, 2016, and that Addington denied his request. Derby Depo. at 233:4-234:9, 238:2-7. Derby testified that he first became aware of Addington denying this request when Addington told him that "there was no more negotiation, everything was irrevocable." Derby Depo. at 235:24-236:4. As discussed *supra*, that occurred on October 6, 2015 when Addington and Derby met and Addington told Derby that the negotiations were over and that the City was proceeding with the terms of the Settlement Agreement. Further, the City has submitted undisputed evidence that the Proposed Amendment contained the only terms under which Addington would agree to allow plaintiff to work past January 8, 2016. Addington Decl. ¶ 18.

Repeated refusals to reopen plaintiff's IA investigation. Plaintiff testified this occurred in 2013, 2014 and early 2015. Derby Depo. at 202:22-203:22, 254:19-255:14, 262:24-263:25; Addington Decl. ¶ 32.[20] Further, although plaintiff asserts that the City should have reopened the IA investigation based upon the dismissal of Wilkerson's civil lawsuit, nothing in the Settlement Agreement required the City to reopen the IA investigation under any circumstances. Moreover, the City has submitted undisputed evidence that plaintiff admitted various allegations that were sustained in the IA investigation, and the dismissal of Wilkerson's civil claims against plaintiff was on procedural grounds, not based upon a finding that plaintiff was innocent of the charges.

Banned from department photos. Plaintiff testified that this occurred in approximately 2009 and continued until Addington became Chief; Addington became Chief in late 2012. Derby Depo. at 264:8-265:12; Addington Decl. ¶ 14.

Banned from department ceremonies. Plaintiff testified that this occurred prior to 2013. Derby Depo. at 266:22-268:3, 269:14-22; Addington Decl. ¶ 33.

Addington and Raman warning plaintiff that he had "enemies." Plaintiff testified that this

_____

[20] One denial came on plaintiff's last day of work. Derby testified he did not know why Addington denied any of his requests. Derby Depo. at 255:1-3. Plaintiff has not raised a triable issue of fact regarding the denial that occurred on plaintiff's last day of work because that denial was consistent with all of Addington's prior denials. Plaintiff testified he did not know why Addington denied his requests, and Addington has testified that he denied these requests because determined that the allegations against plaintiff were sustained and that plaintiff had not provided or referred to any evidence that exonerated him from the specific factual allegations that had been sustained, nor had plaintiff demonstrated that those allegations were false. Addington Decl. ¶ 32.

occurred in 2013 and as late as 2015 when the *Wilkerson* lawsuit was pending (that lawsuit was dismissed in September 2015). Derby Depo. at 271:10-272:7, 273:3-16, 274:19-22; Dale Decl., Ex. 6.

Not receiving anticipated promotions. Plaintiff testified that he did not receive a promotion to captain sometime during Chief Baker's tenure and that Chief Baker told him he was not going to promote him because plaintiff did not "play ball." Derby Depo. at 275:22-276:8. Chief Baker retired in late 2012. Addington Decl. ¶ 34. Plaintiff also alleged that he did not get a promotion he sought in 2014. SAC ¶ 54. The City has provided undisputed evidence that Addington decided not to give plaintiff this promotion because Addington retained a panel of third-party law enforcement experts to assist him with this promotion, and that panel reported that plaintiff was not qualified for the position. Addington Decl. ¶ 34.

Not being invited to command-level staff meetings. Plaintiff testified this happened in 2014 and 2015, with the last such meeting occurring in January 2015. Derby Depo. at 280:8-281:10. The City has also provided undisputed evidence showing that, for one of the meetings (a December 2014 command staff sexual harassment training), plaintiff was not invited due to an inadvertent error. Wentz Decl. ¶¶ 3-4.

Purging of plaintiff's IA files. Plaintiff claims that when he signed the Settlement Agreement, Addington told him that his "IA files would be purged" when plaintiff left the department. At some point plaintiff requested that his IA files be purged, and he was told that they could not be because the *Wilkerson* civil lawsuit was still pending. Derby Depo. at 206:25-208:10; Addington Decl. ¶ 24 ("I understand that the City has an obligation not to destroy potential evidence once a lawsuit has been filed and/or as soon as the City becomes aware that a potential lawsuit could be filed against it."). The *Wilkerson* lawsuit was pending between May 1, 2013 and September 10, 2015. Dale Decl., Ex. 4, 6. Plaintiff testified that he asked a second time about having his IA files purged, and that he was told that they could not be purged because the City was aware that plaintiff had threatened to file a lawsuit. Derby Depo. at 221:18-21. The evidence shows that Addington became aware of plaintiff's threat to potentially file a lawsuit by October 12, 2015, when plaintiff sent the memo to Addington stating that he was refusing to

resign, and cc'ing his attorney, Daniel Horowitz. Addington Decl. ¶ 25, Ex. G. Even if the second denial came after the October 16, 2015 hearing, the City has provided undisputed evidence of a legitimate, non-retaliatory reason for preserving the IA files, namely the City's legal obligation not to destroy evidence potentially relevant to threatened litigation. Finally, to the extent plaintiff claims that the failure to "purge" his IA files caused him to lose employment with Stanislaus County, plaintiff has not provided any admissible evidence in support of that claim, as plaintiff's statements about what Stanislaus County employees told him are inadmissible hearsay. *See* Derby Supp. Decl. ¶¶ 6-7.[21]

### 2. Adverse actions occurring after October 16, 2015 hearing

Plaintiff challenges as retaliatory the following adverse actions that occurred after the October 16, 2015 hearing: (1) denying plaintiff's request to assume reserve officer status upon his resignation on January 8, 2016; (2) Chief Addington's December 4, 2015 letter; (3) failing to remove the Settlement Agreement from plaintiff's personnel file; and (4) incorrectly reporting on a personnel action form that that plaintiff was "dismissed" and not retired. Plaintiff has failed to raise a triable issue of fact as to any of these alleged adverse actions.

Unpaid reserve officer. In December 2015, plaintiff requested the opportunity to be able to work as an unpaid reserve officer. Derby Depo. at 245:6-246:1, 247:1-5, 287:3-6. Addington denied that request. Plaintiff does not know why Addington denied this request and he does not have any facts suggesting that this denial was connected to the October 16, 2015 court appearance. Derby Depo. at 247:6-14, 248:22-249:11. Addington has testified that he denied plaintiff's request because plaintiff rejected the only terms under which Addington would permit Derby to perform work of any sort for the City past January 8, 2016. Addington Decl. ¶ 29. Thus, plaintiff has not raised a triable issue of fact as to any retaliatory motive.

---

[21] Plaintiff's opposition is replete with assertions that lack evidentiary support. For example, plaintiff claims that his October 16, 2015 testimony led to the reversal of 15 criminal convictions. *See* Opp'n at 2 (Dkt. No. 72). As support, plaintiff cites his own declaration, in which he states, "I appeared at the hearing and told the truth. Judge Davis released materials that later was used to exonerate over 15 people." Derby Decl. ¶ 27. As defendant correctly objects, this statement is inadmissible because plaintiff does not establish a foundation.

<u>December 4, 2015 memo</u>.  On December 4, 2015, Addington sent plaintiff a letter stating that the City was prepared to terminate plaintiff due to his previous misconduct regarding Wilkerson.  Addington Decl., Ex. J.  The December 4, 2015 letter was in response to a November 16, 2015 letter from plaintiff to Addington in which he requested that Addington reconsider his decision to proceed with plaintiff's irrevocable resignation.  *Id*., Ex. I.  Addington's December 4, 2015 letter stated that the "resignation and separation agreement will not be 'reconsidered'" because it was "thoroughly negotiated, during which" time plaintiff was "represented by counsel" and was a "very reasonable resolution" for plaintiff given that plaintiff was allowed to continue "his employment with the City through January 8, 2016" despite the City being "prepared to terminate [his] employment" in 2012 "as a result of [his] sustained misconduct."  *Id*., Ex. J. Addington sending this letter is not retaliation for the October 16, 2015 hearing testimony, but rather the record shows that Addington's memo simply recounts facts contained in the Settlement Agreement and was sent in response to plaintiff's November 16, 2015 letter.  Thus, plaintiff has not raised a triable issue of fact as to any retaliatory motive.

<u>Settlement Agreement in Plaintiff's Personnel File</u>.  Plaintiff claims that for some amount of time, the Settlement Agreement was maintained in his personnel file, despite plaintiff's request that it be removed.  Plaintiff testified that he last made that request just before the holiday season in 2015, and plaintiff acknowledges that the agreement was in fact removed from his personnel file in January 2016.  Derby Depo. at 287:23-288:12, 289:13-21.

The Court finds that there is no adverse employment action because it is undisputed that Addington removed the settlement agreement from plaintiff's personnel file.  Further, plaintiff testified at his deposition that he did not suffer any harm as a result of the agreement being in his file:  plaintiff testified that he was not aware of "any facts that would support [that he] was harmed by the settlement agreement being maintained in [his] personnel file before it was removed."  *Id.* at 289:13-21.  To the extent plaintiff claims that he lost employment with Stanislaus County as a result of the settlement agreement remaining in his personnel file for some unspecified amount of time, that claim contradicts his deposition testimony and is unsupported by any admissible evidence.

<u>Incorrect Personnel Action Form</u>.  Upon plaintiff's resignation, the City issued a personnel action form ("PAF") that incorrectly stated that plaintiff was "dismissed" rather than "retired." Plaintiff claims that this was retaliatory.  Defendant has submitted the declaration of Lisa Thompson, who states that she prepared the PAF on or around January 8, 2016, and then she sent it to the Human Resources Department and other City departments for signatures.  Thompson Decl. ¶¶ 2-3.  The PAF contains signatures that are dated January 15, 2016.  *Id.*, Ex. 1.  Ms. Thompson states that she inadvertently checked the box listing "dismissal" rather than "retirement" as the reason for the end of plaintiff's employment, and that no one at the City or the department instructed her to check the box listing "dismissal."  *Id.* ¶ 3.

Once plaintiff became aware of the error, he contacted Addington on January 20, 2016 to alert him to the mistake on the form.  Addington Decl. ¶ 28, Ex. H (email correspondence between Addington and plaintiff regarding PAF).  Addington states that it is his understanding that the mistake was inadvertent, and he provided plaintiff with a corrected PAF by email on January 22, 2016. *Id.* ¶ 28, Ex. H.

Plaintiff claims that the incorrect PAF was issued as retaliation for his October 16, 2015 testimony, and that the incorrect PAF cost him a job with Stanislaus County.  However, plaintiff does not have any evidence suggesting a retaliatory motive, and he testified that he does not know why the incorrect PAF was issued.  Derby Depo. at 240:22-241:1.  In contrast, the City has provided undisputed testimony from Ms. Thompson and Addington stating that the error was inadvertent, and it was corrected almost immediately.  Finally, the Court finds persuasive the City's arguments that the initial incorrect PAF could not have been the reason plaintiff did not obtain employment with Stanislaus County as plaintiff asserts that the County informed plaintiff that he did not get the job by letter dated January 11, 2016, and the initial incorrect PAF was signed and dated January 15, 2016.  Derby Supp. Decl. Ex. 22; Thompson Decl. Ex. 1.

## II.     Retaliation under Cal. Labor Code § 1102.5

"The elements of a section 1102.5(b) retaliation cause of action require that (1) the plaintiff establish a *prima facie* case of retaliation, (2) the defendant provide a legitimate, nonretaliatory

explanation for its acts, and (3) the plaintiff show this explanation is merely a pretext for the retaliation." *Patten v. Grant Joint Union High Sch. Dist.*, 134 Cal. App. 4th 1378, 1384 (2005). To establish a *prima facie* claim of retaliation under California Labor Code § 1102.5, "a plaintiff must show (1) she engaged in a protected activity, (2) her employer subjected her to an adverse employment action, and (3) there is a causal link between the two." *Id.* The Court finds that even assuming that the October 16, 2015 testimony constitutes protected activity under section 1102.5, plaintiff has failed to raise a triable issue of fact regarding a causal link for all of the reasons stated above.

Plaintiff argues that the standard for causation under section 1102.5 is more lenient than under the First Amendment because section 1102.5 "applies if an employer retaliates based on a belief that the employee will disclose illegality in the future," Opp'n at 20, and thus plaintiff can challenge as retaliatory the adverse acts that occurred prior to the October 16, 2015 court testimony. However, the fact remains that plaintiff has not submitted any evidence suggesting a causal connection between his October 16, 2015 court testimony and any of the 14 alleged adverse actions.[22] At most, plaintiff relies on temporal proximity to support his claim that the City retaliated against him in various ways. Even if temporal proximity alone were sufficient to establish a causal link, which the Court questions, plaintiff has not identified any evidence suggesting that any of the alleged adverse acts were done for a retaliatory motive, nor has plaintiff submitted any evidence rebutting the City's evidence that the City and/or Addington had a legitimate, non-retaliatory reason for making the various decisions at issue. On this record, the Court finds that defendant is entitled to summary judgment.

///

///

---

[22] For this reason, the Court finds it unnecessary to address the parties' arguments about exhaustion.

1

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS defendant's motion for summary judgment.

**IT IS SO ORDERED**.

Dated: July 11, 2018

_____
SUSAN ILLSTON
United States District Judge